July 22, 2014

Honorable Kathleen M. Williams
United States District Court Judge
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128-1810

Case# 12-60016-CR-Williams

Your Honor,

    Thank you again for reviewing my correspondence.  I appreciate that you may respond to my correspondence directly.  I would however, be open to meet with the United States Attorney's Office or representatives from other agencies that would be relevant to the problem at hand.

    I would also like to commend Carol Hepburn for her advocacy and efforts on behalf of victims.  It is to that end that I am including you in this correspondence.  I have spoken with Carol who has expressed an interest in working with me but she is very concerned of any appearance of impropriety or ethical violations. I have discussed this with my counsel, Robin Farnsworth and she is unclear as to the legal precedent for such a situation when the accused and a former Government witness both desire to collaborate while appellate proceedings are still on going.  As such I have chosen to include you as something of a Judicial overwatch in our communications.

    As you can see from my correspondence with Carol, we have agreed to create a "Chinese Wall" around anything related to my case or appeal and limit our discussions to topics and technology around the problem at hand and to focus our efforts on cessation and prevention.  I have divided the problem trafficking in child pornography into three working areas:

    1) Existing Trafficking Remediation

    2) Content Remediation

    3) Web & Social Media Remediation

    The enclosed letter is a follow up to a discussion I began with Carol some months ago regarding how to stop the existing trafficking and prevent new content from being trafficked initially. While I have included some background on the industry, the essence is that due to the scale of the problem, the only practical approach is to go after the enabling technology, the network and network providers themselves.  While my previous letter to you included a request for assistance in getting everyone to work together, even if you are not able to facilitate that, as you can see there is an opportunity for the U.S. Attorney's Office to provide some meaningful assistance.

    I recognize the approach I am advocating is unorthodox and without precedent however, the statistics speak for themselves. A recent Gartner Group study indicated that by 2020 there will

be more than 7 billion people online and more than 30 billion devices connected to the Internet. At this scale it is simply impractical to approach the problem on an individual basis. The other, less obvious aspect to this problem, is its nonlinear rate of expansion. It is also further complicated by the various interests of groups that have a financial interest in Internet traffic. While I do not necessarily believe that any executive is consciously choosing to make money through enabling the exploitation of children, ultimately that is the net effect of the current situation.

Without respect to my own on going legal proceedings, I am devoting a portion of my time to developing solutions to the different aspects of this problem. I will state plainly that I have given up all hope of changing the behavior of people, I do not believe they can be "fixed" and even if they could there will always be more that have not been identified or caught. Therefore, my focus is on technological and strategic solutions.

With that said, I have outlined how to effectively stop greater than 85% of all existing trafficking in the U.S., the implementation is in the hands of all of you, as there is little I can do to affect its implementation from here. The next major hurdle is to deal with all the existing content. I will tell you candidly I was not very optimistic when I first began looking at this aspect. It has been said that once something is on the Internet, it can never be fully deleted. I tend to agree with this statement, while it is not completly accurate, the problem is of such staggering scale it is difficult to know where to begin.

Using Carol's client as a test case, the question is how do we remove over 1 MILLION file segments related to her and that does not include content that is web or social media based? I have been careful to qualify my comments in the context of the U.S. and juristictions where the U.S. has some influence. One of the most difficult aspects to any proposed solution is the lack of  consistent legal, social and moral views globally. What is illegal and broadly accepted as morally unacceptable here, is often not viewed the same in other parts of the world, particularly in developing nations where laws relating to the Internet are largely non-existent. I have not given up on finding a solution to the content problem and in fact I have a theory on how to approach it and will include you in the correspondence as I work through the challenges. I believe that answer lies in approaching it as "Big Data".


Respectfully Yours,

James Price - 98922004
Federal Correctional Institution
P.O. Box 779800
Miami, Florida 33177

20 Tammuz 5774

Carol,

    I apologize that it has been longer than I intended for me to pick up our discussions. In the interim I have continued to monitor the situation and work on various options to contain or solve this problem. I was disappointed that Judge Williams was unable to assist us in a more meaningful way but at least having her as something of a judicial overwatch in our discussions gives us some room to work.

    One of the things I have given much thought to is how to create an analogy that fits the situation that we are working with and parameters. The best that I have found is what I have termed "Line Theory". Line Theory works like this, the first point is the Abusers (and initial providers) "A" the second point is the Consumers "C" the line "B" that connects them is the Internet. When I refer to "the Internet" I am not referring to the amorphous, etheral Internet that is a working mystery to most. I am referring to the multi-billion dollar global business that comprises the infrastructure that is the practical plumbing behind what the rest of the world preceives as the Internet.

    Now I have discussed this previously but it is significant to the point of being worth repeating. The sum of A and C is <u>greater</u> than eight (8) million in the United States alone in addition to the nearly twenty-four (24) million worldwide. There are not eight million prison cells in the U.S. to the current premise that we will somehow magically prosecute and imprison our way out of this problem is preposterous on its face. I am intentionally glossing over the more complex issues of the globalization of the problem, instead focusing on the U.S. aspects of the problem, where we have a reasonable expectation of being able to effect changes. As I write this please understand that my intent is to be pragmatic not callous. Setting aside the abhorrent nature of the content, that fact is that line B is a business and porn is a huge driver of that business. Everthing on the Internet is about traffic, whether that traffic is measured as unique visitors, click-throughs or bandwidth, in the end it is all about traffic because traffic equals money.

