FILING FEE

PAID _____ NO

In Forma
Pauperis _____ NO

Angela E. Noble, Clerk

FILED BY _PG_ D.C.

DEC 18 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

ב"ה

## APPEAL No. 1:12-CR-60016-KMW

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

### JAMES PRICE,
Plaintiff-Appellant,
V.
### UNITED STATES OF AMERICA,
Appellee-Defendant.

## AN APPEAL
## FROM THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA

## DEFENDANT'S SECOND EMERGENCY MOTION FOR
## COMPASSIONATE RELEASE/REDUCTION
## IN SENTENCE PURSUANT TO
## 18 U.S.C § 3582(c)(A)(i)

James Price
Appellant-Defendant
USM No. 98922004
Federal Correctional Institution
P.O. Box 779800
Miami, Florida 33177-9800
Tel.: 305-259-2268
Fax.: 305-259-2383
Email.: PriceJamesE@outlook.com

ב"ה

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No: 1:12-CR-60016-KMW

UNITED STATES OF AMERICA,
*Plaintiff,*

v.

JAMES PRICE,
*Defendant.*

_____/

## DEFENDANT'S SECOND EMERGENCY MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C § 3582(c)(1)(A)(i)

**COMES NOW,** James Price ("the Defendant"), and files this, his Second Emergency Motion for Compassionate Release/Reduction in Sentence pursuant to 18 U.S.C. § (c)(1)(A)(i). Based on the facts set forth below, Defendant respectfully moves this Court for the entry of an order to reduce his sentence and for compassionate release.

1

## I.   INTRODUCTION AND FACTUAL BACKGROUND

1.     Beginning in the fall of 2019, a pandemic based on the SARS-COV-2 pneumonia virus swept the modern world. This virus, more commonly known as the novel Coronavirus or simply COVID-19, has been responsible for more than 74.4 million infections worldwide, with more than 17 million of those infections in the United States. Moreover, the serious and often tragic effects of this virus have led to more than 308,000 *deaths* in the United States, and more than 1.65 *million deaths* worldwide. On November 3, 2020, the New York Times reported the President's Coronavirus Task Force Coordinator, Dr. Deborah Birx, "[w]e are entering into the most deadly phase of this pandemic."

## A.   CORONAVIRUS IN THE FEDERAL CORRECTIONAL INSTITUTION MIAMI

2.     On June 15, 2020, the novel Coronavirus pandemic entered the Federal Correctional Institution Miami ("MCI-MIA"). The virus entered the prison due to the failure of the Federal Bureau of Prisons ("BOP") and/or the warden to develop, implement, and *enforce* adequate protective and remediation protocols. The Clinical Director for FCI-MIA, Inerio Alarcon,

2

stated that in his professional opinion but not speaking on behalf of the institution that "there is at least as seventy (70%) chance that anyone here [at FCI-MIA] will get the [Corona]virus."

3.   In the weeks that followed, the Coronavirus spread unchecked by prison officials until July 9, 2020. Only then did the institution begin to take this crisis seriously, having missed the opportunity to simply implement prior action plans. Those efforts proved, tragically, to be too little, too late. In the five (5) day period from July 9, 2020, through July 14, 2020, the *known* infection count skyrocketed from sixteen (16) inmates infected, to seventy-nine (79) inmates infected.

4.   By August 6, 2020, one hundred (100) inmates had tested positive for COVID-19. On that same day, FCI-MIA was forced to publicly report the *first death* of an inmate from COVID-19.[1],[2]

---

[1]   Inmate Baragon, a Columbian National, contracted the virus in the same housing unit where the defendant was housed and subsequently died from the infection.

[2]   All Institution population and coronavirus statistical data obtained from https://www.bop.gov on the date indicated.

3

5.     In an effort to obfuscate the scope of the Coronavirus infection in Federal prisons, the BOP Coronavirus website reports *ONLY* the number of "Active" infections in each institution. The BOP and FCI-MIA only test inmates who present "symptoms" associated with COVID-19.

6.     In August 2020, the BOP and FCI-MIA implemented an "automatic clearance" policy for inmates who had tested positive for COVID-19. Under the "auto-clearance" policy, an inmate who tested positive for COVID-19, is placed in a "quarantine unit" for twenty-one (21) days, after which the inmate is deemed "recovered," automatically cleared, and returned to the general population *without further testing.* Instead of testing the quarantined inmates to confirm a positive or non-positive COVID-19 result, FCI-MIA simply measures the inmates' oxygen saturation and temperature.

7.     The Centers for Disease Control and Prevention ("CDC") has *NOT* found that routine temperature screening and oxygen saturation ("pulse-ox") is effective in the detection of asymptomatic infections of COVID-19.

4

8. The daily statistics reported by the BOP and FCI-MIA are inconsistent, and vary, rising and falling based on changes in testing and measurement practices, not just with new infections and deaths.

9. On August 29, 2020, FCI-MIA reported a population of 794 inmates, with 489 COVID-19 tests having been performed. With thirty (30) test results not being available, there were thirty-two (32) active infections, eighty-nine (89) recovered inmates, and one (1) death, for a reported total of 134 COVID-19 infections.

10. On August 31, 2020, two (2) days later, FCI-MIA reported a population of 794 inmates, with *481* COVID-19 tests (8 fewer total tests performed) than two (2) days earlier. Additionally, the total number of infections increased to 135 (despite a decrease in the total number of tests performed). The number of test results not available (30) and the number of recovered inmates (89) and deaths (1) remained constant.

11. The 33-active infections, the 89 recovered inmates, and the 1 death DO NOT account for the *135* total COVID-19 infections reported. One

5

hundred thirty-five (135) COVID-19 infections represent SEVENTEEN (17%) PERCENT of FCI-MIA's total inmate population.

12. The constant increase in new infections combined with inconsistent reporting and the lack of proper protocols, demonstrate the BOP and FCI-MIA's inability to effectively manage the spread of the deadly virus, or to protect inmates entrusted to their care.

13. As long as inmates are infected and the staff is coming in and out of the facility from a community that is still dealing with a large amount of infections, FCI-Miami will be unsafe – especially for those in the highest risk group such as Mr. Price. In fact, FCI-Miami is one of the facilities about which BOP staff has filed an "Imminent Danger Report" with the Occupational Safety and Health Administration ("OSHA") on March 31, 2020. See Exhibit A. BOP staff reported health and safety hazards related to COVID-19, which include, among others: (a) contrary to CDC guidelines, officials have directed staff throughout the BOP who have come into contact with, or been in close proximity to, individuals who show or have shown symptoms of COVID-19, to report to work and not self-quarantine for 14 days; and (b) the BOP has failed to minimize contact within recreation areas,

6

education areas, counseling/treatment rooms, resulting in prisoners and staff coming in dangerously close contact with each other. *Id.*

14.   Despite the BOP's "Coronavirus Action Plan" to limit inmate movement, separate, and isolate inmates exposed or infected with coronavirus; since April 2020, Mr. Price has been moved five (5) times to different housing units within the prison. Additionally, the Defendant was exposed to nine (9) different cellmates (Boswell, Sawyer, Chikvashvili, Rosello, Napout, Perkins, Farr, Arias*, and Walker), including one (Arias) who had tested positive for COVID-19 *before* he was placed in the Defendant's cell.

15.   In addition to its failure to meet the challenges of the coronavirus pandemic, FCI-MIA has consistently failed to maintain the physical prison facility.   For more than six (6) months, the housing unit(s) where the Defendant has been held have been plagued by malfunctioning and inoperable air conditioning and ventilation.   This is particularly problematic due to the

7

growing understanding that proper ventilation is essential to stopping the spread of COVID-19.[3]

## B.   RISK FACTORS RELEVANT TO THE INCREASE RISK OF SERIOUS COMPLICATIONS OR DEATH FROM COVID-19

16.   The CDC identified seven(7) conditions that conclusively place a person at serious risk of serious complications, permanent injury, or death from COVID-19.[4]

17.   Mr. Price has six (6) risk factors that place him in the highest risk category for serious complications, permanent injury, or death from COVID-19: (i) Age $\geq$ 50; (ii) Gender – Male; (iii) Ethnicity – Hispanic; (iv) Pre-existing respiratory condition; and (v) Hypertension; and (vi) Prior Treatment/drug Interaction (side-effects) of "last Line" drugs.

---

[3]   Tim Rogan, *Opinion, Department of Justice needs to address coronavirus crisis at Miami prison,* Washington Examiner, July 22, 2020 *available at* https://www.washingtonexaminer.com/opinion/department-of-justice-needs-to-address-coronavirus-crisis-at-miami-prison.

[4]   "COVID-19, People Who Are At Higher Risk for Serious Illness," at 2019-ncov/need-extra-precautions/people-at-increase.risk.html.

8

18.     The current pandemic is unprecedented, and is likely the most extraordinary set of circumstances we will face in our lifetimes. The Defendant's particular vulnerability to COVID-19 makes his need so great, that the ultimate, irreversible harm is possible if he is not granted compassionate release. Mr. Price's particular circumstances present "extraordinary and compelling reasons" to reduce his sentence.

19.     The risk to the Defendant is not speculative; it is real, immediate, on-going, and serious.

## C.     COMPLIANCE WITH STATUTORY PROVISIONS OF 18 U.S.C. § 3582

20.     Title 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, permits a defendant to file a motion for a modification of a term of imprisonment after he or she "has fully exhausted all administrative right to appeal a failure to the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden at the Defendant's facility, *whichever is earlier*." See 18 U.S.C. § 3582 (emphasis added).

9

21. On June 19, 2020, Mr. Price submitted a written request to FCI-MIA'S Warden Sylvester Jenkins. The request was received by Warden Jenkins on the same day. See Exhibit "B".

22. As of November 1, 2020, some one hundred-thirty two (132) days later, Warden Jenkins had neither filed the motion on Mr. Price's behalf, nor denied his request.

23. The motion is timely; this court has jurisdiction and authority to GRANT the requested relief.

## D. THE INSTANT OFFENSE, SENTENCE IMPOSED, AND TIME SERVED

24. On June 29, 2012, the Defendant was convicted by a jury of one count of Distribution of Child Pornography [18 U.S.C. § 2252(a)(2)] and one count of Possession of Child Pornography [18 U.S.C. § 2252 (a)(4)(B)]. This Court sentenced Mr. Price to 156 months as to Count 1 and 120 months as to Count 2, to be served concurrently. Additionally, this Court sentenced the defendant to twenty-five (25) years of supervised release.

10

25.     As of November 2020, Mr. Price has served one hundred one (101) months in Prison, or sixty-four (64.7%) percent of the sentence imposed. Mr. Price has been a model prisoner, actively engaged in community service, and has worked for the betterment of the prison for both inmates and staff.

## E.     RELEASE PLAN

26.     Upon release Mr. Price will reside with his wife and adult children in their New York home. The Defendant has obtained employment as a research analyst, technical consultant, and computer forensic examiner for law firms. Additionally, Mr. Price has been given the opportunity to work for and with Human Rights Watch, The Vero Institute for Justice, and the Electronic Privacy Information Center, while he *completes* his Juris Doctorate.

27.     The defendant will receive healthcare insurance through his employer (primary), he is also eligible for veteran's healthcare benefits (secondary), and Medicare/Medicaid (tertiary).

11

## II.   STATEMENT OF POINTS AND AUTHORITIES

28.   Based on the facts set forth herein, the Defendant has clearly demonstrated "extraordinary and compelling reasons" under the statute, and whereupon having jurisdiction, this Court may reduce his sentence.

### A.   JURISDICTION AND AUTHORITY UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

29.   This Court has original jurisdiction over motions filed in this matter pursuant to 28 U.S.C. § 1331. District courts have statutory authority to grant reductions in sentence pursuant to 18 U.S.C. § 3582.

30.   In the consideration of a motion for a reduction in sentence under the statute (*Id.*), a district court must determine:

> i.    That the existence of "extraordinary and compelling reasons warrant such a reduction" *Id.*;

> ii.   That the defendant has exhausted his or her administrative remedies, or the lapse of 30 days from the receipt of a

12

request for compassionate release, whichever comes first;

iii. That the prerequisites (i and ii) have been met and may reduce a defendant's sentence consistent with the factors in § 3553(a) and U.S.S.G. § 1B1.13.

## B. EXTRAORDINARY AND COMPELLING REASONS THAT JUSTIFY MR. PRICE'S COMPASSIONATE RELEASE

31. Extraordinary, an adjective meaning, "of, relating to, or involving an occurrence, especially an incident or accident, that would not have been foreseeable to someone of normal prudence." Gardner, Bryan, *Black's Law Dictionary* (10th ed 2014) at 705. Compelling, an adjective meaning, "a need so great that irreparable harm or injustice would result if it is not met." *Id.* at 342.

32. On May 18, 2020, the Department of Justice issued internal guidance which directs that the Government concede that Defendants who have certain CDC risk factors, including:

13

1. Asthma (moderate to severe)

2. Chronic kidney disease being treated with dialysis

3. Chronic lung disease, such as chronic obstructive pulmonary disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis, and cystic fibrosis

4. Diabetes, including type 1, type 2, or gestational

5. Hemoglobin disorders, such as sickle cell disease and thalassemia

6. Immunocompromised, including from cancer treatment, bone marrow or organ transplantation, immune deficiencies, HIV with a low CD4 cell count or not on HIV treatment, and prolonged use of corticosteroids and other immune weakening medications

7. Liver disease, including cirrhosis

8. Serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension; and/or

9. Severe obesity, defined as a body mass index (BMI) of 40 or above

can establish that "extraordinary and compelling reasons" warrant the reduction in sentence. *United States of America v. Firebaugh IV* Case No. 16-20341-CR-Ungaro, DE 43 (S.D.Fla. June 1, 2020).

33. Put differently, in the government's view, for the purposes of the COVID-19 pandemic, Mr. Price's documented history of respiratory illness, uncontrolled hypertension, and other risk factors present "serious physical

14

or medical condition(s)...that substantially diminish the ability of the defendant to provide self-care within the environment of a correctional facility and from which he ... is not expected to recover." U.S.S.G. § 1B1.3 cmt.n.1(A)(ii)(I).

34. Courts across the country have recognized that the risk of COVID-19 infection to people in prison "is *significantly higher* than in the community, both in terms of risk of transmission/exposure, and harm to individuals who become infected." *Basank v. Decker*, − F.Supp.3d.−, 2020 WL 1481503 at *3 (S.D.N.Y. Mar. 26, 2020)(emphasis added).

35. In a recent South Florida case, where FCI-MIA is located, Judge Middlebrooks held "it is not clear that any individual is safer from the virus while incarcerated." *United States v. Chopra*, Case No. 18-CR-20688-DMM (S.D.Fla. June 8, 2020). Despite numerous reassurances by the BOP, courts have repeatedly taken notice of the growing evidence of the BOP's chronic mismanagement of its vulnerable population during this pandemic. See *Wilson v. Williams*, 2020 WL2542137 at *1-2 (N.D.Ohio May 19, 2020)(Noted "BOP's ineffective[ness]... at stopping the spread [of the virus."]).

15

36.    The current COVID-19 outbreak at FCI-MIA, including both the constant detection of new cases and the DEATH of an FCI-MIA inmate from COVID-19, demonstrates the "extraordinary and compelling" nature of Mr. Price's situation.

37.    The degree of the BOP's mismanagement of prisoners during the crisis has been well-documented in the courts. On April 16, 2020, another federal prisoner, Adrian Solarzano, tested positive for Coronavirus. On May 10, 2020, the BOP claimed Solarzano had "recovered,". Five (5) days later, on May 15, 2020, Solarzano was admitted to the hospital complaining of chest pain and other COVID-19 symptoms. Two (2) days later, Solarzano was pronounced *DEAD* of COVID-19. He clearly had NOT "recovered" as the BOP falsely reported.

38.    On May 5, 2020, the BOP tested another inmate and received the POSITIVE COVID-19 test result on May 7, 2020. The following day, May 8, 2020, the BOP released the COVID-19 positive inmate, and placed him on a commercial flight to Alaska, without informing him he had tested positive for COVID-19.

16

39.   In August 2020, FCI-MIA attempted to send a critically ill inmate with COVID-19 to a local hospital for treatment. The contract hospital REFUSED to accept any "prisoner patients" with COVID-19. The BOP was forced to return the inmate to FCI-MIA while they attempted to locate another hospital that would accept COVID-19 prisoner patients.[5]

40.   On August 6, 2020, FCI-MIA reported its *first* COVID-19 inmate DEATH.

41.   The risk to Mr. Price is real, serious, and immediate where, due to his underlying medical conditions (comorbidities) his health is subject to rapid decline, distress, or death.

---

[5]   Willard Shepard, *Inmates, Correctional Officers Concerned about Growing Number of COVID cases at Miami Prison*, NBC   6   South   Florida,   July   15,   2020   *available   at* https://www.nbcmiami.com/news/local/inmates-correctional-officers-concerned-about-growing-number-of-covid-cases-at-miami-prison/2262886/;*see also,* Luke Barr, *Union officials warn of 'dire' situations at South Florida federal prisons,* ABC News, July 17, 2020, available at https://abcnews.com/Health/union-officials-warn-dire-situations-florida-federal/story?id=71815437

## C.   THE 6 RISK FACTORS THAT PLACE MR. PRICE IN THE HIGHEST-RISK CATEGORY FOR SERIOUS COMPLICATIONS, PERMANENT INJURY OR DEATH

42.   First, Mr. Price is fifty, (50) years old. The CDC identified the *age* of a person as a specific risk factor.



https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html

Specifically, persons aged 50 to 64 years are *FOUR (4x) TIMES MORE likely* to suffer from serious complications that require hospitalization due to either COVID-19, or COVID-19 related illnesses, e.g., respiratory distress, kidney/liver complications, cardiovascular complications, etc. Mr. Price is specifically vulnerable to SARS-COV-2 pneumonia due to his previous life-

threatening infection with SARS variant pneumonia in 2009. That pneumonia infection required the Defendant's placement in ICU isolation and treatment with "last line" drugs that included Avelox and Maxipime. Additionally, persons in the 50 to 64 years old age group are *THIRTY (30) TIMES more likely* to die from COVID-19 related illnesses.

43.    Second, the Defendant is Male. The CDC and the University of Minnesota study (April 29, 2020) identified gender as a significant risk factor and published the supporting statistical data. See Exhibit "C" The study and data demonstrate that *MEN* are *TWO AND ONE-HALF (2.5x) TIMES more likely* to become infected and suffer serious complications that require hospitalization or lead to death, than women. See also "CDC Data Tracker" at https://www.cdc.gov/covid-data-tracker/index.html (last visited July 30, 2020).

44.    Third, Mr. Price's ethnicity is Hispanic. The CDC identified the Ethnicity of a person as a specific risk factor.

19



https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html

Specifically, Hispanics and Latinos are *TWO POINT EIGHT (2.8x) more likely* to become infected with COVID-19. Hispanics and Latinos are *FOUR POINT SIX (4.6x) TIMES more likely* to develop serious complications from COVID-19 that require hospitalization. Additionally, Hispanics and Latinos are *ONE POINT ONE (1.1x) more likely* to die from COVID-19 OR COVID-19 related illnesses.

45.    Fourth, the Defendant's pre-existing respiratory condition, caused by a SARS-based pneumonia is a specific risk identified by the CDC.[6] The CDC identified respiratory conditions as a specific risk factor. Specifically, respiratory conditions, like Mr. Price's, increase his risk of serious complications from COVID-19 related illnesses by *ONE AND ONE-HALF (1.5x) TIMES*. Mr. Price is uniquely vulnerable to the SARS-COV-2 pneumonia *because* his previous SARS-based pneumonia infection resulted in complications that required ICU level hospitalization. See Defendant's Medical Records from Memorial Health System filed separately under seal. The Defendant suffered permanent injuries and irreversible side-effects as a result of both the respiratory infection and the drug treatment necessary to save his life.

46.    Fifth, Mr. Price was diagnosed with Hypertension in October 2020. The CDC identified Hypertension as a specific risk factor.

---

[6]    "COVID-19, People Who Are at Higher Risk for Serious Illness",
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html
.



Specifically, persons with Hypertension are THREE (3X) TIMES more likely

to suffer serious complications that require hospitalization due to COVID-19

or COVID-19 related complications.  The Defendant's Hypertension was the

direct result of FCI-MIA's negligent healthcare practices.  The prison failed

to treat Mr. Price's shoulder that was injured in the prison.  Instead, Inero

Alarcon, FCI-MIA's Clinical Director, prescribed high doses (up to 2,400

mg/day) of Ibuprofen and other Nonsteroidal Anti-Inflammatory Drugs

("NSAIDs") for more than eight (8) months, despite Food and Drug

Administration ("FDA") warnings.  The FDA specifically warns against high

dosages and prolonged use of NSAIDs because they are known to cause "New

22

or worse High Blood Pressure [Hypertension].[7] See BOP records filed under seal.

47.     Sixth, due to the severity of his prior respiratory infection, and the *drug resistance of these viruses*, only the most potent, and potentially harmful "last line" drugs, are effective in their treatment. See Exhibits *"D-F",* Avelox, and Maxipime drug data information sheets. Due to the defendant's prior treatment with last line drugs, his immuno-response to other drugs used to treat COVID-19, *has been reduced.* See also Xiaobo Yang, Yuan Yu, Jiqian Xu, Huaqing Shu, et al., *Clinical course and outcomes of critically ill patients with SARS-CoV-2 pneumonia in Wuhan, China: a single-centered, retrospective, observational study.* https://www.thelancet.com/ action/showPdf?pii=S2213-2600%2820%2930079-5 (last visited September 17, 2020) Lancet Respiratory Medicine (2020); Zhow F. Yu T. Du R. et al., *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19,* Lancet 2020; 385 (10229): 1054-1062; Thomas, B.T., Chambers, R.C., Liv K.D., *Acute Respiratory Distress Syndrome,* The New England Journal of Medicine 2017; 377(6): 562-572.

---

[7]     See https://www.cdc.gov/aging/covid19-guidance.html.

48. Despite the prescription of both Amlodipine and Metoprolol Tartrate, Mr. Price's high blood pressure remains *uncontrolled*. The Defendant's blood pressure ranges from 148/88 to as dangerously high as 168/113, 170/101, and 189/119 as measured by the duty nurse on November 1, 2020, at 11:45 AM.

49. The CDC found that of the "COVID-19 patients admitted to the ICU... 29% had cardiovascular disease.[8] One possible reason for the increased risk of serious illness or death for individuals with high blood pressure is the use of a common medication called Angiotensin Converting Enzyme ("ACE") inhibitors and Angiotensin Receptor Blockers ("ARBs"),[9] like those prescribed to by the BOP to Mr. Price. "These medications have been proposed as a possible factor in the increased incidence of COVID-19 in people with high blood pressure." Id. "That's because of the observation that the Coronavirus attaches to the ACE2 receptors, which are found in heart and lung tissue." Id. "People who take ACE inhibitors and ARBs produce

---

[8] Allison Aubrey, *Who's Sickest from Covid-19? These Conditions Tied to Increased Risk*, NPR (Mar. 31, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824846243/whos-sickest-from-covid-19-these-conditions-tied-to-increased-risk

[9] Dara K. Lee Lewis, *How does cardiovascular disease increase the risk of severe illness and death from Covid-19?*, Harvard Health Blog, *available at* https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401.

24

increased numbers of these [ACE] receptors raising the question of increased susceptibility to [COVID-19] infection." Id.

50.    The Defendant's comorbidities (underling conditions/risk factors) cannot be viewed as an individual risk but instead as cumulative or compounding risks. The CDC identified that a person with three (3) or more risk factors is a specific (cumulative) risk factor.



https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html

Specifically, persons with 3 or more cumulative risk factors are *FIVE (5) TIMES more likely* to suffer from serious complications that require

hospitalization due to COVID-19 or COVID-19 related illnesses. The combination of these risk factors, identified by the CDC, unequivocally places Mr. Price in the *Highest-Risk* category for serious complications, permanent injury, or the greatest irreparable harm. This Court should recognize and adopt the reasoning in line with other courts. "[The] Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify the Defendant's sentence on the grounds that...[his medical history] substantially diminishes his ability to provide self-care [in the prison].[10] See *United States v. Campagna,* Case No. 16-CR-78-01, 2020 WL 1489829 at *3 (S.D.N.Y. March 27, 2020).

## D.  THE DISPROPORTIONATE EFFECTS OF COVID-19 ON PRISONERS

51.  As of September 17, 2020, the BOP reported a population of 126,821 Prisoners in BOP custody, and 13,738 prisoners (10.8%) had been infected with COVID-19. The population of FCI-MIA was 794 prisoners, of

---

[10]      In November 2019 Mr. Price suffered an injury to his shoulder in the prison. The torn tendon/ligament and nerve compression have gone untreated by the BOP for ten (10) months due to the Coronavirus pandemic. Mr. Price has suffered more than 60% loss of function of his left arm.

26

which 135 (17%) have already been infected with COVID-19. The BOP's statistical data conclusively demonstrated the Mr. Price's risk of contraction of COVID-19 is more than 8 *TIMES HIGHER* than in the general population of the United States (2%).

52. Prisons and jails "contain high concentrations of people in close proximity and are breeding grounds for uncontrolled transmission [of infections]." See Open Letter to Federal Agencies from Dr. Sandra Galea, M.D., Dean, Boston University School of Public Health, et al., at https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Heal th-Expert-Letter-to-Trump.pdf.

53. Echoing this concern, Dr. Gregg S. Gonsalves, M.D., stated incarcerated individuals "are at special risk of infections" and "infections control [in prison] is challenging." See Open Letter from Gregg S. Gonsalves, Asst. Prof., Dept. of Epidemiology of Microbial Diseases, Yale School of Public Health (March 2, 2020). https://law.yale.edu/sites/default/files/ area/center/ghjp/documents/final_covid19_letter_from_public_health_and_l egal_experts.pdf.

27

E. **COURTS HAVE GRANTED COMPASSIONATE RELEASE TO DEFENDANTS WITH SIMILAR EXTRAORDINARY AND COMPELLING CIRCUMSTANCES AND COMPARABLE BACKGROUNDS**

54. Federal courts across the country have *granted* compassionate release to prisoners with a variety of offenses, criminal histories, percentages of sentences served, and medical conditions. The common factor in all cases has been specific risk-factors identified by the CDC. In all of the cases below, the district courts *granted* compassionate release over the government's objections, including defendants convicted of violent crimes, significant criminal histories, career offenders, and armed career criminals.

55. In United States v. Lewis, Case No. 1:11-CR-20631-PAS (S.D. Fla. August 26, 2020) the court GRANTED compassionate release to an *armed career criminal* who had served 108 months (60%) of a 180 month sentence, *over the government's objections*. In *United States v. Currington*, Case No. 12-CR-20115-MGC (S.D. Fla. May 11, 2020) the court GRANTED compassionate release to a *career criminal* who had served 108 months (54%) of a 200 month sentence, *over the government's objections*. In *United States v. Welch,* Case No. 09-CR-60212-KAM (S.D.Fla. May 21, 2020) the court

28

GRANTED compassionate release to an *armed career criminal* who had served 120 months (66.6%) of a 180 month sentence, *over the government's objections.* In *United States v. Cuchet,* Case No. 95-CR-06277-WPD (S.D.Fla. July 2, 2020) the court GRANTED compassionate release to a career offender. In *United States v. James,* Case No. 97-CR-00814-FAM (S.D.Fla. July 6, 2020) the court GRANTED compassionate release to a defendant serving a LIFE sentence for a violent crime, *over the government's objections.* In *United States v. Sanchez,* Case No. 95-CR-00421-MGC (S.D.Fla. April 27, 2020) the court GRANTED compassionate release to a defendant serving a LIFE sentence for violent crime, *over the government's objections.*

56. In *United States v. Hope,* Case No. 90-CR-06108-KMW-2 (S.D. Fla. April 10, 2020) this court GRANTED compassionate release *over the government's objections.* This Court held that "COVID-19 has dramatically altered the context in which courts are considering compassionate release requests," and granting compassionate releases over the government's objections in part because "the current pandemic must be seen to alter the calculus of whether a defendant's medical conditions represent severe enough [risk] to warrant a compassionate release."

57. In this case the Defendant had no criminal history, and was sentenced to concurrent terms of imprisonment totaling 156 months. Mr. Price has already served 101 months (76.1%) of his effective sentence of 132.6 months (85% of 156 months). The First Step Act further amended the execution of federal sentences for all prisoners such that the defendant is entitled to up to twelve (12) months placement in a Residential Re-entry Center (Halfway house) and six (6) months of home confinement at the end of his sentence. Mr. Price's current projected release date of July 23, 2023, does NOT contemplate his placement in RRC and home confinement for up to a total of eighteen (18) months. Thus, the Defendant would likely have been "released" in January 2022 or in approximately fourteen (14) months.

58. In *United States v. Chappell,* Case No. 10-CR-06085L (W.D.N.Y. June 19, 2020) the district court GRANTED compassionate release *over the government's objections,* to a defendant with a significant criminal history, who had served 75% of his sentence for enticement of a minor for sexual activity.

59. In *United States v. Stone,* Case No. 2:09-CR-20074 (W.D.ARK. June 23, 2020) the court GRANTED compassionate release, *over the*

30

*government's objections,* to a defendant convicted of distribution of child pornography. The court held the defendant was *NOT a threat to the community* because he was under supervision by U.S. Probation.

### F.   THE § 3553(a) FACTORS WEIGHT STRONGLY IN FAVOR OF RELEASE

60.   In the imposition of a sentence of imprisonment, a district court must consider a variety of factors as set forth in § 3553(a) and U.S.S.G. § 1B1.13.

61.   As a starting point the district court must consider the nature and circumstances of the offense, and the history of the defendant. In this case, the defendant was convicted of distribution and possession of 260 files (216 videos and 44 pictures) depicting child pornography.[11] In written disclosures before trial, the government conceded that the crimes ceased *before* the government obtained and executed the search warrant. Thus all criminal conduct had voluntarily ceased nearly a year and a half *before* Price's conviction.

---

[11]   In its previous memorandum in opposition [ECF No. 219] the government now "approximates" the number of files as though unsure of the actual evidence. This Court sentenced Price on the 260 files then claimed by the government.

62. Moreover, during sentencing this Court DENIED the government's motion for Fines and Restitution and held that "the same crime would have happened if Mr. Price never existed."

63. Mr. Price is a college educated, degreed professional with extensive work experience and *NO criminal history.*

64. Second, a district court must determine the need for the sentence imposed. Specifically, a sentence must reflect the seriousness of the offense, promote respect for the law, and represent just punishment. In this case, the defendant was sentenced below the guideline but well above more recent comparable cases. In *United States v. Beauvais,* Case No. 12-CR-60067-RNS (S.D.Fla. October 19, 2012) the defendant pleaded guilty to possession and distribution of more than 5,000 files depicting child pornography (TWENTY (20x) TIMES more than Mr. Price) and was actively downloading and distributing child pornography when agents arrived at his home. The district court sentenced Beauvais to 75 months imprisonment (52%) less than Mr. Price received in this case) and less time than Mr. Price has already served in prison.

65. In *United States v. Firebaugh,* Case No. 1:16-CR-20347 (S.D.Fla. September 26, 2016) the defendant pleaded guilty to possession of child pornography and was sentenced to 72 months imprisonment. Most recently in *United States v. Perkins, Case No. 9:18-CR-80148-RCR* (S.D.Fla. February 27, 2019) the defendant pleaded guilty to possession of child pornography and was sentenced to sixty (60) months imprisonment (50% less than Mr. Price received for the same offense).

66. A historical review of NON-CONTACT child pornography offenses demonstrates great diversity and disparity in sentencing for substantially similar offense conduct based on little more than the date of the offense and the location of the court.

67. In this case. Mr. Price's sentence was higher than the average sentence in this district for substantially similar conduct. He has already served more time in prison than other defendants in this district convicted of the same or similar offenses. Thus, based on both the quantitative time served by Mr. Price and the relative sentences of other defendants, the factors of seriousness of the offense and respect for the law, and just punishment have been met.

33

68.    The third and fourth factors a district court must consider in the imposition of a sentence merge in this case, where the need to deter criminal conduct and to protect the public from potential crimes have been satisfied. The need to deter criminal conduct through the imposition of substantial sentences has been satisfied in this case, supra.

69.    The defendant in this case poses NO THREAT to the community or public. This Court found that Mr. Price was NOT a danger based on the factors defined in 18 U.S.C. § 3142(g) as required by  U.S.S.G. § 1B1.13. Specifically, Mr. Price was immediately *released on bond* after his arrest. The Defendant remained on bond throughout the trial, and *was permitted to travel outside the district* WITHOUT MONITORING.[12] Additionally, prior to his incarceration, Mr. Price successfully completed five (5) months of sex offender therapy and psychosexual evaluation by a licensed clinical psychologist that specialized in the treatment of sex offenders.

70.    The psychologist reported to U.S. Probation that Mr. Price was NOT A PEDOPHILE,  and was NOT a danger to the safety of any other person

---

[12]    In the government's Memorandum in Opposition [ECF No. 219], it falsely stated that Mr. Price was held in pre-trial custody. The record of this case clearly demonstrates this court found Mr. Price was NOT a danger or threat and properly released him on bond.

34

or the community. It stands to reason that where this Court found Mr. Price was NOT a danger *BEFORE* his imprisonment, he certainly is NOT a danger *AFTER* more than eight (8) years in prison.

71.    Mr. Price's character, service, family and community ties, his conduct in prison, and the nature of his post-incarceration employment further demonstrate, to the point of preclusion, any danger to the community.

72.    The Defendant applied himself in positive and effective endeavors including tutoring fellow prisoners in Mathematics and Science to earn their GED, applied his litigation experience to win the release of six (6) other prisoners[13], and actively engaged in Public Integrity efforts.

73.    Additionally, this Court should consider the insight and dicta of the court in *Stone* where it opined the defendant posed NO threat in part because he was under supervision by the U.S. Probation Office of the court.

---

[13]    Including the immediate release of David Miller, who was improperly sentenced as an Armed Career Criminal before Judge Moore.

35

## G.   HOW DANGEROUS ARE SEX OFFENDERS

74.   In 2016 the Probation and Pretrial Services Office ("USPO") of the Administrative Office of the U.S. Courts published a detailed study, *How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision.* The twelve (12) page published study detailed sex offenders by offense type *and relative to other federal crimes.* https://www.uscourts.gov/sites/default/files/80_2_4_0.pdf.

75.   The study included data from ninety-four (94) federal judicial districts and comprised 7,416 male sex offenders released from federal prison and placed on supervision. The study found that "sex offenders, with the exception of those convicted of sexual assault and SORNA laws, *had lower risk levels than the non-sex offender population.*"

36



Post conviction risk assessment (PCRA) risk categories for federal sex offenders, by instant conviction sex offense



Specifically, "[c]hild pornography offenders were especially likely to be considered low risk, with nearly all (97%) of these offenders initially being assessed in the low or low/moderate risk categories. See Exhibit "G".

76.    The statistical data from USPO clearly demonstrated "among the sex offender types... those under supervision for child pornography offenses had *lower recidivism rates.*"

37

**Three-year recidivism rates for federal sex offenders while under supervision, by instant conviction offense**

| | | | | | | |
|---|---|---|---|---|---|---|
| **All offenders** | | | | | | |
| **Non-sex offender** | **89,615** | **31.4%** | **23.0%** | **7.9%** | **0.5%** | **22.6%** |
| Sex offender | 3,909 | 17.5% | 7.8% | 1.8% | 2.8% | 19.2% |
| **Conviction sex offense** | | | | | | |
| **All child pornography** | **2,287** | **13.0%** | **4.9%** | **0.5%** | **2.6%** | **11.6%** |
| No record of contact behavior | 1,722 | 12.5% | 4.3% | 0.4% | 2.2% | 9.5% |
| Official record of contact behavior | 565 | 14.7% | 6.9% | 0.7% | 4.1% | 18.2% |
| **Sexual assault** | **605** | **23.1%** | **9.9%** | **3.6%** | **2.2%** | **38.5%** |
| SORNA | 299 | 41.8% | 26.1% | 8.0% | 7.7% | 47.2% |
| **Transportation for illegal sexual activity** | **550** | **17.3%** | **7.8%** | **1.6%** | **2.4%** | **14.4%** |

Note: Sub-sample used for 3-year arrest rates is restricted to actively supervised TSR cases for which the offender was sentenced to at least 3 years of supervision.

Specifically, the USPO data show that non-sex offenders violated the terms of supervision THREE (3x) more often than non-contact child pornography offenders, like the Defendant in this case.

77.   Moreover, the USPO data conclusively demonstrated that "those convicted of child pornography offenses had less serious criminal histories,

attained higher levels of education and employment, suffered less frequently from substance abuse problems, and had stronger social support networks."





Note: Includes 5,284 federal sex offenders with PCRA assessments. Arrest and revocation percentages will differ from percentages reported in Table 5 as they track recidivism activity for shorter time periods (e.g., date from PCRA assessment) and are not restricted to recidivism during supervision terms. Includes any arrests or revocations that occurred after the initial PCRA assessment.

Specifically, prior research has shown that child pornography is the *most common* type of sex offense within the federal system and that offenders convicted of child pornography have fewer risk characteristics and recidivate less frequently." See also Babchishin, K.M., Hanson, R. K., and Hermann, C.A. *Online child pornography offenders are different: A meta-analysis of the characteristics of online and offline sex offenders against children (2015).* Archives of Sexual Behavior, 44, 45-46.https://www.researchgate. net/publication/260809955_Online_Child_Pornography_Offenders_are_Diff

39

erent_A_Meta-analysis_of_the_Characteristics_of_Online_and_Offline _Sex
_ Offenders_Against_Children.

## H.   NOTICE OF PRE FILING CONFERENCE

78.   Assistant United States Attorney Marc Stuart Anton has indicated the government opposes this motion.

## III.   CONCLUSION

79.   The risk posed by the potential complications from the Defendant's underlying medical conditions (comorbidities), the individual and cumulative risk factors identified by the CDC together with the current outbreak of COVID-19 at FCI-MIA, constitute extraordinary and compelling reasons for his compassionate release. The risk to Mr. Price from COVID-19 in prison is NOT speculative, it is immediate, real, on-going, and serious.

80.   The severity of the Defendant's conduct has not changed. What has changed, however, is the environment where Mr. Price is serving his sentence and our understanding of the post-conviction risks posed by child pornography sex offenders. When this Court sentenced Mr. Price to a term of imprisonment, it did not intend for that sentence to "include a great and

40

unforeseen risk of severe illness or death brought on by a global pandemic. See *United States v. Zukerman,* Case No. 1:16-CR-00794-AT, ECF No. 179 at 6 (S.D.N.Y. April 22, 2020).

81.    The failure of the BOP to adequately protect prisoners in their custody from COVID-19 has resulted in more prisoner *DEATHS* from COVID-19 in the previous 150 days, than the United States has *EXECUTED* in the previous 150 years.

82.    As Martin Luther King reminded us, the arc of the moral universe is long, but it bends towards justice. Based on the facts set forth herein, the Defendant has clearly demonstrated "extraordinary and compelling reasons" under the statute, and this Court may reduce his sentence accordingly.

**WHEREFORE,** in view of the foregoing statement of points and authorities, the Defendant respectfully moves this Court for the entry of an order for a reduction in sentence and for immediate compassionate release to begin the term of supervised release previously ordered. Additionally, this Court may impose a special condition that Mr. Price be confined to his home for the first six (6) months of his term of supervised release.

Dated: December 17, 2020

Respectfully Submitted,

**James Price**

Digitally signed by James Price
Date: 2020.12.17
13:07:59 -05'00'

/s/James Price
USM No. 98922004
Plaintiff
Federal Correctional Institution
P.O. Box 779800
Miami Florida 33177-9800
Tel.: 305-259-2268
Fax.: 305-259-2383
Email: PriceJameE@outlook.com

42

# Exhibit

# A

U. S. Department of Labor

Occupational Safety and Health Administration

## Notice of Alleged Safety or Health Hazards

### For the General Public:

This form is provided for the assistance of any complainant and is not intended to constitute the exclusive means by which a complaint may be registered with the U.S. Department of Labor .

Sec 8(f)(1) of the Williams-Steiger Occupational Safety and Health Act, 29 U.S.C. 651, provides as follows: Any employees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employee or representative of employees, and a copy shall be provided the employer or his agent no later than at the time of inspection, except that, upon request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear in such copy or on any record published, released, or made available pursuant to subsection (g) of this section. If upon receipt of such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable to determine if such violation or danger exists. If the Secretary determines there are no reasonable grounds to believe that a violation or danger exists, he shall notify the employees or representative of the employees in writing of such determination.

NOTE: Section 11(c) of the Act provides explicit protection for employees exercising their rights, including making safety and health complaints.

### For Federal Employees:

This report format is provided to assist Federal employees or authorized representatives in registering a report of unsafe or unhealthful working conditions with the U.S. Department of Labor.

The Secretary of Labor may conduct unannounced inspection of agency workplaces when deemed necessary if an agency does not have occupational safety and health committees established in accordance with Subpart F, 29 CFR 1960; or in response to the reports of unsafe or unhealthful working conditions upon request of such agency committees under Sec. 1-3, Executive Order 12196; or in the case of a report of imminent danger when such a committee has not responded to the report as required in Sec. 1-201(h).

## INSTRUCTIONS:

Open the form and complete the front page as accurately and completely as possible. Describe each hazard you think exists in as much detail as you can. If the hazards described in your complaint are not all in the same area, please identify where each hazard can be found at the worksite. If there is any particular evidence that supports your suspicion that a hazard exists (for instance, a recent accident or physical symptoms of employees at your site) include the information in your description. If you need more space than is provided on the form, continue on any other sheet of paper.

After you have completed the form, return it to your local OSHA office.

NOTE:    It is unlawful to make any false statement, representation or certification in any document filed pursuant to the Occupational Safety and Health Act of 1970. Violations can be punished by a fine of not more than $10,000. or by imprisonment of not more than six months, or by both. (Section 17(g))

Public reporting burden for this voluntary collection of information is estimated to vary from 15 to 25 minutes per response with an average of 17 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. An Agency may not conduct or sponsor, and persons are not required to respond to the collection of information unless it displays a valid OMB Control Number. Send comment regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to the Directorate of Enforcement Programs, Department of Labor, Room N-3119, 200 Constitution Ave., NW, Washington, DC; 20210.

*OMB Approval# 1218-0064; Expires: 11-30-2020*

Do not send the completed form to this Office.

OSHA-7(Rev. 9/93)

Case 0:12-cr-60016-KMW   Document 226   Entered on FLSD Docket 12/18/2020   Page 46 of 152

Case 9:99-cr-08063-JLK   Document 900-2   Entered on FLSD Docket 10/14/2020   Page 2 of 5
Case 0:11-cr-60025-DMM   Document 52-1   Entered on FLSD Docket 05/26/2020   Page 2 of 5

U. S. Department of Labor

Occupational Safety and Health Administration

## Notice of Alleged Safety or Health Hazards

| | | Complaint Number | |
|---|---|---|---|
| **Establishment Name** | FEDERAL BUREAU OF PRISONS | | |

| **Site Address** | 320 FIRST STREET NW   WASHINGTON, DC 20534 | | |
|---|---|---|---|
| | Site Phone   202-317-2198 | Site FAX | |
| **Mailing Address** | 320 FIRST STREET NW   WASHINGTON, DC 20534 | | |
| | Mail Phone   202-317-2198 | Mail FAX | |
| **Management Official** | Michael Carvajal. Director | Telephone | 202-317-2198 |
| **Type of Business** | Federal Bureau of Prisons | | |

HAZARD DESCRIPTION/LOCATION. Describe briefly the hazard(s) which you believe exist. Include the approximate number of employees exposed to or threatened by each hazard. Specify the particular building or worksite where the alleged violation exists.

PLEASE SEE ATTACHED PAGES FOR COMPLAINT.

| Has this condition been brought to the attention of: | ☐ X Employer ☐ Other Government Agency(specify) |
|---|---|
| Please Indicate Your Desire: | ☐ Do NOT reveal my name to my Employer<br>☒ My name may be revealed to the Employer |

| The Undersigned believes that a violation of an Occupational Safety or Health standard exists which is a job safety or health hazard at the establishment named on this form. | (Mark "X" in ONE box)<br>☐ Former Employee<br>☐ X Current Employee          ☐ Federal Safety and Health Committee<br>☐ Representative of Employees ☐ Other (specify) |
|---|---|

| Complainant Name | SHANE FAUSEY, COUNCIL PRESIDENT | | Telephone | 570-419-1414 |
|---|---|---|---|---|
| Address(Street, City, State, Zip) | 22 Quarry Drive   Watsontown, PA 17777 | | | |
| Signature | | | Date | 3-31-20 |

If you are an authorized representative of employees affected by this complaint, please state the name of the organization that you represent and your title:

Organization Name: Council of Prison Locals 33        Your Title: President

U. S. Department of Labor

Occupational Safety and Health Administration

Notice of Alleged Safety or Health Hazards

The Federal Bureau of Prisons is in violation of The General Duty Clause, 29 CFR 1960.8, Occupational Safety and Health (OSH) Act of 1970, Section 5 (a) (1) 29 USC 654(a)(1), which requires employers to furnish to each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm."

As a matter of record, this complaint is elevated to and considered an *Imminent Danger Report*, pursuant to OSHA of 1970, Executive Order 12196, 29 CFR 1960.8, Agency's Responsibilities, BOP Program Statement 1600.011. The agency's actions described herein are proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities. The agency's actions and inactions are expected to result in death and severe health complications and/or possible life-long disabilities.

Specifically, the Federal Bureau of Prisons, under the direction of N.C. English, Assistant Director of Health Services Division, Jeffery D. Allen, M.D., Medical Director, and Captain Sylvie Cohen, M.D., Branch Chief for Occupational Safety and Health, have directed staff throughout the Bureau of Prisons who have come in contact with, or been in close proximity to, individuals who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines. These guidelines state "If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community): self-quarantine at home for 14 days and return to work if symptoms do not develop". Mr. Allen and/or Captain Cohen have advised local Institutions with these staff to order them back to work within 48 hours of suspected infection and/or contact with individuals having symptoms or confirmation of the virus. Furthermore, staff who were screened and ordered home due to possible exposure based on the screening instruments used by the Bureau of Prisons were also ordered back to work within 48 hours.

The Bureau of Prisons also has violated the above standard by continuously moving inmates by bus and/or airlift to various prison sites across the nation. They have authorized movement of infected inmates, inmates suspected of being infected, inmates who have been in close contact or proximity to infected inmates, to areas of the Country that do not have any rate of infections, or to Institutions that otherwise have not shown signs of any introduction of the virus, thus introducing the virus into an uninfected area. This is a failure to follow the CDC guidelines that state where COVID-19 cases exist within an Institution, management strategies such as "Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding" should be implemented.

The Bureau of Prisons has failed to introduce workplace controls to mitigate or prevent exposure or further exposure to the virus. They have not implemented engineering controls such as high efficiency air filters or air scrubbers to minimize the airborne nature of this virus or otherwise improved the ventilation rates in the environment. Administrative controls such as encouraging or

U. S. Department of Labor

Occupational Safety and Health Administration

Notice of Alleged Safety or Health Hazards

mandating potentially sick or exposed workers to stay home for self-isolation for 14 days per CDC guidelines, have not been utilized nor have they issued a mandatory lockdown if prisons, which would result in minimal contact with staff and other inmates in areas where the infection has been introduced. Other controls failed to be implemented are modified operations where social distancing among inmates and staff can be accomplished. They have failed to minimize contact within recreation areas, education areas, counseling/treatment rooms, resulting in multiple inmates and staff coming in dangerously close contact with each other after potentially being exposed to the virus.

OSHA's Personal Protective Equipment (PPE) standards, 29 CFR Subpart I, 29 CFR 1910.132, 29 CFR 1910.133, 29 CFR 1910.134, and 29 CFR 1910.138. 29 CFR 1910.1030, Bloodborne Pathogens, which require using gloves, eye and face protection, and respiratory protection, when respirators are necessary to protect workers, employers must implement a comprehensive respiratory protection program in accordance with the Respiratory Protection standard (29 CFR 1910.134). While the Agency has followed or implemented fit testing protocols, the Agency has failed to provide the proper N-95 masks to staff who are transporting and have custodial control over hospitalized inmates testing positive for the virus.

To date, there are 28 confirmed inmate cases and 24 confirmed staff cases within the Federal Bureau of Prisons, with one inmate death thus far. There are multiple staff and inmates hospitalized. Below is a listing of all Federal Bureau of Prison sites affected by this complaint under the direction of Director Michael Carvajal.

U. S. Department of Labor
Occupational Safety and Health Administration

# Notice of Alleged Safety or Health Hazards

| | | | |
|---|---|---|---|
| Alderson, WV FPC | Fairton, NJ FCI | Mendota, CA FCI | Terminal Island, CA FCI |
| Aliceville, AL FCI | Florence, CO FCC | Miami, FL FCI | Terre Haute, IN FCC |
| Allenwood, PA FCC | Forrest City, AR FCC | Miami, FL FDC | Texarkana, TX FCI |
| Ashland, KY FCI | Fort Dix, NJ FCI | Milan, MI FCI | Thomson, IL AUSP |
| Atlanta, GA USP | Fort Worth, TX FMC | Montgomery, AL FPC | Three Rivers, TX FCI |
| Atwater, CA USP | Gilmer, WV FCI | Morgantown, WV FCI | Tucson, AZ FCC |
| Bastrop, TX FCI | Glynco, GA | New York, NY MCC | Victorville, CA FCC |
| Beaumont, TX FCC | Grand Prairie, TX | Oakdale, LA FCC | Waseca, MN FCI |
| Beckley, WV FCI | Greenville, IL FCI | Oklahoma City, OK FTC | Williamsburg, SC FCI |
| Bennettsville, SC FCI | Guaynabo, PR MDC | Otisville, NY FCI | Yankton, SD FPC |
| Berlin, NH FCI | Hazelton, WV FCC | Oxford, WI FCI | Yazoo City, MS FCC |
| Big Sandy, KY USP | Herlong, CA FCI | Pekin, IL FCI | |
| Big Spring, TX FCI | Honolulu, HI FDC | Pensacola, FL FPC | |
| Brooklyn, NY MDC | Houston, TX FDC | Petersburg, VA FCC | |
| Bryan, TX FPC | Jesup, GA FCI | Philadelphia, PA FDC | |
| Butner, NC FCC | La Tuna, TX FCI | Phoenix, AZ FCI | |
| Canaan, PA USP | Leavenworth, KS USP | Pollock, LA FCC | |
| Carswell, TX FMC | Lee, WV USP | Ray Brook, NY FCI | |
| Chicago, IL MCC | Lewisburg, PA USP | Rochester, MN FMC | |
| Coleman, FL FCC | Lexington, KY FMC | Safford, AZ FCI | |
| Cumberland, MD FCI | Lompoc, CA FCC | San Diego, CA MCC | |
| Danbury, CT FCI | Loretto, PA FCI | Sandstone, MN FCI | |
| Devens, MA FMC | Los Angeles, CA MDC | Schuylkill, PA FCI | |
| Dublin, CA FCI | Manchester, KY FCI | Seagoville, TX FCI | |
| Duluth, MN FPC | Marianna, FL FCI | SeaTac, WA FDC | |
| Edgefield, SC FCI | Marion, IL USP | Sheridan, OR FCI | |
| El Reno,TX FCI | McCreary, KY USP | Springfield, MO MCFP | |
| Elkton, OH FCI | McDowell, WV FCI | Talladega, AL FCI | |
| Englewood, CO FCI | McKean, PA FCI | Tallahassee, FL FCI | |
| Estill, SC FCI | Memphis, TN FCI | | |

OSHA-7(Rev. 3/96)

# Exhibit

# B

THE HOFFMAN FIRM, P.A.
ATTORNEYS AT LAW
19836 BISCAYNE BLVD
NORTH MIAMI BEACH, FL 33180
305 940.3307

THE DEL VILLAR FIRM, P.A.
ATTORNEYS AT LAW
1400 MADRUGA AVE.
SUITE 211
CORAL GABLES, FL 33146
305.668.7007
305.668 2688 FAX

June 19, 2020

Attn: Warden (Mia/ExecAssistant@bop.gov)
United States Bureau of Prisons
FCI Miami
15801 SW 137 A
Miami, FL 39177
Fax: (305)259-2160

RECEIVED

JUN 19 2020

FCI Miami
Warden's Office

RE:   JAMES PRICE, III (Register No. 98922-004)
      Emergency Motion for Compassionate Release
      (18 U.S.C. 3582)

Dear Warden:

This firm represents Mr. James Price, III.   In light of the COVID-19
pandemic afflicting the nation and the dangerous -even deadly- consequences
that an outbreak of COVID-19 at FCI Miami can have on Mr. Price, we will be
filing an Emergency Motion for Compassionate Release under 18 U.S.C. 3582.

Mr. Price hereby requests that the Bureau of Prisons support the
Emergency Motion for Compassionate Release for the extraordinary and
compelling reasons detailed below.   Because this request constitutes an
emergency that threatens his immediate health and welfare, we respectfully
request that you respond no later than Friday, June 26, 2020[1].

[1] See 28 C.F.R. § 542.18 (mandating a three-day response time for requests "of an emergency nature")

THE HOFFMAN FIRM, P.A.
ATTORNEYS AT LAW
15036 BISCAYNE BLVD
NORTH MIAMI BEACH, FL 33160
305.940.3307

THE DEL VILLAR FIRM, P.A.
ATTORNEYS AT LAW
1450 MADISON AVE
SUITE 211
CORAL GABLES FL 33146
305.662.7007
305.200.8608 FAX

## COMPASSIONATE RELEASE UNDER THE FIRST STEP ACT (18 U.S.C. 3582)

Under 18 U.S.C. § 3582(c)(1)(A)(i), a convicted defendant is entitled to compassionate release if "after considering the factors set forth in section 3553(a) ...extraordinary and compelling reasons warrant" such a release "and that such a reduction [would be] consistent with applicable policy statements issued by the Sentencing Commission." *See also United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *6 (D. Utah Feb.18, 2020) joining the majority of other district courts that have held that "[u]nder the First Step Act, it is for the court, not the Director of the Bureau of Prisons, to determine whether there is an extraordinary or compelling reason to reduce a sentence.

As the BOP's guidance sets forth, "[i]n deciding whether to file a motion under . .. 18 U.S.C. § 3582, the [BOP] should consider whether the inmate's release would pose a danger to the safety of any other person or the community." *Compassionate Release/Reduction in Sentence: Procedures for implementation of 18 U.S.C. §§ 3582 and 4205(g)*, U.S. Dep't of Justice, *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Here, our client Mr. Price is not a danger to the community, has no history of violence, and considering the impact of an outbreak of COVID-19 at FCI Miami, rejecting our Mr. Price's request to serve the remainder of his time on supervised release with home confinement terms, may

2

THE HOFFMAN FIRM, P.A.
ATTORNEYS AT LAW
15938 Biscayne Blvd.
North Miami Beach, FL 33160
305.940.2307

THE DEL VILLAR FIRM, P.A.
ATTORNEYS AT LAW
1450 Madruga Ave.
Suite 211
Coral Gables, FL 33146
305.60.7007
305.230 2889 Fax

effectively convert his remaining sentence into a death sentence. Moreover, granting his request will actually improve the health and welfare of FCI Yazoo City Low's staff and inmates.

### THE COVID-19 PANDEMIC IS AN "EXTRAORDINARY AND COMPELLING REASON" JUSTIFYING COMPASSIONATE RELEASE

On March 11, 2020, the World Health Organization ("WHO") classified COVID-19 as a pandemic, and on March 13, 2020, President Donald Trump declared the pandemic to constitute a national emergency. All states have taken extreme measures to combat the spread of COVID-19, some going so far as to shut down all non-life-sustaining business and to mandate that all their citizens shelter in place at home.

As of June 19, 2020, the global pandemic of COVID-19 has infected over 8,616,748 people (confirmed cases), leading to 457,074 deaths worldwide. The United States has over 2,264,862 confirmed cases and 120,707 deaths. Throughout the nation, the number of confirmed cases - and resulting deaths are climbing at an exponential and alarming rate.

According to the CDC, people who suffer from heart disease, lung disease, diabetes, and asthma are at higher risk of getting very sick from COVID-19. Individuals with other serious illnesses - including compromised immune systems, blood disorders, hypertension, and neurological conditions- are likewise identified as being "particularly vulnerable to serious illness or death from COVID-19." Many states, including New York , California, and Ohio, have implemented measures to release

3

THE HOFFMAN FIRM, P.A.
ATTORNEYS AT LAW
15036 North Beach Blvd
North Miami Beach, FL 33160
308-940-0307

THE DEL VILLAR FIRM, P.A.
ATTORNEYS AT LAW
1400 Biscayne Ave.
Suite 271
Coral Gables FL 32140
400-609-7007
305-609-0007

hundreds of low-risk and vulnerable inmates, and the BOP has acknowledged that the risks of the rapid transmission of contagion in the tight quarters of prisons and jails presents significant challenges in keeping inmates and staff safe and healthy.

### THE COVID-19 PANDEMIC POSES AN INCREASED RISK OF SERIOUS ILLNESS OR DEATH TO OUR CLIENT

Mr. Price is 49 years old and has a history of serious respiratory illness which has in the past required ICU level treatment, placing him in a high-risk health category. But as noted previously, in these alarming times, Mr. Price's illness has been explicitly identified by the CDC as increasing a person's vulnerability to severe illness or death from COVID-19. In short, Mr Price is particularly vulnerable to contracting COVID-19. Should he contract the virus, Mr. Price is more than likely than others to suffer serious illness or death.

### SPECIFIC RELIEF REQUESTED FROM THE BOP

As detailed above, we request that the BOP agree to, and support, Mr. Price's request for immediate release from prison to strict home confinement. Removing this vulnerable person from the prison population will reduce the strain on BOP's health facilities and their staff It will make

4

To: WA...  Case 0:12-cr-60016-KMW   Document 219-1   Entered on FLSD Docket 07/27/2020   Page 5 of 6

THE HOFFMAN FIRM, P.A.
ATTORNEYS AT LAW
19536 BISCAYNE BLVD
NORTH MIAMI BEACH, FL 33180
305 940-3297

THE DEL VILLAR FIRM, P.A.
ATTORNEYS AT LAW
1450 MADRUGA AVE
SUITE 211
CORAL GABLES, FL 33146
305 669-7007
305 230-3804 FAX

the prison population and staff working there safer, as there will be fewer persons in the FCI Miami community who are particularly susceptible to the virus.

We realize this is an extraordinary request, but it is one that reflects the singularly unique circumstances currently being experienced nationwide. Courts across the country have recognized this fact and granted similar requests. *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Perez*, ECF No. 62, Case No. I: 19-cr-297 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the " heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, ECF No. 2798, Case No. 1 5-cr-95 (S.D.N.Y. Mar. 19 , 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail " in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Matthaei*, ECF No. 30, Case No. I: 1 9-cr-243-BL W (D. Idaho Mar. 16, 2020) (extending

To w/Case 0:12-cr-60016-KMW   Document 219-1   Entered on FLSD Docket 07/27/2020   Page 5 of 6

THE HOFFMAN FIRM, P.A.
ATTORNEYS AT LAW
16636 BISCAYNE BLVD
NORTH MIAMI BEACH, FL 33160
306 940 1207

THE DEL VILLAR FIRM, P.A.
ATTORNEYS AT LAW
1450 MADRUGA AVE
SUITE 211
CORAL GABLES, FL 33146
305 669 5007
305 669 5009 FAX

self-surrender date by 90 days in light of COY ID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020 ) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman ... is admitted to the inmate population of the Wahoe County Detention Facility.").

Mr. Price does not pose a danger to the community. While Mr. Price was convicted of a serious crime for which he has served over ninety-five (95) months out of a one hundred-fifty-six (156) month sentence, it does not warrant the loss of life.

Because this request constitutes an emergency that threatens our Client's immediate health and welfare, we respectfully request a response no later than **Friday, June 26, 2020.**

Thank you in advance for your prompt response to, and processing of, this request.

Respectfully submitted of behalf of James Price, III,

Jorge L. Del Villar, Esq.
Digitally signed by Jorge L. Del Villar, Esq.
Date: 2020.06.19 10:10:53 -04'00'

Jorge L. Del Villar, Esq.

6





# Clinical course and outcomes of critically ill patients with SARS-CoV-2 pneumonia in Wuhan, China: a single-centered, retrospective, observational study

Xiaobo Yang*, Yuan Yu*, Jiqian Xu*, Huaqing Shu*, Jia'an Xia*, Hong Liu*, Yongran Wu, Lu Zhang, Zhui Yu, Minghao Fang, Ting Yu, Yaxin Wang, Shangwen Pan, Xiaojing Zou, Shiying Yuan, You Shang

## Summary

**Background** An ongoing outbreak of pneumonia associated with the severe acute respiratory coronavirus 2 (SARS-CoV-2) started in December, 2019, in Wuhan, China. Information about critically ill patients with SARS-CoV-2 infection is scarce. We aimed to describe the clinical course and outcomes of critically ill patients with SARS-CoV-2 pneumonia.

**Methods** In this single-centered, retrospective, observational study, we enrolled 52 critically ill adult patients with SARS-CoV-2 pneumonia who were admitted to the intensive care unit (ICU) of Wuhan Jin Yin-tan hospital (Wuhan, China) between late December, 2019, and Jan 26, 2020. Demographic data, symptoms, laboratory values, comorbidities, treatments, and clinical outcomes were all collected. Data were compared between survivors and non-survivors. The primary outcome was 28-day mortality, as of Feb 9, 2020. Secondary outcomes included incidence of SARS-CoV-2-related acute respiratory distress syndrome (ARDS) and the proportion of patients requiring mechanical ventilation.

**Findings** Of 710 patients with SARS-CoV-2 pneumonia, 52 critically ill adult patients were included. The mean age of the 52 patients was 59·7 (SD 13·3) years, 35 (67%) were men, 21 (40%) had chronic illness, 51 (98%) had fever. 32 (61·5%) patients had died at 28 days, and the median duration from admission to the intensive care unit (ICU) to death was 7 (IQR 3–11) days for non-survivors. Compared with survivors, non-survivors were older (64·6 years [11·2] vs 51·9 years [12·9]), more likely to develop ARDS (26 [81%] patients vs 9 [45%] patients), and more likely to receive mechanical ventilation (30 [94%] patients vs 7 [35%] patients), either invasively or non-invasively. Most patients had organ function damage, including 35 (67%) with ARDS, 15 (29%) with acute kidney injury, 12 (23%) with cardiac injury, 15 (29%) with liver dysfunction, and one (2%) with pneumothorax. 37 (71%) patients required mechanical ventilation. Hospital-acquired infection occurred in seven (13·5%) patients.

**Interpretation** The mortality of critically ill patients with SARS-CoV-2 pneumonia is considerable. The survival time of the non-survivors is likely to be within 1–2 weeks after ICU admission. Older patients (>65 years) with comorbidities and ARDS are at increased risk of death. The severity of SARS-CoV-2 pneumonia poses great strain on critical care resources in hospitals, especially if they are not adequately staffed or resourced.

**Funding** None.

Copyright © 2020 Elsevier Ltd. All rights reserved.

## Introduction

Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) pneumonia is a newly recognised illness that has spread rapidly throughout Wuhan (Hubei province) to other provinces in China and around the world.[1,4] As of Feb 19, 2020, the total number of patients has risen sharply to 74283 in the mainland of China, with 2009 (2·7%) deceased. The clinical spectrum of SARS-CoV-2 pneumonia ranges from mild to critically ill cases. Previous studies have only described the general epidemiological findings, clinical presentation, and clinical outcomes of patients of SARS-CoV-2 pneumonia.[1-3] However, specific information characterising critically ill patients remains unknown.

The data on the clinical characteristics and outcomes of critically ill patients with SARS-CoV-2 infection are scarce, but are of paramount importance to reduce mortality. In this study, we investigated critically ill patients with confirmed SARS-CoV-2 pneumonia who were admitted to Wuhan Jin Yin-tan hospital. The baseline SARS-CoV-2-associated morbidity and mortality data from this study will be of considerable value for the early identification of individuals who are at risk of becoming critically ill and who are most likely to benefit from intensive care treatment.

## Methods

### Study design and participants

This single-centre, retrospective, observational study was done at Wuhan Jin Yin-tan hospital (Wuhan, China), which is a designated hospital to treat patients with SARS-CoV-2 pneumonia. All patients, except infected healh-care workers from Jin Yin-tan hospital, were transferred from other hospitals. We retrospectively

Lancet Respir Med 2020;
8: 475-81

Published Online
February 21, 2020
https://doi.org/10.1016/
S2213-2600(20)30079-5

This online publication
has been corrected.
The corrected version
first appeared at
thelancet.com/respiratory
on February 28, 2020

*Contributed equa.y

Department of Critical Care Medicine (X Yang MD, Y Yu MD, J Xu MD, Prof H Shu MD, Prof H Liu MD, Y Wu MD, Y Wang MD, S Pan MD, Prof X Zou MD, Prof S Yuan MD, Prof Y Shang MD), Institute of Anesthesiology and Critical Care Medicine (X Yang, Y Yu, J Xu, Prof H Shu, Prof H Liu, Y Wu, Y Wang, S Pan, Prof X Zou, Prof S Yuan, Prof Y Shang), Union Hospital, and Department of Critical Care Medicine, Tongji Hospital (Prof M Fang MD), Tongji Medical College, Huazhong University of Science and Technology, Wuhan, China; Jin Yin-tan Hospital, Wuhan, China (X Yang, Prof J Xia MD, Prof H Liu, Prof T Yu MD Prof Y Shang); Department of Critical Care Medicine, Xiangyang Central Hospital, Affiliated Hospital of Hubei University of Arts and Science, Hubei, China (L Zhang MD); and Department of Critical Care Medicine, Renmin Hospital of Wuhan University, Wuhan, China (Prof Z Yu MD)

Correspondence to:
Prof You Shang, Department of Critical Care Medicine, Union Hospital, Tongji Medical College, Huazhong University of Science and Technology, Wuhan 430022, China
you_shang@yahoo.com

### Research in context

**Evidence before this study**

The novel coronavirus disease 2019 is a disease that has affected populations around the world. We searched PubMed for articles published up to Feb 11, 2020, using the keywords "2019 novel coronavirus", "2019-nCoV", "COVID-19", or "SARS-CoV-2". We identified eight articles that describe the epidemiological and clinical characteristics of patients infected with severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). However, none of these studies focused on characterising critically ill patients infected with SARS-CoV-2, who are at increased risk of death.

**Added value of this study**

We report the clinical courses and clinical outcomes of 52 critically ill patients from 710 laboratory-confirmed cases of SARS-CoV-2. 35 (67%) patients had acute respiratory distress syndrome (ARDS) and 37 (71%) required mechanical ventilation. 32 (61·5%) patients had died at 28 days, and the median duration from intensive care unit (ICU) admission to death was 7 (IQR 3–11) days in non-survivors. Compared with survivors, non-survivors were older (64·6 years [11·2] vs 51·9 years [12·9]), more likely to develop acute respiratory distress (ARDS; 26 [81%] patients vs 9 [45%] patients), and more likely to receive mechanical ventilation (30 [94%] patients vs 7 [35%] patients), either invasively or non-invasively.

**Implications of all the available evidence**

The mortality of critically ill patients with SARS-CoV-2 pneumonia at 28 days is considerable. The survival time of non-survivors is likely to be within 1–2 weeks after ICU admission. Older patients (>65 years) with comorbidities and ARDS are at increased risk of death. The severity of SARS-CoV-2 pneumonia poses great strain on critical care resources in hospitals, especially if they are not adequately staffed or resourced.

analysed patients from Dec 24, 2019, to Jan 26, 2020, who had been diagnosed with SARS-CoV-2 pneumonia, according to WHO interim guidance, and who were critically ill.[6] Laboratory confirmation of SARS-CoV-2 infection was performed by the local health authority as previously described.[1,7] Critically ill patients were defined as those admitted to the intensive care unit (ICU) who required mechanical ventilation or had a fraction of inspired oxygen ($FiO_2$) of at least 60% or more.[7,8] Identification of critically ill patients was achieved by reviewing and analysing admission logs and histories from all available electronic medical records and patient care resources. For patients who were alive by Jan 26, 2020, their living status was confirmed on Feb 9, 2020.

The Ethics Commission of Jin Yin-tan hospital approved this study (KY-2020–06.01). Written informed consent was waived due to the rapid emergence of this infectious disease.

## Data collection

We reviewed clinical electronic medical records, nursing records, laboratory findings, and radiological examinations for all patients with laboratory confirmed SARS-CoV-2 infection. The admission data of these patients were collected. Data were evaluated and collected, by using a case record form modified from the standardised International Severe Acute Respiratory and Emerging Infection Consortium case report forms.[10] Any missing or uncertain records were collected and clarified through direct communication with involved health-care providers and their families.

We collected data on age, sex, exposure history, chronic medical histories (chronic cardiac disease, chronic pulmonary disease, cerebrovascular disease, chronic neurological disorder, diabetes, malignancy, dementia, malnutrition, and smoking), symptoms from onset to hospital admission (fever, cough, dyspnoea, myalgia, malaise, rhinorrhoea, arthralgia, chest pain, headache, and vomiting), vital signs at ICU admission (heart rate, respiratory rate, blood pressure), laboratory values on admission (haemoglobin concentration, lymphocyte count, platelet count, arterial blood gas analysis, $FiO_2$, partial pressure of oxygen ($PaO_2$), and lactate concentration), coexisted infection, treatment (oxygen therapy, vasoconstrictive agents, antiviral agents, antibacterial agents, corticosteroids, and immunoglobulin), as well as living status. During the outbreak of SARS-CoV-2 infection, the number of critically ill patients exceeded the capacity of ICUs. Therefore, two provisional ICUs were urgently established in Jin Yin-tan hospital and hence most mechanical ventilator settings and recordings were not recorded, except records of positive end-expiratory pressure in some cases. As a routine, electronic medical data were archived onto a local server, from which we retrieved these data.

## Outcomes

The primary outcome was 28-day mortality after ICU admission. Secondary outcomes included incidence of SARS-CoV-2-related acute respiratory distress syndrome (ARDS) and the proportion of patients requiring mechanical ventilation. ARDS and shock were defined according to the guidance of WHO for novel coronavirus disease 2019 (COVID-19).[6] Acute kidney injury was identified on the basis of serum creatinine.[11] Cardiac injury was diagnosed if the serum concentration of hypersensitive cardiac troponin I (hsTNI) was above the upper limit of the reference range (>28 pg/mL), measured in the laboratory of Jin Yin-tan Hospital.

## Statistical analysis

The aim of this study is to report the clinical courses and clinical outcomes of critically ill patients being cared for

**Articles**



**Figure 1: Study flow diagram**
SARS-CoV-2=severe acute respiratory syndrome coronavirus 2. FiO₂=fraction of inspired oxygen.

|  | Survivors (n=20) | Non-survivors (n=32) | All patients (n=52) |
|---|---|---|---|
| Age, years | 51·9 (12·9) | 64·6 (11·2) | 59·7 (13·3) |
| Age range, years |  |  |  |
| 30–39 | 6 (30%) | 0 | 6 (11·5%) |
| 40–49 | 3 (15%) | 3 (9%) | 6 (11·5%) |
| 50–59 | 4 (20%) | 9 (28%) | 13 (25%) |
| 60–69 | 6 (30%) | 11 (34%) | 17 (33%) |
| 70–79 | 1 (5%) | 7 (22%) | 8 (15%) |
| | | 1 (6%) | |
| Sex |  |  |  |
| Female | 6 (30%) | 11 (34%) | 17 (33%) |
| Male | 14 (70%) | 21 (66%) | 35 (67%) |
| Exposure |  |  |  |
| Exposure to Huanan seafood market* | 9 (45%) | 8 (25%) | 17 (33%) |
| Exposure to patients† | 2 (10%) | 8 (25%) | 10 (19%) |
| Chronic medical illness | 5 (25%) | 16 (50%) | 21 (40%) |
| Chronic cardiac disease | 2 (10%) | 3 (9%) | 5 (10%) |
| Chronic pulmonary disease | 2 (10%) | 2 (6%) | 4 (8%) |
| Cerebrovascular disease | 0 | 7 (22%) | 7 (13·5%) |
| Diabetes | 2 (10%) | 7 (22%) | 9 (17%) |
| Malignancy | 1 (5%) | 1 (3%) | 2 (4%) |
| Dementia | 0 | 1 (3%) | 1 (2%) |
| Malnutrition | 0 | 1 (3%) | 1 (2%) |
| Smoking | 2 (10%) | 0 | 2 (4%) |

Data are n (%) or mean (SD), unless otherwise specified. SARS-CoV-2=severe acute respiratory syndrome coronavirus 2. *Patients who have confirmed SARS-CoV-2 infection or are highly suspected of being infected.

*Table 1:* **Demographics and baseline characteristics of patients with severe SARS-CoV-2 pneumonia**

in the hospital during the study period. There were, therefore, no formal hypotheses being implemented to drive the sample size calculation and we included the maximum number of patients who met the inclusion criteria.

We expressed descriptive data as mean (SD) or median (IQR) for continuous variables and number (%) for categorical variables. We assessed differences between survivors and non-survivors using two-sample $t$ test or Wilcoxon rank-sum test depending on parametric or nonparametric data for continuous variables and Fisher's exact test for categorical variables. We used a Kaplan-Meier plot for survival data.

Tests were two-sided with significance set at a level less than 0·05. The Stata/IC 15.1 software (StataCorp, College Station, TX, USA) was applied for all analyses.

## Results

By Jan 26, 2020, 710 patients had been admitted to Wuhan Jin Yin-tan hospital with confirmed SARS-CoV-2 pneumonia, of whom 658 (93%) were considered ineligible, including three patients who had cardiac arrest immediately after admission. 52 (7%) critically ill patients were included in this study (figure 1). All patients were residents of Wuhan City and were transferred from other hospitals. The mean age was 59·7 years (SD 13·3), and 27 (52%) were older than 60 years (table 1). 35 (67%) patients were men. 17 (33%) patients had a history of exposure to the Huanan seafood market, and 10 (19%) had exposure to patients with confirmed or highly suspected SARS-CoV-2

infection. 21 (40%) patients had chronic diseases, including cerebrovascular diseases in seven (13·5%) patients, all of whom died at 28 days. All patients had bilateral infiltrates on chest x-ray.

The most common symptoms were fever (98%), cough (77%), and dyspnoea (63·5%; table 2). Among 52 critically ill patients, six (11%) did not experienced fever until 2–8 days after the onset of symptoms related to SARS-CoV-2 infection. The median duration from onset of symptoms to radiological confirmation of pneumonia was 5 (IQR 3–7) days. The median duration from onset of symptoms to ICU admission was 9·5 (7·0–12·5) days.

The median Acute Physiology and Chronic Health Evaluation II (APACHE II) score of all patients was 17 (IQR 14–19; table 3). Most patients had organ function damage, including 35 (67%) with ARDS, 15 (29%) with acute kidney injury, 12 (23%) with cardiac injury, 15 (29%) with liver dysfunction, and one (2%) with pneumothorax (table 2). The median hsTNI was 161·0 (IQR 41·8–766·1) pg/mL. Hospital-acquired infection was noted in seven (13·5%) patients, including one (2%) patient who had pulmonary and blood stream infection of carbapenem-

| | Survivors (n=20) | Non-survivors (n=32) | All patients (n=52) |
|---|---|---|---|
| **Symptoms** | | | |
| Fever | 20 (100%) | 31 (97%) | 51 (98%) |
| Cough | 15 (75%) | 25 (78%) | 40 (77%) |
| Dyspnoea | 12 (60%) | 21 (66%) | 33 (63·5%) |
| Myalgia | 2 (10%) | 4 (12·5%) | 6 (11·5%) |
| Malaise | 4 (20%) | 14 (44%) | 18 (35%) |
| Rhinorrhoea | 0 | 3 (9%) | 3 (6%) |
| Arthralgia | 1 (5%) | 0 | 1 (2%) |
| Chest pain | 1 (5%) | 0 | 1 (2%) |
| Headache | 1 (5%) | 2 (6%) | 3 (6%) |
| Vomiting | 1 (5%) | 1 (3%) | 2 (4%) |
| **Comorbidities** | | | |
| Acute respiratory distress syndrome | 9 (45%) | 26 (81%) | 35 (67%) |
| Acute kidney injury | 3 (15%) | 12 (37·5%) | 15 (29%) |
| Cardiac injury | 3 (15%) | 9 (28%) | 12 (23%) |
| Liver dysfunction | 6 (30%) | 9 (28%) | 15 (29%) |
| Hyperglycaemia | 7 (35%) | 11 (34%) | 18 (35%) |
| Gastrointestinal haemorrhage | 0 | 2 (6%) | 2 (4%) |
| Pneumothorax | 1 (5%) | 0 | 1 (2%) |
| Hospital-acquired pneumonia | 4 (20%) | 2 (6%) | 6 (11·5%) |
| Bacteraemia | 0 | 1 (3%) | 1 (2%) |
| Urinary tract infection | 0 | 1 (3%) | 1 (2%) |
| **Treatment** | | | |
| High flow nasal cannula | 17 (85%) | 16 (50%) | 33 (63·5%) |
| Mechanical ventilation | 7 (35%) | 30 (94%) | 37 (71%) |
| Non-invasive | 6 (30%) | 23 (72%) | 29 (56%) |
| Invasive | 3 (15%) | 19 (59%) | 22 (42%) |
| Prone position ventilation | 2 (10%) | 4 (12·5%) | 6 (11·5%) |
| Extracorporeal membrane oxygenation | 1 (5%) | 5 (16%) | 6 (11·5%) |
| Renal replacement therapy | 1 (5%) | 8 (25%) | 9 (17%) |
| Vasoconstrictive agents | 2 (10%) | 16 (50%) | 18 (35%) |
| Antiviral agents | 13 (65%) | 10 (31%) | 23 (44%) |
| Antibacterial agents | 19 (95%) | 30 (94%) | 49 (94%) |
| Glucocorticoids | 14 (70%) | 16 (50%) | 30 (58%) |
| Immunoglobulin | 15 (75%) | 19 (59%) | 28 (54%) |

Data are n (%). SARS-CoV-2=severe acute respiratory syndrome coronavirus 2.

*Table 2:* Symptoms, comorbidities, and treatments of patients with severe SARS-CoV-2 pneumonia

| | Survivors (n=20) | Non-survivors (n=32) |
|---|---|---|
| Duration from onset of symptoms to radiological confirmation of pneumonia, days | 5 (3–9) | 5 (3–7) |
| Duration from onset of symptoms to ICU admission, days | 9 (6–12) | 11 (7–14) |
| Heart rate, beats per min | 89 (20) | 89 (15) |
| Systolic blood pressure, mm Hg | 133 (20) | 140 (21) |
| Ratio of $PaO_2$ to $FiO_2$, mm Hg | 100·0 (66·6–126·7) | 62·5 (52·0–74·1) |
| APACHE II score on day 1 | 14 (12–17) | 18 (16–20) |
| SOFA score on day 1 | 4 (3–4) | 6 (4–8) |
| Haemoglobin concentration, g/l | 127 (20) | 129 (14) |
| Lymphocyte count, ×10⁹ | 2·3 (2·0) | 0·9 (···) |
| Platelet count, ×10⁹ | ··· | ··· |
| Prothrombin time, s | 10·9 (7·7) | 12·9 (2·9) |
| D-dimer concentration, g/l | ··· | ··· |
| Serum creatinine concentration, μmol/L | 76·3 (27·4) | 80·7 (32·3) |
| Lactate concentration, mmol/L | 1·6 (1·3–1·6) | 1·9 (1·4–3·2) |

Data are median (IQR) or mean (SD). COVID-19=novel coronavirus disease 2019. APACHE II=Acute Physiology and Chronic Health Evaluation II. FiO₂=fraction of inspired oxygen. PaO₂=partial pressure of oxygen. SARS-CoV-2=severe acute respiratory syndrome coronavirus 2. SOFA=Sequential Organ Failure Assessment.

*Table 3:* Differences in intensive care measures and vital signs between survivors and non-survivors of severe SARS-CoV-2 pneumonia

resistant *Klebsiella pneumoniae*. Other microorganisms identified from respiratory tract secretions in five (10%) patients included *Aspergillus flavus*, *A fumigatus*, extended-spectrum β-lactamase (ESBL)-positive *K pneumonia*, ESBL-positive *Pseudomonas aeruginosa*, and ESBL-negative *Serratia marcescens*, each microorganism found in one patient each. *Candida albicans* was identified in the urine culture of one (2%) patient (table 2).

33 (63·5%) patients were treated with high-flow nasal cannula, 37 (71%) with mechanical ventilation,

six (11·5%) with prone position ventilation, six (11·5%) with extracorporeal membrane oxygenation (ECMO), nine (17%) with renal replacement therapy, and 18 (35%) with vasoconstrictive agents (table 2). 23 (44%) patients received antiviral agents, 49 (94%) received antibacterial agents, and 30 (58%) patients received glucocorticoids (table 2). Oseltamivir was given to 18 (35%) patients, ganciclovir to 14 (27%), and lopinavir to seven (13·5%).

For the primary outcome, among 52 critically ill patients with SARS-CoV-2 infection, 32 (61·5%) patients had died at 28 days, and the median duration from ICU admission to death was 7 (IQR 3–11) days in the non-survivors (figure 2). Compared with survivors, non-survivors were more likely to develop ARDS (26 [81%] vs 9 [45%]) and were more likely to receive mechanical ventilation (30 [94%] vs 7 [35%]). 30 (81%) of 37 patients requiring mechanical ventilation had died by 28 days.

Of the 20 patients who survived, eight patients were discharged. Three patients were still on invasive ventilation at 28 days, including one patient who was also on ECMO. One patient was on non-invasive ventilation, two were using high-flow nasal cannula, and six were using common nasal cannula.

Compared with survivors, non-survivors were older (64·6 [SD 11·2] vs 51·9 [12·9]) and were more likely to have chronic medical illnesses (17 [53%] vs 4 [20%] patients; table 1). Neither the median duration from onset of symptoms to radiological confirmation of

pneumonia or from onset of symptoms to ICU admission were different between survivors and non-survivors (table 3). The ratio of partial pressure of oxygen ($PaO_2$) to $FiO_2$ was significantly lower in non-survivors. Based on APACHE II score and SOFA score at ICU admission, non-survivors were in a more critical condition than survivors. In the cohort, lymphocytopenia occurred in 44 (85%) patients, with no significant difference between the two groups. Compared with survivors, non-survivors were more likely to develop ARDS, and to receive mechanical ventilation, either invasively or non-invasively.

## Discussion

We report on 52 critically ill patients with confirmed SARS-CoV-2 infection, characterised by severe hypoxaemia. 32 (61·5%) of critically ill patients had died at 28 days. Of all included patients, 37 (71%) required mechanical ventilation and 35 (67%) had ARDS.

Since no specialised medication to treat SARS-CoV-2 infection has been identified at this time, the mainstay of treatment has been supportive care. Patients are being treated in isolation, and their close contacts are being quarantined. For non-critically ill patients, close follow-up is likely to be sufficient to manage the disease.[14] For critically ill patients, however, aggressive treatments and intensive care are needed. To our knowledge, this is the first study to characterise critically ill patients infected by SARS-CoV-2. In three previously published studies of crtically ill patients, the patient numbers were too small to summarise the characteristics and mortality of these patients with SARS-CoV-2 pneumonia.[2,3,5]

Like SARS-CoV and Middle Eastern respiratory syndrome (MERS)-CoV, SARS-CoV-2 is a coronavirus that can be transmitted to humans, and these viruses are all related to high mortality in critically ill patients.[15] However, the mortality rate in patients with SARS-CoV-2 infection in our cohort is higher than that previously seen in critically ill patients with SARS. In a cohort of 38 critically ill patients with SARS from 13 hospitals in Canada, 29 (76%) patients required mechanical ventilation, 13 (43%) patients had died at 28 days, and six (16%) patients remained on mechanical ventilation.[5] 17 (38%) of 45 patients and 14 (26%) of 54 patients who were critically ill with SARS infection were also reported to have died at 28 days in a Singapore cohort[10] and a Hong Kong cohort,[11] respectively. The mortality rate in our cohort is likely to be higher than that seen in critically ill patients with MERS infection. In a cohort of 12 patients with MERS from two hospitals in Saudi Arabia, seven (58%) patients had died at 90 days.[13] Since the follow-up time is shorter in our cohort, we postulate that the mortality rate would be higher after 28 days than that seen in patients with MERS-CoV.

The fundamental pathophysiology of severe viral pneumonia is severe ARDS. Men and people of an older age (>65 years) are more likely to develop ARDS than women or those of a younger age.[16] Therefore, it is



Figure 2: **Survival of critically ill patients with SARS-CoV-2 pneumonia**
Dashed lines represent 95% CIs. One patient died within 24 h after admission to the intensive care unit (ICU).

reasonable that the mortality at 28 days of severe SARS-CoV-2 pneumonia is similar to the mortality of severe ARDS, which is near 50%.[17] With a substantial increase in the number of critically ill patients infected by SARS-CoV-2, more provisional ICUs are being established in Wuhan, China. Qualified specialists are coming to Wuhan from other provinces of China and are currently working in these provisional ICUs, fever clinics, and newly constructed hospitals.[18] As the clinical capacity to treat patients improves, the mortality of critically ill patients with SARS-CoV-2 pneumonia is expected to decrease.

As mentioned in previous studies, nearly 70% of patients infected by SARS-CoV-2 were men.[1,3] The patients are older in our study than in previous studies.[1,2] We observed that non-survivors were older than survivors. Based on previous studies, evidence suggests that older, male patients are the most susceptible to SARS-CoV-2 infection,[1] which is supported by our data. As previously reported, patients with a history of cerebrovascular disease are at increased risk of becoming critically ill or dying if they have SARS-CoV-2 infection.[2]

In our cohort, fever is the most common symptom in patients with SARS-CoV-2 pneumonia, which is in accordance with previous studies, but not all patients had fever.[1,3] We also found that fever was not detected at the onset of illness in six (11·5%), and that it was in fact detected 2–8 days later. The delay of fever manifestation hinders early identification of patients infected with SARS-CoV-2—if patients are asymptomatic identification of suspected cases is more difficult.[2,3] The median duration from onset of symptoms to radiological confirmation of pneumonia was 5 (3–7) days, meaning that early or repeated radiological examinations are useful in screening patients with SARS-CoV-2 pneumonia.[3]

As for laboratory tests, lymphocytopenia occurred in more than 80% of critically ill patients in our cohort. Lymphocytopenia is a prominent feature of critically ill patients with SARS-CoV infection because targeted

479

Numbers at risk  51   39   28   22   21

**Articles**

invasion by SARS-CoV viral particles damages the cytoplasmic component of the lymphocyte and causes its destruction.[21] Additionally, lymphocytopenia is also common in the critically ill patients with MERS infection, which is the result of apoptosis of lymphocytes.[22,23] Therefore, we postulate that necrosis or apoptosis of lymphocytes also induces lymphocytopenia in critically ill patients with SARS-CoV-2 infection. In a previous study, mainly in non-critical patients infected with SARS-CoV-2, 35% of patients had only mild lymphocytopenia,[1] suggesting that the severity of lymphocytopenia reflects the severity of SARS-CoV-2 infection.

Mechanical ventilation is the main supportive treatment for critically ill patients. The PaO₂/FiO₂ ratio was lower in our patients than in patients admitted to Zhongnan Hospital.[5] The substantial difference in PaO₂/FiO₂ ratio between survivors and non-survivors in our study, indicates this ratio is associated with the severity of illness and thus prognosis. Barotrauma seems less severe in patients with SARS-CoV-2 infection who are being mechanically ventilated than that seen in mechanically ventilated patients with SARS-CoV. In our study, barotrauma occurred in only one (2%) patient, who had been hospitalised for nearly 1 month, and he is currently on a ventilator and receiving ECMO. In patients with SARS, barotrauma occurred in about 25% of patients on mechanical ventilation.[24] The lower occurrence of barotrauma in our cohort is probably related to the widely accepted strategy of protective ventilation in mainland China.[24] At the same time, prone position and ECMO have been used to treat patients with SARS-CoV-2 pneumonia.

Without solid evidence, nearly half of the patients were given antiviral agents, and more than half were given intravenous glucocorticoids. Patients treated with lopinavir were from an ongoing clinical trial registered on Chinese Clinical Trial Registry (ChiCTR2000029308). Remdesivir was given to the first patients with SARS-CoV-2 pneumonia in the USA.[4] Trials on remdesivir are about to recruit both mild to moderate patients (NCT04252664) and severe patients (NCT04257636) infected with SARS-CoV-2. Although, intravenous glucocorticoids were commonly used in patients with severe SARS or MERS pneumonia, their efficacy remains controversial and their use to treat SARS-CoV-2 infection is also controversial.[5,6] An ongoing clinical trial (NCT04244591) might shed some light on the safety and efficacy of these drugs as treatment.

This study has several limitations. First, only 52 critically ill patients were included. However, the population from which they were sampled was much larger than that of the three studies previously published.[1,2,5] We included all the critically ill patients being cared for in the ICU of Jin Yin-tan hospital who met the inclusion criteria. Due to the exploratory nature of the study, which was not driven by formal hypotheses, the sample size calculation was waived. Instead, we hope that the findings presented here will encourage a larger

cohort study or potentially some randomly controlled trials. Second, some specific information from the ICU was missing, such as mechanical ventilation settings. The data on radiographical examination, supportive treatment, living status, and the duration from ICU admission to death, however, are indisputable. Third, this is a retrospective study. The data in this study permit a preliminary assessment of the clinical course and outcomes of critically ill patients with SARS-CoV-2 pneumonia. Further studies are still needed.

In conclusion, the mortality of critically ill patients with SARS-CoV-2 pneumonia is high. The survival term of the non-survivors is likely to be within 1–2 weeks after ICU admission. Older patients (>65 years) with comorbidities and ARDS are at increased risk of death. The severity of SARS-CoV-2 pneumonia poses great strain to hospital critical care resources, especially if they are not adequately staffed or resourced.

**Contributors**
XY, YY, JXu, HS, HL, and YS collected the epidemiological and clinical data. JXi, YWu, LZ, ZY, MF, and TY summarised all data. XY, YS, HL, JXi, YWa, SP, and YS drafted the manuscript. XZ and SY revised the final manuscript.

**Declaration of interests**
We declare no competing interests.

**Data sharing**
After publication, the data will be made available to others on reasonable requests to the corresponding author. A proposal with detailed description of study objectives and statistical analysis plan will be needed for evaluation of the reasonability of requests. Additional materials might also be required during the process of evaluation. Deidentified participant data will be provided after approval from the corresponding author and Wuhan Jin Yin-tan Hospital.

**Acknowledgments**
We thank all patients and their families involved in the study.

**References**
1 Huang C, Wang Y, Li X, et al. Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China. *Lancet* 2020; 395: 497–506.
2 Chen N, Zhou M, Dong X, et al. Epidemiological and clinical characteristics of 99 cases of 2019 novel coronavirus pneumonia in Wuhan, China: a descriptive study. *Lancet* 2020; 395: 507–13.
3 Zhu N, Zhang D, Wang W, et al. A novel coronavirus from patients with pneumonia in China, 2019. *N Engl J Med* 2020; published online Jan 24. DOI:10.1056/NEJMoa2001017.
4 Holshue ML, DeBolt C, Lindquist S, et al. First case of 2019 novel coronavirus in the United States. *N Engl J Med* 2020; published online Jan 31. DOI:10.1056/NEJMoa2001191.
5 Wang D, Hu B, Hu C, Clinical characteristics of 138 hospitalized patients with 2019 novel coronavirus-infected pneumonia in Wuhan, China. *JAMA* 2020; published online Feb 7. DOI:10.1001/jama.2020.1585.
6 WHO. Clinical management of severe acute respiratory infection when novel coronavirus (nCoV) infection is suspected. Jan 11. 2020. https://www.who.int/publications-detail/clinical-management-of-severe-acute-respiratory-infection-when-novel-coronavirus-(ncov)-infection-is-suspected (accessed Feb 8, 2020).
7 Dominguez-Cherit G, Lapinsky SE, Macias AE, et al. Critically ill patients with 2009 influenza A(H1N1) in Mexico. *JAMA* 2009; 302: 1880–87.
8 Fowler RA, Lapinsky SE, Hallett D, et al. Critically ill patients with severe acute respiratory syndrome. *JAMA* 2003; 290: 367–73.
9 Kumar A, Zarychanski R, Pinto R, et al. Critically ill patients with 2009 influenza A(H1N1) infection in Canada. *JAMA* 2009; 302: 1872–79.

10   The International Severe Acute Respiratory and Emerging Infection
     Consortium (ISARIC). https://isaric.tghn.org/ (accessed
     Jan 25, 2020).

11   Kidney disease: improving global outcomes (KDIGO) acute kidney
     injury work group. KDIGO clinical practice guideline for acute
     kidney injury. March 2012. https://kdigo.org/wp-content/
     uploads/2016/10/KDIGO-2012-AKI-Guideline-English.pdf (accessed
     Feb 8, 2020).

12   Parry J. Wuhan: Britons to be evacuated as scientists estimate
     44000 cases of 2019-nCOV in the city. BMJ 2020; 368: m351.

13   Lew TW, Kwek TK, Tai D, et al. Acute respiratory distress syndrome
     in critically ill patients with severe acute respiratory syndrome.
     JAMA 2003; 290: 374–80.

14   Gomersall CD, Joynt GM, Lam P, et al. Short-term outcome of
     critically ill patients with severe acute respiratory syndrome.
     Intensive Care Med 2004; 30: 381–87.

15   Arabi YM, Arifi AA, Balkhy HH, et al. Clinical course and
     outcomes of critically ill patients with Middle East respiratory
     syndrome coronavirus infection. Ann Intern Med 2014;
     160: 389–97.

16   de Wit E, van Doremalen N, Falzarano D, Munster VJ. SARS and
     MERS: recent insights into emerging coronaviruses.
     Nat Rev Microbiol 2016; 14: 523–34.

17   Bellani G, Laffey JG, Pham T, et al. Epidemiology, patterns of care,
     and mortality for patients with acute respiratory distress syndrome
     in intensive care units in 50 countries. JAMA 2016; 315: 788–800.

18   USA TODAY. China built a hospital in 10 days to battle coronavirus.
     https://www.usatoday.com/story/news/world/2020/02/03/
     coronavirus-photos-show-wuhan-huoshenshan-hospital-built-10-
     days/4643377002/ (accessed Feb 8, 2020).

19   Rothe C, Schunk M, Sothmann P, et al. Transmission of 2019-nCoV
     infection from an asymptomatic contact in Germany. N Engl J Med
     2020; published online Jan 30. DOI:10.1056/NEJMc2001468.

20   National Health Commission of the People's Republic of China.
     [text unclear] 02/01/c.76086.htm (accessed Feb 8, 2020).

21   Gu J, Gong E, Zhang B, et al. Multiple organ infection and the
     pathogenesis of SARS. J Exp Med 2005; 202: 415–24.

22   Chu H, Zhou J, Wong BH, et al. Middle East respiratory syndrome
     [text unclear] activates the extrinsic and intrinsic apoptosis pathways. J Infect Dis
     2016; 213: 904–14.

23   Liu WJ, Zhao M, Liu K, et al. T-cell immunity of SARS-CoV:
     implications for vaccine development against MERS-CoV.
     Antiviral Res 2017; 137: 82–92.

24   Liu L, Yang Y, Gao Z, et al. Practice of diagnosis and management
     of acute respiratory distress syndrome in mainland China: a cross-
     sectional study. J Thorac Dis 2018; 10: S394–404.

25   Russell CD, Millar JE, Baillie JK. Clinical evidence does not support
     corticosteroid treatment for 2019-nCoV lung injury. Lancet 2020;
     395: 473–75.

# Exhibit

# D

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use AVELOX® safely and effectively. See full prescribing information for AVELOX.

AVELOX (moxifloxacin hydrochloride) tablets, for oral use
AVELOX (moxifloxacin hydrochloride) injection, for intravenous use
Initial U.S. Approval: 1999

---

**WARNING: SERIOUS ADVERSE REACTIONS INCLUDING TENDINITIS, TENDON RUPTURE, PERIPHERAL NEUROPATHY, CENTRAL NERVOUS SYSTEM EFFECTS and EXACERBATION OF MYASTHENIA GRAVIS**
*See full prescribing information for complete boxed warning*

- **Fluoroquinolones, including AVELOX, have been associated with disabling and potentially irreversible serious adverse reactions that have occurred together (5.1) including:**
  o **Tendinitis and tendon rupture (5.2)**
  o **Peripheral Neuropathy (5.3)**
  o **Central nervous system effects (5.4)**

  **Discontinue AVELOX immediately and avoid the use of fluoroquinolones, including AVELOX, in patients who experience any of these serious adverse reactions (5.1)**

- **Fluoroquinolones, including AVELOX, may exacerbate muscle weakness in patients with myasthenia gravis. Avoid AVELOX in patients with known history of myasthenia gravis (5.5).**

- **Because fluoroquinolones, including AVELOX, have been associated with serious adverse reactions (5.1, 5.13), reserve AVELOX for use in patients who have no alternative treatment options for the following indications:**
  o **Acute bacterial sinusitis (1.6)**
  o **Acute bacterial exacerbation of chronic bronchitis (1.7)**

---

-------------------------RECENT MAJOR CHANGES-------------------------

| | |
|---|---|
| Boxed Warning | M/2016 |
| Indications and Usage (1.6, 1.7) | M/2016 |
| Dosage and Administration (2.1) | M/2016 |
| Warnings and Precautions (5.1) | M/2016 |

-------------------------INDICATIONS AND USAGE-------------------------
AVELOX is a fluoroquinolone antibacterial indicated for treating infections in adults 18 years of age and older caused by designated susceptible bacteria, in the conditions listed below:
Community Acquired Pneumonia (1.1)
Skin and Skin Structure Infections: Uncomplicated (1.2) and Complicated (1.3)
Complicated Intra-Abdominal Infections (1.4)
Plague (1.5)
Acute Bacterial Sinusitis (1.6)
Acute Bacterial Exacerbation of Chronic Bronchitis (1.7)

To reduce the development of drug-resistant bacteria and maintain the effectiveness of AVELOX and other antibacterial drugs, AVELOX should be used only to treat or prevent infections that are proven or strongly suspected to be caused by susceptible bacteria. (1.8)

-------------------------DOSAGE AND ADMINISTRATION-------------------------

| Type of Infection | Dose Every 24 hours | Duration (days) |
|---|---|---|
| Community Acquired Pneumonia (1.1) | 400 mg | 7-14 |
| Uncomplicated Skin and Skin Structure Infections (SSSI) (1.2) | 400 mg | 7 |
| Complicated SSSI (1.3) | 400 mg | 7-21 |
| Complicated Intra-Abdominal Infections (1.4) | 400 mg | 5-14 |
| Plague (1.5) | 400 mg | 10-14 |
| Acute Bacterial Sinusitis (1.6) | 400 mg | 10 |
| Acute Bacterial Exacerbation of Chronic Bronchitis (1.7) | 400 mg | 5 |

- No dosage adjustment in patients with renal or hepatic impairment (8.6, 8.7)
- AVELOX Injection: Slow intravenous infusion over 60 minutes. Avoid rapid or bolus intravenous injection. (2.2)
- Do not mix with other medications in intravenous bag or in an intravenous line. (2.3)

---------------------DOSAGE FORMS AND STRENGTHS---------------------
- Tablets: Moxifloxacin hydrochloride (equivalent to 400 mg moxifloxacin) (3.1)
- Injection: Moxifloxacin hydrochloride (equivalent to 400 mg moxifloxacin) in 0.8% sodium chloride solution in a 250 mL flexibag (3.2)

-------------------------CONTRAINDICATIONS-------------------------
Known hypersensitivity to AVELOX or other quinolones (4, 5.8)

---------------------WARNINGS AND PRECAUTIONS---------------------
- Prolongation of the QT interval and isolated cases of torsade de pointes has been reported. Avoid use in patients with known prolongation, proarrhythmic conditions such as clinically significant bradycardia or acute myocardial ischemia, hypokalemia, hypomagnesemia, and with drugs that prolong the QT interval. (5.6, 7.5, 8.5)
- Hypersensitivity and other serious reactions: Serious and sometimes fatal reactions, including anaphylactic reactions, may occur after first or subsequent doses of AVELOX. Discontinue AVELOX at first sign of skin rash, jaundice or any other sign of hypersensitivity. (5.7, 5.8)
- *Clostridium difficile*-Associated Diarrhea: Evaluate if diarrhea occurs (5.9)

-------------------------ADVERSE REACTIONS-------------------------
Most common reactions (3% or greater) were nausea, diarrhea, headache, and dizziness. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Bayer HealthCare Pharmaceuticals Inc. at 1-888-842-2937 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

-------------------------DRUG INTERACTIONS-------------------------

| Interacting Drug | Interaction |
|---|---|
| Multivalent cation-containing products including antacids, sucralfate, multivitamins | Decreased AVELOX absorption. Take AVELOX Tablet at least 4 hours before or 8 hours after these products. (2.2, 7.1, 12.3) |
| Warfarin | Anticoagulant effect enhanced. Monitor prothrombin time/INR, and bleeding. (6, 7.2, 12.3) |
| Class IA and Class III antiarrhythmics | Proarrhythmic effect may be enhanced. Avoid concomitant use. (5.6, 7.5) |
| Antidiabetic agents | Carefully monitor blood glucose. (5.11, 7.3) |

-------------------------USE IN SPECIFIC POPULATIONS-------------------------
- **Pregnancy:** Based on animal data may cause fetal harm. (8.1)
- **Geriatrics:** Increased risk for severe tendon disorders further increased by concomitant corticosteroid therapy and increased risk of prolongation of the QT interval. (5.1, 5.6, 8.5)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide**

Revised: 7/2016

---

**FULL PRESCRIBING INFORMATION: CONTENTS***
**WARNING: SERIOUS ADVERSE REACTIONS INCLUDING TENDINITIS, TENDON RUPTURE, PERIPHERAL NEUROPATHY, CENTRAL NERVOUS SYSTEM EFFECTS AND EXACERBATION OF MYASTHENIA GRAVIS**
**1 INDICATIONS AND USAGE**
1.1 Community Acquired Pneumonia
1.2 Uncomplicated Skin and Skin Structure Infections
1.3 Complicated Skin and Skin Structure Infections
1.4 Complicated Intra-Abdominal Infections
1.5 Plague
1.6 Acute Bacterial Sinusitis
1.7 Acute Bacterial Exacerbation of Chronic Bronchitis
1.8 Usage
**2 DOSAGE AND ADMINISTRATION**
2.1 Dosage in Adult Patients
2.2 Important Administration Instructions
2.3 Drug and Diluent Compatabilities
2.4 Preparation for Administration of AVELOX Injection

1

**3 DOSAGE FORMS AND STRENGTHS**
3.1 AVELOX Tablets
3.2 AVELOX Injection
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
5.1 Disabling and Potentially Irreversible Serious Adverse Reactions Including Tendinitis and Tendon Rupture, Peripheral Neuropathy, and Central Nervous System Effects
5.2 Tendinitis and Tendon Rupture
5.3 Peripheral Neuropathy
5.4 Central Nervous System Effects
5.5 Exacerbation of Myasthenia Gravis
5.6 QT Prolongation
5.7 Hypersensitivity Reactions
5.8 Other Serious and Sometimes Fatal Reactions
5.9 Clostridium difficile-Associated Diarrhea
5.10 Arthropathic Effects in Animals
5.11 Blood Glucose Disturbances
5.12 Photosensitivity/Phototoxicity
5.13 Development of Drug Resistant Bacteria
**6 ADVERSE REACTIONS**
6.1 Clinical Trials Experience
6.2 Postmarketing Experience
**7 DRUG INTERACTIONS**
7.1 Antacids, Sucralfate, Multivitamins and Other Products Containing Multivalent Cations
7.2 Warfarin
7.3 Antidiabetic Agents
7.4 Nonsteroidal Anti-Inflammatory Drugs
7.5 Drugs that Prolong QT
**8 USE IN SPECIFIC POPULATIONS**
8.1 Pregnancy

8.3 Nursing Mothers
8.4 Pediatric Use
8.5 Geriatric Use
8.6 Renal Impairment
8.7 Hepatic Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
11.1 AVELOX Tablets
11.2 AVELOX Injection
**12 CLINICAL PHARMACOLOGY**
12.1 Mechanism of Action
12.2 Pharmacodynamics
12.3 Pharmacokinetics
12.4 Microbiology
**13 NONCLINICAL TOXICOLOGY**
13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
13.2 Animal Toxicology and/or Pharmacology
**14 CLINICAL STUDIES**
14.1 Acute Bacterial Sinusitis
14.2 Acute Bacterial Exacerbation of Chronic Bronchitis
14.3 Community Acquired Pneumonia
14.4 Uncomplicated Skin and Skin Structure Infections
14.5 Complicated Skin and Skin Structure Infections
14.6 Complicated Intra-Abdominal Infections
14.7 Plague
**15 REFERENCES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
16.1 AVELOX Tablets
16.2 AVELOX Injection - Premix Bags
**17 PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed

## FULL PRESCRIBING INFORMATION

**WARNING: SERIOUS ADVERSE REACTIONS INCLUDING TENDINITIS, TENDON RUPTURE, PERIPHERAL NEUROPATHY, CENTRAL NERVOUS SYTEM EFFECTS and EXACERBATION OF MYASTHENIA GRAVIS**

- **Fluoroquinolones, including AVELOX, have been associated with disabling and potentially irreversible serious adverse reactions that have occurred together *[see Warnings and Precautions (5.1)]*, including:**
  - **Tendinitis and tendon rupture *[see Warnings and Precautions (5.2)]***
  - **Peripheral neuropathy *[see Warnings and Precautions (5.3)]***
  - **Central nervous system effects *[see Warnings and Precautions (5.4)]***

  **Discontinue AVELOX immediately and avoid the use of fluoroquinolones, including AVELOX, in patients who experience any of these serious adverse reactions *[see Warnings and Precautions (5.1)]*.**

- **Fluoroquinolones, including AVELOX, may exacerbate muscle weakness in patients with myasthenia gravis. Avoid AVELOX in patients with known history of myasthenia gravis *[see Warnings and Precautions (5.5)]*.**

- **Because fluoroquinolones, including AVELOX, have been associated with serious adverse reactions *[see Warnings and Precautions (5.1-5.13)]*, reserve AVELOX for use in patients who have no alternative treatment options for the following indications:**

  - **Acute bacterial sinusitis *[see Indications and Usage (1.6)]***
  - **Acute bacterial exacerbation of chronic bronchitis *[see Indications and Usage (1.7)]***

Reference ID: 3963471

# 1 INDICATIONS AND USAGE

## 1.1 Community Acquired Pneumonia

AVELOX is indicated in adult patients for the treatment of Community Acquired Pneumonia caused by susceptible isolates of *Streptococcus pneumoniae* (including multi-drug resistant *Streptococcus pneumoniae* [MDRSP]), *Haemophilus influenzae, Moraxella catarrhalis*, methicillin-susceptible *Staphylococcus aureus, Klebsiella pneumoniae, Mycoplasma pneumoniae,* or *Chlamydophila pneumoniae [see Clinical Studies (14.3)]*.

MDRSP isolates are isolates resistant to two or more of the following antibacterial drugs: penicillin (minimum inhibitory concentrations [MIC] > 2 mcg/mL), 2nd generation cephalosporins (for example, cefuroxime), macrolides, tetracyclines, and trimethoprim/sulfamethoxazole.

## 1.2 Uncomplicated Skin and Skin Structure Infections

AVELOX is indicated in adult patients for the treatment of Uncomplicated Skin and Skin Structure Infections caused by susceptible isolates of methicillin-susceptible *Staphylococcus aureus* or *Streptococcus pyogenes [see Clinical Studies (14.4)]*.

## 1.3 Complicated Skin and Skin Structure Infections

AVELOX is indicated in adult patients for the treatment of Complicated Skin and Skin Structure Infections caused by susceptible isolates of methicillin-susceptible *Staphylococcus aureus, Escherichia coli, Klebsiella pneumoniae,* or *Enterobacter cloacae [see Clinical Studies (14.5)]*.

## 1.4 Complicated Intra-Abdominal Infections

AVELOX is indicated in adult patients for the treatment of Complicated Intra-Abdominal Infections including polymicrobial infections such as abscess caused by susceptible isolates of *Escherichia coli, Bacteroides fragilis, Streptococcus anginosus, Streptococcus constellatus, Enterococcus faecalis, Proteus mirabilis, Clostridium perfringens, Bacteroides thetaiotaomicron,* or *Peptostreptococcus* species *[see Clinical Studies (14.6)]*.

## 1.5 Plague

AVELOX is indicated in adult patients for the treatment of plague, including pneumonic and septicemic plague, due to susceptible isolates of *Yersinia pestis* and prophylaxis of plague in adult patients. Efficacy studies of moxifloxacin could not be conducted in humans with plague for feasibility reasons. Therefore this indication is based on an efficacy study conducted in animals only *[see Clinical Studies (14.7)]*.

## 1.6 Acute Bacterial Sinusitis

AVELOX is indicated in adult patients (18 years of age and older) for the treatment of acute bacterial sinusitis (ABS) caused by susceptible isolates of *Streptococcus pneumoniae, Haemophilus influenzae,* or *Moraxella catarrhalis [see Clinical Studies (14.1)]*.

Because fluoroquinolones, including AVELOX, have been associated with serious adverse reactions *[see Warnings and Precautions (5.1-5.13)]* and for some patients ABS is self-limiting, reserve AVELOX for treatment of ABS in patients who have no alternative treatment options.

## 1.7 Acute Bacterial Exacerbation of Chronic Bronchitis

AVELOX is indicated in adult patients for the treatment of Acute Bacterial Exacerbation of Chronic Bronchitis (ABECB) caused by susceptible isolates of *Streptococcus pneumoniae, Haemophilus influenzae, Haemophilus parainfluenzae, Klebsiella pneumoniae,* methicillin-susceptible *Staphylococcus aureus,* or *Moraxella catarrhalis [see Clinical Studies (14.2)]*.

Because fluoroquinolones, including AVELOX, have been associated with serious adverse reactions *[see Warnings and Precautions (5.1-5.13)]* and for some patients ABECB is self-limiting, reserve AVELOX for treatment of ABECB in patients who have no alternative treatment options.

## 1.8 Usage

To reduce the development of drug-resistant bacteria and maintain the effectiveness of AVELOX and other antibacterial drugs, AVELOX should be used only to treat or prevent infections that are proven or strongly suspected to be caused by

3

susceptible bacteria. When culture and susceptibility information are available, they should be considered in selecting or modifying antibacterial therapy. In the absence of such data, local epidemiology and susceptibility patterns may contribute to the empiric selection of therapy.

# 2   DOSAGE AND ADMINISTRATION

## 2.1  Dosage in Adult Patients

The dose of AVELOX is 400 mg (orally or as an intravenous infusion) once every 24 hours. The duration of therapy depends on the type of infection as described in Table 1.

**Table 1: Dosage and Duration of Therapy in Adult Patients**

| Type of Infection[a] | Dose Every 24 hours | Duration[b] (days) |
|---|---|---|
| Community Acquired Pneumonia (1.1) | 400 mg | 7–14 |
| Uncomplicated Skin and Skin Structure Infections (SSSI ) (1.2) | 400 mg | 7 |
| Complicated SSSI (1.3) | 400 mg | 7–21 |
| Complicated Intra-Abdominal Infections (1.4) | 400 mg | 5–14 |
| Plague (1.5)[c] | 400 mg | 10–14 |
| Acute Bacterial Sinusitis (ABS) (1.6) | 400 mg | 10 |
| Acute Bacterial Exacerbation of Chronic Bronchitis (ABECB) (1.7) | 400 mg | 5 |

a)  Due to the designated pathogens *[see Indications and Usage (1)].*

b)  Sequential therapy (intravenous to oral) may be instituted at the discretion of the physician

c)  Drug administration should begin as soon as possible after suspected or confirmed exposure to *Yersinia pestis.*

*Conversion of Intravenous to Oral Dosing in Adults*

Intravenous formulation is indicated when it offers a route of administration advantageous to the patient (for example, patient cannot tolerate an oral dosage form). When switching from intravenous to oral formulation, no dosage adjustment is necessary. Patients whose therapy is started with AVELOX Injection may be switched to AVELOX Tablets when clinically indicated at the discretion of the physician.

## 2.2  Important Administration Instructions

*AVELOX Tablets*

With Multivalent Cations

Administer AVELOX Tablets at least 4 hours before or 8 hours after products containing magnesium, aluminum, iron or zinc, including antacids, sucralfate, multivitamins and didanosine buffered tablets for oral suspension or the pediatric powder for oral solution *[see Drug Interactions (7.1) and Clinical Pharmacology (12.3)].*

With Food

AVELOX Tablets can be taken with or without food, drink fluids liberally.

*AVELOX Injection*

Administer by Intravenous infusion only. It is not intended for intra-arterial, intramuscular, intrathecal, intraperitoneal, or subcutaneous administration.

Administer by intravenous infusion over a period of 60 minutes by direct infusion or through a Y-type intravenous infusion set which may already be in place. Avoid rapid or bolus intravenous infusion.

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit.

Discard any unused portion because the premix flexible containers are for single-use only.

## 2.3  Drug and Diluent Compatibilities

Because only limited data are available on the compatibility of AVELOX intravenous injection with other intravenous substances, additives or other medications should not be added to AVELOX Injection or infused simultaneously through

4

the same intravenous line. If the same intravenous line or a Y-type line is used for sequential infusion of other drugs, or if the "piggyback" method of administration is used, the line should be flushed before and after infusion of AVELOX Injection with an infusion solution compatible with AVELOX Injection as well as with other drug(s) administered via this common line.

Compatible Intravenous Solutions: AVELOX Injection is compatible with the following intravenous solutions at ratios from 1:10 to 10:1:

0.9% Sodium Chloride Injection, USP

1 Molar Sodium Chloride Injection

5% Dextrose Injection, USP

Sterile Water for Injection, USP

10% Dextrose for Injection, USP

Lactated Ringer's for Injection

### 2.4  Preparation for Administration of AVELOX Injection

Refer to complete directions that have been provided with the administration set.

To prepare AVELOX Injection premix in flexible containers:

Close flow control clamp of administration set.

Remove cover from port at bottom of container.

Insert piercing pin from an appropriate transfer set (for example, one that does not require excessive force, such as ISO compatible administration set) into port with a gentle twisting motion until pin is firmly seated.

## 3  DOSAGE FORMS AND STRENGTHS

### 3.1  AVELOX Tablets

Oblong, dull red, film-coated tablets imprinted with "BAYER" on one side and "M400" on the other containing moxifloxacin hydrochloride (equivalent to 400 mg moxifloxacin).

### 3.2  AVELOX Injection

Ready-to-use 250 mL flexibags containing moxifloxacin hydrochloride (equivalent to 400 mg moxifloxacin) in 0.8% sodium chloride aqueous solution. The appearance of the intravenous solution is yellow.

## 4  CONTRAINDICATIONS

AVELOX is contraindicated in persons with a history of hypersensitivity to moxifloxacin or any member of the quinolone class of antibacterials *[see Warnings and Precautions (5.8)]*.

## 5  WARNINGS AND PRECAUTIONS

### 5.1  Disabling and Potentially Irreversible Serious Adverse Reactions Including Tendinitis and Tendon Rupture, Peripheral Neuropathy, and Central Nervous System Effects

Fluoroquinolones, including AVELOX, have been associated with disabling and potentially irreversible serious adverse reactions from different body systems that can occur together in the same patient. Commonly seen adverse reactions include tendinitis, tendon rupture, arthralgia, myalgia, peripheral neuropathy, and central nervous system effects (hallucinations, anxiety, depression, insomnia, severe headaches, and confusion). These reactions can occur within hours to weeks after starting AVELOX. Patients of any age or without pre-existing risk factors have experienced these adverse reactions *[see Warnings and Precautions (5.2, 5.3, 5.4)]*.

Discontinue AVELOX immediately at the first signs or symptoms of any serious adverse reaction. In addition, avoid the use of fluoroquinolones, including AVELOX, in patients who have experienced any of these serious adverse reactions associated with fluoroquinolones.

5

## 5.2 Tendinitis and Tendon Rupture

Fluoroquinolones, including AVELOX, have been associated with an increased risk of tendinitis and tendon rupture in all ages *[see Warnings and Precautions (5.1) and Adverse Reactions (6.2)]*. This adverse reaction most frequently involves the Achilles tendon, and has also been reported with the rotator cuff (the shoulder), the hand, the biceps, the thumb, and other tendons. Tendinitis or tendon rupture can occur within hours or days of starting moxifloxacin or as long as several months after completion of therapy. Tendinitis and tendon rupture can occur bilaterally.

The risk of developing fluoroquinolone-associated tendinitis and tendon rupture is increased in patients over 60 years of age, in patients taking corticosteroid drugs, and in patients with kidney, heart or lung transplants. Other factors that may independently increase the risk of tendon rupture include strenuous physical activity, renal failure, and previous tendon disorders such as rheumatoid arthritis. Tendinitis and tendon rupture have also occurred in patients taking fluoroquinolones who do not have the above risk factors. Discontinue AVELOX immediately if the patient experiences pain, swelling, inflammation or rupture of a tendon. Patients should be advised to rest at the first sign of tendinitis or tendon rupture, and to contact their healthcare provider regarding changing to a non-quinolone antimicrobial drug. Avoid fluoroquinolones, including AVELOX, in patients who have a history of tendon disorders or who have experienced tendinitis or tendon rupture *[see Adverse Reactions (6.2)]*.

Fluoroquinolones, including AVELOX, have been associated with an increased risk of peripheral neuropathy. Cases of sensory or sensorimotor axonal polyneuropathy affecting small and/or large axons resulting in paresthesias, hypoesthesias, dysesthesias and weakness have been reported in patients receiving fluoroquinolones including AVELOX. Symptoms may occur soon after initiation of AVELOX and may be irreversible in some patients *[see Warnings and Precautions (5.1) and Adverse Reactions (6.1, 6.2)]*.

Discontinue AVELOX immediately if the patient experiences symptoms of peripheral neuropathy including pain, burning, tingling, numbness, and/or weakness or other alterations of sensation including light touch, pain, temperature, position sense, and vibratory sensation. Avoid fluoroquinolones, including AVELOX, in patients who have previously experienced peripheral neuropathy

## 5.4 Central Nervous System Effects

Fluoroquinolones, including AVELOX, have been associated with an increased risk of central nervous system (CNS) reactions, including: convulsions and increased intracranial pressure (including pseudotumor cerebri) and toxic psychosis. Fluoroquinolones may also cause CNS reactions of nervousness, agitation, insomnia, anxiety, nightmares, paranoia, dizziness, confusion, tremors, hallucinations, depression, and, suicidal thoughts or acts. These adverse reactions may occur following the first dose. If these reactions occur in patients receiving AVELOX, discontinue AVELOX immediately and institute appropriate measures. As with all fluoroquinolones, use AVELOX when the benefits of treatment exceed the risks in patients with known or suspected CNS disorders (for example, severe cerebral arteriosclerosis, epilepsy) or in the presence of other risk factors that may predispose to seizures or lower the seizure threshold *[see Drug Interactions (7.4)]*.

## 5.5 Exacerbation of Myasthenia Gravis

Fluoroquinolones, including AVELOX, have neuromuscular blocking activity and may exacerbate muscle weakness in patients with myasthenia gravis. Postmarketing serious adverse reactions, including deaths and requirement for ventilatory support, have been associated with fluoroquinolone use in patients with myasthenia gravis. Avoid AVELOX in patients with known history of myasthenia gravis.

## 5.6 QT Prolongation

AVELOX has been shown to prolong the QT interval of the electrocardiogram in some patients. Following oral dosing with 400 mg of AVELOX the mean ($\pm$ SD) change in QTc from the pre-dose value at the time of maximum drug concentration was 6 msec ($\pm$ 26) (n = 787). Following a course of daily intravenous dosing (400 mg; 1 hour infusion each day) the mean change in QTc from the Day 1 pre-dose value was 10 msec ($\pm$22) on Day 1 (n=667) and 7 msec ($\pm$ 24) on Day 3 (n = 667).

Avoid AVELOX in patients with the following risk factors due to the lack of clinical experience with the drug in these patient populations:
- Known prolongation of the QT interval
- Ventricular arrhythmias including torsade de pointes because QT prolongation may lead to an increased risk for these conditions

6

- Ongoing proarrhythmic conditions, such as clinically significant bradycardia and acute myocardial ischemia,
- Uncorrected hypokalemia or hypomagnesemia
- Class IA (for example, quinidine, procainamide) or Class III (for example, amiodarone, sotalol) antiarrhythmic agents
- Other drugs that prolong the QT interval such as cisapride, erythromycin, antipsychotics, and tricyclic antidepressants

Elderly patients using intravenous AVELOX may be more susceptible to drug-associated QT prolongation *[see Use In Specific Populations (8.5)]*.

In patients with mild, moderate, or severe liver cirrhosis, metabolic disturbances associated with hepatic insufficiency may lead to QT prolongation. Monitor ECG in patients with liver cirrhosis treated with AVELOX *[see Clinical Pharmacology (12.3)]*.

The magnitude of QT prolongation may increase with increasing concentrations of the drug or increasing rates of infusion of the intravenous formulation. Therefore the recommended dose or infusion rate should not be exceeded.

In premarketing clinical trials, the rate of cardiovascular adverse reactions was similar in 798 AVELOX and 702 comparator treated patients who received concomitant therapy with drugs known to prolong the QTc interval. No excess in cardiovascular morbidity or mortality attributable to QTc prolongation occurred in over AVELOX treatment in over 15,500 patients in controlled clinical studies, including 759 patients who were hypokalemic at the start of treatment, and there was no increase in mortality in over 18,000 AVELOX tablet treated patients in a postmarketing observational study in which ECGs were not performed.

### 5.7  Other Serious and Sometimes Fatal Adverse Reactions

Other serious and sometimes fatal adverse reactions, some due to hypersensitivity, and some due to uncertain etiology, have been reported in patients receiving therapy with fluoroquinolones, including AVELOX. These reactions may be severe and generally occur following the administration of multiple doses. Clinical manifestations may include one or more of the following:

- Fever, rash, or severe dermatologic reactions (for example, toxic epidermal necrolysis, Stevens-Johnson syndrome)
- Vasculitis; arthralgia; myalgia; serum sickness
- Allergic pneumonitis
- Interstitial nephritis; acute renal insufficiency or failure
- Hepatitis; jaundice; acute hepatic necrosis or failure
- Anemia, including hemolytic and aplastic; thrombocytopenia, including thrombotic thrombocytopenic purpura; leukopenia; agranulocytosis; pancytopenia; and/or other hematologic abnormalities

Discontinue AVELOX immediately at the first appearance of a skin rash, jaundice, or any other sign of hypersensitivity and institute supportive measures.

### 5.8  Hypersensitivity Reactions

Serious anaphylactic reactions, some following the first dose, have been reported in patients receiving fluoroquinolone therapy, including AVELOX. Some reactions were accompanied by cardiovascular collapse, loss of consciousness, tingling, pharyngeal or facial edema, dyspnea, urticaria, and itching. Discontinue AVELOX at the first appearance of a skin rash or any other sign of hypersensitivity *[see Warnings and Precautions (5.7)]*.

### 5.9  *Clostridium difficile*-Associated Diarrhea

*Clostridium difficile*-associated diarrhea (CDAD) has been reported with use of nearly all antibacterial agents, including AVELOX, and may range in severity from mild diarrhea to fatal colitis. Treatment with antibacterial agents alters the normal flora of the colon leading to overgrowth of *C. difficile*.

*C. difficile* produces toxins A and B which contribute to the development of CDAD. Hypertoxin producing strains of *C. difficile* cause increased morbidity and mortality, as these infections can be refractory to antimicrobial therapy and may require colectomy. CDAD must be considered in all patients who present with diarrhea following antibacterial use. Careful medical history is necessary since CDAD has been reported to occur over two months after the administration of antibacterial agents.

If CDAD is suspected or confirmed, ongoing antibiotic use not directed against *C. difficile* may need to be discontinued. Appropriate fluid and electrolyte management, protein supplementation, antibiotic treatment of *C. difficile*, and surgical evaluation should be instituted as clinically indicated.

7

### 5.10    Arthropathic Effects in Animals

In immature dogs, oral administration of AVELOX caused lameness. Histopathological examination of the weight-bearing joints of these dogs revealed permanent lesions of the cartilage. Related quinolone-class drugs also produce erosions of cartilage of weight-bearing joints and other signs of arthropathy in immature animals of various species *[see Nonclinical Toxicology (13.2)]*.

### 5.11    Blood Glucose Disturbances

As with all fluoroquinolones, disturbances in blood glucose, including both hypoglycemia and hyperglycemia have been reported with AVELOX. In AVELOX-treated patients, dysglycemia occurred predominantly in elderly diabetic patients receiving concomitant treatment with an oral hypoglycemic agent (for example, sulfonylurea) or with insulin. In diabetic patients, careful monitoring of blood glucose is recommended. If a hypoglycemic reaction occurs, AVELOX should be discontinued and appropriate therapy should be initiated immediately *[see Drug Interactions (7.3)]*.

### 5.12    Photosensitivity/Phototoxicity

Moderate to severe photosensitivity/phototoxicity reactions, the latter of which may manifest as exaggerated sunburn reactions (for example, burning, erythema, exudation, vesicles, blistering, edema) involving areas exposed to light (typically the face, "V" area of the neck, extensor surfaces of the forearms, dorsa of the hands), can be associated with the use of fluoroquinolones, including AVELOX, after sun or UV light exposure. Therefore, excessive exposure to these sources of light should be avoided. AVELOX should be discontinued if phototoxicity occurs *[see Clinical Pharmacology (12.2)]*.

### 5.13    Development of Drug Resistant Bacteria

Prescribing AVELOX in the absence of a proven or strongly suspected bacterial infection or a prophylactic indication is unlikely to provide benefit to the patient and increases the risk of the development of drug-resistant bacteria.

## 6    ADVERSE REACTIONS

The following serious and otherwise important adverse reactions are discussed in greater detail in the warnings and precautions section of the label:

- Disabling and Potentially Irreversible Serious Adverse Reactions Including Tendinitis and Tendon Rupture, Peripheral Neuropathy, and Central Nervous System Effects *[see Warnings and Precautions (5.1)]*
- Tendinitis and Tendon Rupture*[see Warnings and Precautions (5.2)]*
- Peripheral Neuropathy *[see Warnings and Precautions (5.3)]*
- Central Nervous System Effects *[see Warnings and Precautions (5.4)]*
- Exacerbation of Myasthenia Gravis *[see Warnings and Precautions (5.5)]*
- QT Prolongation *[see Warnings and Precautions (5.6)]*
- Other Serious and Sometimes Fatal Adverse Reactions *[see Warnings and Precautions (5.7)]*
- Hypersensitivity Reactions *[see Warnings and Precautions (5.8)]*
- Clostridium difficile-Associated Diarrhea *[see Warnings and Precautions (5.9)]*
- Blood Glucose Disturbances *[see Warnings and Precautions (5.11)]*
- Photosensitivity/Phototoxicity *[see Warnings and Precautions (5.12)]*
- Development of Drug Resistant Bacteria *[see Warnings and Precautions (5.13)]*

### 6.1    Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

The data described below reflect exposure to AVELOX in 14981 patients in 71 active controlled Phase II-IV clinical trials in different indications *[see Indications and Usage (1)]*. The population studied had a mean age of 50 years (approximately 73% of the population was less than 65 years of age), 50% were male, 63% were Caucasian, 12% were Asian and 9% were Black. Patients received AVELOX 400 mg once daily oral, intravenous, or sequentially (intravenous followed by oral). Treatment duration was usually 6 to 10 days, and the mean number of days on therapy was 9 days.

8

Discontinuation of AVELOX due to adverse reactions occurred in 5% of patients overall, 4% of patients treated with 400 mg PO, 4% with 400 mg intravenous and 8% with sequential therapy 400 mg oral/intravenous. The most common adverse reactions (>0.3%) leading to discontinuation with the 400 mg oral doses were nausea, diarrhea, dizziness, and vomiting. The most common adverse reaction leading to discontinuation with the 400 mg intravenous dose was rash. The most common adverse reactions leading to discontinuation with the 400 mg intravenous/oral sequential dose were diarrhea, pyrexia.

Adverse reactions occurring in 1% of AVELOX-treated patients and less common adverse reactions, occurring in 0.1 to 1% of AVELOX-treated patients, are shown in Tables 2 and Table 3, respectively. The most common adverse drug reactions (3%) are nausea, diarrhea, headache, and dizziness.

**Table 2: Common (1% or more) Adverse Reactions Reported in Active-Controlled Clinical Trials with AVELOX**

| System Organ Class | Adverse Reactions | % (N=14,981) |
|---|---|---|
| **Blood and Lymphatic System Disorders** | Anemia | 1 |
| **Gastrointestinal Disorders** | Nausea | 7 |
| | Diarrhea | 6 |
| | Vomiting | 2 |
| | Constipation | 2 |
| | Abdominal pain | 2 |
| | Dyspepsia | 1 |
| **General Disorders and Administration Site Conditions** | Pyrexia | 1 |
| **Investigations** | Alanine aminotransferase increased | 1 |
| **Metabolism and Nutritional Disorder** | Hypokalemia | 1 |
| **Nervous System Disorders** | Headache | 4 |
| | Dizziness | 3 |
| **Psychiatric Disorders** | Insomnia | 2 |

**Table 3: Less Common (0.1 to less than 1%) Adverse Reactions Reported in Active-Controlled Clinical Trials with AVELOX (N=14,981)**

| System Organ Class | Adverse Reactions |
|---|---|
| **Blood and Lymphatic System Disorders** | Thrombocythemia |
| | Eosinophilia |
| | Neutropenia |
| | Thrombocytopenia |
| | Leukopenia |
| | Leukocytosis |
| **Cardiac Disorders** | Atrial fibrillation |
| | Palpitations |
| | Tachycardia |
| | Angina pectoris |
| | Cardiac failure |
| | Cardiac arrest |
| | Bradycardia |
| **Ear and Labyrinth Disorders** | Vertigo |
| | Tinnitus |
| **Eye Disorders** | Vision blurred |
| **Gastrointestinal Disorders** | Dry mouth |
| | Abdominal discomfort |
| | Flatulence |
| | Abdominal distention |
| | Gastritis |
| | Gastroesophageal reflux disease |
| **General Disorders and Administration Site Conditions** | Fatigue |
| | Chest pain |

9

| System Organ Class | Adverse Reactions |
|---|---|
| | Asthenia |
| | Pain |
| | Malaise |
| | Infusion site extravasation |
| | Edema |
| | Chills |
| | Chest discomfort |
| | Facial pain |
| **Hepatobiliary disorders** | Hepatic function abnormal |
| **Infections and Infestations** | Candidiasis |
| | Vaginal infection |
| | Fungal infection |
| | Gastroenteritis |
| **Investigations** | Aspartate aminotransferase increased |
| | Gamma-glutamyltransferase increased |
| | Blood alkaline phosphatase increased |
| | Electrocardiogram QT prolonged |
| | Blood lactate dehydrogenase increased |
| | Blood amylase increased |
| | Lipase increased |
| | Blood creatinine increased |
| | Blood urea increased |
| | Hematocrit decreased |
| | Prothrombin time prolonged |
| | Eosinophil count increased |
| | Activated partial thromboplastin time prolonged |
| | Blood triglycerides increased |
| | Blood uric acid increased |
| **Metabolism and Nutrition Disorders** | Hyperglycemia |
| | Anorexia |
| | Hyperlipidemia |
| | Decreased appetite |
| | Dehydration |
| **Musculoskeletal and Connective Tissue Disorders** | Back pain |
| | Pain in extremity |
| | Arthralgia |
| | Muscle spasms |
| | Musculoskeletal pain |
| **Nervous System Disorders** | Dysgeusia |
| | Somnolence |
| | Tremor |
| | Lethargy |
| | Paresthesia |
| | Hypoesthesia |
| | Syncope |
| **Psychiatric Disorders** | Anxiety |
| | Confusional state |
| | Agitation |
| | Depression |
| | Nervousness |
| | Restlessness |
| | Hallucination |
| | Disorientation |
| **Renal and Urinary Disorders** | Renal failure |

10

| System Organ Class | Adverse Reactions |
|---|---|
| | Dysuria |
| **Reproductive System and Breast Disorders** | Vulvovaginal pruritus |
| **Respiratory, Thoracic, and Mediastinal Disorders** | Dyspnea |
| | Asthma |
| | Wheezing |
| | Bronchospasm |
| **Skin and Subcutaneous Tissue Disorders** | Rash |
| | Pruritus |
| | Hyperhidrosis |
| | Erythema |
| | Urticaria |
| | Dermatitis allergic |
| | Night sweats |
| **Vascular Disorders** | Hypertension |
| | Hypotension |
| | Phlebitis |

*Laboratory Changes*

Changes in laboratory parameters, which are not listed above and which occurred in 2% or more of patients and at an incidence greater than in controls included: increases in mean corpuscular hemoglobin (MCH), neutrophils, white blood cells (WBCs), prothrombin time (PT) ratio, ionized calcium, chloride, albumin, globulin, bilirubin; decreases in hemoglobin, red blood cells (RBCs), neutrophils, eosinophils, basophils, glucose, oxygen partial pressure ($pO_2$), bilirubin, and amylase. It cannot be determined if any of the above laboratory abnormalities were caused by the drug or the underlying condition being treated.

## 6.2 Postmarketing Experience

Table 4 below lists adverse reactions that have been identified during post-approval use of AVELOX. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

**Table 4: Postmarketing Reports of Adverse Drug Reactions**

| System Organ Class | Adverse Reactions |
|---|---|
| **Blood and Lymphatic System Disorders** | Agranulocytosis |
| | Pancytopenia |
| | *[see Warnings and Precautions (5.7)]* |
| **Cardiac Disorders** | Ventricular tachyarrhythmias (including in very rare cases cardiac arrest and torsade de pointes, and usually in patients with concurrent severe underlying proarrhythmic conditions) |
| **Ear and Labyrinth Disorders** | Hearing impairment, including deafness (reversible in majority of cases) |
| **Eye Disorders** | Vision loss (especially in the course of CNS reactions, transient in majority of cases) |
| **Hepatobiliary Disorders** | Hepatitis (predominantly cholestatic) |
| | Hepatic failure (including fatal cases) |
| | Jaundice |
| | Acute hepatic necrosis |
| | *[see Warnings and Precautions (5.7)]* |
| **Immune System Disorders** | Anaphylactic reaction |
| | Anaphylactic shock |
| | Angioedema (including laryngeal edema) |

11

| | *[see Warnings and Precautions (5.7, 5.8)]* |
|---|---|
| **Musculoskeletal and Connective Tissue Disorders** | Tendon rupture |
| | *[see Warnings and Precautions (5.2)]* |
| **Nervous System Disorders** | Altered coordination |
| | Abnormal gait |
| | *[see Warnings and Precautions (5.3)]* |
| | Myasthenia gravis (exacerbation of) |
| | *[see Warnings and Precautions (5.5)]* |
| | Muscle weakness |
| | Peripheral neuropathy (that may be |
| | irreversible), polyneuropathy |
| | *[see Warnings and Precautions (5.3)]* |
| **Psychiatric Disorders** | Psychotic reaction (very rarely culminating in |
| | self-injurious behavior, such as suicidal |
| | ideation/thoughts or suicide attempts *[see* |
| | *Warnings and Precautions (5.4)]* |
| **Renal and Urinary Disorders** | Interstitial nephritis |
| | *[see Warnings and Precautions (5.7)]* |
| **Respiratory, Thoracic and Mediastinal Disorders** | Allergic pneumonitis |
| | *[see Warnings and Precautions (5.7)]* |
| **Skin and Subcutaneous Tissue Disorders** | Photosensitivity/phototoxicity reaction |
| | *[see Warnings and Precautions (5.12)]* |
| | Stevens-Johnson syndrome |
| | Toxic epidermal necrolysis |
| | *[see Warnings and Precautions (5.7)]* |

## 7   DRUG INTERACTIONS

### 7.1   Antacids, Sucralfate, Multivitamins and other Products Containing Multivalent Cations

Fluoroquinolones, including AVELOX, form chelates with alkaline earth and transition metal cations. Oral administration of AVELOX with antacids containing aluminum or magnesium, with sucralfate, with metal cations such as iron, or with multivitamins containing iron or zinc, or with formulations containing divalent and trivalent cations such as didanosine buffered tablets for oral suspension or the pediatric powder for oral solution, may substantially interfere with the absorption of AVELOX, resulting in systemic concentrations considerably lower than desired. Therefore, AVELOX should be taken at least 4 hours before or 8 hours after these agents *[see Dosage and Administration (2.2) and Clinical Pharmacology (12.3)]*.

### 7.2   Warfarin

Fluoroquinolones, including AVELOX, have been reported to enhance the anticoagulant effects of warfarin or its derivatives in the patient population. In addition, infectious disease and its accompanying inflammatory process, age, and general status of the patient are risk factors for increased anticoagulant activity. Therefore the prothrombin time, International Normalized Ratio (INR), or other suitable anticoagulation tests should be closely monitored if AVELOX is administered concomitantly with warfarin or its derivatives *[see Adverse Reactions (6.2) and Clinical Pharmacology (12.3)]*.

### 7.3   Antidiabetic Agents

Disturbances of blood glucose, including hyperglycemia and hypoglycemia, have been reported in patients treated concomitantly with fluoroquinolones, including AVELOX, and an antidiabetic agent. Therefore, careful monitoring of blood glucose is recommended when these agents are co-administered. If a hypoglycemic reaction occurs, AVELOX should be discontinued and appropriate therapy should be initiated immediately *[see Warnings and Precautions (5.11) and Adverse Reactions (6.1)]*.

## 7.4 Nonsteroidal Anti-Inflammatory Drugs

The concomitant administration of a nonsteroidal anti-inflammatory drug (NSAID) with a fluoroquinolone, including AVELOX, may increase the risks of CNS stimulation and convulsions *[see Warnings and Precautions (5.4)]*.

## 7.5 Drugs that Prolong QT

There is limited information available on the potential for a pharmacodynamic interaction in humans between AVELOX and other drugs that prolong the QTc interval of the electrocardiogram. Sotalol, a Class III antiarrhythmic, has been shown to further increase the QTc interval when combined with high doses of intravenous AVELOX in dogs. Therefore, AVELOX should be avoided with Class IA and Class III antiarrhythmics *[see Warnings and Precautions, (5.6) and Nonclinical Toxicology (13.2)]*.

# 8   USE IN SPECIFIC POPULATIONS

## 8.1  Pregnancy

*Pregnancy Category C.* Because no adequate or well-controlled studies have been conducted in pregnant women, AVELOX should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

Moxifloxacin was not teratogenic when administered to pregnant rats during organogenesis at oral doses as high as 500 mg/kg/day or 0.24 times the maximum recommended human dose based on systemic exposure (AUC), but decreased fetal body weights and slightly delayed fetal skeletal development (indicative of fetotoxicity) were observed. Intravenous administration of 80 mg/kg/day (approximately 2 times the maximum recommended human dose based on body surface area) to pregnant rats resulted in maternal toxicity and a marginal effect on fetal and placental weights and the appearance of the placenta. There was no evidence of teratogenicity at intravenous doses as high as 80 mg/kg/day. Intravenous administration of 20 mg/kg/day (approximately equal to the maximum recommended human oral dose based upon systemic exposure) to pregnant rabbits during organogenesis resulted in decreased fetal body weights and delayed fetal skeletal ossification. When rib and vertebral malformations were combined, there was an increased fetal and litter incidence of these effects. Signs of maternal toxicity in rabbits at this dose included mortality, abortions, marked reduction of food consumption, decreased water intake, body weight loss and hypoactivity. There was no evidence of teratogenicity when pregnant cynomolgus monkeys were given oral doses as high as 100 mg/kg/day (2.5 times the maximum recommended human dose based upon systemic exposure). An increased incidence of smaller fetuses was observed at 100 mg/kg/day. In an oral pre- and postnatal development study conducted in rats, effects observed at 500 mg/kg/day included slight increases in duration of pregnancy and prenatal loss, reduced pup birth weight and decreased neonatal survival. Treatment-related maternal mortality occurred during gestation at 500 mg/kg/day in this study.

## 8.3  Nursing Mothers

Moxifloxacin is excreted in the breast milk of rats. Moxifloxacin may also be excreted in human milk. Because of the potential for serious adverse reactions in infants who are nursing from mothers taking AVELOX, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

## 8.4  Pediatric Use

Safety and effectiveness in pediatric patients and adolescents less than 18 years of age have not been established. AVELOX causes arthropathy in juvenile animals *[see Boxed Warning, Warnings and Precautions (5.10), and Clinical Pharmacology (12.3)]*.

## 8.5  Geriatric Use

Geriatric patients are at increased risk for developing severe tendon disorders including tendon rupture when being treated with a fluoroquinolone such as AVELOX. This risk is further increased in patients receiving concomitant corticosteroid therapy. Tendinitis or tendon rupture can involve the Achilles, hand, shoulder, or other tendon sites and can occur during or after completion of therapy; cases occurring up to several months after fluoroquinolone treatment have been reported. Caution should be used when prescribing AVELOX to elderly patients especially those on corticosteroids. Patients should be informed of this potential side effect and advised to discontinue AVELOX and contact their healthcare provider if any symptoms of tendinitis or tendon rupture occur *[see Boxed Warning, and Warnings and Precautions (5.2)]*.

13

In controlled multiple-dose clinical trials, 23% of patients receiving oral AVELOX were greater than or equal to 65 years of age and 9% were greater than or equal to 75 years of age. The clinical trial data demonstrate that there is no difference in the safety and efficacy of oral AVELOX in patients aged 65 or older compared to younger adults.

In trials of intravenous use, 42% of AVELOX patients were greater than or equal to 65 years of age, and 23% were greater than or equal to 75 years of age. The clinical trial data demonstrate that the safety of intravenous AVELOX in patients aged 65 or older was similar to that of comparator-treated patients. In general, elderly patients may be more susceptible to drug-associated effects of the QT interval. Therefore, AVELOX should be avoided in patients taking drugs that can result in prolongation of the QT interval (for example, class IA or class III antiarrhythmics) or in patients with risk factors for torsade de pointes (for example, known QT prolongation, uncorrected hypokalemia) *[see Warnings and Precautions (5.6), Drug Interactions (7.5), and Clinical Pharmacology (12.3)]*.

### 8.6  Renal Impairment

The pharmacokinetic parameters of moxifloxacin are not significantly altered in mild, moderate, severe, or end-stage renal disease. No dosage adjustment is necessary in patients with renal impairment, including those patients requiring hemodialysis (HD) or continuous ambulatory peritoneal dialysis (CAPD) *[see Dosage and Administration (2), and Clinical Pharmacology (12.3)]*.

### 8.7  Hepatic Impairment

No dosage adjustment is recommended for mild, moderate, or severe hepatic insufficiency (Child-Pugh Classes A, B, or C). However, due to metabolic disturbances associated with hepatic insufficiency, which may lead to QT prolongation, AVELOX should be used with caution in these patients *[see Warnings and Precaution (5.6) and Clinical Pharmacology. (12.3)]*.

## 10  OVERDOSAGE

Single oral overdoses up to 2.8 g were not associated with any serious adverse events. In the event of acute overdose, Empty the stomach and maintain adequate hydration. Monitor ECG due to the possibility of QT interval prolongation. Carefully observe the patient and give supportive treatment. The administration of activated charcoal as soon as possible after oral overdose may prevent excessive increase of systemic moxifloxacin exposure. About 3% and 9% of the dose of moxifloxacin, as well as about 2% and 4.5% of its glucuronide metabolite are removed by continuous ambulatory peritoneal dialysis and hemodialysis, respectively.

## 11  DESCRIPTION

AVELOX (moxifloxacin) hydrochloride is a synthetic antibacterial agent for oral and intravenous administration. Moxifloxacin, a fluoroquinolone, is available as the monohydrochloride salt of 1-cyclopropyl-7-[(S,S)-2,8-diazabicyclo[4.3.0]non-8-yl]-6-fluoro-8-methoxy-1,4-dihydro-4-oxo-3 quinoline carboxylic acid. It is a slightly yellow to yellow crystalline substance with a molecular weight of 437.9. Its empirical formula is $C_{21}H_{24}FN_3O_4 \ast HCl$ and its chemical structure is as follows:



### 11.1    AVELOX Tablets

- AVELOX Tablets are available as film-coated tablets containing moxifloxacin hydrochloride (equivalent to 400 mg moxifloxacin).

14

- The inactive ingredients are microcrystalline cellulose, lactose monohydrate, croscarmellose sodium, magnesium stearate, hypromellose, titanium dioxide, polyethylene glycol and ferric oxide.

## 11.2   AVELOX Injection

- AVELOX Injection for intravenous use is available in ready-to-use 250 mL flexibags as a sterile, preservative free, 0.8% sodium chloride aqueous solution of moxifloxacin hydrochloride (containing 400 mg moxifloxacin) with pH ranging from 4.1 to 4.6. The flexibag is not made with natural rubber latex.

- The appearance of the intravenous solution is yellow. The color does not affect, nor is it indicative of, product stability.

- The inactive ingredients are sodium chloride, USP, Water for Injection, USP, and may include hydrochloric acid and/or sodium hydroxide for pH adjustment.

- AVELOX Injection contains approximately 34.2 mEq (787 mg) of sodium in 250 mL.

# 12  CLINICAL PHARMACOLOGY

## 12.1   Mechanism of Action

AVELOX is a member of the fluoroquinolone class of antibacterial agents *[see Microbiology (12.4)]*.

## 12.2 Pharmacodynamics

*Photosensitivity Potential*

A study of the skin response to ultraviolet (UVA and UVB) and visible radiation conducted in 32 healthy volunteers (8 per group) demonstrated that AVELOX does not show phototoxicity in comparison to placebo. The minimum erythematous dose (MED) was measured before and after treatment with AVELOX (200 mg or 400 mg once daily), lomefloxacin (400 mg once daily), or placebo. In this study, the MED measured for both doses of AVELOX were not significantly different from placebo, while lomefloxacin significantly lowered the MED *[see Warnings and Precautions (5.12)]*.

## 12.3   Pharmacokinetics

*Absorption*

Moxifloxacin, given as an oral tablet, is well absorbed from the gastrointestinal tract. The absolute bioavailability of moxifloxacin is approximately 90 percent. Co-administration with a high fat meal (that is, 500 calories from fat) does not affect the absorption of moxifloxacin.

Consumption of 1 cup of yogurt with moxifloxacin does not affect the rate or extent of the systemic absorption (that is, area under the plasma concentration time curve (AUC).

**Table 5: Mean (± SD) $C_{max}$ and AUC values following single and multiple doses of 400 mg moxifloxacin given orally**

|  | $C_{max}$ (mg/L) | AUC (mg•h/L) | Half-life (hr) |
|---|---|---|---|
| Single Dose Oral | | | |
| Healthy (n = 372) | 3.1 ± 1 | 36.1 ± 9.1 | 11.5–15.6[a] |
| Multiple Dose Oral | | | |
| Healthy young male/female (n = 15) | 4.5 ± 0.5 | 48 ± 2.7 | 12.7 ± 1.9 |
| Healthy elderly male (n = 8) | 3.8 ± 0.3 | 51.8 ± 6.7 | |
| Healthy elderly female (n = 8) | 4.6 ± 0.6 | 54.6 ± 6.7 | |
| Healthy young male (n = 8) | 3.6 ± 0.5 | 48.2 ± 9 | |
| Healthy young female (n = 9) | 4.2 ± 0.5 | 49.3 ± 9.5 | |

a)   Range of means from different studies

15

**Table 6: Mean (± SD) $C_{max}$ and AUC values following single and multiple doses of 400 mg moxifloxacin given by 1-hour intravenous infusion**

|  | $C_{max}$ (mg/L) | AUC (mg•h L) | Half-life (hour) |
|---|---|---|---|
| Single Dose intravenous |  |  |  |
| Healthy young male/female (n = 56) | 3.9 ± 0.9 | 39.3 ± 8.6 | 8.2–15.4[a] |
| Patients (n = 118) |  |  |  |
| Male (n = 64) | 4.4 ± 3.7 |  |  |
| Female (n = 54) | 4.5 ± 2 |  |  |
| < 65 years (n = 58) | 4.6 ± 4.2 |  |  |
| ≥ 65 years (n = 60) | 4.3 ± 1.3 |  |  |
| Multiple Dose intravenous |  |  |  |
| Healthy young male (n = 8) | 4.2 ± 0.8 | 38 ± 4.7 | 14.8 ± 2.2 |
| Healthy elderly (n =12; 8 male, 4 female) | 6.1 ± 1.3 | 48.2 ± 0.9 | 10.1 ± 1.6 |
| Patients[b] (n = 107) |  |  |  |
| Male (n = 58) | 4.2 ± 2.6 |  |  |
| Female (n = 49) | 4.6 ± 1.5 |  |  |
| <65 years (n = 52) | 4.1 ± 1.4 |  |  |
| ≥65 years (n = 55) | 4.7 ± 2.7 |  |  |

a) Range of means from different studies

b) Expected $C_{max}$ (concentration obtained around the time of the end of the infusion)

Plasma concentrations increase proportionately with dose up to the highest dose tested (1200 mg single oral dose). The mean (± SD) elimination half-life from plasma is 12 ± 1.3 hours; steady-state is achieved after at least three days with a 400 mg once daily regimen.

**Mean Steady-State Plasma Concentrations of Moxifloxacin Obtained With Once Daily Dosing of 400 mg Either Orally (n=10) or by Intravenous Infusion (n=12)**



*Distribution*

Moxifloxacin is approximately 30–50% bound to serum proteins, independent of drug concentration. The volume of distribution of moxifloxacin ranges from 1.7 to 2.7 L/kg. Moxifloxacin is widely distributed throughout the body, with tissue concentrations often exceeding plasma concentrations. Moxifloxacin has been detected in the saliva, nasal and bronchial secretions, mucosa of the sinuses, skin blister fluid, subcutaneous tissue, skeletal muscle, and abdominal tissues

16

and fluids following oral or intravenous administration of 400 mg. Moxifloxacin concentrations measured post-dose in various tissues and fluids following a 400 mg oral or intravenous dose are summarized in Table 7. The rates of elimination of moxifloxacin from tissues generally parallel the elimination from plasma.

**Table 7: Moxifloxacin Concentrations (mean ± SD) in Tissues and the Corresponding Plasma Concentrations After a Single 400 mg Oral or Intravenous Dose[a]**

| Tissue or Fluid | N | Plasma Concentration (mcg/mL) | Tissue or Fluid Concentration (mcg/mL or mcg/g) | Tissue Plasma Ratio |
|---|---|---|---|---|
| **Respiratory** | | | | |
| Alveolar Macrophages | 5 | 3.3 ± 0.7 | 61.8 ± 27.3 | 21.2 ± 10 |
| Bronchial Mucosa | 8 | 3.3 ± 0.7 | 5.5 ± 1.3 | 1.7 ± 0.3 |
| Epithelial Lining Fluid | 5 | 3.3 ± 0.7 | 24.4 ± 14.7 | 8.7 ± 6.1 |
| **Sinus** | | | | |
| Maxillary Sinus Mucosa | 4 | 3.7 ± 1.1[b] | 7.6 ± 1.7 | 2 ± 0.3 |
| Anterior Ethmoid Mucosa | 3 | 3.7 ± 1.1[b] | 8.8 ± 4.3 | 2.2 ± 0.6 |
| Nasal Polyps | 4 | 3.7 ± 1.1[b] | 9.8 ± 4.5 | 2.6 ± 0.6 |
| **Skin, Musculoskeletal** | | | | |
| Blister Fluid | 5 | 3 ± 0.5[c] | 2.6 ± 0.9 | 0.9 ± 0.2 |
| Subcutaneous Tissue | 6 | 2.3 ± 0.4[d] | 0.9 ± 0.3[e] | 0.4 ± 0.6 |
| Skeletal Muscle | 6 | 2.3 ± 0.4[d] | 0.9 ± 0.2[e] | 0.4 ± 0.1 |
| **Intra-Abdominal** | | | | |
| Abdominal tissue | 8 | 2.9 ± 0.5 | 7.6 ± 2 | 2.7 ± 0.8 |
| Abdominal exudate | 10 | 2.3 ± 0.5 | 3.5 ±1.2 | 1.6 ± 0.7 |
| Abscess fluid | 6 | 2.7 ± 0.7 | 2.3 ±1.5 | 0.8 ± 0.4 |

a) All moxifloxacin concentrations were measured 3 hours after a single 400 mg dose, except the abdominal tissue and exudate concentrations which were measured at 2 hours post-dose and the sinus concentrations which were measured 3 hours post-dose after 5 days of dosing.
b) N = 5
c) N = 7
d) N = 12
e) Reflects only non-protein bound concentrations of drug.

*Metabolism*

Approximately 52% of an oral or intravenous dose of moxifloxacin is metabolized via glucuronide and sulfate conjugation. The cytochrome P450 system is not involved in moxifloxacin metabolism, and is not affected by moxifloxacin. The sulfate conjugate (M1) accounts for approximately 38% of the dose, and is eliminated primarily in the feces. Approximately 14% of an oral or intravenous dose is converted to a glucuronide conjugate (M2), which is excreted exclusively in the urine. Peak plasma concentrations of M2 are approximately 40% those of the parent drug, while plasma concentrations of M1 are generally less than 10% those of moxifloxacin.

*In vitro* studies with cytochrome (CYP) P450 enzymes indicate that moxifloxacin does not inhibit CYP3A4, CYP2D6, CYP2C9, CYP2C19, or CYP1A2.

*Excretion*

Approximately 45% of an oral or intravenous dose of moxifloxacin is excreted as unchanged drug (~20% in urine and ~25% in feces). A total of 96% ± 4% of an oral dose is excreted as either unchanged drug or known metabolites. The mean (± SD) apparent total body clearance and renal clearance are 12 ± 2 L/hr and 2.6 ± 0.5 L/hr, respectively.

*Pharmacokinetics in Specific Populations*

Geriatric

Following oral administration of 400 mg moxifloxacin for 10 days in 16 elderly (8 male: 8 female) and 17 young (8 male: 9 female) healthy volunteers, there were no age-related changes in moxifloxacin pharmacokinetics. In 16 healthy male

17

volunteers (8 young: 8 elderly) given a single 200 mg dose of oral moxifloxacin. the extent of systemic exposure (AUC and $C_{max}$) was not statistically different between young and elderly males and elimination half-life was unchanged. No dosage adjustment is necessary based on age. In large phase III studies, the concentrations around the time of the end of the infusion in elderly patients following intravenous infusion of 400 mg were similar to those observed in young patients *[see Use In Specific Populations (8.5)]*.

### Pediatric

The pharmacokinetics of moxifloxacin in pediatric subjects has not been studied *[see Use In Specific Populations (8.4)]*.

### Gender

Following oral administration of 400 mg moxifloxacin daily for 10 days to 23 healthy males (19–75 years) and 24 healthy females (19–70 years), the mean AUC and $C_{max}$ were 8% and 16% higher, respectively, in females compared to males. There are no significant differences in moxifloxacin pharmacokinetics between male and female subjects when differences in body weight are taken into consideration.

A 400 mg single dose study was conducted in 18 young males and females. The comparison of moxifloxacin pharmacokinetics in this study (9 young females and 9 young males) showed no differences in AUC or $C_{max}$ due to gender. Dosage adjustments based on gender are not necessary.

### Race

Steady-state moxifloxacin pharmacokinetics in male Japanese subjects were similar to those determined in Caucasians. with a mean $C_{max}$ of 4.1 mcg/mL, an $AUC_{24}$ of 47 mcg•h/mL, and an elimination half-life of 14 hours, following 400 mg p.o. daily.

### Renal Insufficiency

The pharmacokinetic parameters of moxifloxacin are not significantly altered in mild, moderate, severe, or end-stage renal disease. No dosage adjustment is necessary in patients with renal impairment, including those patients requiring hemodialysis (HD) or continuous ambulatory peritoneal dialysis (CAPD).

In a single oral dose study of 24 patients with varying degrees of renal function from normal to severely impaired, the mean peak concentrations ($C_{max}$) of moxifloxacin were reduced by 21% and 28% in the patients with moderate ($CL_{CR} \le 30$ and $\le 60$ mL/min) and severe ($CL_{CR} < 30$ mL/min) renal impairment, respectively. The mean systemic exposure (AUC) in these patients was increased by 13%. In the moderate and severe renally impaired patients, the mean AUC for the sulfate conjugate (M1) increased by 1.7-fold (ranging up to 2.8-fold) and mean AUC and $C_{max}$ for the glucuronide conjugate (M2) increased by 2.8-fold (ranging up to 4.8-fold) and 1.4-fold (ranging up to 2.5-fold), respectively *[see Use in Specific Populations (8.6)]*.

The pharmacokinetics of single dose and multiple dose moxifloxacin were studied in patients with $CL_{CR} < 20$ mL/min on either hemodialysis or continuous ambulatory peritoneal dialysis (8 HD, 8 CAPD). Following a single 400 mg oral dose, the AUC of moxifloxacin in these HD and CAPD patients did not vary significantly from the AUC generally found in healthy volunteers. $C_{max}$ values of moxifloxacin were reduced by about 45% and 33% in HD and CAPD patients, respectively, compared to healthy, historical controls. The exposure (AUC) to the sulfate conjugate (M1) increased by 1.4- to 1.5-fold in these patients. The mean AUC of the glucuronide conjugate (M2) increased by a factor of 7.5, whereas the mean $C_{max}$ values of the glucuronide conjugate (M2) increased by a factor of 2.5 to 3, compared to healthy subjects. The sulfate and the glucuronide conjugates of moxifloxacin are not microbiologically active, and the clinical implication of increased exposure to these metabolites in patients with renal disease including those undergoing HD and CAPD has not been studied.

Oral administration of 400 mg QD AVELOX for 7 days to patients on HD or CAPD produced mean systemic exposure ($AUC_{ss}$) to moxifloxacin similar to that generally seen in healthy volunteers. Steady-state $C_{max}$ values were about 22% lower in HD patients but were comparable between CAPD patients and healthy volunteers. Both HD and CAPD removed only small amounts of moxifloxacin from the body (approximately 9% by HD, and 3% by CAPD). HD and CAPD also removed about 4% and 2% of the glucuronide metabolite (M2), respectively.

### Hepatic Insufficiency

No dosage adjustment is recommended for mild, moderate, or severe hepatic insufficiency (Child-Pugh Classes A, B, or C). However, due to metabolic disturbances associated with hepatic insufficiency, which may lead to QT prolongation,

18

AVELOX should be used with caution in these patients *[see Warnings and Precautions (5.6) and Use in Specific Populations (8.7)]*.

In 400 mg single oral dose studies in 6 patients with mild (Child-Pugh Class A) and 10 patients with moderate (Child-Pugh Class B) hepatic insufficiency, moxifloxacin mean systemic exposure (AUC) was 78% and 102%, respectively, of 18 healthy controls and mean peak concentration ($C_{max}$) was 79% and 84% of controls.

The mean AUC of the sulfate conjugate of moxifloxacin (M1) increased by 3.9-fold (ranging up to 5.9-fold) and 5.7-fold (ranging up to 8-fold) in the mild and moderate groups, respectively. The mean $C_{max}$ of M1 increased by approximately 3-fold in both groups (ranging up to 4.7- and 3.9-fold). The mean AUC of the glucuronide conjugate of moxifloxacin (M2) increased by 1.5-fold (ranging up to 2.5-fold) in both groups. The mean $C_{max}$ of M2 increased by 1.6- and 1.3-fold (ranging up to 2.7- and 2.1-fold), respectively. The clinical significance of increased exposure to the sulfate and glucuronide conjugates has not been studied. In a subset of patients participating in a clinical trial, the plasma concentrations of moxifloxacin and metabolites determined approximately at the moxifloxacin $T_{max}$ following the first intravenous or oral AVELOX dose in the Child-Pugh Class C patients (n=10) were similar to those in the Child-Pugh Class A/B patients (n=5), and also similar to those observed in healthy volunteer studies.

*Drug-Drug Interactions*

The following drug interactions were studied in healthy volunteers or patients.

Antacids and iron significantly reduced bioavailability of moxifloxacin, as observed with other fluoroquinolones *[see Drug Interactions (7.1)]*.

Calcium, digoxin, itraconazole, morphine, probenecid, ranitidine, theophylline, cyclosporine and warfarin did not significantly affect the pharmacokinetics of moxifloxacin. These results and the data from *in vitro* studies suggest that moxifloxacin is unlikely to significantly alter the metabolic clearance of drugs metabolized by CYP3A4, CYP2D6, CYP2C9, CYP2C19, or CYP1A2 enzymes.

Moxifloxacin had no clinically significant effect on the pharmacokinetics of atenolol, digoxin, glyburide, itraconazole, oral contraceptives, theophylline, cyclosporine and warfarin. However, fluoroquinolones, including AVELOX, have been reported to enhance the anticoagulant effects of warfarin or its derivatives in the patient population *[see Drug Interactions (7.2)]*.

### Antacids

When moxifloxacin (single 400 mg tablet dose) was administered two hours before, concomitantly, or 4 hours after an aluminum/magnesium-containing antacid (900 mg aluminum hydroxide and 600 mg magnesium hydroxide as a single oral dose) to 12 healthy volunteers there was a 26%, 60% and 23% reduction in the mean AUC of moxifloxacin, respectively. Moxifloxacin should be taken at least 4 hours before or 8 hours after antacids containing magnesium or aluminum, as well as sucralfate, metal cations such as iron, and multivitamin preparations with zinc, or didanosine buffered tablets for oral suspension or the pediatric powder for oral solution *[see Dosage and Administration (2.2) and Drug Interactions (7.1)]*.

### Atenolol

In a crossover study involving 24 healthy volunteers (12 male; 12 female), the mean atenolol AUC following a single oral dose of 50 mg atenolol with placebo was similar to that observed when atenolol was given concomitantly with a single 400 mg oral dose of moxifloxacin. The mean $C_{max}$ of single dose atenolol decreased by about 10% following co-administration with a single dose of moxifloxacin.

### Calcium

Twelve healthy volunteers were administered concomitant moxifloxacin (single 400 mg dose) and calcium (single dose of 500 mg Ca$^{++}$ dietary supplement) followed by an additional two doses of calcium 12 and 24 hours after moxifloxacin administration. Calcium had no significant effect on the mean AUC of moxifloxacin. The mean $C_{max}$ was slightly reduced and the time to maximum plasma concentration was prolonged when moxifloxacin was given with calcium compared to when moxifloxacin was given alone (2.5 hours versus 0.9 hours). These differences are not considered to be clinically significant.

### Digoxin

No significant effect of moxifloxacin (400 mg once daily for two days) on digoxin (0.6 mg as a single dose) AUC was detected in a study involving 12 healthy volunteers. The mean digoxin $C_{max}$ increased by about 50% during the

19

distribution phase of digoxin. This transient increase in digoxin $C_{max}$ is not viewed to be clinically significant. Moxifloxacin pharmacokinetics were similar in the presence or absence of digoxin. No dosage adjustment for moxifloxacin or digoxin is required when these drugs are administered concomitantly.

Glyburide

In diabetics, glyburide (2.5 mg once daily for two weeks pretreatment and for five days concurrently) mean AUC and $C_{max}$ were 12% and 21% lower, respectively, when taken with moxifloxacin (400 mg once daily for five days) in comparison to placebo. Nonetheless, blood glucose levels were decreased slightly in patients taking glyburide and moxifloxacin in comparison to those taking glyburide alone, suggesting no interference by moxifloxacin on the activity of glyburide. These interaction results are not viewed as clinically significant.

Iron

When moxifloxacin tablets were administered concomitantly with iron (ferrous sulfate 100 mg once daily for two days), the mean AUC and $C_{max}$ of moxifloxacin was reduced by 39% and 59%, respectively. Moxifloxacin should only be taken more than 4 hours before or 8 hours after iron products *[see Dosage and Administration (2.2) and Drug Interactions (7.1)]*.

Itraconazole

In a study involving 11 healthy volunteers, there was no significant effect of itraconazole (200 mg once daily for 9 days), a potent inhibitor of cytochrome P4503A4, on the pharmacokinetics of moxifloxacin (a single 400 mg dose given on the 7th day of itraconazole dosing). In addition, moxifloxacin was shown not to affect the pharmacokinetics of itraconazole.

Morphine

No significant effect of morphine sulfate (a single 10 mg intramuscular dose) on the mean AUC and $C_{max}$ of moxifloxacin (400 mg single dose) was observed in a study of 20 healthy male and female volunteers.

Oral Contraceptives

A placebo-controlled study in 29 healthy female subjects showed that moxifloxacin 400 mg daily for 7 days did not interfere with the hormonal suppression of oral contraception with 0.15 mg levonorgestrel/0.03 mg ethinylestradiol (as measured by serum progesterone, FSH, estradiol, and LH), or with the pharmacokinetics of the administered contraceptive agents.

Probenecid

Probenecid (500 mg twice daily for two days) did not alter the renal clearance and total amount of moxifloxacin (400 mg single dose) excreted renally in a study of 12 healthy volunteers.

Ranitidine

No significant effect of ranitidine (150 mg twice daily for three days as pretreatment) on the pharmacokinetics of moxifloxacin (400 mg single dose) was detected in a study involving 10 healthy volunteers.

Theophylline

No significant effect of moxifloxacin (200 mg every twelve hours for 3 days) on the pharmacokinetics of theophylline (400 mg every twelve hours for 3 days) was detected in a study involving 12 healthy volunteers. In addition, theophylline was not shown to affect the pharmacokinetics of moxifloxacin. The effect of co-administration of 400 mg once daily of moxifloxacin with theophylline has not been studied.

Warfarin

No significant effect of moxifloxacin (400 mg once daily for eight days) on the pharmacokinetics of R- and S-warfarin (25 mg single dose of warfarin sodium on the fifth day) was detected in a study involving 24 healthy volunteers. No significant change in prothrombin time was observed. However, fluoroquinolones, including AVELOX, have been reported to enhance the anticoagulant effects of warfarin or its derivatives in the patient population *[see Adverse Reactions (6.2) and Drug Interactions (7.2)]*.

## 12.4   Microbiology

*Mechanism of Action*

The bactericidal action of moxifloxacin results from inhibition of the topoisomerase II (DNA gyrase) and topoisomerase IV required for bacterial DNA replication, transcription, repair, and recombination.

20

*Mechanism of Resistance*

The mechanism of action for fluoroquinolones, including moxifloxacin, is different from that of macrolides, beta-lactams, aminoglycosides, or tetracyclines; therefore, microorganisms resistant to these classes of drugs may be susceptible to moxifloxacin. Resistance to fluoroquinolones occurs primarily by a mutation in topoisomerase II (DNA gyrase) or topoisomerase IV genes, decreased outer membrane permeability or drug efflux. *In vitro* resistance to moxifloxacin develops slowly via multiple-step mutations. Resistance to moxifloxacin occurs *in vitro* at a general frequency of between $1.8 \times 10^{-9}$ to $< 1 \times 10^{-11}$ for Gram-positive bacteria.

*Cross Resistance*

Cross-resistance has been observed between moxifloxacin and other fluoroquinolones against Gram-negative bacteria. Gram-positive bacteria resistant to other fluoroquinolones may, however, still be susceptible to moxifloxacin. There is no known cross-resistance between moxifloxacin and other classes of antimicrobials.

Moxifloxacin has been shown to be active against most isolates of the following bacteria, both *in vitro* and in clinical infections *[see Indications and Usage (1)]*.

**Gram-positive bacteria**

*Enterococcus faecalis*

*Staphylococcus aureus*

*Streptococcus anginosus*

*Streptococcus constellatus*

*Streptococcus pneumoniae* (including multi-drug resistant isolates [MDRSP] **)

*Streptococcus pyogenes*

**MDRSP, Multi-drug resistant *Streptococcus pneumoniae* includes isolates previously known as PRSP (Penicillin-resistant *S. pneumoniae*), and are isolates resistant to two or more of the following antibiotics: penicillin (MIC $\geq 2$ mcg/mL), 2nd generation cephalosporins (for example, cefuroxime), macrolides, tetracyclines, and trimethoprim/sulfamethoxazole.

**Gram-negative bacteria**

*Enterobacter cloacae*

*Escherichia coli*

*Haemophilus influenzae*

*Haemophilus parainfluenzae*

*Klebsiella pneumoniae*

*Moraxella catarrhalis*

*Proteus mirabilis*

*Yersinia pestis*

**Anaerobic bacteria**

*Bacteroides fragilis*

*Bacteroides thetaiotaomicron*

*Clostridium perfringens*

*Peptostreptococcus* species

**Other microorganisms**

*Chlamydophila pneumoniae*

*Mycoplasma pneumoniae*

Reference ID: 3963471

The following *in vitro* data are available, but their clinical significance is unknown. At least 90 percent of the following bacteria exhibit an *in vitro* minimum inhibitory concentration (MIC) less than or equal to the susceptible breakpoint for moxifloxacin. However, the efficacy of AVELOX in treating clinical infections due to these bacteria has not been established in adequate and well controlled clinical trials.

**Gram-positive bacteria**

*Staphylococcus epidermidis*

*Streptococcus agalactiae*

*Streptococcus viridans* group

**Gram-negative bacteria**

*Citrobacter freundii*

*Klebsiella oxytoca*

*Legionella pneumophila*

**Anaerobic bacteria**

*Fusobacterium* species

*Prevotella* species

*Susceptibility Tests Methods*

When available, the clinical microbiology laboratory should provide the results of *in vitro* susceptibility test results for antimicrobial drug products used in resident hospitals to the physician as periodic reports that describe the susceptibility profile of nosocomial and community acquired pathogens. These reports should aid the physician in selecting an antibacterial drug product for treatment.

*Dilution Techniques*

Quantitative methods are used to determine antimicrobial minimum inhibitory concentrations (MICs). These MICs provide estimates of the susceptibility of bacteria to antimicrobial compounds. The MICs should be determined using a standardized procedure. Standardized procedures are based on a dilution method (broth and/or agar).[1,2,4] The MIC values should be interpreted according to the criteria in Table 8.

*Diffusion Techniques*

Quantitative methods that require measurement of zone diameters can also provide reproducible estimates of the susceptibility of bacteria to antimicrobial compounds. The zone size provides an estimate of the susceptibility of bacteria to antimicrobial compounds. The zone size prove should be determined using a standardized test method.[2,3] This procedure uses paper disks impregnated with 5 mcg moxifloxacin to test the susceptibility of bacteria to moxifloxacin. The disc diffusion interpretive criteria are provided in Table 8.

*Anaerobic Techniques*

For anaerobic bacteria, the susceptibility to moxifloxacin can be determined by a standardized test method.[2,5] The MIC values obtained should be interpreted according to the criteria provided in Table 8.

**Table 8: Susceptibility Test Interpretive Criteria for Moxifloxacin**

| Species | MIC (mcg/mL) | | | Zone Diameter (mm) | | |
|---|---|---|---|---|---|---|
| | S | I | R | S | I | R |
| *Enterobacteriaceae* | ≤ 2 | 4 | ≥ 8 | ≥ 19 | 16–18 | ≤ 15 |
| *Enterococcus faecalis* | ≤ 1 | 2 | ≥ 4 | ≥ 18 | 15–17 | ≤ 14 |
| *Staphylococcus aureus* | ≤ 2 | 4 | ≥ 8 | ≥ 19 | 16–18 | ≤ 15 |
| *Haemophilus influenzae* | ≤ 1 | a | a | ≥ 18 | a | a |
| *Haemophilus parainfluenzae* | ≤ 1 | a | a | ≥ 18 | a | a |
| *Streptococcus pneumoniae* | ≤ 1 | 2 | ≥ 4 | ≥ 18 | 15–17 | ≤ 14 |
| *Streptococcus species* | ≤ 1 | 2 | ≥ 4 | ≥ 18 | 15–17 | ≤ 14 |

22

Reference ID: 3963471

| Anaerobic bacteria | ≤2 | 4 | ≥8 | - | - | - |
| Yersinia pestis | ≤0.25 | a | a | - | - | - |

S=susceptible, I=Intermediate, and R=resistant.

a) The current absence of data on moxifloxacin-resistant isolates precludes defining any results other than "Susceptible". Isolates yielding test results (MIC or zone diameter) other than susceptible, should be submitted to a reference laboratory for additional testing.

A report of "Susceptible" indicates that the antimicrobial is likely to inhibit growth of the pathogen if the antimicrobial compound reaches the concentrations at the infection site necessary to inhibit growth of the pathogen. A report of "Intermediate" indicates that the result should be considered equivocal, and, if the microorganism is not fully susceptible to alternative, clinically feasible drugs, the test should be repeated. This category implies possible clinical applicability in body sites where the drug is physiologically concentrated or in situations where a high dosage of the drug product can be used. This category also provides a buffer zone that prevents small uncontrolled technical factors from causing major discrepancies in interpretation. A report of "Resistant" indicates that the antimicrobial is not likely to inhibit growth of the pathogen if the antimicrobial compound reaches the concentrations usually achievable at the infection site; other therapy should be selected.

*Quality Control*

Standardized susceptibility test procedures require the use of laboratory controls to monitor and ensure the accuracy and precision of supplies and reagents used in the assay and the techniques of the individuals performing the test.[1,2,3,4,5] Standard moxifloxacin powder should provide the following range of MIC values noted in Table 9. For the diffusion technique using the 5 mcg moxifloxacin disk, the criteria in Table 9 should be achieved.

**Table 9: Acceptable Quality Control Ranges for Moxifloxacin**

| Strains | MIC range (mcg/mL) | Zone Diameter (mm) |
|---|---|---|
| *Enterococcus faecalis* ATCC 29212 | 0.06–0.5 | - |
| *Escherichia coli* ATCC 25922 | 0.008–0.06 | 28–35 |
| *Haemophilus influenzae* ATCC 49247 | 0.008–0.03 | 31–39 |
| *Staphylococcus aureus* ATCC 29213 | 0.015–0.06 | - |
| *Staphylococcus aureus* ATCC 25923 | - | 28–35 |
| *Streptococcus pneumoniae* ATCC 49619 | 0.06–0.25 | 25–31 |
| *Bacteroides fragilis* ATCC 25285 | 0.125–0.5 | - |
| *Bacteroides thetaiotaomicron* ATCC 29741 | 1–4 | - |
| *Eubacterium lentum* ATCC 43055 | 0.125–0.5 | - |

# 13  NONCLINICAL TOXICOLOGY

## 13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility

Long term studies in animals to determine the carcinogenic potential of moxifloxacin have not been performed.

Moxifloxacin was not mutagenic in 4 bacterial strains (TA 98, TA 100, TA 1535, TA 1537) used in the Ames *Salmonella* reversion assay. As with other fluoroquinolones, the positive response observed with moxifloxacin in strain TA 102 using the same assay may be due to the inhibition of DNA gyrase. Moxifloxacin was not mutagenic in the CHO/HGPRT mammalian cell gene mutation assay. An equivocal result was obtained in the same assay when v79 cells were used. Moxifloxacin was clastogenic in the v79 chromosome aberration assay, but it did not induce unscheduled DNA synthesis in cultured rat hepatocytes. There was no evidence of genotoxicity *in vivo* in a micronucleus test or a dominant lethal test in mice.

Moxifloxacin had no effect on fertility in male and female rats at oral doses as high as 500 mg/kg/day, approximately 12 times the maximum recommended human dose based on body surface area) or at intravenous doses as high as 45 mg/kg/day, approximately equal to the maximum recommended human dose based on body surface area). At 500 mg/kg

23

orally there were slight effects on sperm morphology (head-tail separation) in male rats and on the estrous cycle in female rats.

### 13.2    Animal Toxicology and/or Pharmacology

Fluoroquinolones have been shown to cause arthropathy in immature animals. In studies in juvenile dogs oral doses of moxifloxacin 30 mg/kg/day or more (approximately 1.5 times the maximum recommended human dose based upon systemic exposure) for 28 days resulted in arthropathy. There was no evidence of arthropathy in mature monkeys and rats at oral doses up to 135 and 500 mg/kg/day, respectively.

Moxifloxacin at an oral dose of 300 mg/kg did not show an increase in acute toxicity or potential for CNS toxicity (for example, seizures) in mice when used in combination with NSAIDs such as diclofenac, ibuprofen, or fenbufen. Some fluoroquinolones have been reported to have proconvulsant activity that is exacerbated with concomitant use of NSAIDs.

A QT-prolonging effect of moxifloxacin was found in dog studies, at plasma concentrations about five times the human therapeutic level. The combined infusion of sotalol, a Class III antiarrhythmic agent, with moxifloxacin induced a higher degree of QTc prolongation in dogs than that induced by the same dose (30 mg/kg) of moxifloxacin alone. Electrophysiological *in vitro* studies suggested an inhibition of the rapid activating component of the delayed rectifier potassium current ($I_{Kr}$) as an underlying mechanism.

No signs of local intolerability were observed in dogs when moxifloxacin was administered intravenously. After intra-arterial injection, inflammatory changes involving the peri-arterial soft tissue were observed suggesting that intra-arterial administration of AVELOX should be avoided.

## 14  CLINICAL STUDIES

### 14.1    Acute Bacterial Sinusitis

In a controlled double-blind study conducted in the US, AVELOX Tablets (400 mg once daily for ten days) were compared with cefuroxime axetil (250 mg twice daily for ten days) for the treatment of acute bacterial sinusitis. The trial included 457 patients valid for the efficacy analysis. Clinical success (cure plus improvement) at the 7 to 21 day post-therapy test of cure visit was 90% for AVELOX and 89% for cefuroxime.

An additional non-comparative study was conducted to gather bacteriological data and to evaluate microbiological eradication in adult patients treated with AVELOX 400 mg once daily for seven days. All patients (n = 336) underwent antral puncture in this study. Clinical success rates and eradication/presumed eradication rates at the 21 to 37 day follow-up visit were 97% (29 out of 30) for *Streptococcus pneumoniae*, 83% (15 out of 18) for *Moraxella catarrhalis*, and 80% (24 out of 30) for *Haemophilus influenzae*.

### 14.2 Acute Bacterial Exacerbation of Chronic Bronchitis

AVELOX Tablets (400 mg once daily for five days) were evaluated for the treatment of acute bacterial exacerbation of chronic bronchitis in a randomized, double-blind, controlled clinical trial conducted in the US. This study compared AVELOX with clarithromycin (500 mg twice daily for 10 days) and enrolled 629 patients. Clinical success was assessed at 7-17 days post-therapy. The clinical success for AVELOX was 89% (222/250) compared to 89% (224/251) for clarithromycin.

**Table 10: Clinical Success Rates at Follow-Up Visit for Clinically Evaluable Patients by Pathogen (Acute Bacterial Exacerbation of Chronic Bronchitis)**

| PATHOGEN | AVELOX | Clarithromycin |
|---|---|---|
| *Streptococcus pneumoniae* | 16/16 (100%) | 20/23 (87%) |
| *Haemophilus influenzae* | 33/37 (89%) | 36/41 (88%) |
| *Haemophilus parainfluenzae* | 16/16 (100%) | 14/14 (100%) |
| *Moraxella catarrhalis* | 29/34 (85%) | 24/24 (100%) |
| *Staphylococcus aureus* | 15/16 (94%) | 6/8 (75%) |
| *Klebsiella pneumoniae* | 18/20 (90%) | 10/11 (91%) |

24

The microbiological eradication rates (eradication plus presumed eradication) in AVELOX treated patients were *Streptococcus pneumoniae* 100%, *Haemophilus influenzae* 89%, *Haemophilus parainfluenzae* 100%, *Moraxella catarrhalis* 85%, *Staphylococcus aureus* 94%, and *Klebsiella pneumoniae* 85%.

### 14.3 Community Acquired Pneumonia

A randomized, double-blind, controlled clinical trial was conducted in the US to compare the efficacy of AVELOX Tablets (400 mg once daily) to that of high-dose clarithromycin (500 mg twice daily) in the treatment of patients with clinically and radiologically documented community acquired pneumonia. This study enrolled 474 patients (382 of whom were valid for the efficacy analysis conducted at the 14–35 day follow-up visit). Clinical success for clinically evaluable patients was 95% (184/194) for AVELOX and 95% (178/188) for high dose clarithromycin.

A randomized, double-blind, controlled clinical trial was conducted in the US and Canada to compare the efficacy of sequential intravenous/oral AVELOX 400 mg once a day for 7–14 days to an intravenous/oral fluoroquinolone control (trovafloxacin or levofloxacin) in the treatment of patients with clinically and radiologically documented community acquired pneumonia. This study enrolled 516 patients, 362 of whom were valid for the efficacy analysis conducted at the 7-30 day post-therapy visit. The clinical success rate was 86% (157/182) for AVELOX therapy and 89% (161/180) for the fluoroquinolone comparators.

An open-label ex-US study that enrolled 628 patients compared AVELOX to sequential intravenous/oral amoxicillin/clavulanate (1.2 gram intravenously every 8 hours/625 mg orally every 8 hours) with or without high-dose intravenous/oral clarithromycin (500 mg twice a day). The intravenous formulations of the comparators are not FDA approved. The clinical success rate at Day 5–7 for AVELOX therapy was 93% (241/258) and demonstrated superiority to amoxicillin/clavulanate ± clarithromycin (85%, 239/280) [95% C.I. of difference in success rates between moxifloxacin and comparator (2.9%, 13.2%)]. The clinical success rate at the 21–28 days post-therapy visit for AVELOX was 84% (216/258), which also demonstrated superiority to the comparators (74%, 208/280) [95% C.I. of difference in success rates between moxifloxacin and comparator (2.6%, 16.3%)].

The clinical success rates by pathogen across four CAP studies are presented in Table 11.

**Table 11: Clinical Success Rates By Pathogen (Pooled CAP Studies)**

| PATHOGEN | AVELOX | |
|---|---|---|
| *Streptococcus pneumoniae* | 80/85 | (94%) |
| *Staphylococcus aureus* | 17/20 | (85%) |
| *Klebsiella pneumoniae* | 11/12 | (92%) |
| *Haemophilus influenzae* | 56/61 | (92%) |
| *Chlamydophila pneumoniae* | 119/128 | (93%) |
| *Mycoplasma pneumoniae* | 73/76 | (96%) |
| *Moraxella catarrhalis* | 11/12 | (92%) |

*Community Acquired Pneumonia caused by Multi-Drug Resistant Streptococcus pneumoniae (MDRSP)\**

AVELOX was effective in the treatment of community acquired pneumonia (CAP) caused by multi-drug resistant *Streptococcus pneumoniae* MDRSP* isolates. Of 37 microbiologically evaluable patients with MDRSP isolates, 35 patients (95%) achieved clinical and bacteriological success post-therapy. The clinical and bacteriological success rates based on the number of patients treated are shown in Table 12.

* MDRSP, Multi-drug resistant *Streptococcus pneumoniae* includes isolates previously known as PRSP (Penicillin-resistant *S. pneumoniae*), and are isolates resistant to two or more of the following antibiotics: penicillin (MIC ≥ 2 mcg/mL), 2nd generation cephalosporins (for example, cefuroxime), macrolides, tetracyclines, and trimethoprim/sulfamethoxazole.

25

**Table 12: Clinical and Bacteriological Success Rates for AVELOX-Treated MDRSP CAP Patients (Population: Valid for Efficacy)**

| Screening Susceptibility | Clinical Success | | Bacteriological Success | |
|---|---|---|---|---|
| | n/N[a] | % | n/N[b] | % |
| Penicillin-resistant | 21/21 | 100%[c] | 21/21 | 100%[c] |
| 2nd generation cephalosporin-resistant | 25/26 | 96%[c] | 25/26 | 96%[c] |
| Macrolide-resistant[d] | 22/23 | 96% | 22/23 | 96% |
| Trimethoprim/sulfamethoxazole-resistant | 28/30 | 93% | 28/30 | 93% |
| Tetracycline-resistant | 17/18 | 94% | 17/18 | 94% |

a)   n = number of patients successfully treated; N = number of patients with MDRSP (from a total of 37 patients)

b)   n = number of patients successfully treated (presumed eradication or eradication); N = number of patients with MDRSP (from a total of 37 patients)

c)   One patient had a respiratory isolate that was resistant to penicillin and cefuroxime but a blood isolate that was intermediate to penicillin and cefuroxime. The patient is included in the database based on the respiratory isolate.

d)   Azithromycin, clarithromycin, and erythromycin were the macrolide antimicrobials tested.

Not all isolates were resistant to all antimicrobial classes tested. Success and eradication rates are summarized in Table 13.

**Table 13: Clinical Success Rates and Microbiological Eradication Rates for Resistant *Streptococcus pneumoniae* (Community Acquired Pneumonia)**

| *S. pneumoniae* with MDRSP | Clinical Success | Bacteriological Eradication Rate |
|---|---|---|
| Resistant to 2 antimicrobials | 12/13 (92.3 %) | 12/13 (92.3 %) |
| Resistant to 3 antimicrobials | 10/11 (90.9 %)[a] | 10/11 (90.9 %)[a] |
| Resistant to 4 antimicrobials | 6/6 (100%) | 6/6 (100%) |
| Resistant to 5 antimicrobials | 7/7 (100%)[a] | 7/7 (100%)[a] |
| Bacteremia with MDRSP | 9/9 (100%) | 9/9 (100%) |

a)   One patient had a respiratory isolate resistant to 5 antimicrobials and a blood isolate resistant to 3 antimicrobials. The patient was included in the category resistant to 5 antimicrobials.

### 14.4 Uncomplicated Skin and Skin Structure Infections

A randomized, double-blind, controlled clinical trial conducted in the US compared the efficacy of AVELOX 400 mg once daily for seven days with cephalexin HCl 500 mg three times daily for seven days. The percentage of patients treated for uncomplicated abscesses was 30%, furuncles 8%, cellulitis 16%, impetigo 20%, and other skin infections 26%. Adjunctive procedures (incision and drainage or debridement) were performed on 17% of the AVELOX treated patients and 14% of the comparator treated patients. Clinical success rates in evaluable patients were 89% (108/122) for AVELOX and 91% (110/121) for cephalexin HCl.

### 14.5   Complicated Skin and Skin Structure Infections

Two randomized, active controlled trials of cSSSI were performed. A double-blind trial was conducted primarily in North America to compare the efficacy of sequential intravenous/oral AVELOX 400 mg once a day for 7-14 days to an intravenous/oral beta-lactam/beta-lactamase inhibitor control in the treatment of patients with cSSSI. This study enrolled 617 patients, 335 of which were valid for the efficacy analysis. A second open-label International study compared AVELOX 400 mg once a day for 7-21 days to sequential intravenous/oral beta-lactam/beta-lactamase inhibitor control in the treatment of patients with cSSSI. This study enrolled 804 patients, 632 of which were valid for the efficacy analysis. Surgical incision and drainage or debridement was performed on 55% of the AVELOX treated and 53% of the comparator treated patients in these studies and formed an integral part of therapy for this indication. Success rates varied with the type of diagnosis ranging from 61% in patients with infected ulcers to 90% in patients with complicated erysipelas. These rates were similar to those seen with comparator drugs. The overall success rates in the evaluable patients and the clinical success by pathogen are shown in Tables 14 and 15.

26

**Table 14: Overall Clinical Success Rates in Patients with Complicated Skin and Skin Structure Infections**

| Study | AVELOX n/N (%) | Comparator n/N (%) | 95% Confidence Interval [a] |
|---|---|---|---|
| North America | 125/162 (77.2%) | 141/173 (81.5%) | (-14.4%, 2%) |
| International | 254/315 (80.6%) | 268/317 (84.5%) | (-9.4%, 2.2%) |

a) of difference in success rates between Moxifloxacin and comparator (Moxifloxacin – comparator)

**Table 15: Clinical Success Rates by Pathogen in Patients with Complicated Skin and Skin Structure Infections**

| Pathogen | AVELOX n/N (%) | Comparator n/N (%) |
|---|---|---|
| *Staphylococcus aureus* (*methicillin-susceptible isolates*)[a] | 106/129 (82.2%) | 120/137 (87.6%) |
| *Escherichia coli* | 31/38 (81.6 %) | 28/33 (84.8 %) |
| *Klebsiella pneumoniae* | 11/12 (91.7 %) | 7/10 (70%) |
| *Enterobacter cloacae* | 9/11 (81.8%) | 4/7 (57.1%) |

a) methicillin susceptibility was only determined in the North American Study

## 14.6   Complicated Intra-Abdominal Infections

Two randomized, active controlled trials of cIAI were performed. A double-blind trial was conducted primarily in North America to compare the efficacy of sequential intravenous/oral AVELOX 400 mg once a day for 5–14 days to intravenous/piperacillin/tazobactam followed by oral amoxicillin/clavulanic acid in the treatment of patients with cIAI, including peritonitis, abscesses, appendicitis with perforation, and bowel perforation. This study enrolled 681 patients. 379 of which were considered clinically evaluable. A second open-label international study compared AVELOX 400 mg once a day for 5–14 days to intravenous ceftriaxone plus intravenous metronidazole followed by oral amoxicillin/clavulanic acid in the treatment of patients with cIAI. This study enrolled 595 patients, 511 of which were considered clinically evaluable. The clinically evaluable population consisted of subjects with a surgically confirmed complicated infection, at least 5 days of treatment and a 25–50 day follow-up assessment for patients at the Test of Cure visit. The overall clinical success rates in the clinically evaluable patients are shown in Table 16.

**Table 16: Clinical Success Rates in Patients with Complicated Intra-Abdominal Infections**

| Study | AVELOX n/N (%) | Comparator n/N (%) | 95% Confidence Interval[a] |
|---|---|---|---|
| North America (overall) | 146/183 (79.8%) | 153/196 (78.1%) | (-7.4%, 9.3%) |
| Abscess | 40/57 (70.2%) | 49/63 (77.8%)[b] | NA[c] |
| Non-abscess | 106/126 (84.1%) | 104/133 (78.2%) | NA |
| International (overall) | 199/246 (80.9%) | 218/265 (82.3%) | (-8.9%, 4.2%) |
| Abscess | 73/93 (78.5%) | 86/99 (86.9%) | NA |
| Non-abscess | 126/153 (82.4%) | 132/166 (79.5%) | NA |

a) of difference in success rates between AVELOX and comparator (AVELOX – comparator)

b) Excludes 2 patients who required additional surgery within the first 48 hours.

c) NA - not applicable

## 14.7 Plague

Efficacy studies of AVELOX could not be conducted in humans with pneumonic plague for ethical and feasibility reasons. Therefore, approval of this indication was based on an efficacy study conducted in animals and supportive pharmacokinetic data in adult humans and animals.

A randomized, blinded, placebo-controlled study was conducted in an African Green Monkey (AGM) animal model of pneumonic plague. Twenty AGM (10 males and 10 females) were exposed to an inhaled mean ($\pm$ SD) dose of 100 $\pm$ 50 $LD_{50}$ (range 92 to 127 $LD_{50}$) of *Yersinia pestis* (CO92 strain) aerosol. The minimal inhibitory concentration (MIC) of moxifloxacin for the *Y. pestis* strain used in this study was 0.06 mcg/mL. Development of sustained fever for at least 4 hours duration was used as the trigger for the initiation of 10 days of treatment with either a humanized regimen of moxifloxacin or placebo. All study animals were febrile and bacteremic with *Y. pestis* prior to the initiation of study

27

treatment. Ten of 10 (100%) of the animals receiving the placebo succumbed to disease between 83 to 139 h (mean 115 ± 19 hours) post treatment. Ten of 10 (100%) moxifloxacin-treated animals survived for the 30-day period after completion of the study treatment. Compared to the placebo group, mortality in the moxifloxacin group was significantly lower (difference in survival: 100% with a two-sided 95% exact confidence interval [66.3%, 100%], p-value<0.0001).

The mean plasma concentrations of moxifloxacin associated with a statistically significant improvement in survival over placebo in an AGM model of pneumonic plague are reached or exceeded in human adults receiving the recommended oral and intravenous dosage regimens. The mean (± SD) peak plasma concentration ($C_{max}$) and total plasma exposure defined as the area under the plasma concentration-time curve (AUC) in human adults receiving 400 mg intravenously were 3.9 ± 0.9 mcg/mL and 39.3 ± 8.6 mcg·h/mL, respectively *[see Clinical Pharmacology (12.3)]*. The mean (± SD) peak plasma concentration and $AUC_{0-24}$ in AGM following one- day administration of a humanized dosing regimen simulating the human $AUC_{0-24}$ at a 400 mg dose were 4.4 ± 1.5 mcg/mL and 22 ± 8.0 mcg·h/mL, respectively.

# 15  REFERENCES

1. Clinical and Laboratory Standards Institute (CLSI), *Methods for Dilution Antimicrobial Susceptibility Tests for Bacteria That Grow Aerobically; Approved Standard — Tenth Edition.* CLSI Document M7-A10 [2015], CLSI, 950 West Valley Rd., Suite 2500, Wayne, PA 19087, USA.
2. Clinical and Laboratory Standards Institute (CLSI), *Performance Standards for Antimicrobial Susceptibility Testing: Twenty-fifth Informational Supplement*, CLSI document M100-S25 [2015]. Clinical and Laboratory Standards Institute, 950 West Valley Road, Suite 2500, Wayne, Pennsylvania 19087, USA. .
3. Clinical and Laboratory Standards Institute (CLSI), *Performance Standards for Antimicrobial Disk Diffusion Susceptibility Tests; Approved Standard – Twelfth Edition.* CLSI document M02-A12 [2015]. Clinical and Laboratory Standards Institute, 950 West Valley Road, Suite 2500, Wayne, Pennsylvania 19087, USA.
4. Clinical and Laboratory Standards Institute (CLSI), *Methods for Antimicrobial Dilution and Disk Susceptibility Testing for Infrequently Isolated or Fastidious Bacteria; Approved Guidelines – Second Edition.* CLSI document M45-A2 [2010], Clinical and Laboratory Standards Institute, 950 West Valley Road, Suite 2500, Wayne, Pennsylvania 19087, USA.
5. Clinical and Laboratory Standards Institute (CLSI), *Methods for Antimicrobial Susceptibility Testing of Anaerobic Bacteria: Approved Standard - Eighth Edition*. CLSI document M11-A8 [2012]. Clinical and Laboratory Standards Institute, 950 West Valley Road, Suite 2500, Wayne, Pennsylvania 19087, USA.

# 16  HOW SUPPLIED/STORAGE AND HANDLING

## 16.1  AVELOX Tablets

AVELOX (moxifloxacin hydrochloride) tablets are available as oblong, dull red film-coated tablets containing 400 mg moxifloxacin.

The tablet is coded with the word "BAYER" on one side and "M400" on the reverse side.

| Package | NDC Code |
|---|---|
| Bottles of 30: | 0085-1733-01 |
| Unit Dose Pack of 50: | 0085-1733-02 |
| ABC Pack of 5: | 0085-1733-03 |

Store at 25°C (77°F); excursions permitted to 15–30°C (59–86°F) *[see USP Controlled Room Temperature]*. Avoid high humidity.

## 16.2  AVELOX Injection – Premix Bags

AVELOX (moxifloxacin hydrochloride) in sodium chloride injection is available in ready-to-use 250 mL flexible bags containing 400 mg of moxifloxacin in 0.8% saline. The flexibag is not made with natural rubber latex. No further dilution of this preparation is necessary.

| Package | NDC Code |
|---|---|
| 250 mL flexible container | 0085-1737-01 |

Store at 25°C (77°F); excursions permitted to 15–30°C (59–86°F) *[see USP Controlled Room Temperature]*.

28

*Do not refrigerate – product precipitates upon refrigeration.*

## 17  PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Medication Guide)

### Serious Adverse Reactions

Advise patients to stop taking AVELOX if they experience an adverse reaction and to call their healthcare provider for advice on completing the full course of treatment with another antibacterial drug.

Inform patients of the following serious adverse reactions that have been associated with AVELOX or other fluoroquinolone use:

- **Disabling and potentially irreversible serious adverse reactions that may occur together:** Inform patients that disabling and potentially irreversible serious adverse reactions, including tendinitis and tendon rupture, peripheral neuropathies, and central nervous system effects, have been associated with use of AVELOX and may occur together in the same patient. Inform patients to stop taking AVELOX immediately if they experience an adverse reaction and to call their healthcare provider.
- **Tendinitis and Tendon Rupture:** Instruct patients to contact their healthcare provider if they experience pain, swelling, or inflammation of a tendon, or weakness or inability to use one of their joints; rest and refrain from exercise; and discontinue AVELOX treatment. Symptoms may be irreversible. The risk of severe tendon disorder with fluoroquinolones is higher in older patients usually over 60 years of age, in patients taking corticosteroid drugs, and in patients with kidney, heart or lung transplants.
- **Peripheral Neuropathies:** Inform patients that peripheral neuropathies have been associated with AVELOX use, symptoms may occur soon after initiation of therapy and may be irreversible. If symptoms of peripheral neuropathy including pain, burning, tingling, numbness and/or weakness develop, immediately discontinue AVELOX and tell them to contact their physician.
- **Central nervous system effects** (for example, convulsions, dizziness, lightheadedness, increased intracranial pressure)**:** Inform patients that convulsions have been reported in patients receiving fluoroquinolones, including AVELOX. Instruct patients to notify their physician before taking this drug if they have a history of convulsions. Inform patients that they should know how they react to AVELOX before they operate an automobile or machinery or engage in other activities requiring mental alertness and coordination. Instruct patients to notify their physician if persistent headache with or without blurred vision occurs.
- **Exacerbation of Myasthenia Gravis:** Instruct patients to inform their physician of any history of myasthenia gravis. Instruct patients to notify their physician if they experience any symptoms of muscle weakness, including respiratory difficulties.
- **Hypersensitivity Reactions:** Inform patients that AVELOX can cause hypersensitivity reactions, even following a single dose, and to discontinue the drug at the first sign of a skin rash, hives or other skin reactions, a rapid heartbeat, difficulty in swallowing or breathing, any swelling suggesting angioedema (for example, swelling of the lips, tongue, face, tightness of the throat, hoarseness), or other symptoms of an allergic reaction.
- **Hepatotoxicity:** Inform patients that severe hepatotoxicity (including acute hepatitis and fatal events) has been reported in patients taking AVELOX. Instruct patients to inform their physician if they experience any signs or symptoms of liver injury including: loss of appetite, nausea, vomiting, fever, weakness, tiredness, right upper quadrant tenderness, itching, yellowing of the skin and eyes, light colored bowel movements or dark colored urine.
- **Diarrhea:** Diarrhea is a common problem caused by antibiotics which usually ends when the antibiotic is discontinued. Sometimes after starting treatment with antibiotics, patients can develop watery and bloody stools (with or without stomach cramps and fever) even as late as two or more months after having taken the last dose of the antibiotic. If this occurs, instruct patients to contact their physician as soon as possible.
- **Prolongation of the QT Interval:** Instruct patients to inform their physician of any personal or family history of QT prolongation or proarrhythmic conditions such as hypokalemia, bradycardia, or recent myocardial ischemia; if they are taking any Class IA (quinidine, procainamide), or Class III (amiodarone, sotalol) antiarrhythmic agents. Instruct patients to notify their physician if they have any symptoms of prolongation of the QT interval, including prolonged heart palpitations or a loss of consciousness.
- **Photosensitivity/Phototoxicity:** Inform patients that photosensitivity/phototoxicity has been reported in patients receiving fluoroquinolones. Inform patients to minimize or avoid exposure to natural or artificial sunlight (tanning beds or UVA/B treatment) while taking quinolones. If patients need to be outdoors while using quinolones, instruct them to

29

wear loose-fitting clothes that protect skin from sun exposure and discuss other sun protection measures with their physician. If a sunburn-like reaction or skin eruption occurs, instruct patients to contact their physician.

- **Blood Glucose Disturbances:** Inform the patients that if they are diabetic and are being treated with insulin or an oral hypoglycemic agent and a hypoglycemic reaction occurs, they should discontinue AVELOX and consult a physician.

**Antibacterial Resistance**

Inform patients that antibacterial drugs including AVELOX should only be used to treat bacterial infections. They do not treat viral infections (for example, the common cold). When AVELOX is prescribed to treat a bacterial infection, patients should be told that although it is common to feel better early in the course of therapy, the medication should be taken exactly as directed. Skipping doses or not completing the full course of therapy may (1) decrease the effectiveness of the immediate treatment and (2) increase the likelihood that bacteria will develop resistance and will not be treatable by AVELOX or other antibacterial drugs in the future.

**Administration With Food, Fluids, and Drug Products Containing Multivalent Cations**

Inform patients that AVELOX tablets may be taken with or without food. Advise patients drink fluids liberally.

Inform patients that AVELOX tablets should be taken at least 4 hours before or 8 hours after multivitamins (containing iron or zinc), antacids (containing magnesium or aluminum), sucralfate, or didanosine buffered tablets for oral suspension or the pediatric powder for oral solution.

**Plague Studies**

Inform patients given AVELOX for plague that efficacy studies could not be conducted in humans for feasibility reasons. Therefore, approval for plague was based on efficacy studies conducted in animals.

30

**FDA-Approved Medication Guide**

## MEDICATION GUIDE
### AVELOX® (*AV-eh-locks*)
### (moxifloxacin hydrochloride)
### Tablets

### AVELOX® (*AV-eh-locks*)
### (moxifloxacin hydrochloride)
### Injection Solution for Intravenous use

Read the Medication Guide that comes with AVELOX® before you start taking it and each time you get a refill. There may be new information. This Medication Guide does not take the place of talking to your healthcare provider about your medical condition or your treatment.

## What is the most important information I should know about AVELOX?

AVELOX belongs to a class of antibiotics called fluoroquinolones. AVELOX can cause serious side effects that can happen at the same time and could result in death. If you get any of the following serious side effects, you should stop taking AVELOX and get medical help right away. Talk with your healthcare provider about whether you should continue to take AVELOX.

**1. Tendon rupture or swelling of the tendon (tendinitis).**

**Tendon problems can happen in people of all ages who take AVELOX.** Tendons are tough cords of tissue that connect muscles to bones. Symptoms of tendon problems may include:
- Pain, swelling, tears and inflammation of tendons including the back of the ankle (Achilles), shoulder, hand, or other tendon sites.

**The risk of getting tendon problems while you take AVELOX is higher if you:**
Are over 60 years of age
Are taking steroids (corticosteroids)
Have had a kidney, heart or lung transplant

**Tendon problems can happen in people who do not have the above risk factors when they take AVELOX.**

**Other reasons that can increase your risk of tendon problems can include:**
Physical activity or exercise
Kidney failure
Tendon problems in the past, such as in people with rheumatoid arthritis (RA).

**Stop taking AVELOX immediately and call your healthcare provider right away at the first sign of tendon pain, swelling or inflammation.** Stop taking AVELOX until tendinitis or tendon rupture has been ruled out by your healthcare provider. Avoid exercise and using the affected area. The most common area of pain and swelling is in the Achilles tendon at the back of your ankle. This can also happen with other tendons.

**Talk to your healthcare provider about the risk of tendon rupture with continued use of AVELOX.** You may need a different antibiotic that is not a fluoroquinolone to treat your infection.

**Tendon rupture can happen while you are taking or after you have finished taking AVELOX.** Tendon ruptures can happen within hours or days after taking AVELOX and have happened up to several months after patients have finished taking their fluoroquinolone.

**Stop taking AVELOX immediately and get medical help right away if you get any of the following signs or symptoms of a tendon rupture:**
Hear or feel a snap or pop in a tendon area
Bruising right after an injury in a tendon area
Unable to move the affected area or bear weight.

**2. Changes in sensation and possible nerve damage (Peripheral Neuropathy).** Damage to the nerves in arms, hands, legs, or feet can happen in people who take fluoroquinolones, including AVELOX. Stop taking

31

AVELOX immediately and talk to your healthcare provider right away if you get any of the following symptoms of peripheral neuropathy in your arms, hands, legs, or feet:

- pain
- burning
- tingling
- numbness
- weakness

AVELOX may need to be stopped to prevent permanent nerve damage.

3. **Central Nervous System (CNS) effects.** Seizures have been reported in people who take fluoroquinolone antibacterial medicines, including AVELOX. Tell your healthcare provider if you have a history of seizures before you start taking AVELOX. CNS side effects may happen as soon as after taking the first dose of AVELOX. Stop taking AVELOX immediately and talk to your healthcare provider right away if you get any of these side effects, or other changes in mood or behavior:

- seizures
- hear voices, see things, or sense things that are not there (hallucinations)
- feel restless
- tremors
- feel anxious or nervous
- confusion
- depression
- trouble sleeping
- nightmares
- feel lightheaded or dizzy
- feel more suspicious (paranoia)
- suicidal thoughts or acts
- headaches that will not go away, with or without blurred vision

4. **Worsening of myasthenia gravis (a disease which causes muscle weakness).** Fluoroquinolones like AVELOX may cause worsening of myasthenia gravis symptoms, including muscle weakness and breathing problems. Tell your healthcare provider if you have a history of myasthenia gravis before you start taking AVELOX. Call your healthcare provider right away if you have any worsening muscle weakness or breathing problems.

See the section "**What are the possible side effects of AVELOX?**" for more information about side effects.

## What is AVELOX?

AVELOX is a fluoroquinolone antibiotic medicine used to treat certain types of infections caused by certain germs called bacteria in adults 18 years or older. These bacterial infections include:

- Community Acquired Pneumonia
- Uncomplicated Skin and Skin Structure Infections
- Complicated Skin and Skin Structure Infections
- Complicated Intra-Abdominal Infections
- Plague
- Acute Bacterial Sinusitis
- Acute Bacterial Exacerbation of Chronic Bronchitis

AVELOX should not be used in patients with acute bacterial sinusitis or acute bacterial exacerbation of chronic bronchitis if there are other treatment options available.

Studies of AVELOX for use in the treatment of plague were done in animals only, because plague could not be studied in people.

It is not known if AVELOX is safe and works in people under 18 years of age. Children have a higher chance of getting bone, joint, and tendon (musculoskeletal) problems while taking fluoroquinolone antibiotic medicines.

Sometimes infections are caused by viruses rather than by bacteria. Examples include viral infections in the sinuses and lungs, such as the common cold or flu. Antibiotics, including AVELOX, do not kill viruses.

Call your healthcare provider if you think your condition is not getting better while you are taking AVELOX.

## Who should not take AVELOX?

Do not take AVELOX if you have ever had a severe allergic reaction to an antibiotic known as a fluoroquinolone, or if you are allergic to any of the ingredients in AVELOX. Ask your healthcare provider if you are not sure. See the list of ingredients in AVELOX at the end of this Medication Guide.

## What should I tell my healthcare provider before taking AVELOX?

See "**What is the most important information I should know about AVELOX?**"

### Tell your healthcare provider about all your medical conditions, including if you:

Have tendon problems; AVELOX should not be used in patients who have a history of tendon problems
Have a disease that causes muscle weakness (myasthenia gravis); AVELOX should not be used in patients who have a history of myasthenia gravis
Have central nervous system problems (such as epilepsy)
Have nerve problems; AVELOX should not be used in patients who have a history of a nerve problem called peripheral neuropathy
Have or anyone in your family has an irregular heartbeat, especially a condition called "QT prolongation"
Have low blood potassium (hypokalemia)
Have a slow heartbeat (bradycardia)
Have a history of seizures
Have kidney problems
Have rheumatoid arthritis (RA) or other history of joint problems
Are pregnant or planning to become pregnant. It is not known if AVELOX will harm your unborn child
Are breast-feeding or planning to breast-feed. It is not known if AVELOX passes into breast milk. You and your healthcare provider should decide whether you will take AVELOX or breast-feed.
Have diabetes or problems with low blood sugar (hypoglycemia).

**Tell your healthcare provider about all the medicines you take,** including prescription and non-prescription medicines, vitamins and herbal and dietary supplements. AVELOX and other medicines can affect each other causing side effects. Especially tell your healthcare provider if you take:

An NSAID (Non-Steroidal Anti-Inflammatory Drug). Many common medicines for pain relief are NSAIDs. Taking an NSAID while you take AVELOX or other fluoroquinolones may increase your risk of central nervous system effects and seizures. See "**What are the possible side effects of AVELOX?**"
A blood thinner (warfarin, Coumadin, Jantoven).
A medicine to control your heart rate or rhythm (antiarrhythmic) See "**What are the possible side effects of AVELOX?**"
An anti-psychotic medicine.
A tricyclic antidepressant.
An oral anti-diabetes medicine or insulin.
Erythromycin.
A water pill (diuretic).
A steroid medicine. Corticosteroids taken by mouth or by injection may increase the chance of tendon injury. See "**What is the most important information I should know about AVELOX?**"
Certain medicines may keep AVELOX from working correctly. Take AVELOX either 4 hours before or 8 hours after taking these products:
  o   An antacid, multivitamin, or other product that has magnesium, aluminum, iron, or zinc
  o   Sucralfate (Carafate®)
  o   Didanosine oral suspension or solution

## Ask your healthcare provider if you are not sure if any of your medicines are listed above.

Know the medicines you take. Keep a list of your medicines and show it to your healthcare provider and pharmacist when you get a new medicine.

## How should I take AVELOX?

Take AVELOX once a day exactly as prescribed by your healthcare provider.

33

Take AVELOX at about the same time each day.

AVELOX Tablets should be swallowed.

AVELOX can be taken with or without food.

Drink plenty of fluids while taking AVELOX.

AVELOX Injection is given to you by intravenous infusion into your vein slowly, over 60 minutes, as prescribed by your healthcare provider.

Do not skip any doses, or stop taking AVELOX even if you begin to feel better, until you finish your prescribed treatment, unless:

You have tendon effects (see "**What is the most important information I should know about AVELOX?**").

- o You have nerve problems. See "**What is the most important information I should know about AVELOX?**"
- o You have central nervous system problems. See "**What is the most important information I should know about AVELOX?**"
- o You have a serious allergic reaction (see "What are the possible side effects of AVELOX?"), or your healthcare provider tells you to stop.

This will help make sure that all of the bacteria are killed and lower the chance that the bacteria will become resistant to AVELOX. If this happens, AVELOX and other antibiotic medicines may not work in the future.

If you miss a dose of AVELOX, take it as soon as you remember. Do not take more than 1 dose of AVELOX in one day.

If you take too much, call your healthcare provider or get medical help immediately.

## What should I avoid while taking AVELOX?

AVELOX can make you feel dizzy and lightheaded. Do not drive, operate machinery, or do other activities that require mental alertness or coordination until you know how AVELOX affects you.

Avoid sunlamps, tanning beds, and try to limit your time in the sun. AVELOX can make your skin sensitive to the sun (photosensitivity) and the light from sunlamps and tanning beds. You could get severe sunburn, blisters or swelling of your skin. If you get any of these symptoms while taking AVELOX, call your healthcare provider right away. You should use a sunscreen and wear a hat and clothes that cover your skin if you have to be in sunlight.

## What are the possible side effects of AVELOX?

AVELOX can cause side effects that may be serious or even cause death. See "**What is the most important information I should know about AVELOX?**"

Other serious side effects of AVELOX include:

### Serious allergic reactions

Allergic reactions can happen in people taking fluoroquinolones, including AVELOX, even after only one dose. Stop taking AVELOX and get emergency medical help right away if you get any of the following symptoms of a severe allergic reaction:

Hives

Trouble breathing or swallowing

Swelling of the lips, tongue, face

Throat tightness, hoarseness

Rapid heartbeat

Faint

Yellowing of the skin or eyes. Stop taking AVELOX and tell your healthcare provider right away if you get yellowing of your skin or white part of your eyes, or if you have dark urine. These can be signs of a serious reaction to AVELOX (a liver problem).

### Skin rash

Skin rash may happen in people taking AVELOX even after only one dose. Stop taking AVELOX at the first sign of a skin rash and call your healthcare provider. Skin rash may be a sign of a more serious reaction to AVELOX.

### Serious heart rhythm changes (QT prolongation and torsade de pointes)

34

Tell your healthcare provider right away if you have a change in your heart beat (a fast or irregular heartbeat), or if you faint. AVELOX may cause a rare heart problem known as prolongation of the QT interval. This condition can cause an abnormal heartbeat and can be very dangerous. The chances of this event are higher in people:

Who are elderly
With a family history of prolonged QT interval
With low blood potassium (hypokalemia)
Who take certain medicines to control heart rhythm (antiarrhythmics)

**Intestine infection** (Pseudomembranous colitis)

Pseudomembranous colitis can happen with most antibiotics, including AVELOX. Call your healthcare provider right away if you get watery diarrhea, diarrhea that does not go away, or bloody stools. You may have stomach cramps and a fever. Pseudomembranous colitis can happen 2 or more months after you have finished your antibiotic.

**Changes in blood sugar**

People who take AVELOX and other fluoroquinolone medicines with oral anti-diabetes medicines or with insulin can get low blood sugar (hypoglycemia) and high blood sugar (hyperglycemia). Follow your healthcare provider's instructions for how often to check your blood sugar. If you have diabetes and you get low blood sugar while taking AVELOX, stop taking AVELOX and call your healthcare provider right away. Your antibiotic medicine may need to be changed.

**Sensitivity to sunlight (photosensitivity)**

See "**What should I avoid while taking AVELOX?**" The most common side effects of AVELOX include nausea and diarrhea.

These are not all the possible side effects of AVELOX. Tell your healthcare provider about any side effect that bothers you or that does not go away. Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

## How should I store AVELOX?

**AVELOX Tablets**
Store AVELOX 59–86°F (15–30°C)
Keep AVELOX away from moisture (humidity)

**Keep AVELOX and all medicines out of the reach of children.**

## General Information about AVELOX

Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. Do not use AVELOX for a condition for which it is not prescribed. Do not give AVELOX to other people, even if they have the same symptoms that you have. It may harm them.

This Medication Guide summarizes the most important information about AVELOX. If you would like more information about AVELOX, talk with your healthcare provider. You can ask your healthcare provider or pharmacist for information about AVELOX that is written for healthcare professionals. For more information go to www.AVELOX.com or call 1-800-526-4099.

## What are the ingredients in AVELOX?

AVELOX Tablets:
Active ingredient: moxifloxacin hydrochloride
Inactive ingredients: microcrystalline cellulose, lactose monohydrate, croscarmellose sodium, magnesium stearate, hypromellose, titanium dioxide, polyethylene glycol, and ferric oxide

AVELOX Injection:
Active ingredient: moxifloxacin hydrochloride

35

Reference ID: 3963471

Inactive ingredients: sodium chloride, USP, water for injection, USP, and may include hydrochloric acid and/or sodium hydroxide for pH adjustment

Manufactured for:

 **Bayer HealthCare**

Bayer HealthCare Pharmaceuticals Inc.
Whippany NJ, 07981

AVELOX Tablets manufactured in Germany
AVELOX Injection manufactured in Germany
 or
AVELOX Injection manufactured in Norway by
Fresenius Kabi Norge AS
NO-1753 Halden, Norway

**Rx Only**

©1999 Bayer HealthCare Pharmaceuticals Inc.

Revised 7/2016

Reference ID: 3963471

# Exhibit

# E

**MAXIPIME™**

**(Cefepime Hydrochloride, USP) for Injection**

**For Intravenous or Intramuscular Use**

To reduce the development of drug-resistant bacteria and maintain the effectiveness of MAXIPIME and other antibacterial drugs, MAXIPIME should be used only to treat or prevent infections that are proven or strongly suspected to be caused by bacteria.

## DESCRIPTION

MAXIPIME (cefepime hydrochloride, USP) is a semi-synthetic, broad spectrum, cephalosporin antibiotic for parenteral administration. The chemical name is 1-[[(6R,7R)-7-[2-(2-amino-4-thiazolyl)-glyoxylamido]-2-carboxy-8-oxo-5-thia-1-azabicyclo[4.2.0] oct-2-en-3-yl]methyl]-1-methylpyrrolidinium chloride,7$^2$-(Z)-(O-methyloxime), monohydrochloride, monohydrate, which corresponds to the following structural formula:



Cefepime hydrochloride is a white to pale yellow powder. Cefepime hydrochloride contains the equivalent of not less than 825 mcg and not more than 911 mcg of cefepime ($C_{19}H_{24}N_6O_5S_2$) per mg, calculated on an anhydrous basis. It is highly soluble in water.

MAXIPIME for Injection is supplied for intramuscular or intravenous administration in strengths equivalent to 500 mg, 1 g, and 2 g of cefepime. (See **DOSAGE AND ADMINISTRATION**.) MAXIPIME is a sterile, dry mixture of cefepime hydrochloride and L-arginine. It contains the equivalent of not less than 90 percent and not more than 115 percent of the labeled amount of cefepime ($C_{19}H_{24}N_6O_5S_2$). The L-arginine, at an approximate concentration of 707 mg/g of cefepime, is added to control the pH of the constituted solution at 4 to 6. Freshly constituted solutions of MAXIPIME will range in color from pale yellow to amber.

## CLINICAL PHARMACOLOGY

Cefepime is an antibacterial agent belonging to the cephalosporin class of antibacterials with *in vitro* antibacterial activity against facultative Gram-positive and Gram-negative bacteria.

Reference ID: 3185289

## Pharmacokinetics

The average plasma concentrations of cefepime observed in healthy adult male volunteers (n=9) at various times following single 30-minute infusions (IV) of cefepime 500 mg, 1 g, and 2 g are summarized in Table 1. Elimination of cefepime is principally via renal excretion with an average (±SD) half-life of 2 (±0.3) hours and total body clearance of 120 (±8) mL/min in healthy volunteers. Cefepime pharmacokinetics are linear over the range 250 mg to 2 g. There is no evidence of accumulation in healthy adult male volunteers (n=7) receiving clinically relevant doses for a period of 9 days.

## Absorption

The average plasma concentrations of cefepime and its derived pharmacokinetic parameters after intravenous (IV) administration are portrayed in Table 1.

Table 1: Average Plasma Concentrations in mcg/mL of Cefepime and Derived Pharmacokinetic Parameters (±SD), Intravenous Administration

| Parameter | MAXIPIME | | |
| --- | --- | --- | --- |
| | 500 mg IV | 1 g IV | 2 g IV |
| 0.5 h | 38.2 | 78.7 | 163.1 |
| 1 h | 21.6 | 44.5 | 85.8 |
| 2 h | 11.6 | 24.3 | 44.8 |
| 4 h | 5 | 10.5 | 19.2 |
| 8 h | 1.4 | 2.4 | 3.9 |
| 12 h | 0.2 | 0.6 | 1.1 |
| $C_{max}$, mcg/mL | 39.1 (3.5) | 81.7 (5.1) | 163.9 (25.3) |
| AUC, h•mcg/mL | 70.8 (6.7) | 148.5 (15.1) | 284.8 (30.6) |
| Number of subjects (male) | 9 | 9 | 9 |

Following intramuscular (IM) administration, cefepime is completely absorbed. The average plasma concentrations of cefepime at various times following a single intramuscular injection are summarized in Table 2. The pharmacokinetics of cefepime are linear over the range of 500 mg to 2 g intramuscularly and do not vary with respect to treatment duration.

Table 2: Average Plasma Concentrations in mcg/mL of Cefepime and Derived Pharmacokinetic Parameters (±SD), Intramuscular Administration

| Parameter | MAXIPIME | | |
| --- | --- | --- | --- |
| | 500 mg IM | 1 g IM | 2 g IM |
| 0.5 h | 8.2 | 14.8 | 36.1 |
| 1 h | 12.5 | 25.9 | 49.9 |
| 2 h | 12 | 26.3 | 51.3 |
| 4 h | 6.9 | 16 | 31.5 |
| 8 h | 1.9 | 4.5 | 8.7 |
| 12 h | 0.7 | 1.4 | 2.3 |
| $C_{max}$, mcg/mL | 13.9 (3.4) | 29.6 (4.4) | 57.5 (9.5) |
| $T_{max}$, h | 1.4 (0.9) | 1.6 (0.4) | 1.5 (0.4) |
| AUC, h•mcg/mL | 60 (8) | 137 (11) | 262 (23) |
| Number of subjects (male) | 6 | 6 | 12 |

Reference ID: 3185289

**Distribution**

The average steady-state volume of distribution of cefepime is 18 (±2) L. The serum protein binding of cefepime is approximately 20% and is independent of its concentration in serum.

Cefepime is excreted in human milk. A nursing infant consuming approximately 1000 mL of human milk per day would receive approximately 0.5 mg of cefepime per day. (See **PRECAUTIONS: Nursing Mothers**.)

Concentrations of cefepime achieved in specific tissues and body fluids are listed in Table 3.

Table 3: Average Concentrations of Cefepime in Specific Body Fluids (mcg/mL) or Tissues (mcg/g)

| Tissue or Fluid | Dose/Route | # of Patients | Average Time of Sample Post-Dose (h) | Average Concentration |
|---|---|---|---|---|
| Blister Fluid | 2 g IV | 6 | 1.5 | 81.4 mcg/mL |
| Bronchial Mucosa | 2 g IV | 20 | 4.8 | 24.1 mcg/g |
| Sputum | 2 g IV | 5 | 4 | 7.4 mcg/mL |
| Urine | 500 mg IV | 8 | 0 to 4 | 292 mcg/mL |
| | 1 g IV | 12 | 0 to 4 | 926 mcg/mL |
| | 2 g IV | 12 | 0 to 4 | 3120 mcg/mL |
| Bile | 2 g IV | 26 | 9.4 | 17.8 mcg/mL |
| Peritoneal Fluid | 2 g IV | 19 | 4.4 | 18.3 mcg/mL |
| Appendix | 2 g IV | 31 | 5.7 | 5.2 mcg/g |
| Gallbladder | 2 g IV | 38 | 8.9 | 11.9 mcg/g |
| Prostate | 2 g IV | 5 | 1 | 31.5 mcg/g |

Data suggest that cefepime does cross the inflamed blood-brain barrier. **The clinical relevance of these data is uncertain at this time.**

**Metabolism and Excretion**

Cefepime is metabolized to N-methylpyrrolidine (NMP) which is rapidly converted to the N-oxide (NMP-N-oxide). Urinary recovery of unchanged cefepime accounts for approximately 85% of the administered dose. Less than 1% of the administered dose is recovered from urine as NMP, 6.8% as NMP-N-oxide, and 2.5% as an epimer of cefepime. Because renal excretion is a significant pathway of elimination, patients with renal dysfunction and patients undergoing hemodialysis require dosage adjustment. (See **DOSAGE AND ADMINISTRATION**.)

**Specific Populations**

*Renal impairment:* Cefepime pharmacokinetics have been investigated in patients with various degrees of renal impairment (n=30). The average half-life in patients requiring hemodialysis was 13.5 (±2.7) hours and in patients requiring continuous peritoneal dialysis was 19 (±2) hours. Cefepime total body clearance decreased proportionally with

Reference ID: 3185289

creatinine clearance in patients with abnormal renal function, which serves as the basis for dosage adjustment recommendations in this group of patients. (See **DOSAGE AND ADMINISTRATION**.)

*Hepatic impairment:* The pharmacokinetics of cefepime were unaltered in patients with hepatic impairment who received a single 1 g dose (n=11).

*Geriatric patients:* Cefepime pharmacokinetics have been investigated in elderly (65 years of age and older) men (n=12) and women (n=12) whose mean (SD) creatinine clearance was 74 (±15) mL/min. There appeared to be a decrease in cefepime total body clearance as a function of creatinine clearance. Therefore, dosage administration of cefepime in the elderly should be adjusted as appropriate if the patient's creatinine clearance is 60 mL/min or less. (See **DOSAGE AND ADMINISTRATION**.)

*Pediatric patients:* Cefepime pharmacokinetics have been evaluated in pediatric patients from 2 months to 11 years of age following single and multiple doses on every 8 hours (n=29) and every 12 hours (n=13) schedules. Following a single intravenous dose, total body clearance and the steady-state volume of distribution averaged 3.3 (±1) mL/min/kg and 0.3 (±0.1) L/kg, respectively. The urinary recovery of unchanged cefepime was 60.4 (±30.4)% of the administered dose, and the average renal clearance was 2 (±1.1) mL/min/kg. There were no significant effects of age or gender (25 male vs 17 female) on total body clearance or volume of distribution, corrected for body weight. No accumulation was seen when cefepime was given at 50 mg per kg every 12 hours (n=13), while $C_{max}$, AUC, and $t_{\frac{1}{2}}$ were increased about 15% at steady state after 50 mg per kg every 8 hours. The exposure to cefepime following a 50 mg per kg intravenous dose in a pediatric patient is comparable to that in an adult treated with a 2 g intravenous dose. The absolute bioavailability of cefepime after an intramuscular dose of 50 mg per kg was 82.3 (±15)% in eight patients.

### Microbiology

Cefepime is a bactericidal agent that acts by inhibition of bacterial cell wall synthesis. Cefepime has a broad spectrum of *in vitro* activity that encompasses a wide range of Gram-positive and Gram-negative bacteria. Cefepime has a low affinity for chromosomally-encoded beta-lactamases. Cefepime is highly resistant to hydrolysis by most beta-lactamases and exhibits rapid penetration into Gram-negative bacterial cells. Within bacterial cells, the molecular targets of cefepime are the penicillin binding proteins (PBP).

Cefepime has been shown to be active against most isolates of the following microorganisms, both *in vitro* and in clinical infections as described in the **INDICATIONS AND USAGE** section.

Aerobic Gram-Negative Microorganisms:

*Enterobacter*

*Escherichia coli*

*Klebsiella pneumoniae*

Reference ID: 3185289

*Proteus mirabilis*

*Pseudomonas aeruginosa*

Aerobic Gram-Positive Microorganisms:

*Staphylococcus aureus* (methicillin-susceptible isolates only)

*Streptococcus pneumoniae*

*Streptococcus pyogenes* (Lancefield's Group A streptococci)

Viridans group streptococci

The following *in vitro* data are available, **but their clinical significance is unknown**. Cefepime has been shown to have *in vitro* activity against most isolates of the following microorganisms; however, the safety and effectiveness of cefepime in treating clinical infections due to these microorganisms have not been established in adequate and well-controlled trials.

Aerobic Gram-Positive Microorganisms:

*Staphylococcus epidermidis* (methicillin-susceptible isolates only)

*Staphylococcus saprophyticus*

*Streptococcus agalactiae* (Lancefield's Group B streptococci)

NOTE: Most isolates of enterococci, eg, *Enterococcus faecalis*, and methicillin-resistant staphylococci are resistant to cefepime.

Aerobic Gram-Negative Microorganisms:

*Acinetobacter calcoaceticus* subsp. *lwoffii*

*Citrobacter diversus*

*Citrobacter freundii*

*Enterobacter agglomerans*

*Haemophilus influenzae* (including beta-lactamase producing isolates)

*Hafnia alvei*

*Klebsiella oxytoca*

*Moraxella catarrhalis* (including beta-lactamase producing isolates)

*Morganella morganii*

*Proteus vulgaris*

*Providencia rettgeri*

*Providencia stuartii*

*Serratia marcescens*

---

EN-3082

Reference ID: 3185289

NOTE: Cefepime is inactive against many isolates of *Stenotrophomonas* (formerly *Xanthomonas maltophilia* and *Pseudomonas maltophilia*).

Anaerobic Microorganisms:

NOTE: Cefepime is inactive against most isolates of *Clostridium difficile*.

### Susceptibility Tests

### Dilution Techniques

Quantitative methods are used to determine antimicrobial minimum inhibitory concentrations (MICs). These MICs provide estimates of the susceptibility of bacteria to antimicrobial compounds. The MICs should be determined using a standardized procedure. Standardized procedures are based on a dilution method[1] (broth or agar) or equivalent with standardized inoculum concentrations and standardized concentrations of cefepime powder. The MIC values should be interpreted according to the following criteria:

Table 4

| Microorganism | MIC (mcg/mL) | | |
|---|---|---|---|
| | Susceptible (S) | Intermediate (I) | Resistant (R) |
| Microorganisms other than *Haemophilus* spp.* and *Streptococcus pneumoniae*\* | 8 | 16 | 32 |
| *Haemophilus* spp.* | | | |
| *S. pneumoniae*\* | 0.5 | 1 | 2 |

*NOTE: Isolates from these species should be tested for susceptibility using specialized dilution testing methods.[1] Also, isolates of *Haemophilus* spp. with MICs greater than 2 mcg/mL should be considered equivocal and should be further evaluated.

A report of "Susceptible" indicates that the pathogen is likely to be inhibited if the antimicrobial compound in the blood reaches the concentrations usually achievable. A report of "Intermediate" indicates that the result should be considered equivocal, and, if the microorganism is not fully susceptible to alternative, clinically feasible drugs, the test should be repeated. This category implies possible clinical applicability in body sites where the drug is physiologically concentrated or in situations where high dosage of drug can be used. This category also provides a buffer zone which prevents small uncontrolled technical factors from causing major discrepancies in interpretation. A report of "Resistant" indicates that the pathogen is not likely to be inhibited if the antimicrobial compound in the blood reaches the concentrations usually achievable; other therapy should be selected.

Standardized susceptibility test procedures require the use of laboratory control microorganisms to control the technical aspects of the laboratory procedures. Laboratory control microorganisms are specific strains of microbiological assay organisms with intrinsic biological properties relating to resistance mechanisms and their genetic expression within bacteria; the specific strains are not clinically significant in their current microbiological status. Standard cefepime powder should provide the following MIC values (Table 5) when tested against the designated quality control strains:

Reference ID: 3185289

| | Table 5 | |
|---|---|---|
| **Microorganism** | **ATCC** | **MIC (mcg/mL)** |
| *Escherichia coli* | 25922 | 0.016 to 0.12 |
| *Staphylococcus aureus* | 29213 | 1 to 4 |
| *Pseudomonas aeruginosa* | 27853 | 1 to 4 |
| *Haemophilus influenzae* | 49247 | 0.5 to 2 |
| *Streptococcus pneumoniae* | 49619 | 0.06 to 0.25 |

### Diffusion Techniques

Quantitative methods that require measurement of zone diameters also provide reproducible estimates of the susceptibility of bacteria to antimicrobial compounds. One such standardized procedure[2] requires the use of standardized inoculum concentrations. This procedure uses paper disks impregnated with 30 mcg of cefepime to test the susceptibility of microorganisms to cefepime. Interpretation is identical to that stated above for results using dilution techniques.

Reports from the laboratory providing results of the standard single-disk susceptibility test with a 30-mcg cefepime disk should be interpreted according to the following criteria:

| | Table 6 | | |
|---|---|---|---|
| | **Zone Diameter (mm)** | | |
| **Microorganism** | **Susceptible (S)** | **Intermediate (I)** | **Resistant (R)** |
| Microorganisms other than *Haemophilus* spp.* and *S. pneumoniae*\* | 18 | 15 to 17 | 14 |
| *Haemophilus* spp.\* | 26 | | |

\*NOTE: Isolates from these species should be tested for susceptibility using specialized diffusion testing methods.[2] Isolates of *Haemophilus* spp. with zones smaller than 26 mm should be considered equivocal and should be further evaluated. Isolates of *S. pneumoniae* should be tested against a 1-mcg oxacillin disk; isolates with oxacillin zone sizes larger than or equal to 20 mm may be considered susceptible to cefepime.

As with standardized dilution techniques, diffusion methods require the use of laboratory control microorganisms to control the technical aspects of the laboratory procedures. Laboratory control microorganisms are specific strains of microbiological assay organisms with intrinsic biological properties relating to resistance mechanisms and their genetic expression within bacteria; the specific strains are not clinically significant in their current microbiological status. For the diffusion technique, the 30 mcg cefepime disk should provide the following zone diameters in these laboratory test quality control strains (Table 7):

| | Table 7 | |
|---|---|---|
| **Microorganism** | **ATCC** | **Zone Size Range (mm)** |
| *Escherichia coli* | 25922 | 29 to 35 |
| *Staphylococcus aureus* | 25923 | 23 to 29 |
| *Pseudomonas aeruginosa* | 27853 | 24 to 30 |
| *Haemophilus influenzae* | 49247 | 25 to 31 |

Reference ID: 3185289

## INDICATIONS AND USAGE

MAXIPIME is indicated in the treatment of the following infections caused by susceptible strains of the designated microorganisms (see also **PRECAUTIONS: Pediatric Use** and **DOSAGE AND ADMINISTRATION**):

**Pneumonia** (moderate to severe) caused by *Streptococcus pneumoniae*, including cases associated with concurrent bacteremia, *Pseudomonas aeruginosa*, *Klebsiella pneumoniae*, or *Enterobacter* species.

**Empiric Therapy for Febrile Neutropenic Patients.** Cefepime as monotherapy is indicated for empiric treatment of febrile neutropenic patients. In patients at high risk for severe infection (including patients with a history of recent bone marrow transplantation, with hypotension at presentation, with an underlying hematologic malignancy, or with severe or prolonged neutropenia), antimicrobial monotherapy may not be appropriate. Insufficient data exist to support the efficacy of cefepime monotherapy in such patients. (See **CLINICAL STUDIES**.)

**Uncomplicated and Complicated Urinary Tract Infections (including pyelonephritis)** caused by *Escherichia coli* or *Klebsiella pneumoniae*, when the infection is severe, or caused by *Escherichia coli*, *Klebsiella pneumoniae*, or *Proteus mirabilis*, when the infection is mild to moderate, including cases associated with concurrent bacteremia with these microorganisms.

**Uncomplicated Skin and Skin Structure Infections** caused by *Staphylococcus aureus* (methicillin-susceptible strains only) or *Streptococcus pyogenes*.

**Complicated Intra-abdominal Infections** (used in combination with metronidazole) caused by *Escherichia coli*, viridans group streptococci, *Pseudomonas aeruginosa*, *Klebsiella pneumoniae*, *Enterobacter* species, or *Bacteroides fragilis*. (See **CLINICAL STUDIES**.)

To reduce the development of drug-resistant bacteria and maintain the effectiveness of MAXIPIME and other antibacterial drugs, MAXIPIME should be used only to treat or prevent infections that are proven or strongly suspected to be caused by susceptible bacteria. When culture and susceptibility information are available, they should be considered in selecting or modifying antibacterial therapy. In the absence of such data, local epidemiology and susceptibility patterns may contribute to the empiric selection of therapy.

## CLINICAL STUDIES

### Febrile Neutropenic Patients

The safety and efficacy of empiric cefepime monotherapy of febrile neutropenic patients have been assessed in two multicenter, randomized trials comparing cefepime monotherapy (at a dose of 2 g intravenously every 8 hours) to ceftazidime monotherapy

Reference ID: 3185289

(at a dose of 2 g intravenously every 8 hours). These studies comprised 317 evaluable patients. Table 8 describes the characteristics of the evaluable patient population.

Table 8: Demographics of Evaluable Patients (First Episodes Only)

| | Cefepime | Ceftazidime |
|---|---|---|
| **Total** | **164** | **153** |
| Median age (yr) | 56 (range, 18 to 82) | 55 (range, 16 to 84) |
| Male | 86 (52%) | 85 (56%) |
| Female | 78 (48%) | 68 (44%) |
| Leukemia | 65 (40%) | 52 (34%) |
| Other hematologic malignancies | 43 (26%) | 36 (24%) |
| Solid tumor | 54 (33%) | 56 (37%) |
| Median ANC nadir (cells/microliter) | 20 (range, 0 to 500) | 20 (range, 0 to 500) |
| Median duration of neutropenia (days) | 6 (range, 0 to 39) | 6 (range, 0 to 32) |
| Indwelling venous catheter | 97 (59%) | 86 (56%) |
| Prophylactic antibiotics | 62 (38%) | 64 (42%) |
| Bone marrow graft | 9 (5%) | 7 (5%) |
| SBP less than 90 mm Hg at entry | 7 (4%) | 2 (1%) |

ANC = absolute neutrophil count; SBP = systolic blood pressure

Table 9 describes the clinical response rates observed. For all outcome measures, cefepime was therapeutically equivalent to ceftazidime.

Table 9: Pooled Response Rates for Empiric Therapy of Febrile Neutropenic Patients

| Outcome Measures | % Response | |
|---|---|---|
| | Cefepime (n=164) | Ceftazidime (n=153) |
| Primary episode resolved with no treatment modification, no new febrile episodes or infection, and oral antibiotics allowed for completion of treatment | 51 | 55 |
| Primary episode resolved with no treatment modification, no new febrile episodes or infection and no post-treatment oral antibiotics | 34 | 39 |
| Survival, any treatment modification allowed | 93 | 97 |
| Primary episode resolved with no treatment modification and oral antibiotics allowed for completion of treatment | 62 | 67 |
| Primary episode resolved with no treatment modification and no post-treatment oral antibiotics | 46 | 51 |

Insufficient data exist to support the efficacy of cefepime monotherapy in patients at high risk for severe infection (including patients with a history of recent bone marrow transplantation, with hypotension at presentation, with an underlying hematologic malignancy, or with severe or prolonged neutropenia). No data are available in patients with septic shock.

### Complicated Intra-Abdominal Infections

Patients hospitalized with complicated intra-abdominal infections participated in a randomized, double-blind, multicenter trial comparing the combination of cefepime (2 g every 12 hours) plus intravenous metronidazole (500 mg every 6 hours) versus imipenem/cilastatin (500 mg every 6 hours) for a maximum duration of 14 days of therapy. The study was designed to demonstrate equivalence of the two therapies. The primary analyses were conducted on the protocol-valid population, which consisted of those with a surgically confirmed complicated infection, at least one pathogen isolated pretreatment, at least 5 days of treatment, and a 4 to 6 week follow-up assessment for cured patients. Subjects in the imipenem/cilastatin arm had higher APACHE II scores at baseline. The treatment groups were otherwise generally comparable with regard to their pretreatment characteristics. The overall clinical cure rate among the protocol-valid patients was 81% (51 cured/63 evaluable patients) in the cefepime plus metronidazole group and 66% (62/94) in the imipenem/cilastatin group. The observed differences in efficacy may have been due to a greater proportion of patients with high APACHE II scores in the imipenem/cilastatin group.

## CONTRAINDICATIONS

MAXIPIME is contraindicated in patients who have shown immediate hypersensitivity reactions to cefepime or the cephalosporin class of antibiotics, penicillins or other beta-lactam antibiotics.

## WARNINGS

**Hypersensitivity Reactions to Cefepime, Cephalosporins, Penicillins, or Other Drugs**
Before therapy with MAXIPIME for Injection is instituted, careful inquiry should be made to determine whether the patient has had previous immediate hypersensitivity reactions to cefepime, cephalosporins, penicillins, or other drugs. Exercise caution if this product is to be given to penicillin-sensitive patients because cross-hypersensitivity among beta-lactam antibiotics has been clearly documented and may occur in up to 10% of patients with a history of penicillin allergy. If an allergic reaction to MAXIPIME occurs, discontinue the drug.

### Use in Patients with Renal Impairment
In patients with creatinine clearance less than or equal to 60 mL/min, adjust the dose of MAXIPIME (cefepime hydrochloride) to compensate for the slower rate of renal elimination [see **DOSAGE AND ADMINISTRATION**]. Because high and prolonged serum cefepime concentrations can occur from usual dosages in patients with renal impairment, the cefepime dosage should be reduced when it is administered to such patients. Continued dosage should be determined by degree of renal impairment, severity of infection, and susceptibility of the causative organisms.

### Neurotoxicity
During postmarketing surveillance, serious adverse reactions have been reported including life-threatening or fatal occurrences of the following: encephalopathy

---

Reference ID: 3185289

(disturbance of consciousness including confusion, hallucinations, stupor, and coma), myoclonus, seizures, and nonconvulsive status epilepticus (see **ADVERSE REACTIONS: Postmarketing Experience**). Most cases occurred in patients with renal impairment who did not receive appropriate dosage adjustment. However, some cases of neurotoxicity occurred in patients receiving a dosage adjustment appropriate for their degree of renal impairment. In the majority of cases, symptoms of neurotoxicity were reversible and resolved after discontinuation of cefepime and/or after hemodialysis. If neurotoxicity associated with cefepime therapy occurs, consider discontinuing cefepime or making appropriate dosage adjustments in patients with renal impairment.

### *Clostridium difficile* **Associated Diarrhea**

*Clostridium difficile* associated diarrhea (CDAD) has been reported with use of nearly all antibacterial agents, including MAXIPIME, and may range in severity from mild diarrhea to fatal colitis. Treatment with antibacterial agents alters the normal flora of the colon leading to overgrowth of *C. difficile.*

*C. difficile* produces toxins A and B, which contribute to the development of CDAD. Hypertoxin-producing strains of *C. difficile* cause increased morbidity and mortality, as these infections can be refractory to antimicrobial therapy and may require colectomy. CDAD must be considered in all patients who present with diarrhea following antibiotic use. Careful medical history is necessary since CDAD has been reported to occur over two months after the administration of antibacterial agents.

If CDAD is suspected or confirmed, ongoing antibiotic use not directed against *C. difficile* may need to be discontinued. Appropriate fluid and electrolyte management, protein supplementation, antibiotic treatment of *C. difficile*, and surgical evaluation should be instituted as clinically indicated.

### **PRECAUTIONS**

### **General**

Prescribing MAXIPIME in the absence of a proven or strongly suspected bacterial infection or a prophylactic indication is unlikely to provide benefit to the patient and increases the risk of the development of drug-resistant bacteria.

As with other antimicrobials, prolonged use of MAXIPIME may result in overgrowth of nonsusceptible microorganisms. Repeated evaluation of the patient's condition is essential. Should superinfection occur during therapy, appropriate measures should be taken.

Many cephalosporins, including cefepime, have been associated with a fall in prothrombin activity. Those at risk include patients with renal or hepatic impairment, or poor nutritional state, as well as patients receiving a protracted course of antimicrobial therapy. Prothrombin time should be monitored in patients at risk, and exogenous vitamin K administered as indicated.

Reference ID: 3185289

Positive direct Coombs' tests have been reported during treatment with MAXIPIME. In hematologic studies or in transfusion cross-matching procedures when antiglobulin tests are performed on the minor side or in Coombs' testing of newborns whose mothers have received cephalosporin antibiotics before parturition, it should be recognized that a positive Coombs' test may be due to the drug.

MAXIPIME (cefepime hydrochloride) should be prescribed with caution in individuals with a history of gastrointestinal disease, particularly colitis.

Arginine has been shown to alter glucose metabolism and elevate serum potassium transiently when administered at 33 times the amount provided by the maximum recommended human dose of MAXIPIME. The effect of lower doses is not presently known.

**Information for Patients**

Patients should be counseled that antibacterial drugs including MAXIPIME should only be used to treat bacterial infections. They do not treat viral infections (eg, the common cold). When MAXIPIME is prescribed to treat a bacterial infection, patients should be told that although it is common to feel better early in the course of therapy, the medication should be taken exactly as directed. Skipping doses or not completing the full course of therapy may (1) decrease the effectiveness of the immediate treatment and (2) increase the likelihood that bacteria will develop resistance and will not be treatable by MAXIPIME or other antibacterial drugs in the future.

Diarrhea is a common problem caused by antibiotics, which usually ends when the antibiotic is discontinued. Sometimes after starting treatment with antibiotics, patients can develop watery and bloody stools (with or without stomach cramps and fever) even as late as two or more months after having taken the last dose of the antibiotic. If this occurs, patients should contact their physician as soon as possible.

Patients should be advised of neurological adverse events that could occur with MAXIPIME use. Patients should be instructed to inform their healthcare provider at once of any neurological signs and symptoms, including encephalopathy (disturbance of consciousness including confusion, hallucinations, stupor, and coma), myoclonus, and seizures, for immediate treatment, dosage adjustment, or discontinuation of MAXIPIME.

**Drug Interactions**

Renal function should be monitored carefully if high doses of aminoglycosides are to be administered with MAXIPIME because of the increased potential of nephrotoxicity and ototoxicity of aminoglycoside antibiotics. Nephrotoxicity has been reported following concomitant administration of other cephalosporins with potent diuretics such as furosemide.

Reference ID: 3185289

**Drug/Laboratory Test Interactions**

The administration of cefepime may result in a false-positive reaction for glucose in the urine when using Clinitest™ tablets. It is recommended that glucose tests based on enzymatic glucose oxidase reactions (such as Clinistix™) be used.

**Carcinogenesis, Mutagenesis, Impairment of Fertility**

No animal carcinogenicity studies have been conducted with cefepime. In chromosomal aberration studies, cefepime was positive for clastogenicity in primary human lymphocytes, but negative in Chinese hamster ovary cells. In other *in vitro* assays (bacterial and mammalian cell mutation, DNA repair in primary rat hepatocytes, and sister chromatid exchange in human lymphocytes), cefepime was negative for genotoxic effects. Moreover, *in vivo* assessments of cefepime in mice (2 chromosomal aberration and 2 micronucleus studies) were negative for clastogenicity. No untoward effects on fertility were observed in rats when cefepime was administered subcutaneously at doses up to 1000 mg/kg/day (1.6 times the recommended maximum human dose calculated on a mg/m$^2$ basis).

**Pregnancy**

**Teratogenic Effects: Pregnancy Category B**

Cefepime was not teratogenic or embryocidal when administered during the period of organogenesis to rats at doses up to 1000 mg/kg/day (1.6 times the recommended maximum human dose calculated on a mg/m$^2$ basis) or to mice at doses up to 1200 mg/kg (approximately equal to the recommended maximum human dose calculated on a mg/m$^2$ basis) or to rabbits at a dose level of 100 mg/kg (0.3 times the recommended maximum human dose calculated on a mg/m$^2$ basis).

There are, however, no adequate and well-controlled studies of cefepime use in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed.

**Nursing Mothers**

Cefepime is excreted in human breast milk in very low concentrations (0.5 mcg/mL). Caution should be exercised when cefepime is administered to a nursing woman.

**Labor and Delivery**

Cefepime has not been studied for use during labor and delivery. Treatment should only be given if clearly indicated.

Reference ID: 3185289

## Pediatric Use

The safety and effectiveness of cefepime in the treatment of uncomplicated and complicated urinary tract infections (including pyelonephritis), uncomplicated skin and skin structure infections, pneumonia, and as empiric therapy for febrile neutropenic patients have been established in the age groups 2 months up to 16 years. Use of MAXIPIME in these age groups is supported by evidence from adequate and well-controlled studies of cefepime in adults with additional pharmacokinetic and safety data from pediatric trials (see **CLINICAL PHARMACOLOGY**).

Safety and effectiveness in pediatric patients below the age of 2 months have not been established. There are insufficient clinical data to support the use of MAXIPIME in pediatric patients under 2 months of age or for the treatment of serious infections in the pediatric population where the suspected or proven pathogen is *Haemophilus influenzae* type b.

IN THOSE PATIENTS IN WHOM MENINGEAL SEEDING FROM A DISTANT INFECTION SITE OR IN WHOM MENINGITIS IS SUSPECTED OR DOCUMENTED, AN ALTERNATE AGENT WITH DEMONSTRATED CLINICAL EFFICACY IN THIS SETTING SHOULD BE USED.

## Geriatric Use

Of the more than 6400 adults treated with MAXIPIME in clinical studies, 35% were 65 years or older while 16% were 75 years or older. When geriatric patients received the usual recommended adult dose, clinical efficacy and safety were comparable to clinical efficacy and safety in nongeriatric adult patients.

Serious adverse events have occurred in geriatric patients with renal insufficiency given unadjusted doses of cefepime, including life-threatening or fatal occurrences of the following: encephalopathy, myoclonus, and seizures. (See **WARNINGS** and **ADVERSE REACTIONS**.)

This drug is known to be substantially excreted by the kidney, and the risk of toxic reactions to this drug may be greater in patients with impaired renal function. Because elderly patients are more likely to have decreased renal function, care should be taken in dose selection, and renal function should be monitored. (See **CLINICAL PHARMACOLOGY: Special Populations, WARNINGS,** and **DOSAGE AND ADMINISTRATION**.)

## ADVERSE REACTIONS

### Clinical Trials

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

---

EN-3082                                                                Page 14 of 24

In clinical trials using multiple doses of cefepime, 4137 patients were treated with the recommended dosages of cefepime (500 mg to 2 g intravenous every 12 hours). There were no deaths or permanent disabilities thought related to drug toxicity. Sixty-four (1.5%) patients discontinued medication due to adverse events thought by the investigators to be possibly, probably, or almost certainly related to drug toxicity. Thirty-three (51%) of these 64 patients who discontinued therapy did so because of rash. The percentage of cefepime-treated patients who discontinued study drug because of drug-related adverse events was very similar at daily doses of 500 mg, 1 g, and 2 g every 12 hours (0.8%, 1.1%, and 2 %, respectively). However, the incidence of discontinuation due to rash increased with the higher recommended doses.

The following adverse events were thought to be probably related to cefepime during evaluation of the drug in clinical trials conducted in North America (n=3125 cefepime-treated patients).

Table 10: Adverse Reactions Cefepime Multiple-Dose Dosing Regimens Clinical Trials— North America

| INCIDENCE EQUAL TO OR GREATER THAN 1% | Local reactions (3 %), including phlebitis (1.3%), pain and/or inflammation (0.6%)*; rash(1.1%) |
|---|---|
| INCIDENCE LESS THAN 1% BUT GREATER THAN 0.1% | Colitis(including pseudomembranous colitis), diarrhea, fever, headache, nausea, oral moniliasis,pruritus,urticaria, vaginitis, vomiting |

* Local reactions, irrespective of relationship to cefepime in those patients who received intravenous infusion (n=3048).

At the higher dose of 2 g every 8 hours, the incidence of probably-related adverse events was higher among the 795 patients who received this dose of cefepime. They consisted of rash (4%), diarrhea (3%), nausea (2%), vomiting (1%), pruritus (1%), fever (1%), and headache (1%).

The following adverse laboratory changes, irrespective of relationship to therapy with cefepime, were seen during clinical trials conducted in North America.

Table 11: Adverse Laboratory Changes Cefepime Multiple-Dose Dosing Regimens Clinical Trials – North America

| INCIDENCE EQUAL TO OR GREATER THAN 1% | Positive Coombs' test (without hemolysis) (16.2%); decreased phosphorus (2.8%); increased ALT/SGPT (2.8%), AST/SGOT (2.4%), eosinophils (1.7%); abnormal PTT (1.6%), PT (1.4%) |
|---|---|
| INCIDENCE LESS THAN 1% BUT GREATER THAN 0.1% | Increased alkaline phosphatase, BUN, calcium, creatinine, phosphorus, potassium, total bilirubin; decreased calcium*, hematocrit, neutrophils, platelets, WBC |

* Hypocalcemia was more common among elderly patients. Clinical consequences from changes in either calcium or phosphorus were not reported.

Reference ID: 3185289

A similar safety profile was seen in clinical trials of pediatric patients (see **PRECAUTIONS: Pediatric Use**).

**Postmarketing Experience**

In addition to the events reported during North American clinical trials with cefepime, the following adverse experiences have been reported during worldwide postmarketing experience.

Encephalopathy (disturbance of consciousness including confusion, hallucinations, stupor, and coma), myoclonus, seizures, and nonconvulsive status epilepticus have been reported. Although most cases occurred in patients with renal impairment who received doses of cefepime that exceeded the recommended dosage schedules, some cases of neurotoxicity occurred in patients receiving an appropriate dosage adjustment for their degree of renal impairment. If neurotoxicity associated with cefepime therapy occurs, consider discontinuing cefepime or making appropriate dosage adjustments in patients with renal impairment. (See **WARNINGS**).

As with other cephalosporins, anaphylaxis including anaphylactic shock, transient leukopenia, neutropenia, agranulocytosis and thrombocytopenia have been reported.

**Cephalosporin-Class Adverse Reactions**

In addition to the adverse reactions listed above that have been observed in patients treated with cefepime, the following adverse reactions and altered laboratory tests have been reported for cephalosporin-class antibiotics:

Stevens-Johnson syndrome, erythema multiforme, toxic epidermal necrolysis, renal dysfunction, toxic nephropathy, aplastic anemia, hemolytic anemia, hemorrhage, hepatic dysfunction including cholestasis, and pancytopenia.

**OVERDOSAGE**

Patients who receive an overdose should be carefully observed and given supportive treatment. In the presence of renal insufficiency, hemodialysis, not peritoneal dialysis, is recommended to aid in the removal of cefepime from the body. Accidental overdosing has occurred when large doses were given to patients with impaired renal function. Symptoms of overdose include encephalopathy (disturbance of consciousness including confusion, hallucinations, stupor, and coma), myoclonus, seizures, and neuromuscular excitability. (See **WARNINGS, ADVERSE REACTIONS, and DOSAGE AND ADMINISTRATION**.)

**DOSAGE AND ADMINISTRATION**

The recommended adult and pediatric dosages and routes of administration are outlined in the following table. MAXIPIME should be administered intravenously over approximately 30 minutes.

EN-3082                                                      Page 16 of 24

Table 12: Recommended Dosage Schedule for MAXIPIME in Patients with CrCL Greater Than 60 mL/min

| Site and Type of Infection | Dose | Frequency | Duration (days) |
|---|---|---|---|
| **Adults** | | | |
| **Moderate to Severe** Pneumonia due to *S. pneumoniae\**, *P. aeruginosa, K. pneumoniae,* or *Enterobacter* species | 1 to 2 g IV | Every 12 hours | 10 |
| Empiric therapy for febrile neutropenic patients (See **INDICATIONS AND USAGE** and **CLINICAL STUDIES.**) | 2 g IV | Every 8 hours | 7\*\* |
| **Mild to Moderate** Uncomplicated or Complicated Urinary Tract Infections, including pyelonephritis, due to *E. coli, K. pneumoniae,* or *P. mirabilis\** | 0.5 to 1 g IV/IM\*\*\* | Every 12 hours | 7 to 10 |
| **Severe** Uncomplicated or Complicated Urinary Tract Infections, including pyelonephritis, due to *E. coli* or *K. pneumoniae\** | 2 g IV | Every 12 hours | 10 |
| **Moderate to Severe** Uncomplicated Skin and Skin Structure Infections due to *S. aureus* or *S. pyogenes* | 2 g IV | Every 12 hours | 10 |
| **Complicated Intra-abdominal Infections** (used in combination with metronidazole) caused by *E. coli,* viridans group streptococci, *P. aeruginosa, K. pneumoniae, Enterobacter* species, or *B. fragilis.* (See **CLINICAL STUDIES.**) | 2 g IV | Every 12 hours | 7 to 10 |

**Pediatric Patients (2 months up to 16 years)**
The maximum dose for pediatric patients should not exceed the recommended adult dose. The usual recommended dosage in pediatric patients up to 40 kg in weight for uncomplicated and complicated urinary tract infections (including pyelonephritis), uncomplicated skin and skin structure infections, and pneumonia is 50 mg per kg per dose, administered every 12 hours (50 mg per kg per dose, every 8 hours for febrile neutropenic patients), for durations as given above.

\*including cases associated with concurrent bacteremia
\*\*or until resolution of neutropenia. In patients whose fever resolves but who remain neutropenic for more than 7 days, the need for continued antimicrobial therapy should be re-evaluated frequently.
\*\*\*Intramuscular route of administration is indicated only for mild to moderate, uncomplicated or complicated UTIs due to *E. coli* when the intramuscular route is considered to be a more appropriate route of drug administration.

## Patients with Hepatic Impairment

No adjustment is necessary for patients with hepatic impairment.

## Patients with Renal Impairment

In patients with creatinine clearance less than or equal to 60 mL/min, the dose of MAXIPIME should be adjusted to compensate for the slower rate of renal elimination. The recommended initial dose of MAXIPIME should be the same as in patients with normal renal function except in patients undergoing hemodialysis. The recommended doses of MAXIPIME in patients with renal impairment are presented in Table 13.

Reference ID: 3185289

When only serum creatinine is available, the following formula (Cockcroft and Gault equation)[3] may be used to estimate creatinine clearance. The serum creatinine should represent a steady state of renal function:

$$\text{Males: Creatinine Clearance (mL/min)} = \frac{\text{Weight (kg)} \times (140 - \text{age})}{72 \times \text{serum creatinine (mg/dL)}}$$

Females: 0.85 × above value

Table 13: Recommended Dosing Schedule for MAXIPIME in Adult Patients
(Normal Renal Function, Renal Impairment, and Hemodialysis)

| Creatinine Clearance (mL/min) | Recommended Maintenance Schedule | | | |
|---|---|---|---|---|
| Greater than 60 Normal recommended dosing schedule | 500 mg every 12 hours | 1 g every 12 hours | 2 g every 12 hours | 2 g every 8 hours |
| 30 to 60 | 500 mg every 24 hours | 1 g every 24 hours | 2 g every 24 hours | 2 g every 12 hours |
| 11 to 29 | 500 mg every 24 hours | 500 mg every 24 hours | 1 g every 24 hours | 2 g every 24 hours |
| Less than 11 | 250 mg every 24 hours | 250 mg every 24 hours | 500 mg every 24 hours | 1 g every 24 hours |
| CAPD | 500 mg every 48 hours | 1 g every 48 hours | 2 g every 48 hours | 2 g every 48 hours |
| Hemodialysis* | 1 g on day 1, then 500 mg every 24 hours thereafter | | | 1 g every 24 hours |

*On hemodialysis days, cefepime should be administered following hemodialysis. Whenever possible, cefepime should be administered at the same time each day.

In patients undergoing continuous ambulatory peritoneal dialysis, MAXIPIME may be administered at normally recommended doses at a dosage interval of every 48 hours (see Table 13).

In patients undergoing hemodialysis, approximately 68% of the total amount of cefepime present in the body at the start of dialysis will be removed during a 3-hour dialysis period. The dosage of MAXIPIME for hemodialysis patients is 1 g on Day 1 followed by 500 mg every 24 hours for the treatment of all infections except febrile neutropenia, which is 1 g every 24 hours.

MAXIPIME should be administered at the same time each day and following the completion of hemodialysis on hemodialysis days (see Table 13).

Reference ID: 3185289

Data in pediatric patients with impaired renal function are not available; however, since cefepime pharmacokinetics are similar in adults and pediatric patients (see **CLINICAL PHARMACOLOGY**), changes in the dosing regimen proportional to those in adults (see Tables 12 and 13) are recommended for pediatric patients.

**Administration**

**For Intravenous Infusion,** Dilute with a suitable parenteral vehicle prior to intravenous infusion. Constitute the 500 mg, 1 g, or 2 g vial, and add an appropriate quantity of the resulting solution to an intravenous container with one of the compatible intravenous fluids listed in the **Compatibility and Stability** subsection. **THE RESULTING SOLUTION SHOULD BE ADMINISTERED OVER APPROXIMATELY 30 MINUTES.**

Intermittent intravenous infusion with a Y-type administration set can be accomplished with compatible solutions. However, during infusion of a solution containing cefepime, it is desirable to discontinue the other solution.

ADD-Vantage™ vials are to be constituted only with 50 mL or 100 mL of 5% Dextrose Injection or 0.9% Sodium Chloride Injection in ADD-Vantage flexible diluent containers. (See ADD-Vantage Vial Instructions for Use.)

**Intramuscular Administration:** For intramuscular administration, MAXIPIME (cefepime hydrochloride) should be constituted with one of the following diluents: Sterile Water for Injection, 0.9% Sodium Chloride, 5% Dextrose Injection, 0.5% or 1 % Lidocaine Hydrochloride, or Sterile Bacteriostatic Water for Injection with Parabens or Benzyl Alcohol (refer to Table 14).

Preparation of MAXIPIME solutions is summarized in Table 14.

Table 14: Preparation of Solutions of MAXIPIME

| Single-Dose Vials for Intravenous/Intramuscular Administration | Amount of Diluent to be added (mL) | Approximate Available Volume (mL) | Approximate Cefepime Concentration (mg/mL) |
|---|---|---|---|
| cefepime vial content | | | |
| 500 mg (IV) | 5 | 5.6 | 100 |
| 500 mg (IM) | 1.3 | 1.8 | 280 |
| 1 g (IV) | 10 | 11.3 | 100 |
| 1 g (IM) | 2.4 | 3.6 | 280 |
| 2 g (IV) | 10 | 12.5 | 160 |
| ADD-Vantage | | | |
| 1 g vial | 50 | 50 | 20 |
| 1 g vial | 100 | 100 | 10 |
| 2 g vial | 50 | 50 | 40 |
| 2 g vial | 100 | 100 | 20 |

**Compatibility and Stability**

Reference ID: 3185289

**Intravenous:** MAXIPIME is compatible at concentrations between 1 mg per mL and 40 mg per mL with the following intravenous infusion fluids: 0.9% Sodium Chloride Injection, 5% and 10% Dextrose Injection, M/6 Sodium Lactate Injection, 5% Dextrose and 0.9% Sodium Chloride Injection, Lactated Ringers and 5% Dextrose Injection, Normosol™-R, and Normosol™-M in 5% Dextrose Injection. These solutions may be stored up to 24 hours at controlled room temperature 20°C to 25°C (68°F to 77°F) or 7 days in a refrigerator 2°C to 8°C (36°F to 46°F). MAXIPIME in ADD-Vantage vials is stable at concentrations of 10 to 40 mg per mL in 5% Dextrose Injection or 0.9% Sodium Chloride Injection for 24 hours at controlled room temperature 20°C to 25°C or 7 days in a refrigerator 2°C to 8°C.

MAXIPIME admixture compatibility information is summarized in Table 15.

Table 15: Cefepime Admixture Stability

| MAXIPIME Concentration | Admixture and Concentration | IV Infusion Solutions | Stability Time for | |
|---|---|---|---|---|
| | | | RT/L (20° to 25°C) | Refrigeration (2° to 8°C) |
| 40 mg/mL | Amikacin 6 mg/mL | NS or D5W | 24 hours | 7 days |
| 40 mg/mL | Ampicillin 1 mg/mL | D5W | 8 hours | 8 hours |
| 40 mg/mL | Ampicillin 10 mg/mL | D5W | 2 hours | 8 hours |
| 40 mg/mL | Ampicillin 1 mg/mL | NS | 24 hours | 48 hours |
| 40 mg/mL | Ampicillin 10 mg/mL | NS | 8 hours | 48 hours |
| 4 mg/mL | Ampicillin 40 mg/mL | NS | 8 hours | 8 hours |
| 4 to 40 mg/mL | Clindamycin Phosphate 0.25 to 6 mg/mL | NS or D5W | 24 hours | 7 days |
| 4 mg/mL | Heparin 10 to 50 units/mL | NS or D5W | 24 hours | 7 days |
| 4 mg/mL | Potassium Chloride 10 to 40 mEq/L | NS or D5W | 24 hours | 7 days |
| 4 mg/mL | Theophylline 0.8 mg/mL | D5W | 24 hours | 7 days |
| 1 to 4 mg/mL | na | Aminosyn™ II 4.25% with electrolytes and calcium | 8 hours | 3 days |
| 0.125 to 0.25 mg/mL | na | Inpersol™ with 4.25% dextrose | 24 hours | 7 days |

NS = 0.9% Sodium Chloride Injection
D5W = 5% Dextrose Injection
na = not applicable
RT/L = Ambient room temperature and light

Solutions of MAXIPIME, like those of most beta-lactam antibiotics, should not be added to solutions of ampicillin at a concentration greater than 40 mg per mL, and should not be

Reference ID: 3185289

added to metronidazole, vancomycin, gentamicin, tobramycin, netilmicin sulfate, or aminophylline because of potential interaction. However, if concurrent therapy with MAXIPIME is indicated, each of these antibiotics can be administered separately.

**Intramuscular:** MAXIPIME (cefepime hydrochloride) constituted as directed is stable for 24 hours at controlled room temperature 20°C to 25°C (68°F to 77°F) or for 7 days in a refrigerator 2°C to 8°C (36°F to 46°F) with the following diluents: Sterile Water for Injection, 0.9% Sodium Chloride Injection, 5% Dextrose Injection, Sterile Bacteriostatic Water for Injection with Parabens or Benzyl Alcohol, or 0.5% or 1% Lidocaine Hydrochloride.

**NOTE: PARENTERAL DRUGS SHOULD BE INSPECTED VISUALLY FOR PARTICULATE MATTER BEFORE ADMINISTRATION. IF PARTICULATE MATTER IS EVIDENT IN RECONSTITUTED FLUIDS, THE DRUG SOLUTION SHOULD BE DISCARDED.**

As with other cephalosporins, the color of MAXIPIME powder, as well as its solutions, tend to darken depending on storage conditions; however, when stored as recommended, the product potency is not adversely affected.

### *INSTRUCTIONS FOR USE*

**These instructions for use should be made available to the individuals who perform the reconstitution steps.**

#### To Open:
Peel overwrap at corner and remove solution container. Some opacity of the plastic due to moisture absorption during the sterilization process may be observed. This is normal and does not affect the solution quality or safety. The opacity will diminish gradually.

#### To Assemble Vial and Flexible Diluent Container:

#### (Use Aseptic Technique)
1. Remove the protective covers from the top of the vial and the vial port on the diluent container as follows:

a. To remove the breakaway vial cap, swing the pull ring over the top of the vial and pull down far enough to start the opening (SEE FIGURE 1.), then pull straight up to remove the cap. (SEE FIGURE 2.)

**NOTE:** Once the breakaway cap has been removed, do not access vial with syringe.





Fig. 1    Fig. 2

b. To remove the vial port cover, grasp the tab on the pull ring, pull up to break the three tie strings, then pull back to remove the cover. (SEE FIGURE 3.)

2. Screw the vial into the vial port until it will go no further. THE VIAL MUST BE SCREWED IN TIGHTLY TO ASSURE A SEAL. This occurs approximately 1/2 turn (180°) after the first audible click. (SEE FIGURE 4.) The clicking sound does not assure a seal; the vial must be turned as far as it will go.

**NOTE:** Once vial is seated, do not attempt to remove. (SEE FIGURE 4.)

3. Recheck the vial to assure that it is tight by trying to turn it further in the direction of assembly.

4. Label appropriately.

 

Fig. 3       Fig. 4

### To Reconstitute the Drug:

1. Squeeze the bottom of the diluent container gently to inflate the portion of the container surrounding the end of the drug vial.

2. With the other hand, push the drug vial down into the container telescoping the walls of the container. Grasp the inner cap of the vial through the walls of the container. (SEE FIGURE 5.)

3**. Pull the inner cap from the drug vial. (SEE FIGURE 6.) Verify that the rubber stopper has been pulled out, allowing the drug and diluent to mix.**

4. Mix container contents thoroughly and use within the specified time.

5. Look through the bottom of the vial to verify that the stopper has been removed and complete mixing has occurred. (SEE FIGURE 7.)

If the rubber stopper is not removed from the vial and medication is not released on the first attempt, the inner cap may be manipulated back into the rubber stopper without removing the drug vial from the diluent container. Repeat steps 3 through 5.

EN-3082                                        Page 22 of 24



**Fig. 5**          **Fig. 6**          **Fig. 7**

**Preparation for Administration:**

**(Use Aseptic Technique)**

1. Confirm the activation and admixture of vial contents.

2. Check for leaks by squeezing container firmly. If leaks are found, discard unit as sterility may be impaired.

3. Close flow control clamp of administration set.

4. Remove cover from outlet port at bottom of container.

5. Insert piercing pin of administration set into port with a twisting motion until the pin is firmly seated. NOTE: See full directions on administration set carton.

6. Lift the free end of the hanger loop on the bottom of the vial, breaking the two tie strings. Bend the loop outward to lock it in the upright position, then suspend container from hanger.

7. Squeeze and release drip chamber to establish proper fluid level in chamber.

8. Open flow control clamp and clear air from set. Close clamp.

9. Attach set to venipuncture device. If device is not indwelling, prime and make venipuncture.

10. Regulate rate of administration with flow control clamp.

**WARNING: Do not use flexible container in series connections.**

**HOW SUPPLIED**

MAXIPIME (cefepime hydrochloride, USP) for Injection is supplied as follows: MAXIPIME (cefepime hydrochloride, USP) for Injection in the dry state, is a white to

---

Reference ID: 3185289

pale yellow powder. Constituted solution of MAXIPIME can range in color from pale yellow to amber.

| 500 mg* | (carton of 10) | NDC 0409-0221-01 |
| 1 g* | (carton of 10) | NDC 0409-0219-01 |
| 2 g* | (carton of 10) | NDC 0409-0220-01 |
| 1 g* | ADD-Vantage (carton of 25) | NDC 0409-0217-01 |
| 2 g* | ADD-Vantage (carton of 25) | NDC 0409-0218-01 |

*Based on cefepime activity

**Storage**

**IN THE DRY STATE STORE AT 20 TO 25°C (68 TO 77°F) [SEE USP CONTROLLED ROOM TEMPERATURE.] PROTECT FROM LIGHT.**

**REFERENCES**

1. National Committee for Clinical Laboratory Standards. *Methods for Dilution Antimicrobial Susceptibility Tests for Bacteria that Grow Aerobically*—Third Edition. Approved Standard NCCLS Document M7-A3, Vol. 13, No. 25, NCCLS, Villanova, PA, December 1993.

2. National Committee for Clinical Laboratory Standards. *Performance Standards for Antimicrobial Disk Susceptibility Tests*—Fifth Edition. Approved Standard NCCLS Document M2-A5, Vol. 13, No. 24, NCCLS, Villanova, PA, December 1993.

3. Cockcroft DW, Gault MH. Prediction of creatinine clearance from serum creatinine. *Nephron.* 1976; 16:31-41.

Hospira, Inc
Lake Forest, IL 60045, USA

*Hospira*

Revised: 06/2012

EN-3082

Product of India

948026160

Reference ID: 3185289

# How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision

*Thomas H. Cohen* *
*Michelle C. Spidell*
*Probation and Pretrial Services Office*
*Administrative Office of the U.S. Courts*

**SEX OFFENSES ARE** among the crimes that provoke serious public concern (Hanson & Morton-Bourgon, 2005, 2009). An especially acute concern involves the growing exploitation of children by online sex offenders who use the Internet and related digital technologies to possess, distribute, or produce child pornography or contact children for sexual purposes (Seto, Hanson, & Babchishin, 2011). Though accounting for a relatively small portion of all sex crimes against children, evidence shows substantial increases in the number of arrests involving online sexual offenses over the past ten years (Motivans & Kyckelhan, 2007; Wolak, Finkelhor, & Mitchell, 2005, 2009). Societal concern over the online sexual exploitation of children, along with evidence showing that many of these online offenders have self-reported histories of contact sexual offenses (Lam, Mitchell, & Seto, 2010; Seto et al., 2011), has produced aggressive law enforcement responses aimed at targeting sex offenders at the state and federal levels.

The federal response to the problem of sex

* Thomas H. Cohen, Social Science Analyst, and Michelle Spidell, Probation Administrator, Probation and Pretrial Services Office, Administrative Office of the United States Courts, Washington, DC. The authors would like to thank Laura Baber, Trent Cornish, Christopher Lowenkamp, Stacy Merolla, and Matthew Rowland for their helpful suggestions and comments. This publication benefited from the careful editing of Ellen Fielding. Direct correspondence to Thomas H. Cohen, Administrative Office of the U.S. Courts, One Columbus Circle NE, Washington, DC 20544 (email: Thomas_cohen@ao.uscourts.gov).

offenders, and especially Internet child pornographers, manifests through both increased resources directed at law enforcement efforts and enhanced sentencing provisions (Faust & Motivans, 2015). Two primary federal legislative responses aimed at sex offenders are the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 (The PROTECT Act) and the Adam Walsh Child Protection and Safety Act of 2006 (The Adam Walsh Act). The PROTECT Act primarily increased mandatory minimum penalties for child pornography and sexual abuse offenders and provided federal judges with discretion to impose life supervision terms on federal sex offenders (Faust & Motivans, 2015; U.S. Sentencing Commission [USSC], 2012). The Adam Walsh Act gave the U.S. Attorney General authority to create a national registry of convicted sex offenders, authorized federal civil commitment for those certified as sexually dangerous, and permitted the imposition of search conditions for sex offenders sentenced to federal probation or supervised release (Faust & Motivans, 2015; USSC, 2012).[1] In addition to these legislative enactments, the U.S. Department of Justice has established numerous regional task forces and funded specialized units within federal law enforcement agencies to investigate and prosecute offenders engaging in Internet child sex crimes (Wolak et al., 2005).

As a result of these changes, the number

---

[1] For additional details about the Walsh and PROTECT Acts, see 42 USC §16911 and 18 USC §2252.

of sex offenders prosecuted, incarcerated, and placed under federal post-conviction supervision has risen exponentially since the mid-1990s. (Faust & Motivans, 2015; USSC, 2012). In an examination of major trends, Faust and Motivans (2015) reported a nearly 1,400 percent increase in the number of sex offenders on post-conviction federal supervision, from 321 offenders in 1994 to 4,714 offenders in 2013, and much of this increase can be attributed to the prosecution of offenders charged with possession, receipt, distribution, or production of child pornography.[2] In addition, federal sex offenders are increasingly being sentenced to lengthy post-conviction supervision terms; for example, the United States Sentencing Commission (USSC) reported that in fiscal year 2010, the average terms of supervised release sentences imposed ranged from 220 months for offenders convicted of child pornography possession to 323 months for offenders convicted of child pornography production (USSC, 2012). By contrast, the average term of supervised release imposed on federal offenders generally in 2010 was about 43 months (USSC, 2012).

As the number of sex offenders, particularly online child pornographers, under federal post-conviction supervision has

---

[2] Faust and Motivans also noted substantial increases from the early 1990s in the number of offenders convicted of sexual abuse, sex trafficking, and violation of the Adam Walsh Act sexual registry mandates; however, by 2013, child pornography offenders accounted for the largest portion of sex offenders incarcerated within federal prisons.

increased, so too have concerns regarding whether these offenders have histories of, or are likely to engage in, offline contact sexual behavior with children. A recent meta-study of child pornography offenders conducted by Seto et al. (2011) found that about 12 percent of child pornography offenders had an official arrest or conviction record of contact sexual behavior, but 55 percent disclosed through self-reporting conducted through treatment programs, background investigations, or polygraphs that they had prior sexual contact with children.[3] A study of federal child pornography offenders conducted by the U.S. Sentencing Commission showed about 33 percent of these offenders engaging in some prior form of criminally sexually dangerous behavior (USSC, 2012).

These studies indicating that many online child pornography offenders are involved in contact offending, coupled with substantial caseload growth, raise important questions about the overall characteristics of federal sex offenders. Key questions have only begun to be explored, including what are the most common offense types (e.g., distribution of online child pornography, sexual assault) under post-conviction supervision, how many have an official arrest or conviction record of offline contact sexual behavior, what are their general recidivism risk characteristics, and how frequently do these offenders reoffend or get revoked (Bourke & Hernandez, 2009; DeLisi et al., 2016; Faust, Bickart, Renaud, & Camp, 2014; Faust & Motivans, 2015; USSC, 2012). Moreover, there have been no empirical assessments of the extent to which the current actuarial instrument used by federal probation officers to predict general recidivism—the Post-Conviction Risk Assessment (PCRA)—can predict general recidivism or revocations for federal sex offenders.

In the sections below, we discuss the federal judiciary's policy for supervising sex offenders, briefly summarize prior research on federal sex offenders, and detail the data and methods used in this study. Afterwards, principal findings will be highlighted, and we conclude by discussing policy implications and directions for future research.

---

[3] Studies examining rates of contact sexual behavior through offender self-reporting have been criticized on the grounds that they could overinflate the contact rates because they rely on offenders participating in treatment programs "who have strong incentives to admit to sexual contacts, even if untrue, as a sign of their progress in treatment" (Seto et al., 2011: 126).

## Federal Policy on Supervising Sex Offenders

The Administrative Office of the U.S. Courts —Probation and Pretrial Services Office (AOUSC-PPSO) has responded to the growing number of sex offenders under federal post-conviction supervision and the concerns that many online child pornography offenders might be involved in offline contact sexual offending by issuing guidance for federal officers charged with supervising these offenders.

Under current policy, the potential threat that sex offenders pose to the community requires them to begin supervision at the "highest" levels until the officer has performed a thorough assessment using all information available. All offenders placed on supervised release after incarceration or sentenced to straight probation[4] have their risk to recidivate for any offense assessed using the PCRA. The PCRA is a dynamic actuarial risk assessment instrument developed for federal probation officers that classifies offenders into the risk levels of low, low/moderate, moderate, or high (AOUSC, 2011).[6] These categories provide crucial information about an offender's likelihood of committing any offense or being revoked (AOUSC, 2011; Johnson, Lowenkamp, VanBenschoten, & Robinson, 2011; Lowenkamp, Johnson, VanBenschoten, Robinson, & Holsinger, 2013). Importantly, however, the PCRA was not constructed to specifically measure an offender's sexual deviance or predict sexual recidivism (Lowenkamp et al., 2013).

The policies provide guidance regarding

---

[4] Supervised release refers to offenders sentenced to a term of community supervision following a period of imprisonment within the Federal Bureau of Prisons (18 U.S.C. §3583). Probation refers to offenders sentenced to a period of supervision without any imposed incarceration sentence (18 U.S.C. §3561). Of the 135,142 federal offenders under supervision in fiscal year 2015, 86 percent were on supervised release and 13 percent were on probation.

[5] See Johnson, Lowenkamp, VanBenschoten, and Robinson (2011); Lowenkamp, Johnson, VanBenschoten, Robinson, and Holsinger (2013); and Lowenkamp, Holsinger, and Cohen (2015) for information about the construction, validation, and implementation of the PCRA in the federal supervision system.

[6] It should be noted that the PCRA is currently undergoing a revision which will involve the integration of a violence assessment into the instrument and result in offenders being placed into 12 different risk groups. At the time of this study, the revised PCRA had not yet been implemented; hence, we continue anchoring our offender population into the four risk groups discussed above.

the intensity of supervision. The policies specifically state that all sex offenders should begin their supervision terms being supervised as high risk regardless of the PCRA's classification. This provides officers with the time to conduct investigations into the extent of an offender's sexually deviant background, observe their responses to treatment, and identify any protective factors, all while ensuring that the offender is being supervised at levels intensive enough to protect the community. The policies, however, guide officers to appropriately lower the supervision levels of sex offenders if, after this initial investigation, the officer determines that less intensive supervision can address risk while maintaining protection of the community.

## Prior Research on Federal Sex and Child Pornography Offenders

Some recently published studies that examined recidivism of those convicted of child pornography and contact sex offenses against children in the U.S. include studies by the U.S. Sentencing Commission (2012) and Faust et al. (2014). In 2012, the USSC published a report to the U.S. Congress on the prosecution, sentencing, incarceration, and supervision of offenders convicted of federal non-production child pornography offenses. Part of this report examined the rearrest rates for 610 offenders sentenced to non-production child pornography offenses in 1999 and 2000. These offenders were tracked for an average of eight and a half years and counted as recidivists if they were arrested for any felony or misdemeanor offenses or had a technical violation leading to an arrest or revocation (USSC, 2012, pp. 295-296). The USSC reported a general recidivism rate of 30 percent and a sexual recidivism rate of 7 percent during the follow-up period. Through the presentence reports, the USSC found that about 33 percent of these offenders had a history of engaging in criminal sexually dangerous behavior (USSC, 2012).

Another study conducted by Faust et al. (2014), compared 428 offenders convicted of non-contact child pornography offenses to 210 offenders convicted of contact sex offenses involving children on several risk and recidivism-related factors. Overall, Faust et al. (2014) found that child pornography offenders had less substantial criminal histories and lower substance abuse rates than contact sex offenders; conversely, child pornography offenders tended to have higher

rates of pre-incarceration employment and education levels than offenders convicted of child-related contact sex offenses. These researchers reported overall arrest rates nearly three times higher for the contact (25.7 percent) compared to the child pornography (9.1 percent) offenders. The differences in arrest rates held even when controlling for other recidivism-related characteristics such as criminal history and substance abuse.

## Data and Methods

### Participants and Sex Offender Types

Data for this study were obtained from 94 federal judicial districts and comprised 7,416 male sex offenders released from federal prison and placed on supervision during fiscal years 2007 through 2013. In a method similar to that used by Faust & Motivans (2015), we identified sex offenders and placed them into broader categories by using the title and section of the U.S. Criminal Code associated with their instant conviction offense. The U.S. Criminal Codes was extracted from the Probation and Pretrial Services Automated Case Tracking System (PACTS), the case management system used by federal probation and pretrial officers. Through this process, we were able to categorize the 7,400 sex offenders into the following groups of sexual offenses involving either children or nonconsenting adult victims.[8]

### Child pornography (N = 4,462)

18 U.S.C. § 1470: Transfer of obscene material to minors

18 U.S.C. § 2251: Sexual exploitation of children

18 U.S.C. § 2251A(a)(b): Selling or buying of children

18 U.S.C. § 2252: Certain activities relating to material involving the sexual exploitation of minors

18 U.S.C. § 2252A: Certain activities relating

---

*[*] Other studies focused on the key trends taking place in the prosecution, incarceration, or supervision of federal sex offenders (see Faust & Motivans, 2015) or examined the frequency with which sex offenders self-reported contact sexual behavior either during polygraph (see DeLisi et al., 2016) or in treatment (see Bourke & Hernandez, 2009).

*[8]* It's important to note that the number of sex offenders analyzed in the current study will not approximate the numbers under active federal supervision reported by PPSO's internal systems (i.e., Decision Support Systems). This discrepancy is partially explained by the fact that DSS includes under its sex offender definition any offender with a current sex offense conviction or with a history of engaging in sexually criminal behavior.

---

to material constituting or containing child pornography

18 U.S.C. § 2260(a)(b): Production of sexually explicit depictions of a minor for importation into the United States

### Transportation for illegal sexual activity (N = 800)

18 U.S.C. § 1591: Sex trafficking of children or by force, fraud, or coercion

18 U.S.C. § 2422: Coercion and enticement

18 U.S.C. § 2423(a)(b): Transportation of minors

18 U.S.C. § 2425: Use of interstate facilities to transmit information about a child relating to illicit sexual activity

### Sexual abuse or assault (N = 1,030)

18 U.S.C. § 2241: Aggravated sexual abuse

18 U.S.C. § 2242: Sexual abuse

18 U.S.C. § 2243: Sexual abuse of a minor or ward

18 U.S.C. § 2244: Abusive sexual contact

18 U.S.C. § 2245: Sexual abuse resulting in death

### Sex Offense Registration and Notification Act (SORNA) (N = 874)

18 U.S.C § 2250: Failure to register as sex offender

There was also a category of sex offenders (N= 250) that we were unable to classify according to their convicted offenses, as the statute codes in PACTS were labelled "other sex" offenses. We included these "other" offenders in the totals but excluded them from most of the analyses comparing sex offender conviction types. Last, those convicted of child pornography were further categorized by whether they had any official arrest or conviction record of contact sexual behavior prior to or concomitantly with their current offense.

### Identifying Sex Offenders with an Official Arrest or Conviction Record of Contact Sexual Behavior

We further classified those on federal supervision for a sex offense according to whether they evidence any contact sexual behavior in their official records. In this study, having an official record of contact sexual behavior means that the offender was either arrested for or convicted of an offense involving contact sexual offenses (e.g., sexual assault, child molestation, child pornography production, child trafficking, etc.) before or for the current offense. We were unable to measure

incidences of self-reported contact behavior that might have arisen through polygraphs or other investigative means for this study.

Being able to measure the presence of an official record of contact sexual behavior is especially important when examining Internet child pornography offenders, because research shows that offenders who commit child pornography and contact sex crimes tend to have higher risk levels and recidivism rates compared to child pornography-only offenders (Babchishin, Hanson, & VanZuylen, 2015). We used a combination of Static-99 data from the Federal Bureau of Prisons (BOP) and arrest history data to identify offenders with past or present evidence of contact criminal sexual behavior. The Static-99 is an actuarial risk prediction instrument that estimates the probability of sexual and/or violent reconviction for adult males who have already been charged with or convicted of at least one contact sexual offense against a child or non-consenting adult (Harris, Phenix, Hanson, & Thornton, 2003). This instrument is scored on all sex offenders incarcerated within the U.S. federal prison system with an official current or prior arrest or conviction record of contact sexual offending. It is used by the BOP to screen for potential civil confinement.

The Static-99 scoring rules preclude this instrument from being used on offenders who have only been arrested for or convicted of non-violent sexual offenses including prostitution, consensual sexual activity, or online non-production child pornography (Harris et al., 2003). Hence, the Static-99's scoring rules allowed us to deduce that, if the offender was scored on this instrument, they had an official arrest or conviction record of contact sexual behavior. In addition to those with a Static-99, any offender whose criminal history indicates a prior arrest for sexual assault or sexual exploitation was classified as having an official record of contact sexual behavior.

The decision to use the Static-99 for the purpose of identifying sex offenders with an official record of contact sexual behavior necessitated that we exclude certain offenders from our analysis. Specifically, the 7,400 sex offenders were extracted from a larger database containing 9,583 offenders with an instant conviction for a sex offense between fiscal years 2005 through 2013. We excluded all female sex offenders (n lost = 215 offenders) and offenders sentenced to probation-only sentences (n lost = 522 offenders), as neither of these groups would be scored on the Static-99 by the BOP. We also removed all

offenders received onto federal supervision before 2007, as the BOP was not uniformly applying this instrument before that year ($n$ lost = 1,304). Last, since we wanted to track offender recidivism patterns, we removed all offenders without criminal history information from the file ($n$ lost = 126).

### Offender Recidivism Outcomes

We defined recidivism as any arrest for new crimes (excluding arrests for technical violations of the conditions of supervision) that took place between the offender's release from federal custody date and the last date these arrest data were assembled (i.e., 3/17/2015). New arrest events encompassed the following major offense categories: arrests for any felony or misdemeanor offenses, arrests for violent nonsexual offenses (e.g., homicide and related offenses, kidnapping, robbery, and assault), and arrests for any sexual offenses violent or nonviolent (e.g., child pornography, sexual assault, and sexual exploitation).[9] We combined violent and non-violent sexual arrest activity because, as will be shown, the base rates for sexual recidivism were fairly low. We also examined the rates at which offenders were revoked during their supervision term. Revocation information was retrieved from PACTS and included any revocation that took place from the start of active supervision until the last date of revocation information retrieval (i.e., 10/30/2014).

### Analytical Plan

The current study primarily uses descriptive statistics to provide an overview of the general (i.e., non-sexual) risk characteristics and recidivism rates for offenders convicted of federal sex offenses. Specifically, this study categorizes the 7,400 federal sex offenders by their instant conviction offenses, assesses how many have an official record of contact sexual behavior, details their demographic profiles, and describes their risk characteristics as measured by the PCRA. We then examine the recidivism and revocation rates within a fixed period while under post-conviction supervision. In addition, we compare the 7,416 sex offenders with a group of 179,812 male non-sex offenders placed on post-conviction supervision during the same time period.

The final component of this study uses multivariate techniques (i.e., logistic regression) to investigate the PCRA's power at predicting

general recidivism and revocation outcomes. As will be shown, the overall recidivism and revocation rates for those with instant offense convictions for sexual assault or violations of the Sex Offender Registration and Notification Act (SORNA) are significantly higher than those of the child pornography offenders. Multivariate logistic regression techniques were employed to examine whether these differences in recidivism and revocation rates still held when the PCRA was included as a statistical control. In addition, we employed an AUC ROC (area under curve - receiver operating characteristics) analysis to assess the PCRA's ability to predict specific recidivism events including arrests for any, violent (non-sexual), or sexual offenses or revocations from supervision.

## Results

### Most Common Instant Conviction Sex Offenses

Table 1 examines the most common instant conviction offenses for sex offenders received into federal supervision between fiscal years 2007 through 2013 and the percentage of these offenders with an official record of arrests or convictions for contact sexual behavior. Offenders convicted of possession, receipt, distribution, or production of online child pornography accounted for the largest numbers of sex offenders under post-conviction supervision. Three-fifths (60 percent) of the

7,416 federal sex offenders had an instant offense conviction for online child pornography offenses, while the remainder were convicted of sexual abuse or assault (14 percent), SORNA violations (12 percent), or transporting minors for illegal sexual activity (hereafter illegal transportation) (11 percent). Three percent of the sex offenders in our study population were unclassifiable.

We also used the presence of a Static-99 score and criminal history data to determine the percent of sex offenders with an official record of past or present contact sexual behavior.[10] Half of the sex offenders under post-conviction supervision had an official record of engaging in contact sexual behavior, meaning that they were either scored on the Static-99 or had a prior arrest for sexual assault or exploitation. Over 90 percent of offenders convicted of sexual assault (91 percent), illegal transportation (91 percent), or SORNA (95 percent) offenses evidenced an official record of contact sexual behavior. Conversely, 24 percent of online child pornography offenders had been arrested for or convicted of contact sexual offenses.

Some caution should be used in interpreting these results on the presence of contact sexual behavior. First, the column identifying

---

[10] See methods section on how we used the Static-99 to assess whether the offender had an official background of contact sexual behavior.

---

### TABLE 1.
### Percent of federal sex offenders with official record of contact sexual behavior

| Instant sex offense at conviction | Number | Percent of offenders with — | | |
| --- | --- | --- | --- | --- |
| | | Any official contact behavior | Static-99 | Prior arrest for sex assault or exploitation |
| All sex offenders | 7,416 | 49.5% | 43.6% | 25.0% |
| Child pornography | 4,462 | 23.6% | 18.6% | 12.0% |
| Other-not classifiable[*] | 250 | 54.4% | 45.6% | 28.4% |
| Sexual assault | 1,030 | 90.6% | 86.0% | 28.9% |
| SORNA[b] | 874 | 94.6% | 82.0% | 75.1% |
| Transportation for illegal sexual activity | 800 | 90.9% | 85.9% | 36.0% |

Note: Includes federal offenders placed on supervised release between fiscal years 2007 through 2013.

Percentages will not sum to totals as offenders can have both a Static-99 and prior arrest for sexual assault or exploitation. The prior sex assault/exploitation arrest variable excludes offenses that resulted in the offender being placed on federal supervision.

[*]The non-classifiable sex offenders are excluded from subsequent analyses as a specific offense category but included in totals.

[b]Includes offenders convicted of violating the Sexual Offender Registration and Notification (SORNA) act.

---

[*] Prostitution offenses were excluded from the sexual recidivism events.

"any evidence of contact offending" is based on an official record of an arrest or conviction and does not include self-reported behavior. Previous research has found about half of online child pornography offenders admitting to some form of prior sexual contact with children (Seto et al., 2011). Moreover, while it might seem surprising that 14 percent of offenders convicted of sexual assault did not have a Static-99, this offense category also includes offenders convicted of consensual (e.g., statutory rape) as well as forcible sexual assault. We were unable to identify offenders convicted of consensual sexual acts through the PACTS offense coding scheme.

Table 2 shows the sex offense conviction categories included in the study. For the 36 percent of offenders convicted of sexual assault, violation of SORNA laws, or illegal transportation, no information on their contact backgrounds was integrated into the analysis because as previously shown (see Table 1), nearly all of these offenders had a record of contact sexual behavior. For most offenders convicted of sexual assault, SORNA violations, or illegal transportation, their past or present conduct would inherently involve some form of contact sexual behavior necessitating a Static-99. For those convicted of child pornography offenses, we used information from the Static-99 and criminal history data to place them into (1) an online child pornography-only group and (2) a group containing child pornography offenders with arrest or conviction records for contact sexual behavior. Table 2 also shows

the offense distributions for sex offenders with PCRA assessments. Since the study includes sex offenders placed on supervised release between fiscal years 2007–2013, not all had PCRA assessments, because implementation of this risk instrument did not begin until mid-2010.

### Demographic Characteristics of Federal Sex Offenders

Table 3 shows the demographic characteristics of federal sex offenders based upon their instant conviction offense. Whites accounted for 81 percent of the general sex offender population; among non-sex offenders, whites comprised 57 percent of the total population. Nearly all offenders (95 percent) convicted of child pornography offenses were white, while minorities accounted for higher portions of the non-child pornography sexual offenses. American Indians and Alaska Natives, for example, comprised 71 percent of the sexual assault offenders and African Americans accounted for 26 percent of the SORNA offenders. Sex, and especially child pornography offenders, skewed older. At the time of being placed on post conviction supervision, the average sex offender was 45 years old, while child pornography offenders averaged 46 years in age.

### PCRA Risk Characteristics of Federal Sex Offenders

Figure 1 provides information on the initial PCRA risk classifications for federal sex

offenders by their instant conviction offense.[11] In general, sex offenders, with the exception of those convicted of sexual assault and SORNA laws, had lower risk levels than the non-sex offender population. For example, 12 percent of the sex offenders with PCRA assessments were classified as either moderate or high risk; in comparison, 26 percent of the non-sex offenders were grouped into the moderate- or high-risk categories. Child pornography offenders were especially likely to be considered low risk, with nearly all (97 percent) of these offenders initially being assessed in the low or low/moderate risk categories. A slightly higher percentage of child pornography offenders with official records of contact sexual behavior garnered a moderate- or high-risk PCRA classification (8 percent) compared to child pornography offenders without contact histories (2 percent). Among offenders convicted of non-child pornography offenses, almost half the SORNA (47 percent) and about a fourth of those convicted of sexual assault (27 percent) were classified moderate or high risk by the PCRA.

Table 4 depicts the average total PCRA scores as well as the average PCRA domain scores in criminal history, education/employment, substance abuse, social networks, and supervision attitudes for sex offenders and compares them to the average PCRA scores for non-sex offenders. In contrast to non-sex offenders, sex offenders averaged lower scores in the PCRA domains of criminal history, education/employment, and substance abuse; however, sex offenders manifested higher average scores in the PCRA domains of social networks and supervision attitudes. Within the specific sex offender categories, offenders convicted of child pornography scored consistently lower in most of the PCRA domains than the sexual assault or SORNA offenders. Not surprisingly, child pornography offenders with contact records of sexual offending received higher PCRA criminal history scores than their child pornography counterparts without contact records. For those offenders convicted of illegal transportation, their average PCRA scores, with the exception of criminal history, were similar to those of child pornography offenders.

### Recidivism Outcomes of Federal Sex Offenders

Table 5 depicts the three-year recidivism

**TABLE 2.**
**Instant conviction sex offense for federal sex offenders including subset with Post Conviction Risk Assessments (PCRA)**

| Instant sex offense at conviction | All offenders | | Subset with PCRAs | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| All sex offenders | 7,416 | 100% | 5,284 | 100% |
| Any child pornography offense | 4,462 | 60.2% | 3,420 | 64.7% |
| No record of contact behavior | 3,411 | 46.0% | 2,651 | 50.2% |
| Official record of contact behavior | 1,051 | 14.2% | 769 | 14.6% |
| Other-not classifiable | 250 | 3.4% | 75 | 1.4% |
| Sexual assault | 1,030 | 13.9% | 548 | 10.4% |
| SORNA | 874 | 11.8% | 674 | 12.8% |
| Transportation for illegal sexual activity | 800 | 10.8% | 567 | 10.7% |

Note: Includes federal offenders placed on supervised release between fiscal years 2007 through 2013 with and without PCRA assessments. Federal offenders began receiving PCRA assessments in mid-2010s. The non-classifiable sex offenders are excluded from subsequent analyses as a specific offense category but are included in totals.

[11] Figure is limited to subsample of 5,284 offenders with PCRA assessments. Adjusted supervision levels not shown.

**TABLE 3.**

Demographic characteristics for federal sex offenders, by instant conviction sex offense

| Demographic characteristics | Instant conviction sex offense | | | | | All offenders | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Child pornography | | | | Transportation for illegal sexual activity | | |
| | No record of contact behavior | Official record of contact behavior | Sexual assault | SORNA | | Sex | Non-sex |
| **Race** | | | | | | | |
| Asian | 1.6% | 1.2% | 1.0% | 0.3% | 4.3% | 1.5% | 2.6% |
| Black | 2.9% | 3.0% | 6.8% | 25.5% | 8.9% | 6.9% | 38.8% |
| American Indian | 0.5% | 0.7% | 71.0% | 2.8% | 0.5% | 10.7% | 1.8% |
| White | 95.0% | 95.1% | 21.2% | 71.4% | 87.4% | 80.9% | 56.8% |
| Hispanic ethnicity | 5.8% | 5.3% | 5.8% | 10.9% | 6.4% | 6.4% | 25.6% |
| Average age (yrs.) | 45.8 | 46.3 | 38.7 | 43.4 | 44.2 | 45.1 | 38.7 |
| Number of offenders | 3,411 | 1,051 | 1,030 | 874 | 800 | 7,416 | 179,812 |

Note: Table includes sex offenders received into federal supervision between 2007 through 2013.

**FIGURE 1.**

Post conviction risk assessment (PCRA) risk categories for federal sex offenders, by instant conviction sex offense



Note: Includes subset of offenders with PCRA assessments

### TABLE 4.

**Average Post Conviction Risk Assessment (PCRA) domain scores for federal sex offenders by instant sex conviction offense**

| Instant sex offense at conviction | Number of offenders | Average total PCRA score | Average PCRA domain scores | | | | |
|---|---|---|---|---|---|---|---|
| | | | Criminal history | Education/ Employment | Substance abuse | Social networks | Supervision attitudes |
| **All offenders** | | | | | | | |
| Non-sex offender | 97,537 | 7.17 | 4.59 | 1.12 | 0.28 | 1.08 | 0.11 |
| Sex offender | 5,284 | 5.08 | 2.60 | 0.98 | 0.12 | 1.23 | 0.15 |
| **Convicted sex offense** | | | | | | | |
| All child pornography | 3,420 | 3.92 | 1.74 | 0.83 | 0.07 | 1.15 | 0.14 |
| No record of contact behavior | 2,651 | 3.62 | 1.53 | 0.79 | 0.07 | 1.10 | 0.13 |
| Official record of contact behavior | 769 | 4.95 | 2.48 | 0.95 | 0.07 | 1.29 | 0.15 |
| Sexual assault | 548 | 7.44 | 4.28 | 1.30 | 0.31 | 1.38 | 0.17 |
| SORNA | 674 | 9.36 | 5.64 | 1.59 | 0.25 | 1.64 | 0.24 |
| Transportation for illegal sexual activity | 567 | 4.64 | 2.43 | 0.83 | 0.07 | 1.15 | 0.15 |

Note: Includes subset of federal sex offenders with PCRA assessments.

rates for sex offenders during their post-conviction supervision term. To be included in this table, the offender's recidivism event had to be observable for a minimum of three years and their court-ordered supervision terms had to be three years or more (Baber, 2015). Offenders, for example, were counted as having recidivated if at any time during the three years in which they were sentenced to supervised release they were either arrested or revoked. Using this approach, offenders sentenced to less than three years of supervised release or whose recidivism event could not be followed for a minimum of three years were excluded from this analysis. Recidivism events occurring after the supervision term or outside the three-year follow-up period were also omitted.

Table 5 generally shows persons convicted of sex offenses being arrested or revoked less frequently than those convicted of non-sex offenses. For example, nearly a fifth (18 percent) of sex offenders were arrested for any offense during their first three years of supervision, while about a third (31 percent) of non-sex offenders had any arrest during the same time period. The percentage of sex offenders arrested for non-sexual violent offenses (2 percent) was also lower in comparison to non-sex offenders (8 percent). Sex offenders, however, were three times more likely to be arrested for sexual offenses (3 percent) than non-sex offenders (1 percent).

Among the sex offense types, those offenders under supervision for SORNA or sexual assault were arrested or revoked at the highest rates, while those under supervision for child pornography offenses had lower recidivism rates. For example, 42 percent of the SORNA and 23 percent of the sexual assault offenders were arrested for any

offense within three years of their supervision start dates, compared to 13 percent of child pornography offenders. The percentage of offenders arrested for non-sexual violent offenses was also higher for the SORNA (8 percent) and sexual assault (4 percent) offenders than for offenders on supervised

### TABLE 5.

**Three-year recidivism rates for federal sex offenders while under supervision, by instant conviction offense**

| Instant offense at conviction | Number | Recidivism outcomes | | | | |
|---|---|---|---|---|---|---|
| | | Any arrest | Major arrest[a] | Non-sexual violent arrest | Any sex arrest | Probation revocation |
| **All offenders** | | | | | | |
| Non-sex offender | 89,615 | 31.4% | 23.0% | 7.9% | 0.5% | 22.6% |
| Sex offender | 3,909 | 17.5% | 7.8% | 1.8% | 2.8% | 19.2% |
| **Conviction sex offense** | | | | | | |
| All child pornography | 2,287 | 13.0% | 4.9% | 0.5% | 2.6% | 11.6% |
| No record of contact behavior | 1,722 | 12.5% | 4.3% | 0.4% | 2.2% | 9.5% |
| Official record of contact behavior | 565 | 14.7% | 6.9% | 0.7% | 4.1% | 18.2% |
| Sexual assault | 605 | 23.1% | 9.9% | 3.6% | 2.2% | 38.5% |
| SORNA | 299 | 41.8% | 26.1% | 8.0% | 7.7% | 47.2% |
| Transportation for illegal sexual activity | 550 | 17.3% | 7.8% | 1.6% | 2.4% | 14.4% |

Note: Sub-sample used for 3-year arrest rates is restricted to actively supervised TSR cases for which the offender was sentenced to at least 3 years of supervision.

[a]Excludes minor offenses including breaches against public peace, invasion of privacy, prostitution, obstruction of justice, liquor law violations, and traffic offenses.

release for child pornography (1 percent). There was less variation between the instant offense categories in regards to recidivism for sex offenses; child pornography offenders, for example, were arrested for sexual offenses at rates (3 percent) similar to that of sexual assault (2 percent) or illegal transportation (2 percent) offenders.

For offenders convicted of child pornography offenses, having an official record of contact sexual behavior was generally not associated with significantly higher recidivism rates. The general rearrest rates for child pornography offenders with contact sexual records (15 percent) was nearly the same as child pornography offenders without any records of contact sexual offending (13 percent). Officers, however, were more likely to revoke child pornography offenders with contact sexual records (18 percent) compared to their counterparts with no official record of contact sexual behavior (10 percent).

## Predictive Efficacy of PCRA for Federal Sex Offenders

We examined whether the differences in arrest rates across the convicted sex offense categories reported in Table 5 still hold when the offender's PCRA scores are introduced as statistical controls. We conducted this examination by calculating the predicted probabilities of arrest or revocation after

initial PCRA assessment for each of the major sex offense categories used in this study. These predicted probabilities were generated through a statistical technique (i.e., logistic regression) that allows us to examine the relationship between the instant conviction offenses and recidivism/revocation outcomes while holding constant the offender's PCRA scores at their means. We compare arrest/revocation probabilities for those convicted of child pornography offenses with no record of contact sexual behavior to those convicted of child pornography with an official record of contact sexual behavior, illegal transportation, sexual assault, or SORNA offenses. Significant differences between the child pornography (non-contact) and other offense types are noted by an asterisk.[*]

Figure 2 shows the predicted probability of any arrest across the sex offender offense categories initially without any controls and then adjusts these probabilities by statistically controlling for an offender's PCRA risk levels and raw scores. The model without any PCRA controls produces predicted arrest patterns similar to the bivariate analysis shown in Table 5. Specifically, the estimated arrest

---

[*] Estimated arrest/revocation probabilities reported in Figures 2 and 3 will differ from percentages reported in Table 5 because these probabilities are estimated for shorter time periods (e.g., date of PCRA assessment) and are not restricted to arrests during supervision terms.

probabilities for the illegal transportation (12 percent), sexual assault (21 percent), and SORNA (30 percent) offenses are significantly higher compared to the estimated arrest probability for child pornography offenders with no record of contact sexual behavior (7 percent). Once the estimated arrest probabilities have been adjusted for an offender's PCRA risk level or raw score, they are less substantial across the sex offense categories. For example, adjusting the probability of arrest to take into account an offender's raw PCRA risk score generates estimated arrest probabilities between those convicted of child pornography offenses with no official record of contact sexual behavior (9 percent) that were not significantly different from those convicted of child pornography with official records of contact sexual behavior (9 percent), illegal transportation (11 percent), and sexual assault (12 percent). Only the SORNA offenders continued to manifest predicted arrest probabilities that are significantly higher (15 percent) than the non-contact child pornography offenders.

We also generated predicted revocation probabilities taking into account an offender's PCRA risk level or raw score, which are shown in Figure 3. In results similar to the prior analysis, we initially show significant differences in the predicted revocation probabilities between the non-contact child pornography offenders and the other sex offender types; however, when the PCRA is used to statistically control for the risk of revocation, the differences in the likelihood of revocation diminish across the sex offender categories.

Last, we focus on the PCRA's utility to predict recidivism outcomes for persons convicted of federal sex offenses through an AUC-ROC (area under curve - receiver operating characteristics) analysis and by examining the recidivism rates across the four PCRA risk categories (e.g., low, low/moderate, moderate, and high). The AUC ROC score is frequently used to assess risk assessment instruments and is often preferred over a correlational analysis because it is not impacted by low base rates (Lowenkamp et al., 2013). Essentially, the AUC ROC measures the probability that a score drawn at random from one sample or population (e.g., offenders with a rearrest) will be higher than that drawn at random from a second sample or population (e.g., offenders with no rearrest) (Lowenkamp et al., 2013; Rice & Harris, 2005). Values for the AUC-ROC range from .0 to 1.0, with values of .70 or greater indicating that the

## FIGURE 2.
### Predicted probabilities of any arrest for federal sex offenders controlling for Post Conviction Risk Assessment (PCRA), by instant conviction offense



Note: Includes a dotted reference (*) when there is a PCRA assessment control indicates significant difference between child porn offender with no contact behavior and the other sex offender offense categories. Arrest probabilities will differ from percentages reported in Table 5 as they track arrests for shorter time periods (e.g., date from PCRA assessment) and are not restricted to arrests during supervision terms.

* p <.05

## FIGURE 3.

**Predicted probabilities of revocation for federal sex offenders controlling for Post Conviction Risk Assessment (PCRA), by instant conviction offense**



Note: Includes added levels of sex offenders to the PCRA assessment of the standard and subcategories to the difference between child porn offender with no contact behavior and the other sex offender offense categories. Revocation probabilities will differ from percentages reported in Table 5 as they track revocations for shorter time periods (e.g., date from PCRA assessment).
* p < .05

actuarial instrument does fairly well at prediction (Andrews & Bonta, 2010). Figure 4 shows the AUC-ROC scores for offenders in this study exceeding the .70 threshold for most of the recidivism outcomes, including any arrests (.72), violent arrests (.79), and probation revocations (.77). The AUC-ROC scores fell under the .70 threshold for only those outcomes associated with sexual recidivism (.63).

In addition to an AUC-ROC analysis, Figure 4 also shows the failure rates involving any arrests, non-sexual violent arrests, any sex arrests, and probation revocations by PCRA risk category for offenders with sex offense convictions. Among the non-sexual recidivism outcomes, the failure rates followed the anticipated pattern of increasing incrementally by each PCRA risk category. The recidivism rates for any arrest activity, for instance, increased from 7 percent for low-risk offenders to 15 percent for low/moderate, 33 percent for moderate, and 46 percent for high-risk offenders. Similar patterns of monotonically increasing failure rates also occurred for recidivism outcomes involving probation revocations and non-sexual violent arrests. The sexual recidivism outcome, however, manifested a weaker relationship with

the PCRA risk groupings. The percentage of offenders rearrested for sexual offenses did not differ significantly for the low/moderate (4 percent), moderate (4 percent), and high (5 percent) PCRA risk categories ($\chi^2$, 2 = .9017, $p$ = .637).

## Discussion and Conclusion

### Summary of Major Findings

This study produced several key findings about persons convicted of sex offenses under federal post-conviction supervision. First, it shows those convicted of child pornography offenses accounting for the majority of sex offenses (60 percent), with the other offense types of sexual assault, illegal transportation, and SORNA accounting for 36 percent of federally supervised sex offenders. An examination of the official contact sexual backgrounds of these offenders shows that over 9 out of 10 of the non-child pornography offenders have an official conviction for, or arrest history of, engaging in contact sexual offenses. For those convicted of child pornography offenses, about a fourth of them had an official record of contact sexual offenses.

While those convicted of sex offenses in general scored lower on the PCRA

and recidivated less frequently than those convicted of non-sex offenses, there was substantial heterogeneity in the recidivism rates and PCRA risk measures among the instant sex offense types. Specifically, those convicted of child pornography offenses had less serious criminal history backgrounds, attained higher levels of education and employment, suffered less frequently from substance abuse problems, and had stronger social support networks than those convicted of sexual assault or SORNA offenses. In fact, almost all the child pornography offenders were classified as either low or low/moderate risk by PCRA. Conversely, those convicted of sexual assault or SORNA offenses manifested general risk characteristics that were either similar to those of people convicted of non-sex offenses or, in the case of the SORNA, substantially higher.

Similar to the PCRA analysis, the recidivism patterns also varied across the conviction types. Offenders convicted of child pornography exhibited lower general and violent rearrest rates and supervision revocations compared to offenders convicted of SORNA or sexual assault. The recidivism activity for the SORNA offenders was particularly high, with about two-fifths of these offenders being rearrested within the three-year follow-up period. For the sexual recidivism outcome, however, there was less variation in arrest rates by conviction offense. It is also notable that those convicted of illegal transportation were rearrested or revoked at rates more similar to the child pornography than to the sexual assault and SORNA offenders. In a finding mirroring other studies, our analysis showed sex offenders being rearrested more frequently for non-sexual than sexual offenses (USSC, 2012; Hanson & Morton-Bourgon, 2009). Last, within the child pornography offense category, those offenders with an arrest or conviction record for contact sexual behavior evidenced only slightly higher-risk characteristics and reoffending behavior compared to child pornography offenders without any official background of contact sexual offenses.

The logistic regression and AUC-ROC analysis showed the PCRA performs well in predicting general rearrest and revocation outcomes for the 5,284 federal sex offenders with PCRA assessments analyzed in this study. Logistic regression results showed little to no significant differences among the arrest odds by the specific sex offender conviction types when controlling for the PCRA scores. Moreover, the AUC-ROC scores of .70 or above for the any arrest, violent arrest,

**FIGURE 4.**

**Post Conviction Risk Assessment (PCRA) failure rates for any arrest, non-sexual violent arrests, any sex arrests, or probation revocations for federal sex offenders**



Note: Includes 5,284 federal sex offenders with PCRA assessments. Arrest and revocation percentages will differ from percentages reported in Table 5 as they track recidivism activity for shorter time periods (e.g., date from PCRA assessment) and are not restricted to recidivism during supervision terms. Includes any arrests or revocations that occurred after the initial PCRA assessment.

and revocation outcomes, combined with the anticipated pattern of incrementally increasing failure rates for these recidivism, measures by risk category, indicate that the PCRA can be used to predict general (non-sexual) recidivism outcomes for offenders with instant convictions for sex offenses. The crucial exception is the PCRA's ability to predict sexual recidivism, as the AUC-ROC analysis and an examination of arrest patterns across the PCRA risk groups show that the PCRA is less effective at predicting this type of recidivistic behavior. This finding is not too surprising, however, because the PCRA was never constructed to predict sexual recidivism nor was it designed to measure sexual deviance (Lowenkamp et al., 2013).

Most of the findings in this paper align with prior research on federal sex offenders and are consistent with the general empirical work focusing on recidivism prediction for the sex offender population. Specifically, prior research has shown that child pornography is the most common type of sex offense within the federal system and that offenders convicted of child pornography have fewer risk characteristics and recidivate less frequently

compared to contact sex offenders (Babchishin et al., 2015; Faust & Motivans, 2015; Faust et al., 2014; USSC, 2012; Babchishin, Hanson, & Herman, 2011). Although the recidivism rates reported in this paper do not exactly match those reported by the USSC, this discrepancy is attributed to the longer follow-up periods and different methodologies for measuring recidivism used by the U.S. Sentencing Commission. However, the recidivism rates for child pornography offenders reported by Faust et al. (2014) of 9 percent are fairly close to the 13 percent arrest rate reported in this study. In addition, the overall pattern of sex offenders being rearrested at higher rates for non-sexual rather than sexual offenses is consistent with the above-cited studies and other meta-analytic reviews of sex offender recidivism (Faust et al., 2014; USSC, 2012; Hanson & Morton-Bourgon, 2009).

This research is also supportive of using general risk assessments for recidivism prediction on sex offenders. Nearly all of these studies have shown that risk assessments designed to predict general or violent recidivism among the overall offender population should perform equally well in predicting

these outcomes for sex offenders (Wormith, Hogg, & Guzzo, 2012; Hanson & Morton-Bourgon, 2009; Hanson & Bussiere, 1998). The prediction capacities of generalized or violent risk assessment instruments, however, are less effective in predicting sexual recidivism compared to risk assessment instruments such as the Static-99 that are specifically designed to predict sexual rearrest outcomes (Hanson & Morton-Bourgon, 2009; Hanson & Bussiere, 1998). Our research showing the PCRA's efficacy at predicting general and violent recidivism, and being less effective in predicting sexual recidivism, is consistent with these prior research efforts.

Last, in a somewhat surprising finding, this research shows that child pornography offenders with backgrounds of contact sexual offending exhibit only slightly higher risk characteristics and recidivism rates compared to child pornography offenders with no records of contact sexual offending. This finding is at odds with some studies showing offenders who commit child pornography and contact crimes having significantly higher risk levels and recidivism rates compared to child pornography-only offenders (Babchishin et

al., 2015). It is interesting to note, however, that the USSC also found similar rates of general recidivism between child pornography offenders with and without histories of criminally sexual dangerous behavior (USSC, 2012). Clearly more research is needed to discern whether offenders convicted of federal child pornography offenses can be disaggregated into more useful risk typologies.

## Limitations and Areas for Future Research

This current study has several limitations that could be addressed by subsequent research. First, we did not consider self-reported contact offending behavior revealed through polygraphs or other investigative techniques. Prior research has shown about half of child pornography offenders admitting to a history of contact sexual offending (Seto et al., 2011). Subsequent research could assess the frequency of self-reported contact sexual behavior identified in a sample of offenders convicted of federal child pornography offenses. Another issue is the relatively short follow-up period of three years used in the current study. Sex offender recidivism studies typically reference the need to engage in long-term follow-ups involving periods of 5 to 20 years (Hanson, Morton, & Harris, 2003). Since our study covered only three years of offender recidivism activity, subsequent work should consider extending the recidivism follow-up terms. The decision to lengthen the follow-up period, however, should be informed by the fact that even studies tracking contact sex offenders for time periods of 20 to 30 years have shown about a third of these offenders eventually being arrested for new sexual offenses (Seto et al., 2011; Hanson, Steffy, & Gauthier, 1993).

## Implications for Federal Probation Officers

The policy and procedures currently in place for the investigation and supervision of sex offenders were informed by the body of empirical knowledge available at that time. In general, the findings produced by this study align with this research used to inform federal sex offender policy and hence support the general framework of federal procedures on sex offender management.

This research supports the procedural guidance advising officers to use the PCRA to assess the risk of general recidivism and criminogenic needs for sex offenders and then augment this generalized risk picture

with information pertaining to an offender's sexually deviant characteristics through an extensive investigation involving polygraphs, interviews, and discussions with treatment personnel. Moreover, it advises officers to use risk instruments such as the Static-99/2002 or Stable & Acute 2007 that are constructed to predict sexual recidivism to further understand an offender's propensities toward sexual deviance. The importance of supplementing the PCRA is supported by this research showing that the PCRA does not specifically assess an offender's risk of sexual recidivism or target those behaviors related to sexual deviance.

This research also highlights areas for further examination and potential enhancements in federal sex offender policies. Currently, federal policy recommends that all sex offenders begin supervision at the "highest" risk levels and then recommends that supervision intensity be adjusted downwards if and when an investigation of the offender's background indicates they are not at risk of committing contact sex offenses. With the availability of Static-99 scores from the BOP for those sex offenders with arrests or convictions for contact sexual offenses, officers can more accurately apply the risk principle to that group of sex offenders. Utilizing the Static-99, and supplementing it with information gleaned from polygraphs and other sources, may provide officers with the details required to thoroughly understand offenders' risk to sexually recidivate and classify them into appropriate supervision levels.

This research further supports federal policy that not all sex offenders have the same risk of recidivism generally and sexual offending specifically. Among the sex offender types, those offenders under supervision for SORNA or sexual assault were arrested or revoked at the highest rates, while the child pornography offenders exhibited lower recidivism rates. Hence, this research suggests that the sexual assault and particularly the SORNA offenders are at high concern for federal probation officers. Officers should consider assessing the SORNA offenders more closely beginning with their entrance into the criminal justice system as they evidence higher rates of general and violent recidivism compared to child pornography offenders.

## References

Administrative Office of the U.S. Courts. (AOUSC) (2011). *An overview of the federal Post Conviction Risk Assessment*. Washington, D.C.: Administrative Office of the U.S.

Courts.

Andrews, D. A., & Bonta, J. (2010). *The psychology of criminal conduct (5th Ed.)*. Cincinnati, OH: Anderson Publishing.

Babchishin, K. M., Hanson, R. K., & Hermann, C. A.. (2011). The characteristics of online sex offenders: A meta-analysis. *Sexual Abuse: A Journal of Research and Treatment, 23*(1), 92-123.

Babchishin, K. M., Hanson, R. K., & VanZuylen, H. (2015). Online child pornography offenders are different: A meta-analysis of the characteristics of online and offline sex offenders against children. *Archives of Sexual Behavior, 44*, 45-66.

Baber, L. (2015). Inroads to reducing federal recidivism. *Federal Probation, 79*(3), 3-8.

Bourke, M. L., & Hernandez, A. E. (2009). The "Butner Redux": A report of the incidence of hands-on child victimization by child pornography offenders. *Journal of Family Violence, 24*, 183-191.

DeLisi, M., Caropreso, D., Drury, A., Elbert, M., Evans, J. D., & Tahja, K. (2016). The dark figure of sexual offending: New evidence from federal sex offenders. *Journal of Criminal Psychology, 6*(1), 3-15.

Faust, E., Bickart, W., Renaud, C., & Camp, S. (2014). Child pornography possessors and child contact sex offenders: A comparison of demographic characteristics and rates of recidivism. *Sexual Abuse: A Journal of Research and Treatment, 27*(5), 1-19.

Faust, E., & Motivans, M. (2015). Sex offenders in the federal correctional system: The consequence of heightened attention to and increased certainty and severity of punishment. *Justice Research and Policy, 16*(1), 81-98.

Hanson, R. K., Scott, H., & Gauthier, R. (1993). Long-term recidivism of child molesters. *Journal of Consulting and Clinical Psychology, 61*, 646-652.

Hanson, R. K., & Bussiere, M. T. (1998). Predicting relapse: A meta-analysis of sexual offender recidivism studies. *Journal of Consulting and Clinical Psychology, 66*(2), 348-362.

Hanson, R. K., Morton, K. E., & Harris, J. (2003). *Sexual offender recidivism risk: What we know and what we need to know*. New York: New York: The New York Academy of Sciences.

Hanson, R. K., & Morton-Bourgon, K. (2005). The characteristics of persistent sexual offenders: A meta-analysis of recidivism studies. *Journal of Consulting and Clinical Psychology, 73*(6), 1154-1163.

Hanson, R. K., & Morton-Bourgon, K. (2009). The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis of 118 prediction studies. *Psychological Assessment,*

*21*(1), 1-21.

Harris, J., Phenix, R., Hanson, R. K., & Thornton, D. (2003). *Static-99 Coding Rules Revised-2003*. Ottawa, Canada: Corrections Directorate Solicitor General Canada.

Johnson, J., Lowenkamp, C. T., VanBenschoten, S. W., & Robinson, C. (2011). The construction and validation of the Federal Post Conviction Risk Assessment (PCRA). *Federal Probation, 75*(2), 16-29.

Lam, A., Mitchell, J., & Seto, M. C. (2010). Lay perceptions of child pornography offenders. *Canadian Journal of Criminology and Criminal Justice, 52,* 173-201.

Lowenkamp, C. T., Johnson, J., VanBenschoten, S. W., Robinson, C., & Holsinger, A. M. (2013). The Federal Post Conviction Risk Assessment (PCRA): A construction and validation study. *Psychological Services,*

*10*(1), 87-96.

Lowenkamp, C. T., Holsinger, A. M., & Cohen, T. H. (2015). PCRA revisited: Testing the validity of the Federal Post Conviction Risk Assessment (PCRA). *Psychological Services, 12*(2), 149-157.

Motivans, M., & Kyckelhan, T. (2007). *Federal prosecution of child sex exploitation offenders, 2006*. Washington, D.C.: Bureau of Justice Statistics.

Rice, M. E., & Harris, G. T. (2005). Comparing effect sizes in follow-up studies: ROC, Cohen's d, and r. *Law and Human Behavior, 29,* 615-620.

Seto, M. C., Hanson, R. K., & Babchishin, K. (2011). Contact sexual offending by men with online sexual offenses. *Sexual Abuse: A Journal of Research and Treatment, 23*(1), 124-145.

U.S. Sentencing Commission. (2012). *Report to Congress: Federal child pornography offenders.* Washington, D.C.: U.S. Sentencing Commission.

Wolak, J., Finkelhor, D., & Mitchell, J. (2005). *Child pornography possessors arrested in Internet-related crimes.* Alexandria, VA.: National Center for Missing and Exploited Children.

Wolak, J., Finkelhor, D., & Mitchell, J. (2009). *Trends in arrests of "online predators."* Durham, NH: Crimes Against Children Research Center.

Wormith, J. S., Hogg, S., & Guzzo, J. (2012). The predictive validity of a general risk needs assessment inventory on sexual offender recidivism and an exploration of the professional override. *Criminal Justice and Behavior, 39*(12), 1511-1538.

# Exhibit

# G

# How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision

*Thomas H. Cohen* [*]
*Michelle C. Spidell*
*Probation and Pretrial Services Office*
*Administrative Office of the U.S. Courts*

**SEX OFFENSES ARE** among the crimes that provoke serious public concern (Hanson & Morton-Bourgon, 2005, 2009). An especially acute concern involves the growing exploitation of children by online sex offenders who use the Internet and related digital technologies to possess, distribute, or produce child pornography or contact children for sexual purposes (Seto, Hanson, & Babchishin, 2011). Though accounting for a relatively small portion of all sex crimes against children, evidence shows substantial increases in the number of arrests involving online sexual offenses over the past ten years (Motivans & Kyckelhan, 2007; Wolak, Finkelhor, & Mitchell, 2005, 2009). Societal concern over the online sexual exploitation of children, along with evidence showing that many of these online offenders have self-reported histories of contact sexual offenses (Lam, Mitchell, & Seto, 2010; Seto et al., 2011), has produced aggressive law enforcement responses aimed at targeting sex offenders at the state and federal levels.

The federal response to the problem of sex offenders, and especially Internet child pornographers, manifests through both increased resources directed at law enforcement efforts and enhanced sentencing provisions (Faust & Motivans, 2015). Two primary federal legislative responses aimed at sex offenders are the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 (The PROTECT Act) and the Adam Walsh Child Protection and Safety Act of 2006 (The Adam Walsh Act). The PROTECT Act primarily increased mandatory minimum penalties for child pornography and sexual abuse offenders and provided federal judges with discretion to impose life supervision terms on federal sex offenders (Faust & Motivans, 2015; U.S. Sentencing Commission [USSC], 2012). The Adam Walsh Act gave the U.S. Attorney General authority to create a national registry of convicted sex offenders, authorized federal civil commitment for those certified as sexually dangerous, and permitted the imposition of search conditions for sex offenders sentenced to federal probation or supervised release (Faust & Motivans, 2015; USSC, 2012).[1] In addition to these legislative enactments, the U.S. Department of Justice has established numerous regional task forces and funded specialized units within federal law enforcement agencies to investigate and prosecute offenders engaging in Internet child sex crimes (Wolak et al., 2005).

As a result of these changes, the number of sex offenders prosecuted, incarcerated, and placed under federal post-conviction supervision has risen exponentially since the mid-1990s. (Faust & Motivans, 2015; USSC, 2012). In an examination of major trends, Faust and Motivans (2015) reported a nearly 1,400 percent increase in the number of sex offenders on post-conviction federal supervision, from 321 offenders in 1994 to 4,714 offenders in 2013, and much of this increase can be attributed to the prosecution of offenders charged with possession, receipt, distribution, or production of child pornography.[2] In addition, federal sex offenders are increasingly being sentenced to lengthy post-conviction supervision terms; for example, the United States Sentencing Commission (USSC) reported that in fiscal year 2010, the average terms of supervised release sentences imposed ranged from 220 months for offenders convicted of child pornography possession to 323 months for offenders convicted of child pornography production (USSC, 2012). By contrast, the average term of supervised release imposed on federal offenders generally in 2010 was about 43 months (USSC, 2012).

As the number of sex offenders, particularly online child pornographers, under federal post-conviction supervision has

---

[*] Thomas H. Cohen, Social Science Analyst, and Michelle Spidell, Probation Administrator, Probation and Pretrial Services Office, Administrative Office of the United States Courts, Washington, DC. The authors would like to thank Laura Baber, Trent Cornish, Christopher Lowenkamp, Stacy Merolla, and Matthew Rowland for their helpful suggestions and comments. This publication benefited from the careful editing of Ellen Fielding. Direct correspondence to Thomas H. Cohen, Administrative Office of the U.S. Courts, One Columbus Circle NE, Washington, DC 20544 (email: Thomas_cohen@ao.uscourts.gov).

[1] For additional details about the Walsh and PROTECT Acts, see 42 USC §16911 and 18 USC §2252.

[2] Faust and Motivans also noted substantial increases from the early 1990s in the number of offenders convicted of sexual abuse, sex trafficking, and violation of the Adam Walsh Act sexual registry mandates; however, by 2013, child pornography offenders accounted for the largest portion of sex offenders incarcerated within federal prisons.

increased, so too have concerns regarding whether these offenders have histories of, or are likely to engage in, offline contact sexual behavior with children. A recent meta-study of child pornography offenders conducted by Seto et al. (2011) found that about 12 percent of child pornography offenders had an official arrest or conviction record of contact sexual behavior, but 55 percent disclosed through self-reporting conducted through treatment programs, background investigations, or polygraphs that they had prior sexual contact with children.[3] A study of federal child pornography offenders conducted by the U.S. Sentencing Commission showed about 33 percent of these offenders engaging in some prior form of criminally sexually dangerous behavior (USSC, 2012).

These studies indicating that many online child pornography offenders are involved in contact offending, coupled with substantial caseload growth, raise important questions about the overall characteristics of federal sex offenders. Key questions have only begun to be explored, including what are the most common offense types (e.g., distribution of online child pornography, sexual assault) under post-conviction supervision, how many have an official arrest or conviction record of offline contact sexual behavior, what are their general recidivism risk characteristics, and how frequently do these offenders reoffend or get revoked (Bourke & Hernandez, 2009; DeLisi et al., 2016; Faust, Bickart, Renaud, & Camp, 2014; Faust & Motivans, 2015; USSC, 2012). Moreover, there have been no empirical assessments of the extent to which the current actuarial instrument used by federal probation officers to predict general recidivism—the Post-Conviction Risk Assessment (PCRA)—can predict general recidivism or revocations for federal sex offenders.

In the sections below, we discuss the federal judiciary's policy for supervising sex offenders, briefly summarize prior research on federal sex offenders, and detail the data and methods used in this study. Afterwards, principal findings will be highlighted, and we conclude by discussing policy implications and directions for future research.

## Federal Policy on Supervising Sex Offenders

The Administrative Office of the U.S. Courts —Probation and Pretrial Services Office (AOUSC-PPSO) has responded to the growing number of sex offenders under federal post-conviction supervision and the concerns that many online child pornography offenders might be involved in offline contact sexual offending by issuing guidance for federal officers charged with supervising these offenders.

Under current policy, the potential threat that sex offenders pose to the community requires them to begin supervision at the "highest" levels until the officer has performed a thorough assessment using all information available. All offenders placed on supervised release after incarceration or sentenced to straight probation[4] have their risk to recidivate for any offense assessed using the PCRA. The PCRA is a dynamic actuarial risk assessment instrument developed for federal probation officers that classifies offenders into the risk levels of low, low/moderate, moderate, or high (AOUSC, 2011).[6] These categories provide crucial information about an offender's likelihood of committing any offense or being revoked (AOUSC, 2011; Johnson, Lowenkamp, VanBenschoten, & Robinson, 2011; Lowenkamp, Johnson, VanBenschoten, Robinson, & Holsinger, 2013). Importantly, however, the PCRA was not constructed to specifically measure an offender's sexual deviance or predict sexual recidivism (Lowenkamp et al., 2013).

The policies provide guidance regarding

the intensity of supervision. The policies specifically state that all sex offenders should begin their supervision terms being supervised as high risk regardless of the PCRA's classification. This provides officers with the time to conduct investigations into the extent of an offender's sexually deviant background, observe their responses to treatment, and identify any protective factors, all while ensuring that the offender is being supervised at levels intensive enough to protect the community. The policies, however, guide officers to appropriately lower the supervision levels of sex offenders if, after this initial investigation, the officer determines that less intensive supervision can address risk while maintaining protection of the community.

## Prior Research on Federal Sex and Child Pornography Offenders

Some recently published studies that examined recidivism of those convicted of child pornography and contact sex offenses against children in the U.S. include studies by the U.S. Sentencing Commission (2012) and Faust et al. (2014). In 2012, the USSC published a report to the U.S. Congress on the prosecution, sentencing, incarceration, and supervision of offenders convicted of federal non-production child pornography offenses. Part of this report examined the rearrest rates for 610 offenders sentenced to non-production child pornography offenses in 1999 and 2000. These offenders were tracked for an average of eight and a half years and counted as recidivists if they were arrested for any felony or misdemeanor offenses or had a technical violation leading to an arrest or revocation (USSC, 2012, pp. 295-296). The USSC reported a general recidivism rate of 30 percent and a sexual recidivism rate of 7 percent during the follow-up period. Through the presentence reports, the USSC found that about 33 percent of these offenders had a history of engaging in criminal sexually dangerous behavior (USSC, 2012).

Another study conducted by Faust et al. (2014), compared 428 offenders convicted of non-contact child pornography offenses to 210 offenders convicted of contact sex offenses involving children on several risk and recidivism-related factors. Overall, Faust et al. (2014) found that child pornography offenders had less substantial criminal histories and lower substance abuse rates than contact sex offenders; conversely, child pornography offenders tended to have higher

---

[3] Studies examining rates of contact sexual behavior through offender self-reporting have been criticized on the grounds that they could overinflate the contact rates because they rely on offenders participating in treatment programs "who have strong incentives to admit to sexual contacts, even if untrue, as a sign of their progress in treatment" (Seto et al., 2011: 126).

[4] Supervised release refers to offenders sentenced to a term of community supervision following a period of imprisonment within the Federal Bureau of Prisons (18 U.S.C. §3583). Probation refers to offenders sentenced to a period of supervision without any imposed incarceration sentence (18 U.S.C. §3561). Of the 135,142 federal offenders under supervision in fiscal year 2015, 86 percent were on supervised release and 13 percent were on probation.

[5] See Johnson, Lowenkamp, VanBenschoten, and Robinson (2011); Lowenkamp, Johnson, VanBenschoten, Robinson, and Holsinger (2013); and Lowenkamp, Holsinger, and Cohen (2015) for information about the construction, validation, and implementation of the PCRA in the federal supervision system.

[6] It should be noted that the PCRA is currently undergoing a revision which will involve the integration of a violence assessment into the instrument and result in offenders being placed into 12 different risk groups. At the time of this study, the revised PCRA had not yet been implemented; hence, we continue anchoring our offender population into the four risk groups discussed above.

rates of pre-incarceration employment and education levels than offenders convicted of child-related contact sex offenses. These researchers reported overall arrest rates nearly three times higher for the contact (25.7 percent) compared to the child pornography (9.1 percent) offenders. The differences in arrest rates held even when controlling for other recidivism-related characteristics such as criminal history and substance abuse.[^]

## Data and Methods

### Participants and Sex Offender Types

Data for this study were obtained from 94 federal judicial districts and comprised 7,416 male sex offenders released from federal prison and placed on supervision during fiscal years 2007 through 2013. In a method similar to that used by Faust & Motivans (2015), we identified sex offenders and placed them into broader categories by using the title and section of the U.S. Criminal Code associated with their instant conviction offense. The U.S. Criminal Codes was extracted from the Probation and Pretrial Services Automated Case Tracking System (PACTS), the case management system used by federal probation and pretrial officers. Through this process, we were able to categorize the 7,400 sex offenders into the following groups of sexual offenses involving either children or nonconsenting adult victims.[^]

### Child pornography (N = 4,462)

18 U.S.C. § 1470: Transfer of obscene material to minors

18 U.S.C. § 2251: Sexual exploitation of children

18 U.S.C. § 2251A(a)(b): Selling or buying of children

18 U.S.C. § 2252: Certain activities relating to material involving the sexual exploitation of minors

18 U.S.C. § 2252A: Certain activities relating to material constituting or containing child pornography

18 U.S.C. § 2260(a)(b): Production of sexually explicit depictions of a minor for importation into the United States

### Transportation for illegal sexual activity (N = 800)

18 U.S.C. § 1591: Sex trafficking of children or by force, fraud, or coercion

18 U.S.C. § 2422: Coercion and enticement

18 U.S.C. § 2423(a)(b): Transportation of minors

18 U.S.C. § 2425: Use of interstate facilities to transmit sexual information about a child relating to illicit sexual activity

### Sexual abuse or assault (N = 1,030)

18 U.S.C. § 2241: Aggravated sexual abuse

18 U.S.C. § 2242: Sexual abuse

18 U.S.C. § 2243: Sexual abuse of a minor or ward

18 U.S.C. § 2244: Abusive sexual contact

18 U.S.C. § 2245: Sexual abuse resulting in death

### Sex Offense Registration and Notification Act (SORNA) (N = 874)

18 U.S.C. § 2250: Failure to register as sex offender

There was also a category of sex offenders (N= 250) that we were unable to classify according to their convicted offenses, as the statute codes in PACTS were labelled "other sex" offenses. We included these "other" offenders in the totals but excluded them from most of the analyses comparing sex offender conviction types. Last, those convicted of child pornography were further categorized by whether they had any official arrest or conviction record of contact sexual behavior prior to or concomitantly with their current offense.

### Identifying Sex Offenders with an Official Arrest or Conviction Record of Contact Sexual Behavior

We further classified those on federal supervision for a sex offense according to whether they evidence any contact sexual behavior in their official records. In this study, having an official record of contact sexual behavior means that the offender was either arrested for or convicted of an offense involving contact sexual offenses (e.g., sexual assault, child molestation, child pornography production, child trafficking, etc.) before or for the current offense. We were unable to measure

incidences of self-reported contact behavior that might have arisen through polygraphs or other investigative means for this study.

Being able to measure the presence of an official record of contact sexual behavior is especially important when examining Internet child pornography offenders, because research shows that offenders who commit child pornography and contact sex crimes tend to have higher risk levels and recidivism rates compared to child pornography-only offenders (Babchishin, Hanson, & VanZuylen, 2015). We used a combination of Static-99 data from the Federal Bureau of Prisons (BOP) and arrest history data to identify offenders with past or present evidence of contact criminal sexual behavior. The Static-99 is an actuarial risk prediction instrument that estimates the probability of sexual and/or violent reconviction for adult males who have already been charged with or convicted of at least one contact sexual offense against a child or nonconsenting adult (Harris, Phenix, Hanson, & Thornton, 2003). This instrument is scored on all sex offenders incarcerated within the U.S. federal prison system with an official current or prior arrest or conviction record of contact sexual offending. It is used by the BOP to screen for potential civil confinement.

The Static-99 scoring rules preclude this instrument from being used on offenders who have only been arrested for or convicted of non-violent sexual offenses including prostitution, consensual sexual activity, or online non-production child pornography (Harris et al., 2003). Hence, the Static-99's scoring rules allowed us to deduce that, if the offender was scored on this instrument, they had an official arrest or conviction record of contact sexual behavior. In addition to those with a Static-99, any offender whose criminal history indicates a prior arrest for sexual assault or sexual exploitation was classified as having an official record of contact sexual behavior.

The decision to use the Static-99 for the purpose of identifying sex offenders with an official record of contact sexual behavior necessitated that we exclude certain offenders from our analysis. Specifically, the 7,400 sex offenders were extracted from a larger database containing 9,583 offenders with an instant conviction for a sex offense between fiscal years 2005 through 2013. We excluded all female sex offenders (n lost = 215 offenders) and offenders sentenced to probation-only sentences (n lost = 522 offenders), as neither of these groups would be scored on the Static-99 by the BOP. We also removed all

[^]: Other studies focused on the key trends taking place in the prosecution, incarceration, or supervision of federal sex offenders (see Faust & Motivans, 2015) or examined the frequency with which sex offenders self-reported contact sexual behavior either during polygraph (see DeLisi et al., 2016) or in treatment (see Bourke & Hernandez, 2009).

[^]: It's important to note that the number of sex offenders analyzed in the current study will not approximate the numbers under active federal supervision reported by PPSO's internal systems (i.e., Decision Support Systems). This discrepancy is partially explained by the fact that DSS includes under its sex offender definition any offender with a current sex offense conviction or with a history of engaging in sexually criminal behavior.

offenders received onto federal supervision before 2007, as the BOP was not uniformly applying this instrument before that year (*n* lost = 1,304). Last, since we wanted to track offender recidivism patterns, we removed all offenders without criminal history information from the file (*n* lost = 126).

## Offender Recidivism Outcomes

We defined recidivism as any arrest for new crimes (excluding arrests for technical violations of the conditions of supervision) that took place between the offender's release from federal custody date and the last date these arrest data were assembled (i.e., 3/17/2015). New arrest events encompassed the following major offense categories: arrests for any felony or misdemeanor offenses, arrests for violent nonsexual offenses (e.g., homicide and related offenses, kidnapping, robbery, and assault), and arrests for any sexual offenses violent or nonviolent (e.g., child pornography, sexual assault, and sexual exploitation).[9] We combined violent and non-violent sexual arrest activity because, as will be shown, the base rates for sexual recidivism were fairly low. We also examined the rates at which offenders were revoked during their supervision term. Revocation information was retrieved from PACTS and included any revocation that took place from the start of active supervision until the last date of revocation information retrieval (i.e., 10/30/2014).

## Analytical Plan

The current study primarily uses descriptive statistics to provide an overview of the general (i.e., non-sexual) risk characteristics and recidivism rates for offenders convicted of federal sex offenses. Specifically, this study categorizes the 7,400 federal sex offenders by their instant conviction offenses, assesses how many have an official record of contact sexual behavior, details their demographic profiles, and describes their risk characteristics as measured by the PCRA. We then examine the recidivism and revocation rates within a fixed period while under post-conviction supervision. In addition, we compare the 7,416 male sex offenders with a group of 179,812 male non-sex offenders placed on post-conviction supervision during the same time period.

The final component of this study uses multivariate techniques (i.e., logistic regression) to investigate the PCRA's power at predicting

general recidivism and revocation outcomes. As will be shown, the overall recidivism and revocation rates for those with instant offense convictions for sexual assault or violations of the Sex Offender Registration and Notification Act (SORNA) are significantly higher than those of the child pornography offenders. Multivariate logistic regression techniques were employed to examine whether these differences in recidivism and revocation rates still held when the PCRA was included as a statistical control. In addition, we employed an AUC-ROC (area under curve - receiver operating characteristics) analysis to assess the PCRA's ability to predict specific recidivism events including arrests for any, violent (non-sexual), or sexual offenses or revocations from supervision.

## Results

### Most Common Instant Conviction Sex Offenses

Table 1 examines the most common instant conviction offenses for sex offenders received into federal supervision between fiscal years 2007 through 2013 and the percentage of these offenders with an official record of arrests or convictions for contact sexual behavior. Offenders convicted of possession, receipt, distribution, or production of child pornography accounted for the largest numbers of sex offenders under post-conviction supervision. Three-fifths (60 percent) of the

7,416 federal sex offenders had an instant offense conviction for online child pornography offenses, while the remainder were convicted of sexual abuse or assault (14 percent), SORNA violations (12 percent), or transporting minors for illegal sexual activity (hereafter illegal transportation) (11 percent). Three percent of the sex offenders in our study population were unclassifiable.

We also used the presence of a Static-99 score and criminal history data to determine the percent of sex offenders with an official record of past or present contact sexual behavior.[10] Half of the sex offenders under post-conviction supervision had an official record of engaging in contact sexual behavior, meaning that they were either scored on the Static-99 or had a prior arrest for sexual assault or exploitation. Over 90 percent of offenders convicted of sexual assault (91 percent), illegal transportation (91 percent), or SORNA (95 percent) offenses evidenced an official record of contact sexual behavior. Conversely, 24 percent of online child pornography offenders had been arrested for or convicted of contact sexual offenses.

Some caution should be used in interpreting these results on the presence of contact sexual behavior. First, the column identifying

---
[10] See methods section on how we used the Static-99 to assess whether the offender had an official background of contact sexual behavior.

## TABLE 1.
### Percent of federal sex offenders with official record of contact sexual behavior

| Instant sex offense at conviction | Number | Percent of offenders with — | | |
| | | Any official contact behavior | Static-99 | Prior arrest for sex assault or exploitation |
|---|---|---|---|---|
| All sex offenders | 7,416 | 49.5% | 43.6% | 25.0% |
| Child pornography | 4,462 | 23.6% | 18.6% | 12.0% |
| Other-not classifiable[c] | 250 | 54.4% | 45.6% | 28.4% |
| Sexual assault | 1,030 | 90.6% | 86.0% | 28.9% |
| SORNA[b] | 874 | 94.6% | 82.0% | 75.1% |
| Transportation for illegal sexual activity | 800 | 90.9% | 85.9% | 36.0% |

Note: Includes federal offenders placed on supervised release between fiscal years 2007 through 2013.

Percentages will not sum to totals as offenders can have both a Static-99 and prior arrest for sexual assault or exploitation. The prior sex assault/exploitation arrest variable excludes offenses that resulted in the offender being placed on federal supervision.

[c] The non-classifiable sex offenders are excluded from subsequent analyses as a specific offense category but included in totals.

[b] Includes offenders convicted of violating the Sexual Offender Registration and Notification (SORNA) act.

---
[9] Prostitution offenses were excluded from the sexual recidivism events.

"any evidence of contact offending" is based on an official record of an arrest or conviction and does not include self-reported behavior. Previous research has found about half of online child pornography offenders admitting to some form of prior sexual contact with children (Seto et al., 2011). Moreover, while it might seem surprising that 14 percent of offenders convicted of sexual assault did not have a Static-99, this offense category also includes offenders convicted of consensual (e.g., statutory rape) as well as forcible sexual assault. We were unable to identify offenders convicted of consensual sexual acts through the PACTS offense coding scheme.

Table 2 shows the sex offense conviction categories included in the study. For the 36 percent of offenders convicted of sexual assault, violation of SORNA laws, or illegal transportation, no information on their contact backgrounds was integrated into the analysis because as previously shown (see Table 1), nearly all of these offenders had a record of contact sexual behavior. For most offenders convicted of sexual assault, SORNA violations, or illegal transportation, their past or present conduct would inherently involve some form of contact sexual behavior necessitating a Static-99. For those convicted of child pornography offenses, we used information from the Static-99 and criminal history data to place them into (1) an online child pornography-only group and (2) a group containing child pornography offenders with arrest or conviction records for contact sexual behavior. Table 2 also shows

the offense distributions for sex offenders with PCRA assessments. Since the study includes sex offenders placed on supervised release between fiscal years 2007-2013, not all had PCRA assessments, because implementation of this risk instrument did not begin until mid-2010.

## Demographic Characteristics of Federal Sex Offenders

Table 3 shows the demographic characteristics of federal sex offenders based upon their instant conviction offense. Whites accounted for 81 percent of the general sex offender population; among non-sex offenders, whites comprised 57 percent of the total population. Nearly all offenders (95 percent) convicted of child pornography offenses were white, while minorities accounted for higher portions of the non-child pornography sexual offenses. American Indians and Alaska Natives, for example, comprised 71 percent of the sexual assault offenders and African Americans accounted for 26 percent of the SORNA offenders. Sex, and especially child pornography offenders, skewed older. At the time of being placed on post-conviction supervision, the average sex offender was 45 years old, while child pornography offenders averaged 46 years in age.

## PCRA Risk Characteristics of Federal Sex Offenders

Figure 1 provides information on the initial PCRA risk classifications for federal sex

offenders by their instant conviction offense.[1] In general, sex offenders, with the exception of those convicted of sexual assault and SORNA laws, had lower risk levels than the non-sex offender population. For example, 12 percent of the sex offenders with PCRA assessments were classified as either moderate or high risk; in comparison, 26 percent of the non-sex offenders were grouped into the moderate- or high-risk categories. Child pornography offenders were especially likely to be considered low risk, with nearly all (97 percent) of these offenders initially being assessed in the low or low/moderate risk categories. A slightly higher percentage of child pornography offenders with official records of contact sexual behavior garnered a moderate or high-risk PCRA classification (8 percent) compared to child pornography offenders without contact histories (2 percent). Among offenders convicted of non-child pornography offenses, almost half the SORNA (47 percent) and about a fourth of those convicted of sexual assault (27 percent) were classified moderate or high risk by the PCRA.

Table 4 depicts the average total PCRA scores as well as the average PCRA domain scores in criminal history, education/employment, substance abuse, social networks, and supervision attitudes for sex offenders and compares them to the average PCRA scores for non-sex offenders. In contrast to non-sex offenders, sex offenders averaged lower scores in the PCRA domains of criminal history, education/employment, and substance abuse; however, sex offenders manifested higher average scores in the PCRA domains of social networks and supervision attitudes. Within the specific sex offender categories, offenders convicted of child pornography scored consistently lower in most of the PCRA domains than the sexual assault or SORNA offenders. Not surprisingly, child pornography offenders with contact records of sexual offending received higher PCRA criminal history scores than their child pornography counterparts without contact records. For those offenders convicted of illegal transportation, their average PCRA scores, with the exception of criminal history, were similar to those of child pornography offenders.

## Recidivism Outcomes of Federal Sex Offenders

Table 5 depicts the three-year recidivism

**TABLE 2.**

**Instant conviction sex offense for federal sex offenders including subset with Post Conviction Risk Assessments (PCRA)**

| Instant sex offense at conviction | All offenders | | Subset with PCRAs | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| All sex offenders | 7,416 | 100% | 5,284 | 100% |
| Any child pornography offense | 4,462 | 60.2% | 3,420 | 64.7% |
| No record of contact behavior | 3,411 | 46.0% | 2,651 | 50.2% |
| Official record of contact behavior | 1,051 | 14.2% | 769 | 14.6% |
| Other-not classifiable | 250 | 3.4% | 75 | 1.4% |
| Sexual assault | 1,030 | 13.9% | 548 | 10.4% |
| SORNA | 874 | 11.8% | 674 | 12.8% |
| Transportation for illegal sexual activity | 800 | 10.8% | 567 | 10.7% |

Note: Includes federal offenders placed on supervised release between fiscal years 2007 through 2013 with and without PCRA assessments. Federal offenders began receiving PCRA assessments in mid-2010s. The non-classifiable sex offenders are excluded from subsequent analyses as a specific offense category but are included in totals.

---

[1] Figure is limited to subsample of 5,284 offenders with PCRA assessments. Adjusted supervision levels not shown.

Volume 80 Number 2

**TABLE 3.**
Demographic characteristics for federal sex offenders, by instant conviction sex offense

| Demographic characteristics | Child pornography | | Sexual assault | SORNA | Transportation for illegal sexual activity | All offenders | |
|---|---|---|---|---|---|---|---|
| | No record of contact behavior | Official record of contact behavior | | | | Sex | Non-sex |
| **Race** | | | | | | | |
| Asian | 1.6% | 1.2% | 1.0% | 0.3% | 4.3% | 1.5% | 2.6% |
| Black | 2.9% | 3.0% | 6.8% | 25.5% | 8.9% | 6.9% | 38.8% |
| American Indian | 0.5% | 0.7% | 71.0% | 2.8% | 0.5% | 10.7% | 1.8% |
| White | 95.0% | 95.1% | 21.2% | 71.4% | 87.4% | 80.9% | 56.8% |
| **Hispanic ethnicity** | 5.8% | 5.3% | 5.8% | 10.9% | 6.4% | 6.4% | 25.6% |
| **Average age (yrs.)** | 45.8 | 46.3 | 38.7 | 43.4 | 44.2 | 45.1 | 38.7 |
| **Number of offenders** | 3,411 | 1,051 | 1,030 | 874 | 800 | 7,416 | 179,812 |

Note: Table includes sex offenders received into federal supervision between 2007 through 2013.

**FIGURE 1.**
Post conviction risk assessment (PCRA) risk categories for federal sex offenders, by instant conviction sex offense



Note: Includes subset of offenders with PCRA assessments

## TABLE 4.

**Average Post Conviction Risk Assessment (PCRA) domain scores for federal sex offenders by instant sex conviction offense**

| Instant sex offense at conviction | Number of offenders | Average total PCRA score | Criminal history | Education/ Employment | Substance abuse | Social networks | Supervision attitudes |
|---|---|---|---|---|---|---|---|
| **All offenders** | | | | | ╱ | | |
| Non-sex offender | 97,537 | 7.17 | 4.59 | 1.12 | 0.28 | 1.08 | 0.11 |
| Sex offender | 5,284 | 5.08 | 2.60 | 0.98 | 0.12 | 1.23 | 0.15 |
| **Convicted sex offense** | | | | | | | |
| All child pornography | 3,420 | 3.92 | 1.74 | 0.83 | 0.07 | 1.15 | 0.14 |
| No record of contact behavior | 2,651 | 3.62 | 1.53 | 0.79 | 0.07 | 1.10 | 0.13 |
| Official record of contact behavior | 769 | 4.95 | 2.48 | 0.95 | 0.07 | 1.29 | 0.15 |
| Sexual assault | 548 | 7.44 | 4.28 | 1.30 | 0.31 | 1.38 | 0.17 |
| SORNA | 674 | 9.36 | 5.64 | 1.59 | 0.25 | 1.64 | 0.24 |
| Transportation for illegal sexual activity | 567 | 4.64 | 2.43 | 0.83 | 0.07 | 1.15 | 0.15 |

Note: Includes subset of federal sex offenders with PCRA assessments.

rates for sex offenders during their post-conviction supervision term. To be included in this table, the offender's recidivism event had to be observable for a minimum of three years and their court-ordered supervision terms had to be three years or more (Baber, 2015). Offenders, for example, were counted as having recidivated if at any time during the three years in which they were sentenced to supervised release they were either arrested or revoked. Using this approach, offenders sentenced to less than three years of supervised release or whose recidivism event could not be followed for a minimum of three years were excluded from this analysis. Recidivism events occurring after the supervision term or outside the three-year follow-up period were also omitted.

Table 5 generally shows persons convicted of sex offenses being arrested or revoked less frequently than those convicted of non-sex offenses. For example, nearly a fifth (18 percent) of sex offenders were arrested for any offense during their first three years of supervision, while about a third (31 percent) of non-sex offenders had any arrest during the same time period. The percentage of sex offenders arrested for non-sexual violent offenses (2 percent) was also lower in comparison to non-sex offenders (8 percent). Sex offenders, however, were three times more likely to be arrested for sexual offenses (3 percent) than non-sex offenders (1 percent).

Among the sex offense types, those

offenders under supervision for SORNA or sexual assault were arrested or revoked at the highest rates, while those under supervision for child pornography offenses had lower recidivism rates. For example, 42 percent of the SORNA and 23 percent of the sexual assault offenders were arrested for any

offense within three years of their supervision start dates, compared to 13 percent of child pornography offenders. The percentage of offenders arrested for non-sexual violent offenses was also higher for the SORNA (8 percent) and sexual assault (4 percent) offenders than for offenders on supervised

## TABLE 5.

**Three-year recidivism rates for federal sex offenders while under supervision, by instant conviction offense**

| Instant offense at conviction | Number | Any arrest | Major arrest[a] | Non-sexual violent arrest | Any sex arrest | Probation revocation |
|---|---|---|---|---|---|---|
| **All offenders** | | | | | | |
| Non-sex offender | 89,615 | 31.4% | 23.0% | 7.9% | 0.5% | 22.6% |
| Sex offender | 3,909 | 17.5% | 7.8% | 1.8% | 2.8% | 19.2% |
| **Conviction sex offense** | | | | | | |
| All child pornography | 2,287 | 13.0% | 4.9% | 0.5% | 2.6% | 11.6% |
| No record of contact behavior | 1,722 | 12.5% | 4.3% | 0.4% | 2.2% | 9.5% |
| Official record of contact behavior | 565 | 14.7% | 6.9% | 0.7% | 4.1% | 18.2% |
| Sexual assault | 605 | 23.1% | 9.9% | 3.6% | 2.2% | 38.5% |
| SORNA | 299 | 41.8% | 26.1% | 8.0% | 7.7% | 47.2% |
| Transportation for illegal sexual activity | 550 | 17.3% | 7.8% | 1.6% | 2.4% | 14.4% |

Note: Sub-sample used for 3-year arrest rates is restricted to actively supervised TSR cases for which the offender was sentenced to at least 3 years of supervision.

[a] Excludes minor offenses including breaches against public peace, invasion of privacy, prostitution, obstruction of justice, liquor law violations, and traffic offenses.

release for child pornography (1 percent). There was less variation between the instant offense categories in regards to recidivism for sex offenses; child pornography offenders, for example, were arrested for sexual offenses at rates (3 percent) similar to that of sexual assault (2 percent) or illegal transportation (2 percent) offenders.

For offenders convicted of child pornography offenses, having an official record of contact sexual behavior was generally not associated with significantly higher recidivism rates. The general rearrest rates for child pornography offenders with contact sexual records (15 percent) was nearly the same as child pornography offenders without any records of contact sexual offending (13 percent). Officers, however, were more likely to revoke child pornography offenders with contact sexual records (18 percent) compared to their counterparts with no official record of contact sexual behavior (10 percent).

### Predictive Efficacy of PCRA for Federal Sex Offenders

We examined whether the differences in arrest rates across the convicted sex offense categories reported in Table 5 still hold when the offender's PCRA scores are introduced as statistical controls. We conducted this examination by calculating the predicted probabilities of arrest or revocation after initial PCRA assessment for each of the major sex offense categories used in this study. These predicted probabilities were generated through a statistical technique (i.e., logistic regression) that allows us to examine the relationship between the instant conviction offenses and recidivism/revocation outcomes while holding constant the offender's PCRA scores at their means. We compare arrest/revocation probabilities for those convicted of child pornography offenses with no record of contact sexual behavior to those convicted of child pornography with an official record of contact sexual behavior, illegal transportation, sexual assault, or SORNA offenses. Significant differences between the child pornography (non-contact) and other offense types are noted by an asterisk.[17]

Figure 2 shows the predicted probability of any arrest across the sex offender offense categories initially without any controls and then adjusts these probabilities by statistically controlling for an offender's PCRA risk levels and raw scores. The model without any PCRA controls produces predicted arrest patterns similar to the bivariate analysis shown in Table 5. Specifically, the estimated arrest

---

[17] Estimated arrest/revocation probabilities reported in Figures 2 and 3 will differ from percentages reported in Table 5 because these probabilities are estimated for shorter time periods (e.g., date of PCRA assessment) and are not restricted to arrests during supervision terms.

probabilities for the illegal transportation (12 percent), sexual assault (21 percent), and SORNA (30 percent) offenses are significantly higher compared to the estimated arrest probability for child pornography offenders with no record of contact sexual behavior (7 percent). Once the estimated arrest probabilities have been adjusted for an offender's PCRA risk level or raw score, they are less substantial across the sex offense categories. For example, adjusting the probability of arrest to take into account an offender's raw PCRA risk score generates estimated arrest probabilities between those convicted of child pornography offenses with no official record of contact sexual behavior (9 percent) that were not significantly different from those convicted of child pornography with official records of contact sexual behavior (9 percent), illegal transportation (11 percent), and sexual assault (12 percent). Only the SORNA offenders continued to manifest predicted arrest probabilities that are significantly higher (15 percent) than the non-contact child pornography offenders.

We also generated predicted revocation probabilities taking into account an offender's PCRA risk level or raw score, which are shown in Figure 3. In results similar to the prior analysis, we initially show significant differences in the predicted revocation probabilities between the non-contact child pornography offenders and the other sex offender types; however, when the PCRA is used to statistically control for the risk of revocation, the differences in the likelihood of revocation diminish across the sex offender categories.

Last, we focus on the PCRA's utility to predict recidivism outcomes for persons convicted of federal sex offenses through an AUC-ROC (area under curve - receiver operating characteristics) analysis and by examining the recidivism rates across the four PCRA risk categories (e.g., low, low/moderate, moderate, and high). The AUC-ROC score is frequently used to assess risk assessment instruments and is often preferred over a correlational analysis because it is not impacted by low base rates (Lowenkamp et al., 2013). Essentially, the AUC-ROC measures the probability that a score drawn at random from one sample or population (e.g., offenders with a rearrest) will be higher than that drawn at random from a second sample or population (e.g., offenders with no rearrest) (Lowenkamp et al., 2013; Rice & Harris, 2005). Values for the AUC-ROC range from .0 to 1.0, with values of .70 or greater indicating that the

---

**FIGURE 2.**
**Predicted probabilities of any arrest for federal sex offenders controlling for Post Conviction Risk Assessment (PCRA), by instant conviction offense**



Note: Includes 5,204 federal sex offenders. An asterisk indicates a statistically significant difference between child porn offender with no contact behavior and the other sex offender offense categories. Arrest probabilities will differ from percentages reported in Table 5 as they track arrests for shorter time periods (e.g., date from PCRA assessment) and are not restricted to arrests during supervision terms.

* p <.05

## FIGURE 3.

### Predicted probabilities of revocation for federal sex offenders controlling for Post Conviction Risk Assessment (PCRA), by instant conviction offense



Note. Includes 5,284 federal sex offenders with PCRA assessments. Bars denote signficant difference between child porn offender with no contact behavior and the other sex offender offense categories. Revocation probabilities will differ from percentages reported in Table 5 as they track revocations for shorter time periods (e.g., date from PCRA assessment).
\* p < .05

actuarial instrument does fairly well at prediction (Andrews & Bonta, 2010). Figure 4 shows the AUC-ROC scores for offenders in this study exceeding the .70 threshold for most of the recidivism outcomes, including any arrests (.72), violent arrests (.79), and probation revocations (.77). The AUC-ROC scores fell under the .70 threshold for only those outcomes associated with sexual recidivism (.63).

In addition to an AUC-ROC analysis, Figure 4 also shows the failure rates involving any arrests, non-sexual violent arrests, any sex arrests, and probation revocations by PCRA risk category for offenders with sex offense convictions. Among the non-sexual recidivism outcomes, the failure rates followed the anticipated pattern of increasing incrementally by each PCRA risk category. The recidivism rates for any arrest activity, for instance, increased from 7 percent for low-risk offenders to 15 percent for low/moderate, 33 percent for moderate, and 46 percent for high-risk offenders. Similar patterns also occurred for recidivism outcomes involving probation revocations and non-sexual violent arrests. The sexual recidivism outcome, however, manifested a weaker relationship with

the PCRA risk groupings. The percentage of offenders rearrested for sexual offenses did not differ significantly for the low/moderate (4 percent), moderate (4 percent), and high (5 percent) PCRA risk categories ($\chi^2$, 2 = .9017, $p$ = .637).

## Discussion and Conclusion

### Summary of Major Findings

This study produced several key findings about persons convicted of sex offenses under federal post-conviction supervision. First, it shows those convicted of child pornography offenses accounting for the majority of sex offenses (60 percent), with the other offense types of sexual assault, illegal transportation, and SORNA accounting for 36 percent of federally supervised sex offenses. An examination of the official contact sexual backgrounds of these offenders shows that over 9 out of 10 of the non-child pornography offenders have an official conviction for, or arrest history of, engaging in contact sexual offenses. For those convicted of child pornography offenses, about a fourth of them had an official record of contact sexual offenses.

While those convicted of sex offenses in general scored lower on the PCRA

and recidivated less frequently than those convicted of non-sex offenses, there was substantial heterogeneity in the recidivism rates and PCRA risk measures among the instant sex offense types. Specifically, those convicted of child pornography offenses had less serious criminal history backgrounds, attained higher levels of education and employment, suffered less frequently from substance abuse problems, and had stronger social support networks than those convicted of sexual assault or SORNA offenses. In fact, almost all the child pornography offenders were classified as either low or low/moderate risk by PCRA. Conversely, those convicted of sexual assault or SORNA offenses manifested general risk characteristics that were either similar to those of people convicted of non-sex offenses or, in the case of the SORNA, substantially higher.

Similar to the PCRA analysis, the recidivism patterns also varied across the conviction types. Offenders convicted of child pornography exhibited lower general and violent rearrest rates and supervision revocations compared to offenders convicted of SORNA or sexual assault. The recidivism activity for the SORNA offenders was particularly high, with about two-fifths of these offenders being rearrested within the three-year follow-up period. For the sexual recidivism outcome, however, there was less variation in arrest rates by conviction offense. It is also notable that those convicted of illegal transportation were rearrested or revoked at rates more similar to the child pornography than to the sexual assault and SORNA offenders. In a finding mirroring other studies, our analysis showed sex offenders being rearrested more frequently for non-sexual than sexual offenses (USSC, 2012; Hanson & Morton-Bourgon, 2009). Last, within the child pornography offense category, those offenders with an arrest or conviction record for contact sexual behavior evidenced only slightly higher-risk characteristics and reoffending behavior compared to child pornography offenders without any official background of contact sexual offenses.

The logistic regression and AUC-ROC analysis showed the PCRA performs well in predicting general rearrest and revocation outcomes for the 5,284 federal sex offenders with PCRA assessments analyzed in this study. Logistic regression results showed little to no significant differences among the arrest odds by the specific sex offender conviction types when controlling for the PCRA scores. Moreover, the AUC-ROC scores of .70 or above for the any arrest, violent arrest,

**FIGURE 4.**

**Post Conviction Risk Assessment (PCRA) failure rates for any arrest, non-sexual violent arrests, any sex arrests, or probation revocations for federal sex offenders**



Note: Includes 5,284 federal sex offenders with PCRA assessments. Arrest and revocation percentages will differ from percentages reported in Table 5 as they track recidivism activity for shorter time periods (e.g., date from PCRA assessment) and are not restricted to recidivism during supervision terms. Includes any arrests or revocations that occurred after the initial PCRA assessment.

and revocation outcomes, combined with the anticipated pattern of incrementally increasing failure rates for these recidivism, measures by risk category, indicate that the PCRA can be used to predict general (non-sexual) recidivism outcomes for offenders with instant convictions for sex offenses. The crucial exception is the PCRA's ability to predict sexual recidivism, as the AUC-ROC analysis and an examination of arrest patterns across the PCRA risk groups show that the PCRA is less effective at predicting this type of recidivistic behavior. This finding is not too surprising, however, because the PCRA was never constructed to predict sexual recidivism nor was it designed to measure sexual deviance (Lowenkamp et al., 2013).

Most of the findings in this paper align with prior research on federal sex offenders and are consistent with the general empirical work focusing on recidivism prediction for the sex offender population. Specifically, prior research has shown that child pornography is the most common type of sex offense within the federal system and that offenders convicted of child pornography have fewer risk characteristics and recidivate less frequently

compared to contact sex offenders (Babchishin et al., 2015; Faust & Motivans, 2015; Faust et al., 2014; USSC, 2012; Babchishin, Hanson, & Herman, 2011). Although the recidivism rates reported in this paper do not exactly match those reported by the USSC, this discrepancy is attributed to the longer follow-up periods and different methodologies for measuring recidivism used by the U.S. Sentencing Commission. However, the recidivism rates for child pornography offenders reported by Faust et al. (2014) of 9 percent are fairly close to the 13 percent arrest rate reported in this study. In addition, the overall pattern of sex offenders being rearrested at higher rates for non-sexual rather than sexual offenses is consistent with the above-cited studies and other meta-analytic reviews of sex offender recidivism (Faust et al., 2014; USSC, 2012; Hanson & Morton-Bourgon, 2009).

This research is also supportive of using general risk assessments for recidivism prediction on sex offenders. Nearly all of these studies have shown that risk assessments designed to predict general or violent recidivism among the overall offender population should perform equally well in predicting

these outcomes for sex offenders (Wormith, Hogg, & Guzzo, 2012; Hanson & Morton-Bourgon, 2009; Hanson & Bussiere, 1998). The prediction capacities of generalized and violent risk assessment instruments, however, are less effective in predicting sexual recidivism compared to risk assessment instruments such as the Static-99 that are specifically designed to predict sexual rearrest outcomes (Hanson & Morton-Bourgon, 2009; Hanson & Bussiere, 1998). Our research showing the PCRA's efficacy at predicting general and violent recidivism, and being less effective in predicting sexual recidivism, is consistent with these prior research efforts.

Last, in a somewhat surprising finding, this research shows that child pornography offenders with backgrounds of contact sexual offending exhibit only slightly higher risk characteristics and recidivism rates compared to child pornography offenders with no records of contact sexual offending. This finding is at odds with some studies showing offenders who commit child pornography and contact crimes having significantly higher risk levels and recidivism rates compared to child pornography-only offenders (Babchishin et

al., 2015). It is interesting to note, however, that the USSC also found similar rates of general recidivism between child pornography offenders with and without histories of criminally sexual dangerous behavior (USSC, 2012). Clearly more research is needed to discern whether offenders convicted of federal child pornography offenses can be disaggregated into more useful risk typologies.

## Limitations and Areas for Future Research

This current study has several limitations that could be addressed by subsequent research. First, we did not consider self-reported contact offending behavior revealed through polygraphs or other investigative techniques. Prior research has shown about half of child pornography offenders admitting to a history of contact sexual offending (Seto et al., 2011). Subsequent research could assess the frequency of self-reported contact sexual behavior identified in a sample of offenders convicted of federal child pornography offenses. Another issue is the relatively short follow-up period of three years used in the current study. Sex offender recidivism studies typically reference the need to engage in long-term follow-ups involving periods of 5 to 20 years (Hanson, Morton, & Harris, 2003). Since our study covered only three years of offender recidivism activity, subsequent work should consider extending the recidivism follow-up terms. The decision to lengthen the follow-up period, however, should be informed by the fact that even studies tracking contact sex offenders for time periods of 20 to 30 years have shown about a third of these offenders eventually being arrested for new sexual offenses (Seto et al., 2011; Hanson, Steffy, & Gauthier, 1993).

## Implications for Federal Probation Officers

The policy and procedures currently in place for the investigation and supervision of sex offenders were informed by the body of empirical knowledge available at that time. In general, the findings produced by this study align with this research used to inform federal sex offender policy and hence support the general framework of federal procedures on sex offender management.

This research supports the procedural guidance advising officers to use the PCRA to assess the risk of general recidivism and criminogenic needs for sex offenders and then augment this generalized risk picture

with information pertaining to an offender's sexually deviant characteristics through an extensive investigation involving polygraphs, interviews, and discussions with treatment personnel. Moreover, it advises officers to use risk instruments such as the Static 99/2002 or Stable & Acute 2007 that are constructed to predict sexual recidivism to further understand an offender's propensities toward sexual deviance. The importance of supplementing the PCRA is supported by this research showing that the PCRA does not specifically assess an offender's risk of sexual recidivism or target those behaviors related to sexual deviance.

This research also highlights areas for further examination and potential enhancements in federal sex offender policies. Currently, federal policy recommends that all sex offenders begin supervision at the "highest" risk levels and then recommends that supervision intensity be adjusted downwards if and when an investigation of the offender's background indicates they are not at risk of committing contact sex offenses. With the availability of Static-99 scores from the BOP for those sex offenders with arrests or convictions for contact sexual offenses, officers can more accurately apply the risk principle to that group of sex offenders. Utilizing the Static-99, and supplementing it with information gleaned from polygraphs and other sources, may provide officers with the details required to thoroughly understand offenders' risk to sexually recidivate and classify them into appropriate supervision levels.

This research further supports federal policy that not all sex offenders have the same risk of recidivism generally and sexual offending specifically. Among the sex offender types, those offenders under supervision for SORNA or sexual assault were arrested or revoked at the highest rates, while the child pornography offenders exhibited lower recidivism rates. Hence, this research suggests that the sexual assault and particularly the SORNA offenders are of high concern for federal probation officers. Officers should consider assessing the SORNA offenders more closely beginning with their entrance into the criminal justice system as they evidence higher rates of general and violent recidivism compared to child pornography offenders.

## References

Administrative Office of the U.S. Courts (AOUSC) (2011). *An overview of the federal Post Conviction Risk Assessment*. Washington, DC: Administrative Office of the US

Courts.

Andrews, D. A., & Bonta, J. (2010). *The psychology of criminal conduct (5th Ed.)*. Cincinnati, OH: Anderson Publishing.

Babchishin, K. M., Hanson, R. K., & Hermann, C. A. (2011). The characteristics of online sex offenders: A meta-analysis. *Sexual Abuse: A Journal of Research and Treatment, 23*(1), 92-123.

Babchishin, K. M., Hanson, R. K., & VanZuylen, H. (2015). Online child pornography offenders are different: A meta-analysis of the characteristics of online and offline sex offenders against children. *Archives of Sexual Behavior, 44*, 45-66.

Baber, L. (2015). Inroads to reducing federal recidivism. *Federal Probation, 79*(3), 3-8.

Bourke, M. L., & Hernandez, A. E. (2009). The "Butner Redux": A report of the incidence of hands-on child victimization by child pornography offenders. *Journal of Family Violence, 24*, 183-191.

DeLisi, M., Caropreso, D., Drury, A., Elbert, M., Evans, J. H. & Tahja, K. (2016). The dark figure of sexual offending: New evidence from federal sex offenders. *Journal of Criminal Psychology, 6*(1), 3-15.

Faust, E., Bickart, W., Renaud, C., & Camp, S. (2014). Child pornography possessors and child contact sex offenders: A multilevel comparison of demographic characteristics and rates of recidivism. *Sexual Abuse: A Journal of Research and Treatment, 27*(5), 1-19.

Faust, E., & Motivans M. (2015). Sex offenders in the federal correctional system: The consequence of heightened attention and increased certainty and severity of punishment. *Justice Research and Policy, 16*(1), 81-98.

Hanson, R. K., Steffy, R. A., & Gauthier, R. (1993). Long term recidivism of child molesters. *Journal of Consulting and Clinical Psychology, 61*, 646-652.

Hanson, R. K., & Bussiere, M. T. (1998). Predicting relapse: A meta-analysis of sexual offender recidivism studies. *Journal of Consulting and Clinical Psychology, 66*(2), 348-362.

Hanson, R. K., Morton, K. E., & Harris, J. (2003). *Sexual offender recidivism risk: What we know and what we need to know*. New York: New York: The New York Academy of Sciences.

Hanson, R. K., & Morton-Bourgon, K. (2005). The characteristics of persistent sexual offenders: A meta-analysis of recidivism studies. *Journal of Consulting and Clinical Psychology, 73*(6), 1154-1163.

Hanson, R. K., & Morton-Bourgon, K. (2009). The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis of 118 prediction studies. *Psychological Assessment,*

*21*(1), 1-21.

Harris, J., Pheux, R., Hanson, R. K., & Thornton, D. (2003). *Static-99 Coding Rules Revised-2003*. Ottawa, Canada: Corrections Directorate Solicitor General Canada.

Johnson, J., Lowenkamp, C. T., VanBenschoten, S. W., & Robinson, C. (2011). The construction and validation of the Federal Post Conviction Risk Assessment (PCRA). *Federal Probation, 75*(2), 16-29.

Lam, A., Mitchell, J., & Seto, M. C. (2010). Lay perceptions of child pornography offenders. *Canadian Journal of Criminology and Criminal Justice, 52*, 173-201.

Lowenkamp, C. T., Johnson, J., VanBenschoten, S. W., Robinson, C., & Holsinger, A. M. (2013). The Federal Post Conviction Risk Assessment (PCRA): A construction and validation study. *Psychological Services,*

*10*(1), 87-96.

Lowenkamp, C. T., Holsinger, A. M., & Cohen, T. H. (2015). PCRA revisited: Testing the validity of the Federal Post Conviction Risk Assessment (PCRA). *Psychological Services, 12*(2), 149-157.

Motivans, M., & Kyckelhan, T. (2007). *Federal prosecution of child sex exploitation offenders, 2006*. Washington, D.C.: Bureau of Justice Statistics.

Rice, M. E., & Harris, G. T. (2005). Comparing effect sizes in follow up studies: ROC, Cohen's d, and r. *Law and Human Behavior, 29*, 615-620.

Seto, M. C., Hanson, R. K., & Babchishin, K. (2011). Contact sexual offending by men with online sexual offenses. *Sexual Abuse: A Journal of Research and Treatment, 23*(1), 124-145.

U.S. Sentencing Commission. (2012). *Report to Congress: Federal child pornography offenders*. Washington, D.C.: U.S. Sentencing Commission.

Wolak, J., Finkelhor, D., & Mitchell, J. (2005). *Child pornography possessors arrested in Internet-related crimes*. Alexandria, VA.: National Center for Missing and Exploited Children.

Wolak, J., Finkelhor, D., & Mitchell, J. (2009). Trends in arrests of "online predators." Durham, NH: Crimes Against Children Research Center.

Wormith, J. S., Hogg, S., & Guzzo, J. (2012). The predictive validity and gender differences in the Level of Service/Case Management needs assessment inventory on sexual offender recidivism and an exploration of the professional override. *Criminal Justice and Behavior, 39*(12), 1511-1538.



## FOR DOMESTIC AND INTERNATIONAL USE
### PLACE MAILING LABEL HERE



**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL EXPRESS®**

E0 381 767 275 US

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)    PHONE ( )



**Research Assist**
Address: P.O. Box 130370
Springfield Gardens, NY 11413
Email: Researchassist@outlook.com
Phone: 305-791-2699

**PAYMENT BY ACCOUNT (if applicable)**

USPS® Corporate Acct. No.    Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

☑ 1-Day  ☐ 2-Day  ☐ Military  ☐ DPO

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 11413 | 12/18/20 | $ 46.20 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 12/17/20 | ☐ 10:30 AM ☐ 3:00 PM ☐ 12 NOON | $ | $ |

**DELIVERY OPTIONS (Customer Use Only)**

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)

USMS INSPECTED
By _____

| Accepted | 10:30 AM Delivery Fee | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 2:49 ☐AM ☑PM | | $ | $ |

| Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | $ 46.20 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
400 NORTH MIAMI AVENUE
MIAMI FLORIDA 33128

☐ Flat Rate   Acceptance Employee Initials

lbs.  9  ozs.

**(POSTAL SERVICE USE ONLY)**

| Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐AM ☐PM | |

| Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐AM ☐PM | |

LABEL 11-B, MARCH 2019    PSN 7690-02-000-9996

  

* Mon destinat
+ Money E

◆ PEEL FROM THIS CORNER

## VISIT US AT USPS.COM®
### ORDER FREE SUPPLIES ONLINE

**UNITED STATES POSTAL SERVICE**

ly 2013
5 x 15.125