ב"ה

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No: 1:12-CR-60016-KMW

UNITED STATES OF AMERICA,
    *Plaintiff,*

v.

JAMES PRICE.
    *Defendant.*

_____/



FILED BY ___ D.C.

JAN 04 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## DEFENDANT'S SUPPLEMENT TO THE MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

**COMES NOW,** James Price ("the Defendant") and files this, his Supplement to the Motion for Compassionate Release/Reduction in Sentence.

1

## I.    COVID-19 INFECTION AND REINFECTION

1.    After the discovery of the Defendant's uncontrolled Hypertension and Tachycardia, blood, urine, and fecal tests revealed Mr. Price has NOT been infected with COVID-19 but *reinfected* with COVID-19.

### A.    DEFENDANT'S COVID-19 AND COVID-19 COMPLICATONS STATUS

2.    On November 2, 2020, the Defendant tested *negative* For COVID-19 *twice* using both Abbott Labs "Rapid Test" and a PCR/RNA test by Quest Diagnostic, Inc. labs. On the same day Mr. Price's blood, urine, and fecal samples were taken for analysis.

3.    The hematology (blood) report and analysis indicated the Defendant's White Blood Cell ("WBC"), Red Blood Cell ("RBC"), HBC, and iron levels were abnormally low. The Bureau of Prisons ("BOP") medical staff informed Mr. Price that "his blood work was consistent with his body fighting a major infection." At that time Mr. Price has neither shown nor felt any type of sickness all year. The BOP ordered the

Defendant to get an influenza vaccine. Approximately ten (10) days later, Mr. Price became sick.

4.    On December 1, 2020, the Defendant tested *positive* for COVID-19 using the Rapid Test.

5.    On December 3, 2020, barely 36-hours after testing positive for COVID-19 Mr. Price was transferred to Larkin Community Hospital ("LCH") for acute, uncontrolled, Hypertension (high blood pressure), Tachycardia (irregular/high heart rate), and COVID-19 treatment. The Defendant was hospitalized for three (3) days. Mr. Price was released from the hospital and placed in quarantine at the Federal Correctional Institution Miami ("FCI-MIA").

6.    Doctors at LCH reviewed the Defendant's BOP medical records, including his November 2020 hematology report. The LCH doctors determined that Price's November 2020 hematology was "consistent with other patients who had *previously been infected with COVID-19*, typically asymptomatic in presentation". Thus, the LCH doctors determined that Mr.

3

Price's December 2020 COVID-19 infection was most likely his *SECOND INFECTION* with COVID-19.

7.   The LCH doctors opined that Mr. Price likely suffered an asymptomatic COVID-19 infection in the early Spring (March-May) 2020, had a low antibody response, and was subsequently *reinfected* some 6-to-7 months later in November/December 2020.

8.   The Defendant is not the first prisoner to have become *reinfected* with COVID-19 at FCI-MIA. Indeed, as court records show, *at least* three (3) other prisoners at FCI-MIA have been reinfected with COVID-19. See *United States v. Hasson*, S.D.Fla Case No. 0:99-CR-08063-JLK (August 4, 2020), ECF No. 897 at 3. Moreover, evidence has suggested that reinfections are maybe even more dangerous than first infections.[1]

9.   The matter of *United States v. Huarte*, S.D.Fla. Case No. 11-CR-20587-RNS (July 31, 2020), ECF No. 1584, is instructive to this case Huarte was GRANTED Compassionate Release over the government's objections. There the district court held, "although she has not required

---

[1]   See https://www.vox.com/2020/7/12/21321653/getting-COVID-19-twice-reinfection-antibody-herd-immunity (Last visited December 29, 2020).

hospitalization for this illness thus far, the court acknowledges the possibility that she could develop complications from the disease, and critically, she is still susceptible to catching COVID-19 [again]."

10.   In this case, Mr. Price was hospitalized for COVID-19 related complications, i.e., acute, uncontrolled Hypertension, Tachycardia (abnormally high/irregular heartrate), and chest pain. Even after his discharge from LCH, the Defendant's uncontrolled Hypertension has remained in the highest, and most dangerous, Hypertension Stage II level (systolic pressure ≥ 140, diastolic pressure ≥ 90). The Defendant remains at tremendous risk from both COVID-19 and COVID-19 related complications. COVID-19 studies have shown that 90.8% of COVID-19 *deaths* occur in patients with cardiovascular conditions like Mr. Price.

