

# Exhibit

# A

A Look Inside A Federal Prison With Covid-19: FCI Seagoville
Walter Pavlo Contributor
Personal Finance
*I write, consult, and lecture on white collar crime situations*

I get calls from prisons, family members and Bureau of Prisons corrections officers, all frustrated with how the agency has handled COVID-19.

There are 1,334 federal inmates and 596 BOP staff who have confirmed positive test results for Covid-19 nationwide (As of August 2020) ... 10,098 inmates and 853 staff have recovered ... must be that great medical care. There have been 114 federal inmate deaths and 1 BOP staff member death attributed to Covid-19.

Prison: Warning COVID-19 Inside
Prison: Warning COVID-19 Inside GETTY

One inmate wrote me from FCI Seagoville (Texas) to share the conditions of a day in his life and, as he put it, very possibly his last. I give him a voice here because I hope to encourage others to step forward with confidence that their stories will be heard and that someone will act (Congress, Office of Inspector General ... or even the BOP) to fix the tragedy of our federal prison system.

The voices of someone in prison are important, because I find them accurate, sincere, and hopeful. This is one of them, a 40 year old white male (age and race may or may not reflect the person ... out of fear of retribution). Prison is supposed to be difficult, but it is downright inhumane these days.

*FCI Seagoville, where I am confined, is a low-security federal prison. The inmate housing is entirely communal, i.e., no self-contained rooms (unlike some institutions having in-cell toilets, sinks, showers, etc.); and activities (such as dining, recreation, education, library, chapel, commissary, laundry, medical) all occur in specialized locations, separate from the dormitories, and conducted en masse.*

*This prison is not equipped for long-term lockdowns: inmates cannot be restricted to their cells. Even during "modified operations," in place here since early March of 2020 — by which prisoners residing in each housing unit are (nominally and ostensibly) kept separate from the others — intra-unit inmate-to-inmate and group interaction continues among the 150 to 300 persons confined in close proximity*

1

*due to the gross overcrowding in each building which, for years, has seen every non-living area converted to bunk space.*

*No "social distancing" whatsoever is possible here. There is simply no place in these housing units where prisoners can find six feet of distance from anyone else. Of course, this physical impossibility hasn't stopped the administration from posting wink-and-nod signs purporting to "require" six feet of social distancing. Indeed, the existence of the signs speaks cynical volumes. Since the majority of inmates are housed in rooms containing from 5 to 14 people, the most that staff can practically direct is that inmates "sleep head to toe" (that is, each double bunk should contain one man facing one way while the other orients his body in the reverse).*

*Our cells lack tables — in ordinary times we are directed to the dining hall for meals and to the library to write. So we eat standing up against our lockers or sitting down on our bunks, hunched over our Styrofoam trays and bag lunches (containing the same processed carbohydrates delivered every day to the housing units — and picked up by streaming lines of inmates standing barely six inches apart). Inmates gather by the scores to watch television, to use telephones and computers, at mail call and pill line, and whenever an administrative staff member accidentally shows up inside a housing unit. Wearing of face masks is not enforced as to either prisoners or officers. Sanitation supplies (bleach, soap) are not regularly available, despite the posting of bulletins purporting to describe frequent sterilization procedures. Many such bulletins have been posted, containing words like "must," but our response (if anyone cared to inquire, which assuredly no one does) could only be "can't" when we are simply not provided with the means.*

*Before the virus, prisoners perform all menial labor so that staff are required only to turn keys. But now, federal employees are shouldering more of the work of operating the prison, and staff loath to do the work that they would rather supervise. So instead of biweekly, our clothes are now only laundered centrally once per week. However — since inmates are only authorized to possess a maximum of three sets of clothing, and that's all they've given us — we are therefore required to either wear the same clothes across two to three days, or to hand-wash them in showers and sinks (hardly a true cleansing, and worthless in terms of sanitization). This disgusting circumstance has been embraced by responsible officials up to and including the Warden.*

*Officials instantiated "modified operations" earlier this year in preparation for potential infiltration by the novel coronavirus. But during that period, inmates and staff still mingled freely between buildings, e.g., at the chow hall. UNICOR workers (who manufacture military uniforms for pennies per hour) and food service*

*workers, in particular, continued to congregate daily from multiple housing units to work at central locations, and then returned to their respective buildings each day. In spite of the obvious fact that reduction of overcrowding has always been the most direct (and loudly touted) way to mitigate the spread of the virus, virtually no inmates at FCI Seagoville were granted "compassionate release," or even transferred to "home confinement," under the putatively broad latitude afforded by the CARES Act and memoranda issued by the Attorney General. So, overcrowding persists, and "social distancing" is a deliberately ironic construct here.*

*When, on June 25, 2020, a number of Covid-19 cases were reported by inmates, the virus was quickly confirmed to have spread throughout the entire prison. The response of administrative staff under Warden Zook was, bizarrely, to effectively "mix-n-match" prisoners: Those found or suspected to be "positive" were moved into certain designated units, while space was made for them by simultaneously moving others out; the same went for "symptomatic" inmates and "negatives." This circus resulted in thousands upon thousands of moves over days and weeks, involving mass gatherings of inmates of all ages and of varied "cohorts," with no physical distance between them, breathing heavily from exertion in helping one another to carry hundreds of pounds of personal property each from point A to point B (to point C to point D to point E to point F); most inmates were moved several times.*

*To date, as of August 12, 2020, over 1,350 prisoners — virtually the entire population — have tested positive. At least 3 prisoners have been killed by the virus at FCI Seagoville, which immediately skyrocketed to the top of the charts of BOP facilities in terms of number and proportion of inmates confirmed infected. By Friday, July 24, 2020, only about 100 of us remained negative and asymptomatic; all of these were collected from the various housing units and crowded into a single (newly vacated by positive inmates, but not cleaned or sanitized) building now designated "quarantine." I am one of these.*