    One of the most important aspects to understand about line B is the number of commercial businesses thatcomprise the three layers (Acces, Distribution and Core) in the U.S. is approximately twenty-five. There are a number of smaller players but if we are successful in changing things in the twenty-five the rest are largely unimportant. There are five companies that comprise the core, the backbone of the Internet in the U.S. and to a certain extent globally (I will explain that more later), they are:

        - Verizon
        - Spint
        - AT&T
        - CenturyLink (formerly Quest)
        - Level 3

The number of distribution only carriers is fairly small and are fading as a primary business and instead being absorbed into the business units of the backbone providers. Thus most cross-connects today connect directly from the Access (last-mile) providers, think Covad, Comcast, Adelphia, etc. (the CLECs) to the big boys (the LECs) i.e. AT&T, Sprint, Level 3, etc.

The business model at this level is simple, bandwidth, bandwidth, bandwidth. They don't care what content is driving it, their only interest is in monitizing the consumption of bandwidth. If you have have any doubt abouts about this you need only look at the recent FCC filings from AT&T and Comcast requesting changes to the existing "Equal Access" standard for Internet traffic. Content providers like Netfix and VoIP have changed the nature of the business to the point that access providers (Comcast and AT&T actually provide both access and content so they have an even larger vested interest) want the legal authority to classify and further monitize certain types of traffic.

Why does this matter to us? It matters to us because as I have stated almost from the beginning of my analysis of this mess the only practical way to stop the existing and prevent future trafficking of child pronography is the block or filter it in the core and access layers. The stock and trade response to any suggestions like this from the carrier's perspective is that they do not have the ability to classify and prioritize traffic in their networks. This was obviously not true but it was a difficult arguement to make. Now as a result of these filings they have clearly indicated their ability to classify and prioritize traffic as they see fit because they determined it is in their financial interest to do it. The bottom line is that if they can classify, prioritize and perform specialized traffic accounting for Netflix, Hulu, VoIP, etc. they can do it for porn.

If is truly so straightforward for the carriers to do this for why don't we just call them up and ask them to block all the chlid porn from transiting their network? The answer is money, money drives all the decision making. Porn, all types of porn drives bandwidth consumption (traffic) and bandwidth equals money, allowing porn to freely transit their network allows them to keep their circuits full of traffic and bill at the highest capacities. A further point of explanation, other than your typical consumer access connection which is a fixed cost/bandwidth agreement, all upstream connections are billed at what is referred to in the business as the "95 Percentile". Meaning the utilization of each circuit is measured (sampled) every fifteen minutes or 2880 samples per month (based on a 30 day month). The highest 144 samples are discarded, the highest remaining sample is considered "the 95th Percentile" and is the bandwidth rate the customer is billed at for that period (month). There are a number of other factors I am leaving out less this become a whitepaper on telecom billing but sufficient for you to understand the underlying premise of where the money comes from and their incentive to do <u>nothing</u>.

What all of this means is that anything, any kind of traffic that drives up utilization of bandwidth represents a direct increase in billable revenue for the carriers. Porn used to be low quality, low resolution stuff produced by scumbag amateurs (they are still scumbag amateurs but now their equipment is much, much better).

Now, cellphones have 10 megapixel cameras and shoot video in HD, many in 1080p. As a result, horrifying as it is, is much higher (technologically speaking) quality porn. Higher resolution means bigger files, bigger files consume more bandwidth to transfer, more bandwidth consumed equals...more money for the carriers.

This is the part where just a little help from Judge Williams and an enterprising young prosecutor would have been helpful. The quickest way to almost categorically put a stop to child porn trafficking, is to ask the carriers, the Big 5, to block it on their networks. In something of a bemusing anecdote, I had a conversation with an FBI agent on one of the cases when I was on the carrier side who asked me why if we knew someone was trafficking from a given IP and the Feds came calling why we couldn't just block the IP and shut them down? I stifled the urge to laugh as this revealed both his gross lack of practical knowledge and the overall linear thinking patterns of law enforcement at the highest levels. It was as if the reason why attacking the problem on a per user basis being so wildly impractical was beyond his comprehension. These are the people, we have put in charge of solving the problem. They are so obsessed with the deviant motivations of those involved that they have become overwhelmed to the point of paralysis. It is the same sort of thinking as when people askwhy do people do this or can't we fix them with therapy? The answers are there is no reason why, the offenders are just sick and <u>NO</u> they cannot be cured with therapy or imprisonment.