11.   The recent records of the Defendant's acute, uncontrolled Hypertension and Tachycardia, as measured by the BOP, illustrate the imminent danger posed:

5

| Date | Systolic/Diastolic | Heart-Rate |
|------|--------------------|------------|
| 12/08/2020 | 213/173 | Not Recorded |
| 12/09/2020 | 180/132 | Not Recorded |
| 12/10/2020 | 170/126 | 133 |
| 12/11/2020 | 155/119 | Not Recorded |
| 12/13/2020 | 203/167 | Not Recorded |
| 12/14/2020 | 157/105 | 102 |
| 12/19/2020 | 174/127 | Not Recorded |

Hypertension Stage II, like Mr. Price suffers, may cause (1) heart attack; (2) stroke; (3) aneurysm; (4) heart failure; (5) kidney damage; (6) eye damage; (7) metabolic syndrome; and (8) memory and concentration problems. The first four of these (heart attack, stroke, aneurysm, and heart failure) often occur with little or no warning and result in death or permanent debilitation. "The risk is simply too great that the BOP will fail to detect a decline in [the] Defendant's condition, and if his condition suddenly becomes more emergent than it currently is, that the BOP will fail to provide him the specialized care be needs. The court will not play Russian roulette with the Defendant's life." See *United States v. McCall*, _F. Supp._, 2020 WL 2992197, at *2 (M.D. Ala. June 4, 2020).

6

## B.   IMMUNITY, REDUCTION, AND VACCINES

12.   The term "immunity" in this context refers to the human body's response to an infection in this case the SARS-COV-2 infection.[2] Immunity *does not* necessarily imply resistance to infections as commonly believed, Only *some* immune responses accomplish this resistance to infections, At present, however, discussions of the levels of antibodies to this *Coronavirus*, though popular in the press are mostly irrelevant. It is still not known whether the presence of antibodies – at any levels – confers immunity, or conversely, whether the absence of antibodies signals a lack of immunity.[3] This is evident in the differences in efficacy, dosage requirements, and immune-response of different vaccines. Further, the immune-response of current vaccines may offer partial or no protection from new strains of Coronavirus, e.g., strain B117, that is now spreading through Western Europe. See also Hasson, ECF No. 900-3 at 33.

---

[2]      Atlantic (2020, August 5) au. Ed Yong. *Immunology is Where Intuition Goes to Die*. https://www.theatlantic.com/health/archive/2020/08/covid-19-immunity-is-the-pandemics-centralmystery/614956/

[3]      CDC (2020, August 16). *Duration of Isolation and Precautions for Adults with COVID-19*. Retrieved August 17, 2020 from: https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html

7

13.   The measurement of Coronavirus antibody levels following an infection does show a sharp drop-off after a period of months following an infection.[4] Antibody levels triggered by infection or vaccination have a non-binary relationship to immunity and reinfection. Stated another way, some people may experience a more mild form of the infection, and some may have no protection at all. Some immunities are short-lived and some last throughout a person's life. *Id.* at 34.

14.   The Centers for Disease Control ("CDC") issued a guideline recommending *against retesting* asymptomatic individuals, i.e., those having "recovered" from the disease, for a period of three (3) months after the initial infection was diagnosed. The CDC stated "this science *does not* imply a person is immune from reinfection with COVID-19... in the three months following infection.[5]

15.   Put simply, "[t]here is *no current science* showing that these individuals [having recovered from  a COVID-19 infection or having been

---

[4]      Long, Q., Tang, X., Shi, Q. *et al.* Clinical and immunological assessment of asymptomatic SARS-CoV-2 infections. *Nat Med* 26, 1200–1204 (2020). https://doi.org/10.1038/s41591-020-0965-6

[5]      CDC Media Statement (2020, August 14). *Updated Isolation Guidance Does Not Imply Immunity to COVID-19*. Retrieved August 17, 2020 from: https://www.cdc.gov/media/releases/2020/s0814-updated-isolationguidance.html

vaccinated] are immune to reinfection" over time.[6] These facts are increasingly relevant in light of the New Strains of SARS-Cov-2, identified as "strain B117". This new strain of COVID-19 is currently spreading through England, Norway, Sweden, and other Western European Nations, en route to the United States. What is known, is that immunity levels will vary from person to person, and the length of time any level of immunity imparted either by infection or vaccination lasts will also vary from person to person.[7]