*Up to this point, inmates had all been tested several times, with the results returning from the lab within about 2 days each time. (Abbott Rapid Tests were also utilized on occasion.) Upon receipt of results, inmates were "separated by cohort," but were frequently mixed up: Many times, a set of inmates were moved into my building (of negatives) only to be removed, hours later, when their test results (from samples taken days before) came back positive — after, of course, they had had substantial opportunity to infect others.*

3

*On July 28, 2020, four days after I and the other "negatives" were moved to the "quarantine" building, all 100-odd of us were tested again and our samples sent to a lab. Results were not provided to inmates.*

*On August 7, 2020, we were told by Ms. Long in Health Services that "it's better if you and all of the inmates get it, so we can open up the whole compound." Although we "negative" inmates were the minority, the apparently flippant intention of officials to infect us all for the sake of expedience was shocking given the serious risk of severe injury or death involved.*

*On August 9, 2020, four inmates were removed from this "quarantine" building based on the return of positive test results from the July 28th samples. On August 10, two more "positives" were removed; and on August 11, another four inmates were tagged "positive" and removed. I remain in the "negative" cohort, but have not been tested since July 28th.*

*Indeed, no further testing has been conducted; yet those several inmates removed within the past week were, in fact, "positive" two and a half weeks ago when their samples were taken on July 28th. Presumably enough, they infected some unknown number of us yet remaining in this building. There are thus, almost certainly, "positive" inmates here with me right now, as a result of this official practice; and odds are that at least one additional inmate has been infected by any of the ten known positives not removed until earlier this week. And, odds are, this nonzero number of new positives has been infecting the rest of us ever since.*

*But on August 11, 2020, Associate Warden Bayliss and Acting Captain Smith (accompanied by Nurse Campese) addressed a group of inmates here, in this "quarantine" building, and told us that we will remain here for 14 days beyond the last (rolling) removal of a "positive" inmate, and that no further testing is scheduled.*

*Inmates who previously tested positive, now located throughout the institution, are being reclassified as "recovered," not based on any negative test results — they're still positive for the virus — but only based on the passage of 10 days without reported symptoms, which apparently means they are no longer infectious. Yet rather than place us safely with them, or conduct rapid tests to separate us from danger, we are forced to remain housed with infectious and unidentified positive inmates.*

*This system is problematic for reasons plain enough; but worst is the unreasonable course of action to date, culminating in the stunning decision to leave us to succumb to infection by attrition in the "quarantine" building at FCI Seagoville.*

4

Follow me on Twitter or LinkedIn. Check out my website or some of my other work here.

Walter Pavlo

5



# COVID AND CORRECTIONS: A PROFILE OF COVID DEATHS IN CUSTODY IN TEXAS

November 2020



The University of Texas at Austin
Lyndon B. Johnson School
of Public Affairs



COVID, Corrections,
and Oversight Project

# COVID, Corrections, and Oversight Project

**PROJECT DATA TEAM**

**William Bucknall**
LBJ School of Public Affairs
M.P.Aff. (expected 2020)

**Destiny Moreno**
LBJ School of Public Affairs
M.P.Aff. (expected 2022)

**PROJECT DIRECTORS**

**Michele Deitch, J.D., M.Sc.**
Distinguished Senior Lecturer
Project Director
LBJ School of Public Affairs

**Alycia Welch, M.P.Aff., M.S.S.W**
Project Associate Director
LBJ School of Public Affairs

**COVID AND CORRECTIONS: A PROFILE OF COVID DEATHS IN CUSTODY IN TEXAS**

© The Lyndon B. Johnson School of Public Affairs
The University of Texas at Austin
November 2020
All rights reserved

*Preferred citation:*

Michele Deitch, Alycia Welch, William Bucknall, and Destiny Moreno, *COVID and Corrections: A Profile of COVID Deaths in Custody in Texas*, Lyndon B. Johnson School of Public Affairs, November 2020.

Please direct any inquiries to Michele Deitch at Michele.Deitch@austin.utexas.edu.

This report was produced with the generous support of the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin and Arnold Ventures.

The views expressed herein are the authors' alone and do not represent the opinions or positions of Arnold Ventures, the Lyndon B. Johnson School of Public Affairs, or The University of Texas at Austin.

I.    Introduction ....................................................................................................................... 5

II.   Key Datapoints.................................................................................................................. 6

III.  Overview of COVID Deaths in Texas Prisons and Jails ............................................... 6

      *How many people have died from COVID in Texas prisons and jails?*................................ 6

            Figure 1: Total Reported COVID Death Counts Associated with Texas Correctional Facilities .......... 6

      *How have deaths from COVID in Texas prisons and jails changed since the start of the pandemic?*...... 7

            Figure 2: Number of COVID Deaths in Texas Prisons and Jails, by Month .................................. 7

      *How do deaths in Texas prisons and jails in 2020 compare to previous years?* ......................... 8

            Figure 3: Number of Deaths from Natural Causes, Illness, and "Other" in Texas Prisons During the Pandemic Period, by Year ................................................................................................ 8

IV.   COVID in Texas Prisons: A Comparative Analysis ...................................................... 8

      *How does Texas compare to other jurisdictions with respect to the <u>number</u> of COVID infections in prisons?*............................................................................................................................... 8

            Figure 4: The Top 5 Prison Systems for the Number of COVID Infections of Incarcerated People ....... 9

            Figure 5: The Top 5 Prison Systems for the Number of Staff COVID Infections ................................. 9

      *How does Texas compare to other jurisdictions with respect to the <u>number</u> of COVID deaths in prisons?*............................................................................................................................... 9