The carriers will not voluntarily filter or block this stuff for us, the financial implications are too big, they will only do it if they are forced to do it. My suggestion, have some enterprising AUSA out to make a name for himself or herself buddy up with an FBI agent capable of spelling content filtering and book meetings with the general counsels of the Big 5. Explain that the DOJ has suddenly realized they are actively participating in the trafficking of child pornography. They are doing so by knowingly selling bandwidth that is used to traffic in illicit content. Further, by selling connectivity in multiple juristictions and through their peering agreements (partnerships with other carriers) have created a nexus for interstate and international trafficking and or the conspiracy to traffic in child pornography. In the interim, while we try and get the DOJ to warm up to this idea, you should use one of your open cases to subpoena the traffic analysis reports from all of the Big 5. A subpoena like that, if you can find grounds to seek it and a judge to issue it, will send a shock wave through the carriers. The reason is they know exactly how much bandwidth and money they are making by allowing porn trafficking to transit their networks.

Get ready for the fight of your legal career because what you asking them to do is to walk away from approximately a $957.6 million per year revenue stream (that's $79.8M/month), that is continuing to grow and for which they invest nothing. This might be the worst use of this turn of phrase ever but for the carriers, porn is the gift that just keeps giving.

As I was researching for various statistics and looking at different models I took a look at the statistics for "The War

on Drugs", the Government likes to tout all their inconsequential victories, seizures, high profile arrests, big prison sentences, etc. but what they fail to mention is the actual, practical effects of their efforts.  In 1995 a kilo of cocaine cost $50K on the street, in 2014 the same kilo cost only $24K.  In 1995 there were less than 12 major types of illicit drugs in commoon use, in 2014 there are more than 30.  The net effect of the Billions spent in the War on Drugs is having the cost reduced by slightly more than 50% and a nearly 3 fold increase in the variety of ways to get high.  This is an(other) example of the abject failure of this program.  As if these statistics were not bad enough, I will not site the statistics related to pornography, they are much worse.  The only thing the Government hasn't done is start doing it themselves.  Unfortunately, some of them have, I found a couple of judges and a striking number of FBI Agents (in an internal Office of Professional Responsibility Report) that had engaged in possession and trafficking in child porn.

    At the end of the day there is some good news here, the shift in the business model in the industry is an opportunity for us to effect a change in the status quo of trafficking.  This will not happen without a fight but this is something of a break for us to actually get something meaningful accomplished.

    I am deeply greived by what is about to happen with encryption and cloud services as it relates to trafficking.  The bottom line is that once these scumbags move into the cloud in a meaningful way, we are in a real pickle and our fearless friends at the FBI will be hopelessly out teched, as though they weren't already. I will write you more on this topic later but gist of it is the minute either distributed endpoint encryption takes off and or some enterprising scumbag sets up a cloud shop in a juristiction where there are no laws regarding trafficking, it is going to become much tougher than it is today to reign this stuff in or even to control access to it.  Think about this, today in most juristictions like N.Y. it isn't illegal to "view" child pornography so long as you do it without actually downloading it, I know this seems odd but viewing it, particularly if you can do it without leaving a trace won't land a person in prison because viewing without possession it turns out isn't a crime.  Now, imagine that your one of these scumbags and you are even marginally tech savvy and you put your collection in the cloud and encrypt it using a distributed encryption methodology and access it (and build it) using a virtual desktop from the cloud.

    This is hugely problematic for us because a) so long as the cloud portions are hosted in a juristiction without laws covering this sort of thing (think developing nations eager for high tech money) there is no crime and b) since the connections to the cloud are themselves encrypted, not to mention the content itself, we cannot "see" the traffic to even know that it is there.  Why, because all these connections are secured with SSL and child porn in an SSL wrapper looks just like you loging-in to your bank account or shopping on Amazon where all the packet payload is wrapped in SSL.  At that point, one scumbag could openly share child porn with his/her scumbag friends and no one would be able to tell the difference, there are no "files" for someone to accidentally stumble upon, there is <u>NO</u> computer to track the activity back to, it is for all intents and purposes and invisible runtime environment.

This is only one of our "worst-case" scenarios that I have been working on. This is in part why trafficking within the Government and yes I mean by Government employees while at work, is difficult to catch. I helped design the 90,000 seat virtual desktop and datacenter consolidation project with Citrix Systems for the Department of the Interior (just before and while I was on trial) and the v1 and v2 designs of "Virtual SIPPER" for JSOC and DOD. In both cases we knew the products were going to be deployed O-CONUS and as such there would be very little if any oversight in their use. These type of designs are standard in enterprises today and the carriers have been trying for years to develop a model to be able to package and sell the same concept through your settop cable box or Over-the-Air (OTA). This also does not account for the commercial deployment of distributed encryption. Again, that one is too complex for me to cover here but suffice it to say that it alone much less when combined with any of these other things is bad news for us when it comes to stopping trafficking, even in the U.S.

I am not saying that I have given up figuring out a way to detect, track and stop the next generation of trafficking technology but it will be much more difficult and computationally intensive. That is all I have for you for now. As always, I look forward to hearing from you and if you have any questions, let me know and I'll get back to you as quickly as possible.


Best Personal Regards,

James Price - 98922004
Federal Correctional Institution
P.O. Box 779800
Miami, Florida 33177


CC: Honorable Kathleen Williams
CC: Michael Caruso