## II.   COLLATERAL EFFECTS AND COMPLICATIONS FROM COVID-19

16.   Like many COVID-19 survivors, Mr. Price continues to suffer health problems, despite having "recovered" from the disease *twice*. The Defendant, were he called upon by this Court, would testify, and the medical records support, that he suffers from chest pain, heart palpitations, irregular/elevated heart-rate (Tachycardia), uncontrolled high blood

---

[6]     CDC (2020, August 14). *Updated Isolation Guidance Does Not Imply Immunity to COVID-19.* Retrieved 8/14/20
from: https://www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html

[7]     Apporva Mandavilli, You May Have Antibodies After Coronavirus Infection, But Not for Long (New York Times, June 18, 2020),
https://www.nytimes.com/2020/06/18/health/coronavirusantibodies.html?referringsouce=articleshare.

pressure (Hypertension), extreme fatigue (sleeping 12-15 hours per day), memory and cognition problems, chronic headaches, vision problems, insulin resistance and diabetic metabolic syndrome (HGB $\geq$ 5.7).

17.   Prior to his incarceration and his infection with COVID-19, Mr. Price had NO HISTORY of any of these conditions. In fact, BOP intake records show the Defendant's blood pressure $\leq$ 120/80, and normal levels of RBC, WBC, HBC, and iron. All medical records prior to his infection with COVID-19 indicate Mr. Price was in excellent health.

18.   Due to the BOP's lack of broad-based COVID-19 testing and other lax healthcare practices, it is not possible to determine whether the BOP's over-prescription of Non-Steroidal Anti-Inflammatory Drugs ("NSAIDs"), or his initial COVID-19 infection, or a combination of both that precipitated and or exacerbated the acute, uncontrolled Hypertension he now suffers.

19.   Additionally, and subsequent to his *second COVID-19 infection,* Mr. Price developed and now suffers from Insulin Resistance and diabetic metabolic syndrome. In simple terms, as a result of his latest COVID-19

infection, the Defendant became pre-Type II Diabetic. With a blood glucose level of $\geq 157$ and an A/C of 5.9, Mr. Price is .6% from requiring daily insulin injections as a result of COVID-19.

20.   The combination of the Defendant's Hypertension, Tachycardia, and Diabetic problems have created a condition of significant risk to his health. The Department of Justice ("DOJ") has already conceded that "the ability to provide self-care within the environment of a correctional institution" is "substantially diminished where an inmate suffers from... diabetes...hypertension...". Due to the on-going Coronavirus lockdowns, quarantines, and other restrictions related to the pandemic, Mr. Price has a severely limited option for diet and exercise, both of which are critical management of and to prevent worsening of his diabetic condition. Due to his uncontrolled Hypertension and Tachycardia, he needs constant blood pressure and heart-rate monitoring. Additionally, to prevent a major cardiovascular event (heart attack, stroke, heart failure, etc.) he needs access to cardiovascular specialists, not available in the BOP, to diagnose the cause and actually manage his Hypertension. The Defendant should receive treatment *before* he suffers a heart attack or stroke, not merely after-the-fact.

11

### III.   COGNITIVE DISSONANCE: WORDS VERSES ACTIONS

21.   The BOP has published a multi-phase COVID-19 Action Plan. The plan was based on guidance from the CDC and other agencies to function as a "Best Practices" guide for individual institutions. Likewise, the Attorney General ("AG") provided guidance to the United States Attorneys and the BOP regarding the expansion of home confinement and compassionate release during, the pandemic. The problem is *NOT* that the DOJ and BOP generally, or FCI-MIA specifically, lack sufficient written plans. The problem *is* the cognitive dissonance between their written *words* and their physical *actions*, or more accurately, their inaction.

22.   The cases of Pedro Lima, Michael Perkins, and Michael Casey outline the cautionary tale that is the reality of COVID-19 in FCI-MIA. Likewise, the accounts from FCI-Seagoville, (Texas), FCC-Lompoc (California), and the Federal Transfer Center (Oklahoma) demonstrate that the cautionary tale of FCI-MIA is, in fact, emblematic of the BOP writ large. See Exhibit "A".

12

23.    As a starting point, Messers Lima, Perkins, Casey, and Price, along with approximately ninety-six (96) other prisoners, are confined in FCI-MIA's "Dolphin" housing unit. All prisoners in the housing unit *share* common facilities, e.g., showers, sinks, hot water dispensers, water fountain, ice machine, mops, brooms, etc. Dolphin unit is one of two housing units that utilize a centralized shared recirculating ventilation system. Air from all cells and common areas is returned to a central ventilation system and then recirculated. Thus, all inmates, infected or not, share the same recirculated air.