            Figure 6: The Top 5 Prison Systems for the Number of COVID Deaths of Incarcerated People ...... 10

            Figure 7: The Top 5 Prison Systems for the Number of COVID Deaths of Prison Staff..................... 10

      *How does Texas compare to other jurisdictions when it comes to the <u>rates</u> of COVID infections and deaths in prisons?*............................................................................................................ 11

            Figure 8: Comparing COVID Infection Rates for People in Texas Prisons to Other Incarcerated and General Populations.......................................................................................................... 11

            Figure 9: Comparing COVID Deaths per 10,000 People in Texas Prisons to Other Incarcerated and General Populations.......................................................................................................... 11

            Figure 10: COVID Infection Rates per 10,000 People in Prison in the 10 Largest Prison Systems ...... 12

            Figure 11: COVID Deaths per 10,000 People in Prison in the 10 Largest Prison Systems................. 12

      *How does Texas compare to other states with respect to reducing the number of prison COVID deaths?*................................................................................................................................ 13

            Figure 12: Comparing States' Success in Reducing the Number of Prison COVID Deaths Over Time.................................................................................................................................. 13

V.    Location of COVID Deaths in Custody in Texas .......................................................... 13

      *Which Texas county jails have had deaths from COVID?*.................................................... 13

            Figure 13: Location of Jail COVID Deaths in Texas......................................................................... 14

      *Which Texas prison facilities have had the highest numbers of deaths from COVID?*............................ 14

Figure 14: TDCJ Prison Facilities with the Highest Numbers of Prison COVID Deaths...................14

Figure 15: The Percentage of People Who Died from COVID in TDCJ Facilities with the Highest Numbers of Prison Deaths ...............15

**VI.   Demographic characteristics of those who died from COVID in Texas prisons and jails .....................15**

*How have COVID deaths in prison custody affected different age groups?...........................................15*

Figure 16: Prison COVID Deaths in Texas by Age Group............................................................16

Figure 17: Comparing Prison Deaths by Age Group to Age Makeup of the TDCJ Population .......16

*How have COVID deaths in custody affected different racial groups?.......................................17*

Figure 18: Comparing the Racial Breakdown of Prison Deaths to the Racial Demographics of Texas and the TDCJ Population.................................................................................................17

*What are the demographic characteristics of those who died from COVID in Texas jails?...................17*

*What are the demographic characteristics of corrections staff who died from COVID? ........................17*

**VII.   Conviction and Sentencing Status of Those Who Died from COVID in Custody in Texas...................18**

*Had the people who died from COVID in Texas jails been convicted of a crime? ...................................18*

Figure 19: Conviction Information for People Who Died from COVID in Texas County Jails .........18

*Why were people who died from COVID in Texas prisons incarcerated? ..............................................18*

Figure 20: Breakdown of Texas Prison COVID Deaths by Conviction Offense Category .................19

*Were people who died from COVID in Texas prisons likely to be released someday? ..........................19*

Figure 21: The Likelihood of Eventual Release for People Who Died from COVID in TDCJ Facilities ...........................................................................................................................19

*How close to mandatory release were people who died from COVID in Texas prisons at the time of their deaths?...............................................................................................................................19*

Figure 22: Breakdown of Texas Prison COVID Deaths by Amount of Time Remaining on Sentence ...............................................................................................................................20

Figure 23: Breakdown of Texas Prison COVID Deaths by Percentage of Sentence Completed .....20

*Were people who died from COVID in Texas prisons eligible or approved for parole?..........................21*

Figure 24: Parole Eligibility of People Who Died of COVID in Texas Prisons ...................................21

**VIII.   Conclusion ..............................................................................................................................21**

**Methodological Appendix.................................................................................................................23**

## I.  Introduction

COVID-19 has had a uniquely devastating impact on prisons and jails across the country. At one point, prisons and jails represented 44 of the top 50 COVID clusters in the United States.[1] Criminal justice advocates, policymakers, and public health specialists alike are seeking information about the toll of the crisis and possible solutions to address it. To try to meet the demand for this kind of data, a handful of organizations are tracking the spread of COVID-19 in correctional facilities and related policy responses (see, for example, the data collection efforts of The Marshall Project, the Prison Policy Initiative, the Texas Justice Initiative, and the UCLA COVID Behind Bars Project). The information collected by these organizations sparked questions for our team of LBJ School researchers[2] about Texas' response to the virus in its correctional facilities and the more than 231 lives the virus has taken as of early October 2020. A forthcoming report will explore these questions in detail. In the interim, this brief offers a preliminary examination of some of the Texas-specific data about COVID deaths in prisons and jails.[3]

Provided here are figures to help establish a shared understanding of the problem's scope and a starting place for discussion about potential policy responses. The brief begins with some key datapoints for easy reference. Then, we provide an overview of the death toll of incarcerated people and people who staff Texas prisons and jails. We compare Texas' prison deaths as a proportion of the prison population and infection rates with those for the state as a whole, the nation overall, and some peer prison systems in other jurisdictions. Next is an analysis of the demographics of people who died in terms of their age and race. We then briefly examine the legal status of those who died in custody, including their conviction status,

sentences, parole eligibility, and conviction offense. By presenting this information, we hope to create a more detailed picture of the toll of COVID in Texas prisons and jails. The context and implications of the data will be examined in a future report.

This brief covers only state-operated prisons and county-operated jails. Our counts of COVID infections and deaths in Texas do not include federal prison facilities or Immigrations and Customs Enforcement (ICE) facilities.