24.    Mr. Lima, a sixty-eight (68) year old, Hispanic, male, who suffers from Hypertension, Hyperlipidemia, sleep apnea, inter alia, is also a Type II diabetic. Mr. Lima and Mr. Price walked to the "Pill line" twice a day, every day, to receive Mr. Lima's insulin shots, medication, and Mr. Price's medication. Mr. Lima informed the FCI-MIA staff every day that he was sick, coughing, and had trouble breathing. Mr. Lima was repeatedly advised to return to his cell, lie down, drink fluids, and take an aspirin.

25.    Despite Mr. Lima's visibly deteriorating condition, FCI-MIA *did not* test him for COVID-19 for over a week. Pedro Lima tested *positive* for

COVID-19. Three (3) days later, he was rushed to Jackson South Hospital in acute respiratory distress. The following day Mr. Lima was moved to the ICU, incubated, and placed on a ventilator. Despite Lima's critical condition and serious COVID-19 infection, FCI-MIA *did not* conduct any broad-based testing in Dolphin Unit or institute any type of containment or quarantine in Dolphin Unite for nearly two (2) weeks. As of December 9, 2020, Mr. Lima's condition was listed as "critical-Medically unresponsive".

26.   On December 1, 2020, Michael Perkins, tested *positive* for COVID-19 with a temperature of 104°F. He was sent back to his cell in Dolphin Unit, told to drink water and take Tylenol for his fever. Two (2) days later, Mr. Perkins's cellmate tested *positive* for COVID-19 and was transported to the hospital. The FCI-MIA staff left Mr. Perkins *alone in a cell,* knowing he was infected with COVID-19 and a temperature of 104°F, for five (5) days.

27.   On December 5, 2020, Mr. Perkins was found unconscious, on the floor of his cell by another inmate. Again, FCI-MIA was forced to call 9-1-1 for an ambulance to rush a prisoner in critical condition to the

hospital. Mr. Perkins spent two (2) weeks, in two (2) different hospitals fighting to recover from COVID-19, complicated by pneumonia.

28.   In April 2020, the FCI-MIA Case Manager responsible for Michael Casey, informed him that based on the AG's COVID-19 guidance, he has been submitted for Home Confinement. Mr. Casey is seventy-three (73) years old, he has Hypertension, Hyperlipidemia, and suffered a stroke while at FCI-MIA. Mr. Casey has no disciplinary history, no criminal history, and his current offense of conviction for securities fraud clearly fell within the scope of the AG's guidance.

29.   In June 2020, FCI-MIA *approve*d Mr. Casey for Home Confinement, yet six (6) months later, he still has not been released. He was not released because USPO was not provided with any information by the BOP as to how a 75-year old would support himself on Home Confinement for the next seventeen (17) years that he was projected to be on Home Confinement. The reason: because no one at FCI-MIA thought it important to *ask Mr. Casey* if, in fact, he  had the means to support himself (he does). In eight (8) months, and despite clear written plans, no one took *physical action* to walk over to Mr. Casey's cell to ask him the question.

15

30. The August death from COVID-19 of Inmate Baragon, the impending death of Pedro Lima from COVID-19, and the needless suffering and resultant permanent injuries to inmates like Michael Perkins, clearly demonstrate one of the considerations before this Court. Is the BOP and FCI-MIA's manifest inability to implement and adhere to their own action plans and policies a threat to the health and safety of those committed to their custody?

31. Stated another way, does the cognitive dissonance between the BOP's words versus their actions, rise to the threshold that this Court should GRANT relief under statute?

## IV. A PROFILE OF COVID-19 DEATHS IN CUSTODY

32. The study "COVID and Corrections: A Profile of COVID Deaths in Custody in Texas" by the Lyndon B Johnson School of Public Affairs, offered a chilling view into the stark reality of COVID-19 in prisons. While focused on Texas State Prisons, the study included data and comparative analysis with the U.S. Federal Prison System operated by the BOP. See Exhibit "B".

33.   The comparative analysis showed the BOP had the 3rd highest number of prisoner COVID-19 infection of *all* prison systems. As of October 2020, the BOP had infected 16,446 federal prisoners.





Not surprisingly, the BOP also had the 3rd highest number of COVID-19 prisoner deaths of *all* prison systems in the United States. As of September 2020. 133 federal prisoners had died of COVID-19.