Throughout this brief, the term **"staff deaths"** includes only those employees who worked in a state or local correctional facility at the time of their death from COVID, such as correctional officers, prison clergy, or medical staff. We did not include the deaths of any law enforcement officials, such as sheriff's deputies working a patrol function, who were not working in a prison or jail at the time of their death. **"Prison deaths"** refers to deaths of people incarcerated in prisons. For Texas prison deaths, this includes individuals incarcerated in facilities operated or contracted by the Texas Department of Criminal Justice (TDCJ), whose custodial death report listed COVID as the cause of death, as well as deaths announced in statements released on TDCJ's website as resulting from COVID. The term **"jail deaths"** refers to those people who died from COVID while detained in county-run jails, as determined by the jail agencies in their custodial death reports or reports to the Texas Commission on Jail Standards (TCJS).

All data used in this brief were collected beginning early March 2020 through our last update on October 4, 2020. For full calculation and sourcing details, see the Methodological Appendix.

---

1  COVID clusters refer to groupings of cases linked to a specific site, workplace, or event; The New York Times. "Coronavirus in the U.S.: Latest Map and Case Count," The New York Times, Updated September 6, 2020, 1:33 A.M. E.T., https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Top%20 Stories&pgtype=Homepage (Accessed September 6, 2020).

2  The research for this report was conducted in conjunction with an Advanced Research course on "COVID and Corrections" at the Lyndon B. Johnson School of Public Affairs at the University of Texas. Our research team is working on a number of related reports under the auspices of the COVID, Corrections, and Oversight Project, with the generous support of Arnold Ventures.

3  Our analysis relies heavily on the database of the Texas Justice Initiative (TJI), which tracks all deaths in custody in Texas and serves as an extraordinary resource for researchers, policy makers, advocates, and the media. We are grateful for the assistance and guidance of Eva Ruth Moravec, TJI's Executive Director, and Margarita Bronshteyn, TJI's volunteer data scientist.

## II. Key Datapoints

- At least **231** people have died from COVID in Texas correctional facilities. This includes staff, jail, and prison deaths.

- The prison death curve in Texas has remained stubbornly high since the start of the pandemic.

- Prison deaths account for **93%** of deaths among people in custody.

- In one prison, the Duncan Unit, almost **6%** of the incarcerated population has died.

- Men make up **all** jail deaths and **97%** of prison deaths.

- The average age of death is **64** for people in prison. It is **56** for people in jail.

- The youngest incarcerated person who died from COVID was **28**, and the oldest was **85**. Both were incarcerated in state prisons.

- **21** people had served 90% or more of their sentence at the time of their death.

- **73%** of people who died from COVID in prison did not have a life sentence.

- **80%** of people who died in jails from COVID were not convicted of a crime.

- **58%** of people who died in prisons from COVID were eligible for parole.

- **9** people who died in prisons from COVID were approved for parole but were not yet released.

## III. Overview of COVID Deaths in Texas Prisons and Jails

**How many people have died from COVID in Texas prisons and jails?**

A total of 231 deaths due to COVID-19 have been reported from the start of the pandemic through October 4, 2020. As Figure 1 highlights, there have been 27 staff deaths, 14 jail deaths, and 190 prison deaths. The first deaths were in early April and since then, deaths have remained steadily high up to the time we published this brief.

**Figure 1: Total Reported COVID Death Counts Associated with Texas Correctional Facilities April 7, 2020 - October 4, 2020**

**27** reported staff deaths from COVID-19

**14** reported jail deaths from COVID-19

**190** reported prison deaths from COVID-19

These numbers will likely rise as TDCJ and county jails update custodial death reports. Agencies are required to report all deaths in custody within 30 days, but often amend reports much later, after an autopsy is conducted and the official cause of death is determined. It is also extremely important to emphasize that these numbers are conservative and there is a great risk of undercounting, especially for county jail deaths. People spend much shorter periods in custody in jails compared to prisons.

6

Because of high levels of "churn" in the jail population, it is possible that individuals contracted the virus in jail, were released, and then died on the outside. Also, some jails may have intentionally released people at risk of dying so that the death would not be recorded as a jail death.[4]

Moreover, in both prisons and jails, some people died without ever having been tested for COVID, and some died from a pre-existing medical condition worsened by COVID. Those deaths are not counted as COVID deaths.[5]

Together, these factors contribute to the difficulty in providing a complete picture of the loss of life associated with COVID behind bars in Texas.

**How have deaths from COVID in Texas prisons and jails changed since the start of the pandemic?**

Figure 2 below shows the known COVID deaths in Texas prisons and county jails since the pandemic began up until September 2020. September data are faded in Figure 2 because the count is incomplete. While TDCJ and Texas county jails have 30 days after a death occurs to file a custodial death report with the Texas Office of the Attorney General, there are instances of reporting taking much longer. Because of this, we do not recognize September prison or jail death counts as complete and recommend caution in interpreting them. Figure 2 also contains the average daily population (ADP) of jails and prisons in the state to provide context about the relative size of these systems.

**Figure 2: Number of COVID Deaths in Texas Prisons and Jails, by Month April - September 2020**



----

4  Texas Commission on Jail Standards, 2019 Self Evaluation Report, 2019, https://www.sunset.texas.gov/public/uploads/files/reports/Texas%20Commission%20on%20Jail%20Standards%20SER.pdf (Accessed October 26, 2020); Sundaram, Arya, "How Texas Jails Avoid Investigations of Inmate Deaths," Texas Observer, October 29, 2020, https://www.texasobserver.org/how-texas-jails-avoid-investigations-of-inmate-deaths/

5  Frontline, "Autopsy 101," NPR & ProPublica, https://www.pbs.org/wgbh/pages/frontline/post-mortem/things-to-know/autopsy-101.html#:~:text=Autopsies%20usually%20take%20two%20to,to%20six%20weeks%20to%20prepare.