**Figure 6: The Top 5 Prison Systems for the Number of COVID Deaths of Incarcerated People April - September 2020**



Similarly, the BOP reported that ten (10%) percent of all prisoners deaths between April 2020 and September 2020, were related to COVID-19. The BOP's COVID-19 mortality rate is *fifty-nine (59%) higher* than the overall U.S. population.

34.    The BOP's reticent to release the "raw statistical data" regarding the actual number of unique inmates tested, the actual number of positive/negative tests per inmate (the Defendant has been tested five (5) times), the total (cumulative) number of infected inmates per institution, the

number of fatalities directly and related to COVID-19, etc. Instead, the BOP publicly makes available only data and reports on "active" infections versus the public health standard of all infections by date.

35.   The Marshall Project and others continue to work on the collection and production of a study on the BOP's *actual* handling of COVID-19, using the Texas study as a model.

36.   This Court should consider the comparative analyses of the BOP data as a part of the Texas study in contrast to the rosy picture of competence and efficiency offered by the United States.

## V.   CONCLUSION

37.   The Defendant has met the threshold showing of extraordinary and compelling reasons for compassionate release/reduction in sentence under the statute, sentencing guidelines, and the guidance of the Attorney General. Mr. Price timely filed his Motion before the Court upon the lapse of thirty (30) days without response or action by Warden Jenkins to his request. As of December 2020, the Defendant has served 76.9% of his

effective sentence or 102 months of 132.6 months of his full-term sentence. Additionally, the combined factors under 18 U.S.C. § 3142 (g) and § 3553(a) strongly favor his release.

**WHEREFORE,** in view of the foregoing facts and citations of authority, the Defendant respectfully moves this Court for the entry of an order to **GRANT** the Motion for Compassionate Release/Reduction in Sentence, and for immediate release to begin a term of supervised release with the special condition that he be confined to his home for the first six (6) months.

Dated December 30, 2020

Respectfully Submitted,

## James Price

Digitally signed by James Price
Date: 2020.12.30
10:48:47 -05'00'

/s/ James Price
USM No. 98922004
Defendant
Federal Correction Institution
P.O. Box 779800
Miami, Florida 33177-9800
Tel: 305-259-2402
Email: PriceJamesE@outlook.com

# PRIORITY MAIL EXPRESS®

FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

PS10001000006

EP13F May 2020

OD: 12 1/2 x 9 1/2

UNITED STATES POSTAL SERVICE® | PRIORITY MAIL EXPRESS®

EJ 157 002 355 US

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE ( )

Research Assistance
P.O. Box 130378
Springfield Gardens
NY 11413

DELIVERY OPTIONS (Customer Use Only)

☒ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options

- ☐ No Saturday Delivery (delivered next business day)
- ☐ Sunday/Holiday Delivery Required (additional fee, where available*)
- ☐ 10:30 AM Delivery Required (additional fee, where available*)

*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

United States District Court
Southern District
400 North Miami Avenue
Miami, Florida

ZIP + 4® (U.S. ADDRESSES ONLY)

33128

USPS INSPECTED

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

PEEL FROM THIS CORNER

PAYMENT BY ACCOUNT (if applicable)

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
|---|---|
| | |

ORIGIN (POSTAL SERVICE USE ONLY)

| ☒ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|
| PO ZIP Code: 11580 | Scheduled Delivery Date (MM/DD/YY): 12/31/20 | Postage: $ 26.35 | |
| Date Accepted (MM/DD/YY): 12/30/20 | Scheduled Delivery Time: ☐ 10:30 AM ☐ 3:00 PM ☒ 12 NOON | Insurance Fee: $ 0 | COD Fee: $ 0 |
| Time Accepted: 1:08 ☐ AM ☒ PM | 10:30 AM Delivery Fee: $ 0 | Return Receipt Fee: $ 0 | Live Animal Transportation Fee: $ 0 |
| Special Handling/Fragile: $ 0 | Sunday/Holiday Premium Fee: $ 0 | Total Postage & Fees: $ 26.35 | |
| Weight: ☒ Flat Rate lbs. ozs. | Acceptance Employee Initials: MO | | |

DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| | ☐ AM ☐ PM | |

LABEL 11-B, MARCH 2019 PSN 7690-02-000-9996

UNITED STATES POSTAL SERVICE.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; May 2020; All rights reserved.