**How do deaths in Texas prisons and jails in 2020 compare to previous years?**

The high number of prison deaths is striking compared to jail deaths. To determine whether this high level of deaths in prison is unique to 2020, we compared the total number of deaths in the pandemic period in 2020 to the same period in the last few years. Figure 3 shows that deaths caused by illness or natural causes are much higher this year than in the past few years. Also included in the calculation are deaths categorized as "other." These deaths make up a small portion of the total number of deaths, but they include custodial death reports with undetermined causes or reports pending results or investigation. Because COVID deaths may be filed in any of these three categories, we include all three in our analysis.

**Figure 3: Number of Deaths from Natural Causes, Illness, and "Other" in Texas Prisons During the Pandemic Period, by Year**
**April - September 2015 to April - September 2020**



## IV.  COVID in Texas Prisons: A Comparative Analysis

The state prison system in Texas is run by the Texas Department of Criminal Justice (TDCJ). This section examines in more detail how COVID-19 has impacted TDCJ compared to other sectors of society and other prison systems, in both absolute terms and using rates to account for the size of the system. We do not have these analyses with jail death data because of the unique difficulty in capturing an accurate jail population count. A number of factors contribute to this difficulty, as explained in Section III.

**How does Texas compare to other jurisdictions with respect to the number of COVID infections in prisons?**

Figure 4 shows how the COVID infection numbers for people incarcerated in Texas' prison system compared to the infection numbers for the other states that rank highest in this regard. More people in Texas prisons have contracted COVID than in any other prison system in the United States. Figure 5 shows a similar situation when it comes to the number of COVID infections for staff in these facilities — Texas tops the national comparison chart.

**Figure 4: The Top 5 Prison Systems for the Number of COVID Infections of Incarcerated People April - October 2020**



**Figure 5: The Top 5 Prison Systems for the Number of Staff COVID Infections April - October 2020**



**How does Texas compare to other jurisdictions with respect to the number of COVID deaths in prisons?**

Raw numbers of deaths from COVID-19 in TDCJ facilities, both among incarcerated people and staff, far outpace deaths in any other state or federal prison system in the country. Figures 6 and 7 demonstrate this by comparing Texas to the next four states with the highest numbers of deaths among incarcerated people and staff, respectively.

9

**Figure 6: The Top 5 Prison Systems for the Number of COVID Deaths of Incarcerated People April - September 2020**



TDCJ has experienced higher numbers of staff deaths than any other U.S. prison system. Figure 7 reveals that TDCJ has had more than double the number of staff deaths from COVID than the state prison system with the next highest number of deaths, California. The majority of states have had one or zero staff deaths.

**Figure 7: The Top 5 Prison Systems for the Number of COVID Deaths of Prison Staff April - August 2020**



**How does Texas compare to other jurisdictions when it comes to the rates of COVID infections and deaths in prisons?**

Since Texas has the country's largest prison system, it is perhaps not surprising that it has the most COVID deaths in absolute terms. But even when we account for the size of Texas' prison system by using rates instead of absolute numbers, Texas fares poorly by comparison. As Figures 8 and 9 below show, we found that people in Texas prisons test positive for the virus and die from COVID at higher rates when compared to the overall Texas population, the national average, and the national prison average.

### Figure 8: Comparing COVID Infection Rates for People in Texas Prisons to Other Incarcerated and General Populations April - September 2020



### Figure 9: Comparing COVID Deaths per 10,000 People in Texas Prisons to Other Incarcerated and General Populations April - September 2020



11

Compared to other jurisdictions with large prison systems, Texas performs relatively worse in preventing the spread of COVID infections and prison deaths. Figures 10 and 11 show that Texas has one of the highest rates of both COVID infections and COVID deaths of any large prison system.

**Figure 10: COVID Infection Rates per 10,000 People in Prison in the 10 Largest Prison Systems March - October 2020**



**Figure 11: COVID Deaths per 10,000 People in Prison in the 10 Largest Prison Systems March - October 2020**



**How does Texas compare to other states with respect to reducing the number of prison COVID deaths?**

At the beginning of the pandemic, Texas had one of the highest numbers of prison deaths in the country. But of the four states with the highest prison death counts in this first stage of the crisis, Texas is the only state that has been unable to substantially reduce the number of COVID fatalities. As Figure 12 shows, other states started with higher numbers of deaths in prisons than Texas in April 2020, but took steps that had the effect of dramatically lowering the number of prison deaths in subsequent months. By contrast, the number of reported COVID deaths in Texas prisons remains stubbornly high.

**Figure 12: Comparing States' Success in Reducing the Number of Prison COVID Deaths Over Time April - August 2020**



## V.   Location of COVID Deaths in Custody in Texas

COVID-19 is a disease that spreads very rapidly through certain communities, while others are not impacted at all. This is true for deaths from COVID in the prisons and jails of Texas, the vast majority of which have few or no deaths from COVID. Only a few facilities have seen significant numbers of deaths from COVID. This section details which facilities these are, and how they compare to the state as a whole.

**Which Texas county jails have had deaths from COVID?**

There have been reported jail deaths from COVID in 9 of Texas' 254 counties. As Figure 13 shows, the Harris County Jail, with 6 deaths of people in custody from COVID, accounts for the largest share of jail deaths, over 40%. Every other jail with a COVID death has had only one death. The counties with jail deaths are primarily ones with a large population. Of these 9 counties, 4 have populations of over 2 million, and the other 5 have populations between 200,000 and 1 million. Among the 5 most populous counties in the state, only Travis County has not had any jail deaths from COVID.

### Figure 13: Location of Jail COVID Deaths in Texas
### May - September 2020

**Texas Counties with Jail COVID Deaths**

| County | Number of Jail Deaths |
|--------|-----------------------|
| Bexar | 1 |
| Brazos | 1 |
| Cameron | 1 |
| Dallas | 1 |
| El Paso | 1 |
| Harris | 6 |
| Jefferson | 1 |
| Smith | 1 |
| Tarrant | 1 |

*Source: Texas Justice Initiative and the Texas Commission on Jail Standards*

**Which Texas prison facilities have had the highest numbers of deaths from COVID?**

TDCJ operated, or contracted for the operation of, a total of 106 facilities through most of the period of study. Out of those, almost half, or 46, have had at least one prison death. As shown by Figure 14, the majority of the 190 prison deaths are concentrated in just a few prisons, with 58% arising from just 7 TDCJ facilities.

### Figure 14: TDCJ Prison Facilities with the Highest Numbers of Prison COVID Deaths
### April - September 2020



The TDCJ facilities that have the highest number of deaths from COVID tend to be prisons that house large numbers of elderly incarcerated people as well as individuals with physical disabilities and serious medical conditions, such as the Duncan, Pack, and Estelle Units.

Even when controlling for the size of the facilities, these 7 prisons have a significantly higher percentage of their population dying from COVID than the TDCJ population as a whole, as shown in Figure 15.

**Figure 15: The Percentage of People Who Died from COVID in TDCJ Facilities with the Highest Numbers of Prison Deaths April - September 2020**



To provide a sense of the extreme significance of the percentage of incarcerated people who died in these units, the Duncan Unit has had almost 6% of its incarcerated population die from COVID. This means that approximately one out of every 18 people housed at the Duncan Unit died from COVID in the span of five months. Even the percentage of incarcerated people who died at the Telford Unit,

the unit with the lowest share of deaths among these 7 units, is more than twice as high as the TDCJ average. Notably, the percentage of people who died from COVID across Texas prisons as a whole is among the highest in the country.

**The Duncan Unit has had almost 6% of its incarcerated population die from COVID.**

## VI. Demographic characteristics of those who died from COVID in Texas prisons and jails

This section explores some of the demographic characteristics of those who died from COVID-19 in custody in Texas prisons and jails, focusing largely on race and age. We also highlight characteristics of staff members who died from COVID.

### How have COVID deaths in prison custody affected different age groups?

When looking at the ages of those who died from COVID in TDCJ facilities, Figure 16 shows that the

vast majority are over the age of 55, with only 4 people dying under the age of 45. Because of the poorer health of people who are incarcerated, most health experts believe that their physical health more closely resembles that of a person 10 years older in the general population. In other words, people age 55 in prison have similar medical vulnerabilities to their 65-year old peers who are not incarcerated.[6]

---

6 Chammah, Maurice, "Do You Age Faster in Prison?" The Marshall Project, August 24, 2015, https://www.themarshallproject.org/2015/08/24/do-you-age-faster-in-prison

**Figure 16: Prison COVID Deaths in Texas by Age Group**
**April - September 2020**



Figure 17 shows that when these deaths are considered in light of the makeup of the Texas prison population, the harsh age impact of COVID in custody becomes unmistakable. While people under 45 make up over half of the TDCJ population, they account for just 2% of the COVID deaths. In contrast, individuals incarcerated in TDCJ prisons who are older than 55 are dying at significantly higher rates from COVID given their share of the TDCJ population. The percentage of COVID deaths among people aged 65-75 is 12 times their share of the population, and the percentage of COVID deaths among people over 75 is 26 times their share of the population.

**Figure 17: Comparing Prison Deaths by Age Group to Age Makeup of the TDCJ Population**
**April - September 2020**



16

### How have COVID deaths in custody affected different racial groups?

Figure 18 shows that Black people account for a significantly larger share of prison COVID deaths than their share of the general Texas population, but their share of prison COVID deaths is proportional to their representation in the Texas prison population. However, Hispanic people are somewhat over-represented in prison COVID deaths compared to their representation in the TDCJ population, while White people are somewhat under-represented.

**Figure 18: Comparing the Racial Breakdown of Prison Deaths to the Racial Demographics of Texas and the TDCJ Population
April - October 2020**



### What are the demographic characteristics of those who died from COVID in Texas jails?

Among the 14 jail deaths, 8 of those individuals who died were Black, 3 were Hispanic, 2 were White, and 1 had no race information. Thus, Black people make up over half of the jail deaths from COVID. However, the sample size (14 deaths) is too small to draw any conclusions about the demographics of people who died in jails.

The average age of those who died from COVID while in custody in Texas jails is 56, eight years younger than the average age of death among those who died in TDCJ facilities.

### What are the demographic characteristics of corrections staff who died from COVID?

Among the 27 correctional staff who died from COVID, the majority were correctional officers working in TDCJ facilities.[7] Also included in the total death count are chaplains, a nurse practitioner, a commissary manager, and a cannery worker. There have also been 5 deaths among county jail employees. Analysis of the data about staff deaths reveals that:

---

7  Note that TDCJ does not release information on the race of staff who died from COVID.

- 37% of the staff who died had less than 5 years to Texas' retirement age (age 65).
- 22% were at or past the age of retirement.

- The average age of death for staff is 57. The youngest staff member who died was 36, while the oldest was 77.

## VII. Conviction and Sentencing Status of Those Who Died from COVID in Custody in Texas

This section analyzes data about how people in custody who died from COVID were involved in the criminal justice system. It presents information about whether people had been convicted of crimes, their offenses, the length of their sentences, and whether they were eligible or approved for parole. This data is important because these factors impact potential policy solutions for preventing deaths in custody from the COVID. These policy solutions will be explored in a future report.

### Had the people who died from COVID in Texas jails been convicted of a crime?

Figure 19 shows that of those who died from COVID in a Texas county jail, the vast majority, 11 out of 14, or almost 80%, were in pre-trial detention and had not been convicted of any crimes.

**Figure 19: Conviction Information for People Who Died from COVID in Texas County Jails May - September 2020**



### Why were people who died from COVID in Texas prisons incarcerated?

Figure 20 examines the conviction offenses of the people who died from COVID in TDCJ facilities and compares them to the general TDCJ population. The offenses are broken up into four types that follow TDCJ's categorization of these crimes: person, drug, property, and other. Person offenses include a broad range of crimes, including robbery, simple assault, sexual assault, and murder. Drug offenses include manufacturing, delivery, and possession of drugs. Property crimes consist of offenses such as burglary or arson. Finally, "other" offenses include technical violations, DWIs, and other miscellaneous offenses.

Most people incarcerated in Texas prisons have been convicted of person offenses, so we would expect to see that these individuals also account for most COVID deaths. However, as Figure 20 also shows, people incarcerated for person crimes make up a disproportionately large share of COVID deaths compared to people convicted of other offenses, while the reverse is true for the other three offense categories. This disparity makes some intuitive sense, since person offenses often carry longer sentences, meaning that people convicted of these crimes are more likely to age in prison, putting them at a higher risk of dying from COVID.

18

**Figure 20: Breakdown of Texas Prison COVID Deaths by Conviction Offense Category April - September 2020**



### Were people who died from COVID in Texas prisons likely to be released someday?

Among those who died from COVID in a TDCJ facility, 137 people (73%) were not serving life sentences. In other words, they would have been released to the community at some point, had they not died. Figure 21 shows this population represents almost three-quarters of prison deaths.

**Figure 21: The Likelihood of Eventual Release for People Who Died from COVID in TDCJ Facilities April - September 2020**



### How close to mandatory release were people who died from COVID in Texas prisons at the time of their deaths?

Figure 22 looks at how long people who died from COVID in TDCJ facilities had until their prison discharge date, excluding anyone who was serving a life sentence. While the majority of people who died still had at least 10 years left on their sentence, 11 people (8%) died with less than a year until their mandatory release date and an additional 10 people (7.5%) died within a year or two of their release date. Importantly, this chart focuses on the longest possible time these individuals had remaining in prison, since most would be eligible for parole or discretionary mandatory supervision at various earlier points.

**Figure 22: Breakdown of Texas Prison COVID Deaths by Amount of Time Remaining on Sentence April - September 2020**



Figure 23 looks at how much of their sentences people had completed at the time of their deaths from COVID, limiting the analysis to people who were not serving life sentence. Among this population, nearly half had served over 50% of their sentence when they died. Additionally, almost three-quarters of those who died from COVID had completed at least 25% of their sentence. This is an important metric because in most cases people in custody are eligible for parole after completing 25% of their sentence. For people who are convicted of the most serious offenses (so-called "3g offenses"), they are eligible for parole after serving 50% of their sentence.

**Figure 23: Breakdown of Texas Prison COVID Deaths by Percentage of Sentence Completed April - September 2020[8]**



8  Note that the time served on a sentence is based only on the offense of record, as recorded in the High Value Data Set. A person may also have a separate sentence on another charge, or may be serving time on a parole revocation that would not have credited time spent on parole towards completion of the sentence.

**Were people who died from COVID in Texas prisons eligible or approved for parole?**

Figure 24 shows that 102 people, or 58%, of those who died in a Texas prison from COVID were eligible at the time of their deaths for parole consideration because they had already served the minimum sentence requirement. "Parole eligible" means that the Parole Board could consider them for release, not that they would in fact be granted a favorable parole decision.

### Figure 24: Parole Eligibility of People Who Died of COVID in Texas Prisons April - September 2020



Our analysis further indicates that most people who were parole-eligible at the time of their death had been eligible for longer than a year. On average, they had been parole-eligible for 6.5 years before they died.

Additionally, **9 people died from COVID after they were approved for release on parole**, but they were still incarcerated at the time of their death. There is often a lag time between the decision to approve someone for parole release and the actual release date, as there may be a requirement for the person to participate in a program prior to actual release. However, as our forthcoming report will discuss, many of these required programs have been put on hold during the pandemic.

*9 people died from COVID after they were approved for release on parole.*

## VIII. Conclusion

The preliminary data in this brief should be viewed as a starting point for policy discussions about Texas' failure to curb the spread of the virus in its corrections facilities and the resulting devastating human toll of COVID behind bars. And again, these numbers are conservative; the true toll of the pandemic is likely much higher. The brief also presents the data necessary to begin any discussion about potential policy solutions.

Our research team will be issuing a future report that goes into even more detail about this data, documents the lives of those who died from COVID in Texas prisons and jails, examines the steps that Texas has taken or not taken to date to address the COVID risks in custodial settings, and identifies critical policy recommendations to stem the crisis.

While there is much about the virus that we do not yet know, what we do know is that COVID is having a devastating impact on the people who live and work in our state's prisons and jails. We thus have a moral obligation to put this data to immediate use to better protect incarcerated people and staff in Texas' correctional facilities.

# Methodological Appendix

This Appendix provides detailed information about the sources we used to gather the data for our analysis, and our methodological approach to our analysis.

*Average daily population counts (ADP)*

The **prison ADP** was calculated by averaging the March 2020 and September 2020 population totals provided by the Texas Department of Criminal Justice (TDCJ). These are the most recent totals and they can be found in the High-Value Datasets that TDCJ publishes on a monthly basis. The most recent dataset can be downloaded on the TDCJ website.

The **jail ADP** was calculated using abbreviated population reports published by the Texas Commission on Jail Standards. We averaged the last four monthly counts, from July 1, 2020 to October 1, 2020, to mirror the timeline provided by TDCJ's population counts. These population reports can be found on TCJS's website.

*Infection and death counts*

**All prison infection** counts are taken from The Marshall Project. The Marshall Project's regularly updated "A State-by-State Look at Coronavirus in Prisons" page contains case counts and death counts for every jurisdiction since the beginning of the pandemic. Infection counts were last collected on October 15, 2020.

**Texas prison and jail death counts** are extensively tracked by the Texas Justice Initiative (TJI). TJI maintains an extensive COVID death dataset after monitoring custodial death reports filed with the Texas Office of the Attorney General, news releases published by the Bureau of Prisons and Texas Department of Criminal Justice, and daily tallies from the Texas Commission on Jail Standards from county jails. We use TJI instead of The Marshall Project for Texas death counts because TJI's data contains names associated with every death whenever possible, and this is essential for our later analyses. **Prison death counts for all other jurisdictions** are taken from The Marshall Project's regularly updated "A State-by-State Look at Coronavirus in Prisons" page.

**Texas prison staff deaths** have been compiled from the official TDCJ website and media mentions of staff deaths. We compiled data on **local jail staff deaths** based on information from news articles we found using Google alerts. Data on jail staff deaths may not be exhaustive. **Prison staff deaths for all other jurisdictions** are taken from The Marshall Project's regularly updated "A State-by-State Look at Coronavirus in Prisons" page.

**Death counts for the general population in Texas** and **the U.S.** come from the New York Times COVID-19 dashboard.

All death counts were last updated on October 4, 2020.

*Infection rates and deaths as a proportion of populations*

**Prison infection rates for Texas** and for **the U.S. prison population as a whole** were calculated by dividing total COVID case counts in a prison system by the total population count of that prison system, and then multiplying by 10,000. We used case counts from The Marshall Project's "A State-by-State Look at Coronavirus in Prisons" page, and prison population counts come from their "COVID Tracking In Prisons" database. Population counts capture prison populations from roughly mid-March 2020 to the end of August 2020. We used only March 2020 counts as they reflect prison populations before most pandemic-related policies were implemented. Additionally, we wanted to stay consistent as we use an agency-provided dataset in later analyses capturing the Texas prison population in March 2020.

23

**Prison deaths as a proportion of populations for Texas** were calculated by dividing total deaths from COVID in a prison system by the population of that prison system, and then multiplying by 10,000. Texas COVID death counts come from TJI. All prison population counts were taken from The Marshall Project's GitHub.

**Infection and deaths per 10,000 for the Texas and U.S. general populations** were calculated by dividing the number of COVID cases or deaths in a given population by its total population, then multiplying by 10,000. For non-incarcerated populations, we used case and death counts from the New York Times COVID-19 dashboard. Population data for Texas comes from the most recent U.S. Census Bureau population estimates. Population data for the U.S. comes from the U.S. Census Bureau population clock as of September 29, 2020.

All rates were last updated on October 4, 2020.

*Location and unit data*

Data from TJI included the location of all **Texas jail deaths** and **Texas prison deaths**.

TDCJ published data about the prison units in which **staff deaths** occurred.

To calculate the percentage of people who died in the seven units with the highest number of deaths, we used the data from TJI to determine the number of deaths in each unit and then divided that number by the population of a given unit based on population data from TDCJ's High-Value Dataset.

TDCJ's High-Value Datasets can be downloaded on the official TDCJ website. We used an archived file from March 2020 because more recent datasets do not include data profiles for individuals who died before the most recent publication. This time frame is also consistent with population counts used in infection rates and deaths as a proportion of populations.

*Age data*

To determine the age breakdown of all **Texas prison deaths** from COVID, we used datasets from TJI and TDCJ. TJI provides an individual's full name, age, race, and unit of confinement for every COVID death. TDCJ's High-Value Dataset, mentioned above, includes a detailed data profile for every individual confined in TDCJ facilities. Between the information provided by TJI and information available on the High-Value Dataset, we were able to determine the ages of everyone who died from COVID in a Texas prison. We used the High-Value Datasets to determine the breakdown of the total TDCJ population by age group and then compared that to prison deaths from COVID.

To determine the age breakdown of all **Texas jail deaths**, we relied on data provided by TJI.

To determine the age breakdown of all **Texas staff deaths**, we used information published by TDCJ for prison staff and information published by the media for jail staff.

*Racial data*

To determine the racial breakdown of all **Texas prison deaths**, we used datasets from TJI and TDCJ. TJI provides an individual's full name, age, race, and unit of confinement for every COVID death. Using names and other unique identifiers provided by TJI, we were able to successfully match 179 of 190 individuals to their full TDCJ data profile in the High-Value Dataset mentioned above. For the 11 individuals we were unable to match, we used custodial death reports linked by TJI to find their race.

To determine the racial breakdown of all **Texas jail deaths**, we used <u>TJI's dataset</u> and TJI's linked custodial death reports.

We used TDCJ's dataset to determine the racial breakdown of **Texas prisons as a whole**. County jails and federal facilities, and private facilities that do not contract with TDCJ are not included in this dataset nor in our racial breakdown.

Finally, **Texas' state population** racial data comes from the <u>most recent Census Bureau estimates</u>.

*Conviction and Sentencing Status*

To determine the sentencing status for **prison deaths**, we used TDCJ's High-Value Dataset from March 2020, which includes each individual's offense, sentence, and parole status. A successful match between a TDCJ data profile and <u>TJI datapoint</u> includes an individual's name, date of death, date of birth, sex at birth, race, unit of confinement, projected release, parole eligibility date, offense, offense and sentence dates, sentence, and last parole decision. The 11 individuals we were unable to match due to inadequate identifiers are excluded from the sentencing status analyses.

To compare conviction rates for different categories of offenses between Texas prison deaths and the total TDCJ population, we used data from <u>TDCJ's yearly statistical report</u> from Fiscal Year 2019.

For **jail deaths**, we used <u>custodial death reports linked by TJI</u> to determine whether an individual was convicted of a crime at the time of their death.